3-57

01:18:58  1      that?

01:18:58  2      A.   I remember the testimony.

01:19:00  3      Q.   Did you ever ask Tom Shamshak to ask

01:19:04  4      Mr. O'Brien, Senior, to come testify on

01:19:06  5      your behalf in this proceeding?

01:19:09  6      A.   I never did so, no.

01:19:11  7      Q.   Then lastly going back to Mr. O'Brien,

01:19:16  8      Eddie O'Brien, Junior's, letter of

01:19:19  9      September 23, 2020, he basically gave you

01:19:23  10     the okay to waive the attorney/client

01:19:24  11     privilege and talk to Mr. Schneider,

01:19:27  12     correct?

01:19:27  13     A.   Yes, he did.

01:19:29  14     Q.   And you fully intend to do that,

01:19:31  15     correct?

01:19:31  16     A.   Yes, I do.

01:19:32  17     Q.   And are you willing to do whatever you

01:19:36  18     can do to help Eddie O'Brien, Junior, get

01:19:40  19     out of jail?

01:19:42  20     A.   I will do whatever I can do within the

01:19:44  21     bounds of the law.

01:19:46  22          MR. MAFFEI:  I have no further

01:19:47  23     questions of Mr. George.

Leavitt Reporting, Inc.

3-58

01:19:52   1          MS. BAGGER:  Ms. Anderson?

01:19:54   2          MS. ANDERSON:  Mr. Woolf, could

01:20:02   3     you display the letter from Eddie O'Brien,

01:20:04   4     Junior, that Mr. George has been referring

01:20:06   5     to.

01:20:07   6          MR. WOOLF:   Yes, give me a

01:20:12   7     second.

01:20:23   8          MS. ANDERSON:  And the envelope

01:20:25   9     too, please.

01:20:25   10                Cross-Examination

01:20:36   11   Q.   (By Ms. Anderson) Mr. George, the

01:20:37   12   letter is dated September 23 and the

01:20:40   13   postmark is September 24.  Mr. O'Brien

01:20:48   14   sent the letter to -- I can't read it

01:20:50   15   anymore -- post office box something in

01:20:58   16   South Dennis.  Was that a good address for

01:21:01   17   you, Mr. George?

01:21:02   18   A.   Yes.

01:21:03   19   Q.   And when did you say that you received

01:21:09   20   the letter?

01:21:12   21   A.   I received that letter sometime last

01:21:15   22   week.

01:21:15   23   Q.   So that would be the week of October,

3-59

01:21:28    1    sometime the week of October 13?

01:21:30    2    A.    Yes.

01:21:30    3    Q.    So your testimony is this letter took

01:21:32    4    three weeks to get to you?

01:21:34    5    A.    All I can tell you is that is when we

01:21:37    6    received it in the post office box.

01:21:39    7    Q.    How often do you -- well, strike that

01:21:43    8    question.

01:21:48    9          In any event when you received the

01:21:49   10    letter you did not call Mr. Schneider,

01:21:53   11    correct?

01:21:53   12    A.    I have not yet called Mr. Schneider,

01:21:58   13    no.

01:21:58   14    Q.    Do you have any idea, Mr. George, why

01:22:04   15    Mr. O'Brien is angry about you for not

01:22:09   16    being in communication with him since

01:22:11   17    1998?

01:22:13   18    A.    No, I do not but as I mentioned I have

01:22:27   19    no idea if he even knows I have these

01:22:29   20    communications.

01:22:33   21    Q.    And your testimony is that he has

01:22:35   22    never attempted to call you or write to

01:22:38   23    you or email you himself?

3-60

01:22:41  1    **A.**   I have received no communication from

01:22:44  2    Mr. O'Brien of any kind since 1998.

01:22:47  3    Mr. O'Brien, Senior.

01:22:50  4    **Q.**   In terms of these documents, what were

01:22:52  5    the documents that these lawyers asked for

01:22:55  6    you to look for in storage?

01:22:57  7    **A.**   Any and all documents that I had left

01:23:01  8    over from the hard copy, trial files.

01:23:08  9    **Q.**   And your testimony is that you didn't

01:23:10  10   know whether or not there were any such

01:23:12  11   documents?

01:23:13  12   **A.**   I didn't believe I had any, but I did

01:23:16  13   go to the storage facility that --

01:23:19  14   Mr. O'Brien referred to a storage

01:23:22  15   facility.  That storage facility was

01:23:22  16   Record Keeper in Avon, Mass.  I had the --

01:23:26  17   I went to the storage facility, and I

01:23:31  18   pulled all the trial files from 1995

01:23:36  19   through 1998 and I have nothing left from

01:23:39  20   Mr. O'Brien.

01:23:40  21   **Q.**   When was that?

01:23:42  22   **A.**   That was back in 2007.  I have not had

01:23:49  23   the Record Keeper -- I closed down the

01:23:50  1    Record Keeper storage facility in 2011.

01:23:53  2    Q.   Do you know how Mr. O'Brien knew that

01:23:57  3    you had gone to that storage facility?

01:23:59  4    A.   I have no idea how Mr. O'Brien knew

01:24:03  5    that, but allowing for his discussions

01:24:08  6    with O'Melveny & Myers, with any

01:24:10  7    investigators, it would not have been a

01:24:12  8    surprise.

01:24:13  9    Q.   Now, you testified earlier in the

01:24:24  10   direct examination about things that Ed,

01:24:31  11   Junior, had told you about his father and

01:24:34  12   frankly I didn't really understand what

01:24:37  13   you were talking about, what the relevance

01:24:39  14   of that was.  Can you explain it?

01:24:44  15        MR. MAFFEI:   Objection.  I just

01:24:46  16   want to remind the witness of the

01:24:51  17   discussions about the confidentiality of

01:24:57  18   the communications that we are talking

01:25:00  19   about.

01:25:18  20        MS. BAGGER:   You can answer the

01:25:19  21   question, Mr. George.

01:25:20  22   A.   With all due respect to you, Counsel

01:25:25  23   Anderson, his discussions with me revolved

3-62

01:25:30  1    around his father's presence at the crime

01:25:33  2    scene and his father's activities before

01:25:35  3    and after the body was discovered.

01:25:40  4    Q.   What does that have to do with

01:25:42  5    Mr. O'Brien's testimony the other day?

01:25:47  6         MR. MAFFEI:  Again, I alert you,

01:25:49  7    Mr. George, you have a -- your client has

01:25:53  8    a privilege.  You have invoked it on his

01:25:56  9    behalf, and I think no amount of questions

01:25:59  10   should pressure you in any way to do

01:26:03  11   something that you are unwilling to do.

01:26:08  12   A.   What I've said to you was -- what I

01:26:11  13   said was that I do not want to impact in

01:26:16  14   any way Ed O'Brien, Junior's, attempts to

01:26:19  15   get free of his first-degree murder

01:26:21  16   conviction as a result of anything I say

01:26:23  17   here.  That is what I said.  The

01:26:28  18   communications I had with him --

01:26:33  19   Q.   You understand that I would never ask

01:26:36  20   you to reveal privileged conversations,

01:26:38  21   Mr. O'Brien, I mean Mr. George.  This is

01:26:41  22   something that you brought up on direct

01:26:43  23   and I was just trying to understand what

3-63

01:26:45  1    the relevance was.

01:26:46  2    **A.**   I'm sorry.  I don't mean to over talk

01:26:49  3    for the court reporter, but Eddie O'Brien,

01:26:55  4    Junior, is trying to get paroled, and I

01:26:58  5    felt that revealing conversations or

01:27:02  6    discussions with him about activities both

01:27:06  7    during, before and after the crime would

01:27:08  8    impact his attempts to get free on a

01:27:12  9    life-without-parole sentence.  That is

01:27:14  10   what I said.

01:27:15  11   **Q.**   Did you think that we were inquiring

01:27:18  12   about that?

01:27:19  13   **A.**   No.  I did not want to impinge on any

01:27:22  14   of those things either consciously or

01:27:25  15   unconsciously and discuss Mr. O'Brien's

01:27:28  16   testimony the other day.  That's all.  I

01:27:31  17   just don't want to affect Eddie, Junior's,

01:27:35  18   chances in any way.

01:27:42  19   **Q.**   Mr. Maffei also asked you questions

01:27:46  20   about Rule 1.6 (b)(2) I think --

01:27:49  21        MR. WOOLF:   Five.

01:27:54  22   **Q.**   -- in terms of your possible, would it

01:28:02  23   be permissible for you to reveal

01:28:04   1    information to protect yourself from

01:28:09   2    charges against you.  What is the import

01:28:20   3    of that in your mind?

01:28:26   4    **A.**   Mr. O'Brien's discussions with you the

01:28:30   5    other day or discussions with the panel

01:28:32   6    the other day, they were hard -- they were

01:28:38   7    hard to understand in the sense as to how

01:28:40   8    they impacted Rule 1.6.

01:28:46   9            In other words, Rule 1.6 -- the

01:28:47   10   attack on me, and Mr. Maffei and I

01:28:50   11   discussed this yesterday, puts me in a

01:28:53   12   position where I can respond to it, and

01:28:56   13   that's what we felt or what I felt was at

01:29:00   14   stake.

01:29:00   15           I did not want to go too far in

01:29:03   16   responding to the things that Mr. O'Brien

01:29:05   17   said, and I didn't want to violate any of

01:29:08   18   his son's attorney/client rights with me

01:29:12   19   at the time in an effort to respond to

01:29:15   20   things here.  So I didn't want to impact

01:29:18   21   Eddie, Junior's, case in any way in

01:29:21   22   responding to Mr. O'Brien.

01:29:22   23           So Rule 1.6 was something

3-65

01:29:24  1    Mr. Maffei brought to my attention, and I
01:29:27  2    reviewed -- and he told me I could discuss
01:29:29  3    some things, and I have tried to do it
01:29:32  4    here without impacting Eddie's rights.
01:29:36  5    That is how I think it applies.
01:29:38  6         MS. ANDERSON:  Thank you.  I have
01:29:40  7    nothing further.
01:29:41  8         MR. MAFFEI:  I have one more
01:29:42  9    question.
01:29:42 10              Redirect Examination
01:29:43 11    **Q.**   (By Mr. Maffei)  In terms of the
01:29:44 12    things that Ms. Anderson was asking about
01:29:46 13    what Mr. O'Brien was saying, he did say,
01:29:50 14    did he not, when asked whether or not he
01:29:55 15    was critical of your handling of the trial
01:29:58 16    and he said -- I don't have a transcript,
01:30:00 17    but he said something like, "You'll find
01:30:02 18    out in a few weeks," or something like
01:30:04 19    that.
01:30:06 20         Did you take that to refer to some
01:30:08 21    threat by him that an ineffective
01:30:13 22    assistance of counsel or some other attack
01:30:14 23    that he is contemplating?

3-66

01:30:16  1    **A.**   Possibly.

01:30:18  2    **Q.**   And he also said some things that had

01:30:22  3    nothing do with Eddie, Junior, including

01:30:24  4    this comment about you being a homophobe

01:30:27  5    or something to that effect.  What was

01:30:29  6    your reaction to that?

01:30:30  7    **A.**   Well, I was shocked beyond words when

01:30:35  8    he said that, and it was almost like he

01:30:40  9    was -- I know he was asked the question

01:30:42  10   that he initially hadn't wanted to say

01:30:45  11   anything of the sort, and I regret that

01:30:48  12   people have to hear in a public forum

01:30:50  13   those kind of allegations against me

01:30:52  14   because anyone who knows me knows I don't

01:30:54  15   even have to deny those kinds of remarks.

01:30:56  16         There are people in my life who

01:30:59  17   are closest to me, who attended my trial,

01:31:02  18   who spent every holiday with me for the

01:31:04  19   past 40 years and some of whom I talk to

01:31:06  20   every day who are gay, who are lesbian.

01:31:11  21   And to say that I commented on catching

01:31:16  22   AIDS or made negative comments about David

01:31:19  23   Brudnoy who died in 2004 who was a

01:31:23  1      longstanding friend of mine made it even

01:31:26  2      worse.  I was at David's memorial services

01:31:30  3      at Majestic Theater over at Emerson in

01:31:35  4      2005, and just to hear him say it shocked

01:31:37  5      me.

01:31:38  6              That is an example of Mr. O'Brien

01:31:41  7      being so angry over what happened with his

01:31:44  8      son in 1995, 25 years ago, that he would

01:31:48  9      say such a thing today, but the fact that

01:31:50  10     it's on a public screen made it worse.  I

01:31:53  11     just -- the people who I love the most in

01:31:57  12     this life had to hear that, and I was

01:31:59  13     sorry for it.

01:32:04  14             MR. HILL:   Attorney Bagger, I

01:32:04  15     would like to request a sidebar with the

01:32:09  16     panel.

01:32:09  17             MS. BAGGER:  Mr. Maffei, are you

01:32:11  18     finished?

01:32:12  19             MR. MAFFEI:  Yes, I am done.

01:32:13  20             MS. BAGGER:  Then why don't we do

01:32:15  21     that and we will -- what time is it?

01:32:17  22     Should we just take -- maybe we should

01:32:19  23     just take a break but, yes, the panel can

01:32:24   1      have a sidebar during the break.  Why

01:32:26   2      don't we -- it's ten after 11:00.  11:25

01:32:32   3      which will give the panel a chance both to

01:32:36   4      sidebar and to take a break themselves.

01:32:40   5           MR. WOOLF:   Thank you.

01:53:15   6           (Break taken at this time.)

01:53:15   7           MS. BAGGER:  It's time to go back

01:53:30   8      on the live stream.

01:53:31   9           MS. YU:   We are now returned to

01:53:33   10     the live stream.  Thank you.

01:53:34   11          MS. BAGGER:  Mr. George, I wanted

01:53:40   12     to ask you about the payment arrangements

01:53:46   13     for the O'Brien case.  Mr. O'Brien was

01:53:50   14     responsible for the fees in that case?

01:53:53   15          THE WITNESS:   Yes.  Well, the

01:54:01   16     family was, yes.

01:54:03   17          MS. BAGGER:  And so he testified

01:54:07   18     that he asked you for an accounting of the

01:54:10   19     fees and did he do that?

01:54:14   20          THE WITNESS:   No, I have no -- I

01:54:16   21     don't want to say he didn't do it.  I have

01:54:18   22     no recall of that.  I do not recall him

01:54:20   23     ever asking.  I can tell you that I found

3-69

01:54:23  1      nothing electronically or what I have left

01:54:27  2      where there is any mention of it anywhere.

01:54:29  3              MS. BAGGER:  You testified a bit

01:54:34  4      ago that you do recall the $25,000 because

01:54:37  5      that is the money that was the bail money

01:54:39  6      that then was applied towards fees.

01:54:43  7      Mr. O'Brien estimated that he paid about

01:54:45  8      $150,000.  Do you have an estimate as to

01:54:50  9      whether the amount the family paid was

01:54:52  10     closer to the 25 or closer to the 150?

01:54:56  11             THE WITNESS:  It was more than

01:54:57  12     25, but it was much less than $100,000.

01:55:03  13             MS. BAGGER:  Who paid the five

01:55:05  14     co-counsel who tried the case with you?

01:55:07  15             THE WITNESS:  I was paying

01:55:08  16     co-counsel based on, you know, on the work

01:55:12  17     they were doing out of what money the

01:55:17  18     O'Briens gave me.  In other words, the

01:55:18  19     O'Briens didn't pay it.  I paid it.

01:55:19  20             MS. BAGGER:  Your billing records

01:55:21  21     for that case were discarded with the rest

01:55:27  22     of the files in the case?

01:55:29  23             THE WITNESS:  I don't want to say

3-70

01:55:31   1     discarded, but I don't have any access to

01:55:34   2     them.  That's my problem.  I don't have

01:55:36   3     them and the reason -- so you know, the

01:55:39   4     reason I don't have them is back in the

01:55:41   5     day I did not scan documents.  I just --

01:55:46   6     it was something we weren't doing back

01:55:48   7     then.  It was in 1995, 1996, and 1997.  I

01:55:53   8     cannot tell you when I started doing that

01:55:55   9     kind of electronics, but it wasn't then.

01:55:58   10          MS. BAGGER:  But those records did

01:56:00   11    exist but then left your custody?

01:56:04   12          THE WITNESS:  I would have kept

01:56:13   13    records like that because I did on every

01:56:09   14    case.

01:56:10   15          MS. BAGGER:  Mr. Hill has some

01:56:16   16    questions.

01:56:16   17          MR. HILL:   Thank you. Mr. George,

01:56:18   18    I would like to leave the O'Brien matter

01:56:22   19    for a minute and go back to your case.  In

01:56:27   20    reading the transcripts I recall, I

01:56:31   21    believe, that when the individual that was

01:56:40   22    involved with the towing arrangement --

01:56:45   23    what was his name?

3-71

01:56:46  1             THE WITNESS:   Dardinksi.

01:56:49  2             MR. HILL: Yes, Dardinksi.   Thank

01:56:50  3     you.   When Dardinksi referred you to a

01:56:52  4     prospective client, do you remember that?

01:56:56  5             THE WITNESS:  Yes.

01:56:57  6             MR. HILL:   And that client gave

01:57:01  7     you cash, is that correct?

01:57:02  8             THE WITNESS:  Yes, he did,

01:57:03  9     Mr. Hill.

01:57:04  10            MR. HILL:   We have learned from

01:57:07  11    Judge Gertner that criminal attorneys

01:57:10  12    sometimes receive cash in payment, is that

01:57:14  13    correct?

01:57:14  14            THE WITNESS:  Yes, sir.

01:57:17  15            MS. BAGGER:  Did you know the

01:57:22  16    origin of that cash?  Was that revealed to

01:57:24  17    you?

01:57:24  18            THE WITNESS:  No, it was not.  It

01:57:27  19    was paid to me as a legal fee pursuant to

01:57:30  20    a fee arrangement.  I'm sorry, a

01:57:33  21    representation agreement.  So, no, it was

01:57:35  22    not.

01:57:36  23            MR. HILL:   Was there some mention

Leavitt Reporting, Inc.

3-72

01:57:38  1    in the transcript that you were told that

01:57:40  2    it was proceeds of drug money?

01:57:43  3         THE WITNESS:   No.  The money, I

01:57:46  4    hope I've got this -- you are talking

01:57:48  5    about the referral at the end of the case.

01:57:50  6         MR. HILL:   Yes.

01:57:51  7         THE WITNESS:  The person who

01:57:53  8    handed me that money, the client was an

01:57:56  9    undercover police officer who was

01:58:00  10   retaining me pursuant to a fee agreement

01:58:03  11   to represent two of his associates for a

01:58:06  12   drug trafficking case, but he did not

01:58:10  13   discuss with me where the money came from.

01:58:11  14   He just handed me the $25,000 in cash.

01:58:15  15        MR. HILL:   Let's continue on that

01:58:18  16   same line.  You received the cash, and

01:58:23  17   what did you do with the cash?

01:58:25  18        THE WITNESS:  I took the cash and

01:58:28  19   I deposited $9,000 into a Bank of America

01:58:34  20   account.  Later that day, that same day I

01:58:43  21   deposited an additional $8,000 into the

01:58:46  22   same account.  So $17,000 of it was

01:58:51  23   deposited on the same day into the same

3-73

01:58:56  1  bank account.  It was my personal account.

01:59:04  2          The remainder of that money was

01:59:07  3  money that I did not deposit but claimed

01:59:10  4  on my income tax.  In other words, I did

01:59:13  5  not deposit $8,000 of the $25,000 and I

01:59:17  6  used it for other expenses, but I claimed

01:59:20  7  it on my taxes.

01:59:21  8          MR. HILL:  So why did you make

01:59:24  9  two deposits?

01:59:25  10          THE WITNESS:  Well, the reason I

01:59:28  11  made two deposits was because I had

01:59:30  12  written a $17,000 check to the Department

01:59:36  13  of Revenue that had been sent to the

01:59:38  14  Department of Revenue that same day by my

01:59:44  15  wife, but the balance in the account was

01:59:46  16  less than $17,000 even after the $9,000

01:59:52  17  deposit in the account earlier that day.

01:59:55  18          So after speaking to my wife on

01:59:57  19  the telephone and understanding that the

01:59:59  20  check had been sent, I then stopped at the

02:00:02  21  same bank and deposited an additional

02:00:04  22  $8,000 in the account to cover the check.

02:00:07  23  So the 17,000 that I discussed with you a

3-74

02:00:13  1    minute ago was used to back a $17,000

02:00:16  2    check that had been written to the

02:00:18  3    Department of Revenue.

02:00:19  4         MR. HILL:   What would she have

02:00:20  5    done if she had not received the cash and

02:00:23  6    that $17,000 check was out there?

02:00:26  7         THE WITNESS:   I would have

02:00:27  8    transferred the money from my office

02:00:29  9    account into the account.  I would have

02:00:34  10   found the money elsewhere.  We had a

02:00:37  11   Citizens Bank account.  I would have found

02:00:40  12   it elsewhere, but I had the money in the

02:00:43  13   office account.

02:00:44  14        MR. HILL:   Were you aware at the

02:00:45  15   time that depositing money just under

02:00:48  16   $10,000 would raise red flags?

02:00:51  17        THE WITNESS:   Well, I was charged

02:00:52  18   with structuring as a result of it.  I can

02:00:55  19   tell you that the reason I deposited it in

02:00:58  20   the way that I did constituted structuring

02:01:01  21   because I didn't -- I deposited the way I

02:01:05  22   did.

02:01:06  23        However, I wrongly thought that

3-75

02:01:11  1     the currency transaction report that was

02:01:13  2     generated by the Bank of America covered

02:01:15  3     me on that front because the accumulation

02:01:17  4     of the two brought me over $10,000 and I

02:01:20  5     knew that a currency transaction report

02:01:22  6     was going to generate, but it turned out

02:01:25  7     and it turns out that depositing the funds

02:01:28  8     in that way are what caused me to get

02:01:31  9     charged with structuring.

02:01:34  10         MR. HILL:   Did you -- did you

02:01:37  11    give a $2,500 referral fee to whom?

02:01:44  12         THE WITNESS:   I gave a $2,500

02:01:46  13    referral fee for that case to Dardinksi

02:01:51  14    approximately a couple of weeks later when

02:01:54  15    he met with me the day before I was

02:01:56  16    arrested because he said he needed it to

02:02:00  17    buy a swing set for his daughter, but that

02:02:03  18    was wrong as well.  That was also one of

02:02:06  19    the money laundering counts.

02:02:08  20         MR. HILL:   Why was that wrong?

02:02:10  21         THE WITNESS:   Well, because

02:02:11  22    you're not supposed to -- first of all,

02:02:13  23    the cash that I was accused of giving him

02:02:17    1    from the account was -- it turned out to

02:02:21    2    be the basis of what they called laundered

02:02:24    3    funds.  So it was part of that last 25,000

02:02:27    4    that you started asking me about earlier.

02:02:29    5    So it was a laundering count, but it's

02:02:32    6    also -- you shouldn't be giving a referral

02:02:35    7    to a non-lawyer.

02:02:38    8            MR. HILL:   You knew that?

02:02:40    9            THE WITNESS:  Well, at that time I

02:02:43   10    knew that it was wrong to do that, to give

02:02:45   11    him a referral of any kind.

02:02:46   12            MR. HILL:   Why did you do it?

02:02:48   13            THE WITNESS:   Because he told me

02:02:49   14    he needed the money and he was -- he

02:02:51   15    actually met me.  When I wrote him that

02:02:54   16    check, he was with his

02:02:57   17    two-and-a-half-year-old daughter Olivia

02:02:59   18    who I had met before, and he was

02:03:03   19    discussing the swing set right on tape as

02:03:07   20    I was handing it to him. So I gave it to

02:03:09   21    him because he said he needed it and I

02:03:11   22    shouldn't have.

02:03:13   23            MR. HILL:   Have you done that

3-77

02:03:16  1      before in other instances?

02:03:17  2              THE WITNESS:   I had never done

02:03:18  3      that before.

02:03:20  4              MR. HILL:   And then the balance

02:03:22  5      of the money you used for expenses, family

02:03:22  6      expenses?

02:03:26  7              THE WITNESS:   I actually traveled

02:03:28  8      with my family, my son, my daughter and my

02:03:30  9      wife.  We went to Marco Island, Florida, I

02:03:35  10     believe, came back about eight days later

02:03:40  11     and I was arrested the next day, but I

02:03:43  12     claimed it on my taxes.

02:03:46  13             In other words, I didn't keep it

02:03:47  14     from my tax, but I kept the cash and I

02:03:51  15     still to this day believe that claiming it

02:03:54  16     on my taxes was what mattered but I didn't

02:04:00  17     deposit it because I used it to travel to

02:04:11  18     Florida with my family.

02:04:12  19             MR. HILL:   Last question.  At the

02:04:15  20     time this is evolving -- strike that.

02:04:19  21             We know from the testimony that

02:04:20  22     you were having issues with back taxes.

02:04:27  23             THE WITNESS:  Yes.

3-78

02:04:28   1          MR. HILL:  You filed your tax

02:04:30   2     returns but you ended up paying late and

02:04:32   3     had penalties and interest.

02:04:34   4          THE WITNESS:   That's true, yes.

02:04:38   5          MR. HILL:   Were you constantly --

02:04:40   6     during your practice were you constantly

02:04:42   7     under financial pressure because of

02:04:47   8     supporting your family and payment of

02:04:49   9     money to the IRS?

02:04:52   10          THE WITNESS:  I was constantly

02:04:53   11     under pressure to pay the bills because of

02:04:57   12     the episodic nature and the up-and-down

02:04:59   13     nature, the case-to-case nature of my

02:05:02   14     practice.

02:05:03   15          You know, some months were lean,

02:05:05   16     some months were not lean.  When I say

02:05:10   17     lean meaning some months I was flush with

02:05:12   18     money and some months I was not, and I

02:05:14   19     always tried to keep up as the money came

02:05:16   20     in.

02:05:21   21          MR. HILL:   Thank you, Mr. George.

02:05:22   22     No more questions.

02:05:24   23          THE WITNESS:  Thank you, sir.

3-79

| | | |
|---|---|---|
| 02:05:25 | 1 | MS. LeBLANC:  Good morning. |
| 02:05:38 | 2 | THE WITNESS:  Good morning. |
| 02:05:39 | 3 | MS. LeBLANC I have a few questions |
| 02:05:40 | 4 | for you, sir.  Is it fair to say that |
| 02:05:44 | 5 | based on your extensive practice in |
| 02:05:49 | 6 | criminal law that you are aware generally |
| 02:05:51 | 7 | that people commit crimes for a number of |
| 02:05:55 | 8 | different reasons, is that fair to say? |
| 02:05:57 | 9 | THE WITNESS:  Yes. |
| 02:05:58 | 10 | MS. LeBLANC:  And that sometimes |
| 02:06:02 | 11 | is referred to as motive for a crime, is |
| 02:06:04 | 12 | that right? |
| 02:06:04 | 13 | THE WITNESS:  Yes. |
| 02:06:06 | 14 | MS. LeBLANC:  And do you |
| 02:06:08 | 15 | understand, sir, that as part of this |
| 02:06:10 | 16 | reinstatement hearing that part of what |
| 02:06:13 | 17 | we, the panel, are charged to do is to |
| 02:06:18 | 18 | determine whether you have the requisite |
| 02:06:22 | 19 | moral qualifications to return to the |
| 02:06:25 | 20 | practice of law? |
| 02:06:26 | 21 | THE WITNESS:  Yes. |
| 02:06:27 | 22 | MS. LeBLANC:  And do you agree, |
| 02:06:33 | 23 | sir, that in considering that that your |

3-80

02:06:40  1        insight into the wrongdoing which led to

02:06:44  2        your disbarment is an important aspect of

02:06:49  3        that?

02:06:49  4                THE WITNESS:   Yes.

02:06:50  5                MS. LeBLANC:   And we have talked

02:06:53  6        at length about the various charges for

02:07:00  7        which you were prosecuted, the acts, and I

02:07:03  8        just want to give you the opportunity,

02:07:05  9        sir, to explain to us, please, if you can,

02:07:10  10       what insight you have into why you

02:07:15  11       committed those acts.

02:07:16  12               THE WITNESS:   As I tried to touch

02:07:24  13       on during my testimony earlier, I have

02:07:30  14       spent much time since this occurred

02:07:35  15       looking at what happened here and looking

02:07:39  16       inside myself.  I mean I have looked at it

02:07:44  17       from every single angle and, as Mr. Hill

02:07:47  18       just said, the financial pressures that

02:07:49  19       were on me at the time, I didn't realize

02:07:52  20       them at the time the way I do now.

02:07:56  21               In fact I told Judge Gorton that I

02:07:59  22       didn't realize that I was supposedly broke

02:08:02  23       until they put up the big boards in the

3-81

02:08:04  1          courtroom.  So I can tell you that these

02:08:09  2          acts are not the acts of greed.  I didn't

02:08:12  3          commit these crimes because I was greedy.

02:08:16  4          I had never committed these kinds of acts

02:08:19  5          before.  Over years and years and years of

02:08:24  6          practice I had never committed acts even

02:08:27  7          remotely similar.  Nothing like this had

02:08:30  8          ever occurred before, and I had no vices

02:08:34  9          that I was feeding on the side with money

02:08:36  10         or with me.  I had no vices.

02:08:40  11              all I had was the law.  All I had

02:08:43  12         was my family.  Really those are the two

02:08:46  13         things that I had, and I would have, I did

02:08:51  14         my job 24 hours a day, and I was immersed

02:08:56  15         in it 24 hours a day.  I have come to see

02:09:02  16         that I had no balance between my job and

02:09:07  17         my life, and I was -- when I say that I

02:09:11  18         could never say no, I was always,

02:09:17  19         constantly trying to help.  In this case

02:09:23  20         what I think it's important to say is that

02:09:25  21         when I say I didn't ever say no is I know

02:09:30  22         now that I should have turned Dardinski

02:09:33  23         away when he came to me and told me what

02:09:36  1    he needed to do.  So what that tells me is

02:09:40  2    I was immersed so deep knowing at the time

02:09:43  3    that my judgment was affected in a very

02:09:49  4    negative way and that at a point where I

02:09:52  5    should have known that it was

02:09:54  6    unprofessional and wrong to refer him to

02:09:58  7    Hansen that I didn't see it.  I didn't see

02:10:00  8    it at that time, and I see it now.

02:10:02  9         I realize now and I should have

02:10:05  10   realized then that Dardinski was asking me

02:10:10  11   to refer him to someone to get that cash

02:10:12  12   into circulation, and that was wrong.  The

02:10:15  13   fact that I didn't immediately see it was

02:10:18  14   wrong then, and thinking to refer him to

02:10:24  15   Hansen would take me out of it makes me

02:10:27  16   see today, after much reflection, that my

02:10:30  17   need to please Dardinski, my need to help

02:10:33  18   Dardinski erased my judgment, my

02:10:45  19   professional judgment, my ethical judgment

02:10:47  20   in what was wrong at the time.

02:10:51  21        And as I looked at it, and

02:10:53  22   Ms. Anderson asked me about it the other

02:10:55  23   day.  I mean I don't have a little nugget

3-83

02:10:58  1    hammer that is able to dig into my brain

02:11:00  2    to tell me why I acted as I did at the

02:11:03  3    time, but I now know that that is

02:11:05  4    something that I should not have done and

02:11:09  5    when I did it something was flawed in my

02:11:12  6    judgment at the time because since that

02:11:15  7    happened and since this trial and in all

02:11:19  8    the years since this time -- that happened

02:11:22  9    almost ten years ago.  I have looked at it

02:11:27  10   from every angle, and the reason I know it

02:11:29  11   will never happen again is because now I

02:11:32  12   understand that it was wrong at that time

02:11:35  13   to do that, and I tried to demonstrate by

02:11:39  14   everything I have done since then that I

02:11:41  15   understand that I have insight into what

02:11:46  16   happened and it will never happened again

02:11:47  17   because I have changed the way I live, I

02:11:51  18   have changed the way I want to practice

02:11:53  19   law, and I understand that going from case

02:11:56  20   to case to case, chasing fee after fee

02:11:59  21   after fee and being in so over my head in

02:12:04  22   the law and in the practice of law in the

02:12:06  23   way in the way I was put me in a position

3-84

02:12:09  1      where I didn't know that that was wrong at

02:12:12  2      the time.

02:12:13  3           I have tried every day to just do

02:12:17  4      what I can do to demonstrate that I have

02:12:19  5      changed.  Not necessarily that I have

02:12:22  6      remorse because I do but that I understand

02:12:26  7      that I had to change and I have to change

02:12:30  8      to be considered qualified and morally fit

02:12:33  9      to reenter the ranks of the Mass Bar and

02:12:40  10     everything -- I try to prove it to

02:12:42  11     everyone and demonstrate it to everyone by

02:12:44  12     my actions, and that is what I try to do.

02:12:47  13          MS. LeBLANC:  If I can follow up

02:12:49  14     on that, sir, I think I understand your

02:12:53  15     answer in terms of your interaction with

02:12:57  16     Dardinski, the referral, etcetera.  Let me

02:13:01  17     ask you specifically.  What insight if any

02:13:04  18     do you have specifically with respect to

02:13:09  19     your acceptance of the fee, if you will,

02:13:15  20     from Mr. Hansen, that act?

02:13:23  21          THE WITNESS:  Accepting that fee

02:13:25  22     from Hansen cemented my involvement in

02:13:26  23     this crime from the beginning to the end.

3-85

02:13:29    1      I should have not taken any referral from

02:13:34    2      Hansen because I had not earned the money,

02:13:37    3      and referring him to Dardinski at the

02:13:40    4      time, I strictly was trying to put

02:13:44    5      Dardinski with Hansen to get done what

02:13:46    6      Dardinski needed done to get the

02:13:49    7      restitution order adjust.

02:13:51    8              By taking the money from Hansen,

02:13:53    9      once again it was 15 or 16 months later.

02:13:57   10      When he initially gave me the referral, he

02:14:01   11      initially offered me the referral, I

02:14:03   12      refused it.  He first wrote me a check for

02:14:07   13      it which I did not cash, and then he

02:14:10   14      chased me down to pay me the referral in

02:14:14   15      cash.

02:14:15   16              You would think that I would have

02:14:17   17      understood that that kind of pursuit was

02:14:21   18      something I shouldn't be involved in, but

02:14:23   19      at the time in taking that money for the

02:14:26   20      reason I took it -- the reason I took it

02:14:28   21      was it was another fee that I was putting

02:14:32   22      into my bank account to pay expenses.  It

02:14:35   23      makes me understand that it's something I

3-86

02:14:38  1    should have never taken.  For whatever

02:14:41  2    reason I took it, but I can tell you that

02:14:44  3    it caught me by surprise when it was

02:14:46  4    offered.  It was almost 17 or 18 months

02:14:49  5    after I had first sent Dardinski to him,

02:14:51  6    and I took it without knowing the full

02:14:54  7    extent of what him and Dardinski had done

02:14:57  8    at that point.

02:14:58  9         I should have known after my

02:15:00  10   discussions with Hansen prior to taking it

02:15:02  11   that it was something I should not have

02:15:06  12   accepted.  When I took it, it was the

02:15:11  13   bookend to the beginning of this.  I

02:15:13  14   mentioned the other day about the snowball

02:15:15  15   down the hill.  At that point I was at the

02:15:17  16   bottom of the hill involved in the

02:15:19  17   conspiracy on the tail end.  It was

02:15:22  18   something I should not have done, and I

02:15:24  19   know that now.

02:15:26  20        MS. LeBLANC:  And finally, sir,

02:15:30  21   you talked about being overwhelmed, if you

02:15:34  22   will, so wrapped up in your practice.  You

02:15:37  23   did speak to this, but I want to clarify.

02:15:41  1        If you were to be reinstated what

02:15:46  2        boundaries do you think you would be able

02:15:48  3        to implement such that this would not

02:15:52  4        occur again in your practice?

02:15:54  5             THE WITNESS:  Well, I have no

02:15:56  6        intention of handling -- you have gotten a

02:16:01  7        flavor over the last few days of the

02:16:05  8        number of cases I was handling back then

02:16:08  9        and the types of cases.  I have no desire

02:16:11  10       to handle many of those types of cases

02:16:14  11       anymore, nor do I feel like I want to

02:16:17  12       handle that many cases anymore.

02:16:20  13            I want to do it on a more low-

02:16:23  14       profile, low-key basis.  I want to do more

02:16:26  15       appellate work.  I want to do white collar

02:16:29  16       work if any.  I do not want to be involved

02:16:32  17       in a high-pressure, high-volume practice

02:16:35  18       anymore with so many clients.

02:16:37  19            I don't have a need to make fees

02:16:41  20       the way I used to then because

02:16:44  21       circumstances have dramatically changed.

02:16:47  22       I see myself practicing on Cape Cod in the

02:16:50  23       community in which I live, trying to do

3-88

02:16:53    1    more pro bono work, do more community work

02:16:57    2    for people.  I no longer need to be in the

02:17:02    3    spotlight and at the center of the action

02:17:07    4    as Mr. Hinchey talked about the other day

02:17:08    5    because my life has changed dramatically,

02:17:13    6    and I don't have a need for any of that

02:17:14    7    anymore.

02:17:17    8         So the changes in the

02:17:18    9    environmental, in the environment around

02:17:21   10    me and the professional environment that I

02:17:23   11    want to be in, whether it's with other

02:17:25   12    associates meaning another attorney or

02:17:27   13    not, is something that I think I can

02:17:30   14    implement today because it's a different

02:17:34   15    day, I'm a different person, and I don't

02:17:37   16    have the same needs, desires or wants that

02:17:40   17    I did many years ago.

02:17:46   18         MS. LeBLANC:  Thank you, sir.  I

02:17:47   19    have no further questions.

02:17:50   20         THE WITNESS:   Thank you.

02:17:52   21         MS. BAGGER:  I have a few and I

02:17:53   22    hate to take it from the macro down to the

02:17:58   23    micro but I just wanted to ask you a

3-89

02:18:01  1    couple more questions about the fee that

02:18:06  2    led to the structuring conviction.

02:18:10  3         So how frequently did you receive

02:18:13  4    cash payments from your clients?  I mean

02:18:16  5    over the years was it a frequent or an

02:18:18  6    infrequent thing?

02:18:18  7         THE WITNESS:  Occasionally.  I

02:18:20  8    wouldn't -- I would call it closer to

02:18:23  9    infrequent than frequent.  It certainly

02:18:25  10   wasn't frequent.

02:18:26  11        MS. BAGGER:  And what did you

02:18:28  12   usually do with the money, how did you --

02:18:32  13        THE WITNESS:  I can tell you,

02:18:35  14   Ms. Bagger, Attorney Bagger, that I would

02:18:38  15   always claim it on my taxes, but most of

02:18:42  16   the time I would deposit it into my

02:18:44  17   operating account.

02:18:46  18        MS. BAGGER:  And had you ever had

02:18:50  19   one that was over $10,000 previously, a

02:18:55  20   cash payment from a client?

02:18:58  21        THE WITNESS:  That was very

02:18:59  22   infrequent but, yes, I had.

02:19:01  23        MS. BAGGER:  Did you deposit those

3-90

02:19:05  1        into either your operating or personal

02:19:07  2        account?

02:19:08  3                  THE WITNESS:   Yes.

02:19:09  4                  MS. BAGGER:   And why did you not

02:19:13  5        deposit the $17,000 into your account that

02:19:18  6        day?

02:19:18  7                  THE WITNESS:   Well, the reason

02:19:21  8        split it up the way I did is I was going

02:19:23  9        to deposit it into different accounts.   I

02:19:26  10       was going to deposit some into our

02:19:29  11       Citizens Bank house account for the house

02:19:30  12       at home.   I was going to deposit some of

02:19:32  13       it into my operating account in Boston.   I

02:19:34  14       was going to keep some of it to travel to

02:19:36  15       Florida, and I was going to put the rest

02:19:39  16       of it into the bank account that I

02:19:40  17       eventually used twice that day to pay for

02:19:46  18       expenses such as the check that I talked

02:19:47  19       about.

02:19:49  20                  MS. BAGGER:   Would you have

02:19:59  21       handled it differently if you had it to do

02:20:01  22       over again?

02:20:02  23                  THE WITNESS:   Absolutely.

3-91

02:20:05  1          MS. BAGGER:  What would you have

02:20:05  2      done?

02:20:06  3          THE WITNESS:  If I had deposited

02:20:08  4      the 17,000 at once, I wouldn't be, I

02:20:14  5      wouldn't be accused of structuring on

02:20:16  6      those two deposits.  I would have been

02:20:19  7      accused of perhaps not filing the proper

02:20:21  8      paperwork for making that cash deposit, a

02:20:25  9      Form 8300, but by depositing it separately

02:20:28  10     on the same day -- I think it was four or

02:20:31  11     five hours apart -- I created two

02:20:34  12     laundering counts because deposits, as

02:20:37  13     Mr. Hill noted, were both under $10,000.

02:20:41  14          So had I done it -- had I known

02:20:44  15     when I left the house that morning that

02:20:46  16     the check had been sent to the DOR and had

02:20:49  17     I deposited the $17,000, the first

02:20:53  18     deposit, I wouldn't have generated two

02:20:59  19     structuring counts.  I wouldn't have

02:21:00  20     generated one structuring account as a

02:21:01  21     result of those deposits.

02:21:03  22          MS. BAGGER:  I guess what I am

02:21:05  23     trying to ask is whether you see what

02:21:09  1    happened with those deposits as sort of a

02:21:13  2    bad piece of luck or bad circumstances or

02:21:17  3    whether you think that you did something

02:21:20  4    wrong.

02:21:20  5              THE WITNESS:   Oh, I know I did --

02:21:23  6    I know that I did something wrong.  What I

02:21:26  7    am trying to communicate to you is that

02:21:28  8    when I did it I wasn't trying to avoid

02:21:35  9    reporting it to the tax authorities

02:21:37  10   because I was paying my taxes with it.

02:21:40  11             I felt that by putting it in the

02:21:42  12   bank to back the check that I was backing

02:21:46  13   a check that had already been sent to

02:21:48  14   taxes.  However, I know today -- and by

02:21:52  15   the way, I had never handled a structuring

02:21:54  16   case that I know of prior to this.  As a

02:21:56  17   result of all my research into

02:21:59  18   structuring, other than a clear intent to

02:22:02  19   defraud I satisfied every technical aspect

02:22:06  20   of a structuring charge, and I understand

02:22:09  21   that I am guilty of structuring for making

02:22:11  22   those deposits in the way I did.  And I

02:22:14  23   will never do it again because I now know

3-93

02:22:16  1      that making those deposits in cash for

02:22:19  2      under $10,000 is not structuring as long

02:22:24  3      as I file a Form 8300 which, by the way,

02:22:27  4      up to that point in time I had never filed

02:22:29  5      a Form 8300.  I didn't really know what a

02:22:34  6      Form 8300 was until this case.  I now know

02:22:36  7      if I file that document on my side that

02:22:38  8      the generation of a currency transaction

02:22:41  9      report on the other side is not enough,

02:22:43  10     but I want you to know that I know that I

02:22:46  11     am guilty of structuring and I accept my

02:22:49  12     guilt for structuring on these two counts

02:22:53  13     as result of what I did that day.

02:22:54  14          MS. BAGGER:  There were also two

02:22:56  15     money laundering counts with respect to

02:22:59  16     the $9,000 and $8000, correct?

02:23:01  17          THE WITNESS:  That's right.  They

02:23:02  18     also amounted to money laundering counts.

02:23:07  19     It was the act of the way I deposited it

02:23:10  20     that generated the structuring, and the

02:23:12  21     money that was part of it constitute the

02:23:16  22     laundering counts.  There were five

02:23:17  23     laundering counts.

3-94

02:23:18   1          MS. BAGGER:  Do you accept your

02:23:21   2     guilt on those two laundering accounts

02:23:26   3     arising from that transaction?

02:23:28   4          THE WITNESS:   Yes, I do.

02:23:31   5          MS. BAGGER:  I don't have any

02:23:32   6     other questions unless the panel or

02:23:38   7     Ms. Anderson or Mr. Maffei does.

02:23:38   8          MS. ANDERSON:  I have a follow-up

02:23:38   9     question or two.

02:23:38   10               Recross-Examination

02:23:48   11    Q.   (By Ms. Anderson)  Mr. George, Edward

02:23:49   12    O'Brien, Senior, testified that the family

02:23:53   13    paid you 65,000 which they borrowed from

02:23:56   14    their sister-in-law I think and another

02:23:58   15    85,000.  You testified this morning that

02:24:01   16    they definitely didn't give you as much as

02:24:05   17    a hundred thousand dollars.  Do you stand

02:24:08   18    by that testimony?

02:24:10   19    A.   I said my memory after discussing it

02:24:12   20    with Mr. Lowney was that we did not

02:24:15   21    receive $140,000.

02:24:19   22    Q.   I thought you said less than a

02:24:20   23    hundred.

02:24:21  1      **A.**    I believe it was less than a hundred

02:24:23  2      after speaking with Mr. Lowney.

02:24:25  3      **Q.**    Do you think that Mr. O'Brien who

02:24:27  4      clearly this was a huge thing in his life,

02:24:31  5      that this money was money that they had to

02:24:33  6      borrow, these were people of limited

02:24:35  7      means, that he is really mistaken when he

02:24:37  8      says they paid you $140,000?

02:24:40  9      **A.**    No.  I accept the fact that

02:24:42  10     Mr. O'Brien borrowed money to pay me, and

02:24:45  11     I am not disputing the amounts of money

02:24:47  12     that they say they paid.  I am telling you

02:24:49  13     that based on my memory, the best I could

02:24:53  14     recall even after discussing it with

02:24:55  15     co-counsel from a quarter century ago that

02:24:59  16     the most I remember receiving or can

02:25:01  17     recall receiving is somewhere between

02:25:03  18     $25,000 and $100,000 for the case.

02:25:06  19          I don't dispute anything

02:25:08  20     Mr. O'Brien tells you about money.  I am

02:25:11  21     just telling you what I am able to come up

02:25:13  22     with 25 years later.

02:25:15  23     **Q.**    So 25 years later on the basis of your

02:25:19   1    memory of one case which for you is just

02:25:21   2    one of hundreds of cases you're going to

02:25:24   3    sit here and testify that you think he

02:25:26   4    paid you between $25,000 and $100,000?

02:25:30   5    **A.**   I am telling you that that is my

02:25:31   6    memory without calling him incorrect about

02:25:36   7    anything.  It's just all I can come up

02:25:38   8    with.

02:25:38   9    **Q.**   Why would you even have, you know, an

02:25:41   10   accurate memory right now about what the

02:25:42   11   O'Briens paid you back in the 1990s?

02:25:48   12          MR. MAFFEI:  Objection.

02:25:48   13   **A.**   Because you asked me to.  You asked me

02:25:51   14   to.  Not you personally but Mr. O'Brien's

02:25:56   15   testimony asked me to.

02:26:05   16          MS. ANDERSON:  That is all I have.

02:26:06   17   Thank you.

02:26:08   18          MR. MAFFEI:  I have no questions.

02:26:10   19          MS. BAGGER:  Thank you,

02:26:11   20   Mr. George.

02:26:13   21          MS. LeBLANC:  Could I just ask one

02:26:15   22   follow-up?  I am so sorry.  Mr. George, I

02:26:18   23   don't know if you're able to answer this

3-97

02:26:19  1      but are you able to give us any ballpark

02:26:23  2      estimate in terms of the number of hours

02:26:26  3      in which you worked personally on the

02:26:28  4      O'Brien matter?

02:26:31  5              THE WITNESS:  Counselor LeBlanc, I

02:26:33  6      can tell you that I was consumed by the

02:26:36  7      O'Brien case in terms of hours and work

02:26:40  8      from when I entered my appearance in late

02:26:43  9      1995 through early 1997.  It was thousands

02:26:49  10     of hours.  Thousands of hours.  I can't --

02:26:53  11     I can't even tell you how much I worked on

02:26:54  12     that case.  I worked on that case

02:26:57  13     constantly over a course of two years.

02:27:01  14             MS. LeBLANC:  Thank you very much.

02:27:03  15     Thank you.

02:27:04  16             MS. BAGGER:  Thank you,

02:27:05  17     Mr. George.  Mr. Maffei, what I propose to

02:27:10  18     do now if it's acceptable to you and to

02:27:13  19     Ms. Anderson is if we could call the last

02:27:17  20     witness, Ms. George, and then we break for

02:27:20  21     lunch and perhaps have you both close

02:27:23  22     after lunch.  Would that work?

02:27:25  23             MR. MAFFEI:  That's fine.

3-98

| 02:27:34 | 1 | MR. MAFFEI:  I would like to call |
| 02:27:36 | 2 | Meghan George. |
| 02:27:48 | 3 | MEGHAN GEORGE, having been duly |
| 02:27:48 | 4 | identified and sworn testified as follows: |
| 02:27:48 | 5 | <u>Direct Examination</u> |
| 02:28:09 | 6 | **Q.**  (By Mr. Maffei)  Good afternoon, |
| 02:28:10 | 7 | Ms. George.  Should I use your marriage |
| 02:28:14 | 8 | name?  Which do you prefer? |
| 02:28:15 | 9 | **A.**  You can call me Meghan or you can call |
| 02:28:20 | 10 | me Ms. George.  My legal name is still |
| 02:28:21 | 11 | Ms. George.  That is how I practice. |
| 02:28:23 | 12 | **Q.**  I will call you Ms. George.  We've |
| 02:28:25 | 13 | never met, right? |
| 02:28:26 | 14 | **A.**  Correct. |
| 02:28:27 | 15 | **Q.**  Would you give the panel your full |
| 02:28:32 | 16 | name and address. |
| 02:28:34 | 17 | **A.**  Sure.  Meghan Elizabeth George.  I |
| 02:28:38 | 18 | live at 28920 Oak Creek Lane, No. 1901, in |
| 02:28:46 | 19 | Agora Hills, California 91301. |
| 02:28:48 | 20 | **Q.**  Where is that in relation to some of |
| 02:28:52 | 21 | the big cities like L A? |
| 02:28:54 | 22 | **A.**  It's a suburb, probably about 25 miles |
| 02:28:57 | 23 | north of Los Angeles. |

3-99

| | | |
|---|---|---|
| 02:28:59 | 1 | Q.   And where did you go to school, |
| 02:29:02 | 2 | Ms. George? |
| 02:29:02 | 3 | A.   I went to high school at Ursuline |
| 02:29:08 | 4 | Academy in Dedham, Massachusetts.  It's an |
| 02:29:10 | 5 | all girls Catholic school.  I'm sure my |
| 02:29:13 | 6 | dad would love for me to brag about my |
| 02:29:16 | 7 | academic accolades, but I will just say I |
| 02:29:18 | 8 | graduated from the top of my class.  From |
| 02:29:21 | 9 | there I went to Boston College.  I got a |
| 02:29:23 | 10 | Bachelor's Degree from Boston College.  I |
| 02:29:26 | 11 | graduated with honors.  From there I went |
| 02:29:29 | 12 | directly to law school at Pepperdine |
| 02:29:32 | 13 | University in Malibu, California, where I |
| 02:29:34 | 14 | graduated in 2010 also with honors. |
| 02:29:39 | 15 | Q.   Pepperdine, that is the great school |
| 02:29:41 | 16 | that is on the beach, correct? |
| 02:29:43 | 17 | A.   It's very beautiful, yes. |
| 02:29:45 | 18 | Q.   Tell us about your work history.  What |
| 02:29:50 | 19 | year did you graduate from law school? |
| 02:29:53 | 20 | A.   2010. |
| 02:29:55 | 21 | Q.   What bars did you get admitted to? |
| 02:29:59 | 22 | A.   I am admitted to the California bar |
| 02:30:05 | 23 | and all districts of Federal Court in |

3-100

02:30:08  1    California.

02:30:09  2    Q.   Tell us your work history from when

02:30:11  3    you first passed the bar right up to

02:30:14  4    present.

02:30:14  5    A.   Well, my legal work history probably

02:30:18  6    started actually a little bit before I

02:30:20  7    passed the bar I would say.  I worked

02:30:22  8    throughout law school.  I worked at

02:30:24  9    various firms as a clerk while I studied.

02:30:28  10   I worked for the Geragos Law Firm.  It's a

02:30:28  11   pretty prominent plaintiff's law firm in

02:30:35  12   Southern California.  That is where I sort

02:30:38  13   of first got my feet wet with civil rights

02:30:39  14   work which is what I do now.

02:30:42  15        The summer between my second and

02:30:44  16   third year of law school I did elect to

02:30:49  17   take an internship with the U.S.

02:30:50  18   Attorney's Office in Boston over other

02:30:52  19   offers of summer associate positions in

02:30:55  20   California.  When I graduated from law

02:30:58  21   school, I was pretty lucky to be able to

02:31:00  22   get a job pretty quickly after taking the

02:31:03  23   bar exam as a clerk at a business

02:31:05   1    litigation firm and I stayed there after I

02:31:08   2    passed the bar and was licensed for two

02:31:11   3    years.

02:31:13   4         I eventually determined for a

02:31:15   5    number of reasons that that type of work

02:31:17   6    was not for me, and that is when I started

02:31:20   7    working in plaintiff's civil rights both

02:31:22   8    inside and outside of the employment

02:31:24   9    context.  I worked for four years at one

02:31:27  10    plaintiff's law firm, and then I was

02:31:30  11    offered a great opportunity at another

02:31:32  12    where I am now still working as senior

02:31:35  13    litigation counsel and I am in charge of

02:31:37  14    the employment rights division at that

02:31:39  15    firm.

02:31:39  16    Q.   Give me -- would you give me the names

02:31:42  17    of the firms. The business litigation firm

02:31:44  18    and then the other two firms.

02:31:46  19    A.   Sure.  The business litigation firm

02:31:48  20    was the Hartnett Law Group, the first

02:31:51  21    plaintiff's law firm was the Mancini &

02:31:55  22    Associates Law Firm, and the current law

02:31:57  23    firm I work for is the Law Offices of Todd

3-102

02:32:01  1    M. Friedman.

02:32:01  2    **Q.**   Does that office have -- does that

02:32:03  3    firm have offices in various places?

02:32:05  4    **A.**   Yes.  We have two offices in

02:32:07  5    California.  We have an office in Chicago

02:32:10  6    and an office in Philadelphia.

02:32:12  7    **Q.**   Now, you said you were an intern in

02:32:15  8    the U.S. Attorney's Office.

02:32:16  9    **A.**   I was, yes.

02:32:18  10   **Q.**   Was that during, between second and

02:32:20  11   third year at law school?

02:32:22  12   **A.**   Yes.

02:32:22  13   **Q.**   So what year was that?

02:32:25  14   **A.**   It was the summer of 2009, probably

02:32:31  15   from about May through August I would say

02:32:36  16   of 2009.

02:32:37  17   **Q.**   Was that in the U.S. Attorney's Office

02:32:39  18   in Boston?

02:32:40  19   **A.**   In Boston, correct.

02:32:41  20   **Q.**   What division or section of that

02:32:45  21   office were you in?

02:32:46  22   **A.**   I worked in the organized crime drug

02:32:50  23   enforcement task force they referred to as

3-103

02:32:56   1       the OCDETF unit.

02:32:59   2       Q.    You were in the U.S. Attorney's Office

02:33:00   3       in the organized crime drug unit in the

02:33:03   4       summer of 2009, correct?

02:33:04   5       A.    Correct.

02:33:05   6       Q.    Did you -- and your father's arrest

02:33:08   7       took place in 2011, correct?

02:33:11   8       A.    Correct.

02:33:12   9       Q.    Did you -- was the unit you were

02:33:16   10      working in the unit that was investigating

02:33:19   11      your dad?

02:33:20   12      A.    I later learned that it was, yes.

02:33:23   13      Q.    Did you have any indication when you

02:33:25   14      were there that that was going on?

02:33:27   15      A.    No, I didn't, and that was a really

02:33:33   16      difficult thing to find out.  It was a

02:33:36   17      really prominent position that I was put

02:33:39   18      in.  I was really privileged to get that

02:33:41   19      internship.  I elected to take it as part

02:33:45   20      of my career path, and to find out that

02:33:49   21      it's kind of been sullied since that point

02:33:52   22      was really difficult for me and for my

02:33:55   23      dad.

3-104

02:33:55    1        Q.    Just briefly tell us about your
02:33:59    2    family.
02:33:59    3        A.    Well, I grew up in Weston,
02:34:03    4    Massachusetts, with my mother, my father,
02:34:05    5    my brother who is four years younger than
02:34:08    6    I am and my sister who is two years
02:34:11    7    younger than I am.  I am the oldest.
02:34:13    8             My childhood was very wonderful.
02:34:15    9    Those years were some of the happiest I
02:34:16   10    can remember. I had a wonderful childhood.
02:34:19   11    I am married.  I've been happy married
02:34:22   12    since September 2016.  My husband and I
02:34:25   13    had a long engagement because we wanted to
02:34:27   14    make sure that my father was able to be at
02:34:30   15    our wedding.  It was really important for
02:34:33   16    me that he walk me down the aisle.  So we
02:34:35   17    did push it back to September 2016 so he
02:34:38   18    could be there.  We are expecting twins in
02:34:42   19    a couple of months, in January.
02:34:45   20        Q.    Congratulations.
02:34:47   21        A.    Thank you.  My mom -- what can I say
02:34:49   22    about my mom?  I'm sure she is watching.
02:34:51   23    Hi, mom.  She is amazing.  She is the rock

02:34:53  1      in our family without question.  She and

02:34:55  2      my dad have been married, don't quote me,

02:34:59  3      36 years, something like that.  She is a

02:35:02  4      nurse.  Like many nurses are she is just

02:35:06  5      such a natural caretaker.  She makes it a

02:35:10  6      priority to take care of everybody around

02:35:11  7      her.

02:35:13  8              She was home when we were younger.

02:35:14  9      She wasn't working as a nurse, but she was

02:35:16  10     always so busy.  I think personally she

02:35:19  11     personally took care of every sick

02:35:22  12     relative that I can remember, her aunts,

02:35:25  13     more recently my grandmother.

02:35:29  14             When my dad's mother, my other

02:35:30  15     grandmother, was in an assisted living

02:35:32  16     home, my mom went every single day to that

02:35:35  17     home to visit my grandmother to make sure

02:35:38  18     somebody was there with her if my dad

02:35:40  19     could not get there that day.

02:35:41  20             She was also an amazing school

02:35:43  21     mom.  She always involved -- she was on

02:35:45  22     the PTO.  She came on field trips.  At

02:35:48  23     some points my brother and I and my sister

3-106

02:35:51   1    all went to different schools and she had

02:35:53   2    the same involvement in all of our

02:35:55   3    schools, and I'm sure that was spreading

02:35:59   4    her very thin but she never let on.  She

02:36:02   5    did go back to work professionally as a

02:36:05   6    nurse after my dad got arrested.

02:36:08   7        We have a very large extended

02:36:09   8    family.  I have so many cousins my husband

02:36:13   9    likes to joke that at our wedding we had a

02:36:15   10   receiving line and every single person who

02:36:17   11   introduced themselves to my husband said

02:36:19   12   that they were my cousin.  We have a huge

02:36:22   13   family just on both sides, my dad's side

02:36:25   14   and my mom's side, and everyone is

02:36:27   15   wonderfully supportive as they have been

02:36:29   16   through this whole process and we are very

02:36:32   17   lucky in that way.  I know a lot of people

02:36:34   18   don't have that support.

02:36:37   19   Q.   Obviously as you started to get

02:36:40   20   older -- did you always want to be a

02:36:41   21   lawyer?

02:36:42   22   A.   As long as I can remember, yes.

02:36:45   23   Q.   As you were growing up you obviously

02:36:47  1      knew that your father was a high-powered,

02:36:52  2      high-profile busy criminal defense lawyer,

02:36:55  3      correct?

02:36:55  4      **A.**   I knew that because, like you said,

02:37:01  5      many of the cases were really high-profile

02:37:03  6      and I obviously knew what my father did,

02:37:05  7      but in terms of did he really bring it

02:37:09  8      home with him? Not really.  I can tell you

02:37:11  9      that, and now as an adult I really

02:37:14  10     appreciate this in a way that I don't

02:37:16  11     think I did when I was younger.

02:37:18  12          No matter what his schedule was or

02:37:20  13     how busy it was, he never missed an

02:37:22  14     important event.  He never missed an

02:37:24  15     important sporting event.  He never missed

02:37:26  16     a dance recital or any important occasion

02:37:28  17     that I can remember.  I just remember

02:37:31  18     looking out from the softball field and

02:37:33  19     seeing my dad in a full suit and tie just

02:37:36  20     in the corner standing under a tree.  He

02:37:38  21     made it there, and I know that those games

02:37:41  22     were sometimes at 3:00 in the afternoon

02:37:42  23     which is the middle of a workday and he

3-108

02:37:45   1       made it.  He made it work.

02:37:47   2       Q.    From your vantage point how did your

02:37:52   3       father manage to keep that sort of

02:37:56   4       fast-paced life and often a public life

02:38:01   5       separate or, if he did, separate from your

02:38:05   6       family life and your home life?

02:38:08   7       A.    I don't know how he did it, but he did

02:38:11   8       it.  I know that his work was consuming

02:38:13   9       for him, but he really tried to keep those

02:38:17   10      parts of his job, those difficult parts of

02:38:20   11      his job away from us.

02:38:22   12            Most often -- except for maybe

02:38:23   13      when he was in a trial and, you know,

02:38:26   14      working on a really difficult time in a

02:38:30   15      particular case he would most often be

02:38:33   16      home for dinner every night.  He would --

02:38:37   17      that was important for my family.  We

02:38:38   18      always had dinner together as often as we

02:38:40   19      could because, like I said, my brother,

02:38:42   20      sister and I all had different hectic

02:38:45   21      schedules and were doing every activity.

02:38:47   22            So that was an important time that

02:38:48   23      we all sat together and had dinner

3-109

02:38:50   1    together, and then after that very often

02:38:52   2    he would go back to work.  He would -- you

02:38:56   3    know, our home -- we had a family computer

02:38:59   4    outside of my bedroom, and I'm a very

02:39:01   5    light sleeper.  I've always been a light

02:39:03   6    sleeper.  I would wake up, and this

02:39:05   7    happened way more than one time, because

02:39:07   8    in the middle of the night the printer

02:39:09   9    would be going, and I would come out into

02:39:11   10   the hallway and my dad would be sitting

02:39:13   11   there in the middle of the night working

02:39:14   12   at the computer on something he had to do

02:39:16   13   for the next day because he had left work

02:39:19   14   early to come home and come to our games

02:39:22   15   and pick us up and be a good father and

02:39:24   16   then he went back to work after.

02:39:26   17        The best I can tell you is that

02:39:29   18   he -- it was a difficult balance, but he

02:39:31   19   did it and he shifted around his time and

02:39:35   20   he made it work.

02:39:38   21   Q.   Did you ever work with your dad as you

02:39:40   22   got older?

02:39:41   23   A.   I did.

3-110

02:39:43  1    **Q.**    What did you do and when?

02:39:45  2    **A.**    I started helping out probably when I

02:39:52  3    was, in summers maybe when I was in high

02:39:54  4    school just doing things, answering the

02:39:56  5    phones, little clerical tasks.  As I got

02:40:00  6    more interested in the law and thought

02:40:02  7    that would be something I would want to

02:40:04  8    study, he started giving me more

02:40:06  9    important, I guess, tasks to do.

02:40:10  10        He let me come to trials.  He let

02:40:12  11   me come to opening arguments, closing

02:40:14  12   arguments.  He would select the cases so

02:40:16  13   it wasn't anything too grisly for a kid,

02:40:20  14   but in one particular trial I remember he

02:40:23  15   took me and he told me, "I'm going to be

02:40:26  16   questioning this witness, and then once

02:40:27  17   you think I've done a good enough job I

02:40:29  18   want you to move your water bottle from

02:40:31  19   the right side of your lap to the left

02:40:33  20   side of your lap.  Then I'll look at you

02:40:36  21   and I'll know I should be done with that

02:40:37  22   witness," and I took that so seriously, in

02:40:39  23   retrospect extremely seriously, and I did

3-111

02:40:44  1    it.  And he looked over and he nodded and

02:40:46  2    he moved on and started asking different

02:40:49  3    questions on a different topic.  He got me

02:40:51  4    involved in those ways.

02:40:54  5         As I was older and I was in law

02:40:56  6    school or maybe just before I went to law

02:40:59  7    school actually -- I remember he had a big

02:41:01  8    trial I think the summer before I went to

02:41:03  9    law school, and he talked to the judge and

02:41:06  10   convinced the judge to let me actually

02:41:08  11   come and sit at counsel table with him

02:41:10  12   during the trial.  So I was a part of the

02:41:12  13   trial from the beginning to the end.  They

02:41:13  14   took me to sidebar.  They took me to

02:41:16  15   chambers conferences, and it was a really

02:41:18  16   valuable experience for me.  So he always

02:41:22  17   involved me.

02:41:23  18   Q.   From your sort of non-lawyer viewpoint

02:41:27  19   back then, did he do a good job?

02:41:30  20   A.   Oh, I always thought he did a great

02:41:32  21   job.  I was really proud of him.  My

02:41:35  22   dad -- he's so kind and such a great dad

02:41:40  23   and he has such a kind heart, but in the

3-112

02:41:42  1    courtroom he's such a bulldog.  It was

02:41:45  2    really impressive to see two different

02:41:48  3    sides of him in that way.

02:41:49  4    **Q.**   Have you seen your father deal with

02:41:51  5    other people?

02:41:52  6    **A.**   Of course, yes.

02:41:54  7    **Q.**   What is your take on that?

02:41:57  8    **A.**   Well, you know, he treats everybody

02:42:03  9    with the same level of respect regardless

02:42:06  10   of who it is.  One of the most important

02:42:08  11   things he taught me as far as being a

02:42:10  12   lawyer is that, and I still remember when

02:42:11  13   he told me this, you need to treat the

02:42:14  14   clerk and the courtroom assistant with the

02:42:16  15   same respect you treat the judge.

02:42:18  16        I always do that now, and now that

02:42:20  17   I'm a lawyer I see that it's really

02:42:22  18   shocking the amount of people who don't

02:42:24  19   act that way.  Attorneys who don't act

02:42:26  20   that way.  So it makes it more impactful

02:42:31  21   on me the way I saw that he always --

02:42:32  22   from, you know, the bailiff, the court

02:42:35  23   officers, the courtroom assistants up to

3-113

02:42:39    1    the judge, there was no difference in the

02:42:41    2    way he treated people with respect and

02:42:43    3    kindness and he always, you know, knew the

02:42:46    4    shoeshine guy's name who was at the

02:42:49    5    courtroom every day.  He had one of his

02:42:52    6    clients, who was a contractor, build the

02:42:55    7    shoeshine guy a shoeshine stand so he

02:42:59    8    wouldn't have to stoop over and bend down

02:43:01    9    while he was doing people's shoes.

02:43:03   10         You know, one time he donated

02:43:10   11    anonymously, which I now know many years

02:43:12   12    later was him, to my 7th and 8th grade

02:43:15   13    basketball team.  He donated uniforms to

02:43:19   14    us.  He had them made with everyone's

02:43:20   15    names and donated them because my school

02:43:24   16    didn't have the money or didn't care to

02:43:25   17    put the money towards getting us uniforms,

02:43:30   18    and we were playing in practice t-shirts

02:43:32   19    against these other teams.

02:43:32   20         So he's just so kind.  He has a

02:43:34   21    really kind heart.  He gives to others.

02:43:35   22    He doesn't care what position in life

02:43:38   23    you're in, he treats everybody with that

3-114

02:43:39  1    same level of kindness.  He always wants

02:43:42  2    to help people.

02:43:43  3    Q.    I have a couple more questions,

02:43:45  4    Meghan.  Did you sit through the trial?

02:43:50  5    A.    Yes, every day.

02:43:52  6    Q.    And did your sister and brother do the

02:43:54  7    same?

02:43:54  8    A.    They did, yes, every day.

02:43:56  9    Q.    By the way, the people who were in

02:43:59  10   that courtroom prosecuting your dad, were

02:44:01  11   they some of the people you worked with?

02:44:02  12   A.    Yes.  My direct supervisor for my

02:44:08  13   internship -- and maybe I should make it

02:44:11  14   clearer.  There are a lot of interns who

02:44:14  15   work for the U.S. Attorney's Office, but

02:44:17  16   there are many units at the U.S.

02:44:19  17   Attorney's Office where you can be placed.

02:44:22  18   So I could have been placed across the

02:44:24  19   street in civil litigation.  I had no

02:44:26  20   choice where I was placed.  I was placed

02:44:29  21   in that unit just because they told me

02:44:31  22   that was where I was going to go, and that

02:44:33  23   unit was very small.  There were only five

3-115

02:44:35  1    interns.  We had our own keys.  It was a

02:44:40  2    high-security unit and we had a special

02:44:40  3    security clearance.

02:44:44  4            So it's really confusing as to why

02:44:46  5    I was placed there when I look back at it,

02:44:48  6    but my supervisor of the five of us who

02:44:51  7    were in that unit was lead counsel on that

02:44:55  8    case.  He prosecuted my dad every day.

02:44:59  9    The director of the unit who had taken us

02:45:03  10   all out to lunch a couple of times came

02:45:05  11   and sat behind me in the courtroom every

02:45:07  12   day.  Every day.  And one of the other

02:45:09  13   five interns who I worked with was the

02:45:11  14   judge's clerk, and she sat in the

02:45:14  15   courtroom and watched the trial every day

02:45:15  16   too.  It was really difficult.

02:45:17  17   Q.   Do you think looking back and knowing

02:45:22  18   what you know -- while you live in

02:45:25  19   California, you stay in touch with your

02:45:27  20   family regularly?

02:45:28  21   A.   Yes, we speak daily.  Yes.

02:45:31  22   Q.   Do you think your father's arrest,

02:45:34  23   conviction and incarceration has had an

3-116

02:45:36  1    effect on him?

02:45:39  2    **A.**   Yes.  I think it's had a really

02:45:42  3    noticeable effect on him.

02:45:44  4    **Q.**   Speak to the panel about what you

02:45:47  5    observe about your dad since his release.

02:45:52  6    **A.**   He is a very different person.  You

02:45:55  7    know, he's -- like I said, he's always

02:45:57  8    been kind.  He always found the good in

02:45:59  9    people.  It's a really good quality when

02:46:01  10   you were defending the type of people he

02:46:03  11   was defending for being charged with what

02:46:06  12   they were charged with, but he's different

02:46:08  13   in a lot of ways.

02:46:11  14            He's a lot calmer.  He has a lot

02:46:14  15   slower of a pace.  I don't think he ever

02:46:16  16   really enjoyed quiet time before.  I don't

02:46:21  17   think he knew how to enjoy quiet time, and

02:46:23  18   now he loves it.  I mean he goes to the

02:46:27  19   beach in the middle of the week to read a

02:46:29  20   book, and he'll be there for hours.  He

02:46:32  21   spends time with my mom.

02:46:35  22            He takes satisfaction in simpler

02:46:38  23   things that I had never seen him do before

3-117

02:46:41  1    like cooking.  He makes his own spice

02:46:43  2    blends.  He sends me once a month a new

02:46:47  3    spice blend that he pastes his photo on,

02:46:51  4    and I now have a cabinet of spice blends

02:46:51  5    that he's created.  He really enjoys it.

02:46:54  6    He still does magic.  I know somebody

02:46:55  7    already talked about that, but he really

02:46:58  8    likes doing simple, these sort of simple

02:46:59  9    things that give him joy.

02:47:01  10       I think that everything that

02:47:03  11   happened to him really shocked him to his

02:47:07  12   core.  He's not angry.  He's not

02:47:11  13   resentful.  I think a lot of people would

02:47:13  14   be.  He has always, like I said, been so

02:47:15  15   passionate about helping people.  He never

02:47:18  16   was able to say no, and I think that came

02:47:20  17   from a really deep place in his character.

02:47:24  18       Because of the fact that he was no

02:47:27  19   longer able to do that by being a lawyer,

02:47:28  20   he had to come up with other ways that he

02:47:30  21   could do that, and he has.  He volunteers

02:47:33  22   at the food pantry.  He volunteers for

02:47:37  23   veterans.  He's in a pandemic driving

3-118

02:47:39  1    trucks to deliver food to people who are

02:47:41  2    hungry.  I recently visited and I was

02:47:45  3    there for about a month, and while I was

02:47:47  4    there I saw the lights of his car go on at

02:47:51  5    5:00 AM and I was like, "Where in the

02:47:52  6    world could he be going this early in the

02:47:52  7    morning?"

02:47:56  8          He came back, got dressed and he

02:47:58  9    left again and went to work.  He had been

02:48:00  10   at the food pantry.  He goes every week.

02:48:02  11   He goes before he goes to work because he

02:48:06  12   enjoys doing it and he enjoys these new

02:48:08  13   ways that he has found to help people

02:48:10  14   that, you know, he can continue doing.

02:48:14  15         I think that he has obviously

02:48:16  16   suffered professional consequences, that

02:48:18  17   is obvious, but the greatest -- for sure

02:48:22  18   the greatest way that he suffered was

02:48:26  19   living with the realization that my mom

02:48:30  20   and my brother and my sister and I all

02:48:32  21   went through this nightmare with him

02:48:34  22   because of a mistake that he had made.  We

02:48:37  23   lived with it for as long as he lived with

3-119

02:48:40  1        it.

02:48:41  2                You know, the time leading up to

02:48:43  3        the trial, it was difficult on a daily

02:48:46  4        basis.  The trial I already talked about

02:48:48  5        was awful.  I sat through the entire

02:48:51  6        thing.  I watched these people I admired,

02:48:53  7        you know, avoid eye contact with me every

02:48:56  8        day.  Our family's finances were plastered

02:49:00  9        all over the news and the courtroom.  You

02:49:03  10       know, my mom had to go back to work after

02:49:05  11       many years so she could support the

02:49:07  12       family.  My brother, he just had graduated

02:49:11  13       I think from college.  He was barely on

02:49:13  14       his own financially.  The same was true

02:49:16  15       for me.  I had just gotten a job, and I

02:49:19  16       was barely making a livable wage and was

02:49:23  17       terrified to lose that job.  I was

02:49:25  18       terrified of what would happen if I lost

02:49:27  19       my only source of income.

02:49:30  20               For me specifically it had deep

02:49:32  21       professional ramifications.  You know, I

02:49:35  22       had always wanted to be a federal

02:49:37  23       prosecutor.  That was my career goal.

02:49:40  1    After going through this ordeal I really

02:49:42  2    couldn't even stomach the thought of it.

02:49:44  3    I had to completely reevaluate my career

02:49:48  4    choices and thought maybe I didn't want to

02:49:50  5    be a lawyer at all anymore.  You know, the

02:49:53  6    federal government, they sent subpoenas to

02:49:57  7    my law school for all of my personal law

02:49:59  8    school records.  I had to go meet with the

02:50:02  9    deans and explain why they were getting it

02:50:04  10   and what was happening.  That was a really

02:50:07  11   difficult conversation.  I think they did

02:50:09  12   the same to my brother and sister.

02:50:13  13        The prosecution was really hard,

02:50:15  14   and they made sure we all felt it and that

02:50:18  15   is the worst punishment for my dad.  He

02:50:22  16   puts his family above everybody else. It's

02:50:25  17   the thing he cares about most in the

02:50:26  18   world.  Knowing that we were suffering

02:50:28  19   because of a mistake he had made is what

02:50:30  20   hurt him the most.  I can tell you

02:50:34  21   unequivocally he will never make this

02:50:37  22   mistake or any mistake like it ever again

02:50:40  23   if not for any other reason, and I can

3-121

02:50:42  1    tell you there are a lot of other reasons

02:50:44  2    but because he would never want to put us

02:50:47  3    through this again, ever.

02:50:49  4             MR. MAFFEI:   Thank you, Meghan.

02:50:53  5    Good luck to you when you give birth to

02:50:54  6    your twins in January.  No further

02:50:56  7    questions.

02:51:00  8             MS. ANDERSON:  Ms. George, I just

02:51:03  9    have one question.

02:51:03  10                  Cross-Examination

02:51:05  11   Q.   (By Ms. Anderson)  What is the

02:51:06  12   understanding of your family as to why

02:51:11  13   your father was indicted and then

02:51:13  14   convicted of several crimes?

02:51:17  15   A.   Well, we all know what he was

02:51:22  16   convicted of and we know why.  We sat

02:51:26  17   through the trial every day.  I'm a lawyer

02:51:28  18   so I read everything I could read on what

02:51:31  19   he had done and why it was wrong and, you

02:51:35  20   know, I never asked -- I don't know if

02:51:40  21   this answers your question.  I never asked

02:51:41  22   him the questions that are being asked

02:51:43  23   here of him, you know, why did you do this

3-122

02:51:46   1   because frankly the way I was raised is

02:51:50   2   that excuses and explanations are not as

02:51:53   3   important as actions and I didn't really

02:51:57   4   care.

02:52:01   5        He apologized hundreds of times,

02:52:03   6   you know, but at a certain point that only

02:52:06   7   means so much.  You really need to show

02:52:10   8   everybody that you've changed and show

02:52:14   9   that you're sorry, and it wasn't like it

02:52:17   10  was going to make a difference for me.  I

02:52:19   11  wasn't evaluating by what he was saying

02:52:23   12  whether or not he was still going to be my

02:52:25   13  dad.  He was still going to be my dad

02:52:28   14  always, and I was always going to love him

02:52:31   15  and I was always going to stand by him and

02:52:32   16  my whole family felt that same way.  We

02:52:34   17  just accepted it, accepted his apologies

02:52:38   18  and decided as a family how are we going

02:52:41   19  to move forward and how are we going to

02:52:43   20  get through this together.

02:52:45   21       That's what we did, and I think I

02:52:47   22  can speak for myself and for the rest of

02:52:49   23  my family, immediate family when I say

3-123

02:52:51  1   that he has proven to us that he has

02:52:53  2   changed and that he's sorry and he's never

02:52:56  3   going to make a mistake like this again.

02:52:59  4           I would just like to say one more

02:53:01  5   thing if I can.

02:53:03  6   **Q.**   Sure.

02:53:04  7   **A.**   You know, I know there has been some

02:53:07  8   question about the Eddie O'Brien case and,

02:53:12  9   you know, whether or not my dad's

02:53:15  10  reinstatement would be a benefit to the

02:53:17  11  bar, and I just want to say as an

02:53:19  12  attorney -- there are a lot of types of

02:53:21  13  attorneys in this word.  There's lots of

02:53:24  14  things you can do with a law degree, but

02:53:26  15  being a criminal lawyer is so often such a

02:53:31  16  thankless job and I think that the Eddie

02:53:33  17  O'Brien case is sort of a perfect example

02:53:36  18  that I can use since we've been talking

02:53:38  19  about it.

02:53:38  20          When he was accused of murder, he

02:53:41  21  was 15 years old and I at the time was 13

02:53:44  22  years old, and, and I think my father had a

02:53:45  23  personal connection to the case.  It was

3-124

02:53:47  1    the first time I really remember noticing

02:53:50  2    how hard he was working on it.  Our home

02:53:53  3    had a detached garage, and he had

02:53:55  4    converted it to a war room.  It was like

02:53:57  5    covered in papers and boxes, and we

02:54:00  6    weren't allowed to go out there.  He was

02:54:01  7    afraid we would stumble upon something we

02:54:04  8    shouldn't see, but I can tell you that I

02:54:06  9    know for two years how tirelessly he

02:54:10  10   worked on that case and how passionate he

02:54:14  11   was about that case and that client and

02:54:16  12   trying to help him.

02:54:19  13        Even then, even after two years of

02:54:20  14   that because he lost -- and in this line

02:54:23  15   of work you're going to lose way more than

02:54:27  16   you're going to win.  27 years later he

02:54:30  17   has to sit here and sort of just listen to

02:54:31  18   this kind of garbage being said about him

02:54:33  19   and being said about that he didn't care

02:54:35  20   about his son.  It is just so far from the

02:54:38  21   truth, and I know it because I lived it.

02:54:42  22        It's a thankless job, and for

02:54:44  23   every Ed O'Brien, Senior, there is

3-125

02:54:48   1   somebody's mother who will send boxes of

02:54:51   2   homemade cinnamon rolls every year at

02:54:54   3   Christmastime because they are just so

02:54:56   4   grateful that he saved their son's life.

02:55:00   5   And after all he has been through I just

02:55:04   6   think that should really tell you

02:55:06   7   something, that he still wants you to

02:55:08   8   allow him to do that work.

02:55:10   9   Q.   Ms. George, one other question.   When

02:55:14   10   you read the transcripts, and apparently

02:55:16   11   you did, of the recorded conversations

02:55:19   12   between your father and Mr. Dardinski and

02:55:21   13   Mr. Hansen, did you feel like you were

02:55:24   14   listening to a person you didn't know?

02:55:28   15   A.   No.   You know, I was -- like I said a

02:55:37   16   little bit about, my dad has had a tough

02:55:42   17   exterior.   He was a bulldog in the

02:55:45   18   courtroom and sometimes he had to have a

02:55:47   19   tough exterior with his clients, the types

02:55:47   20   of clients that he dealt with.   But it

02:55:47   21   didn't change - and I sort of had seen

02:55:47   22   that.

02:55:56   23        You know, of course he never

3-126

02:55:58  1   cursed around me or anything like that so

02:56:01  2   that was sort of new, but the fact that he

02:56:04  3   would have sort of a different exterior

02:56:07  4   when dealing with certain clients and

02:56:10  5   people didn't truly -- it definitely

02:56:13  6   didn't change the way I see him because I

02:56:16  7   know his heart and I know what kind of a

02:56:18  8   person he is on a much deeper level than a

02:56:23  9   tape recording.

02:56:26  10           MS. ANDERSON:  Thank you.

02:56:31  11           MS. BAGGER:  Thank you very much,

02:56:32  12   Ms. George.

02:56:34  13           MR. MAFFEI:  Thank you, Meghan.

02:56:36  14           MS. BAGGER:  It is 12:30.

02:56:38  15   Counsel, would you like to come back at

02:56:43  16   1:15 or 1:30?  It really depends how much

02:56:46  17   time you might need.

02:56:47  18           MR. MAFFEI:  I would like to do it

02:56:51  19   at 1:15.  I would like -- I don't know.

02:56:57  20   Obviously I want to think about my closing

02:57:00  21   more, but is bar counsel going to take a

02:57:04  22   position on --

02:57:06  23           MS. ANDERSON:  Yes.

3-127

02:57:09    1          MR. MAFFEI:  Are you going to let

02:57:10    2     us know?

02:57:12    3          MS. ANDERSON:  You are all going

02:57:15    4     to know very soon.  I would like to -- I

02:57:20    5     would like 1:30 just because I would like

02:57:23    6     to have some time to go over my notes,

02:57:25    7     maybe eat a little lunch.  So I think 1:30

02:57:30    8     would be better.

02:57:30    9          MR. MAFFEI:  Are you not going to

02:57:32   10     tell us before the break so that --

02:57:34   11          MS. ANDERSON:  Tom, we can talk.

02:57:39   12          MR. MAFFEI:  Okay.

02:57:42   13          MS. BAGGER:  Okay.  1:30 then.

02:57:45   14     Thank you.  You can turn off the stream.

02:57:51   15          MR. MAFFEI:  Thank you.  See you

02:57:53   16     at 1:30.

02:57:54   17          MS. ANDERSON:  Tom, please feel

02:58:00   18     free to call me.

02:58:01   19          MR. MAFFEI:  Okay.

03:50:35   20          (Lunch break taken at this time.)

03:53:33   21          MS. BAGGER:  Anything we need to

03:53:36   22     deal with before we have the closing?

03:53:41   23     Hearing nothing, Michelle if you will

3-128

03:53:45  1      start the live stream, we can hear from

03:53:49  2      counsel.

03:53:49  3              MS. YU:   Madame chair, we are now

03:53:52  4      live streaming again.

03:53:55  5              MS. BAGGER:   Okay.   Now we will

03:53:56  6      have our closings and Dorothy,

03:54:01  7      Ms. Anderson.

03:54:02  8              MS. ANDERSON:   Good afternoon,

03:54:05  9      members of the panel.   Thank you for your

03:54:07  10     close attention to all the evidence in

03:54:08  11     this case for the last three days.   I am

03:54:12  12     sure Mr. Maffei and I both are very much

03:54:17  13     aware of how you have listened carefully

03:54:21  14     and asked very pertinent questions of

03:54:26  15     Mr. George and of his other witnesses.

03:54:31  16              After consulting with bar counsel

03:54:34  17     today, we have determined that we do not

03:54:37  18     object to the reinstatement of Robert

03:54:39  19     George to the practice of law in

03:54:41  20     Massachusetts, but since I'm sure that

03:54:45  21     Mr. Maffei will review for you all the

03:54:48  22     favorable evidence pointing to

03:54:50  23     Mr. George's reinstatement, I am going to

3-129

03:54:54    1       use this opportunity to just review the

03:54:57    2       negatives that this panel will want to

03:54:59    3       consider in reaching its own conclusion

03:55:01    4       about whether or not Mr. George has met

03:55:04    5       his burden.

03:55:08    6               Now, I think that the evidence

03:55:10    7       shows that at least prior to his 2012

03:55:14    8       convictions there were two sides of

03:55:17    9       Mr. George.  I will start with the darker

03:55:20   10       side.  That side is shown in the 2007

03:55:28   11       admonition.  That was the medical

03:55:29   12       malpractice case in which Mr. George

03:55:33   13       represented a plaintiff and agreed to take

03:55:38   14       over the case from predecessor counsel and

03:55:42   15       then proceeded to really make very little

03:55:47   16       effort to ready that case for trial.

03:55:49   17               He did not kind of shore up the

03:55:52   18       person who he thought was going to be the

03:55:54   19       expert witness, did not really talk to

03:55:56   20       him, didn't appear at a pretrial

03:55:59   21       conference shortly before when the trial

03:56:01   22       was to be held, did not appear on the

03:56:03   23       trial date.  Then when he learned the

03:56:06  1    trial had been postponed for two months I

03:56:09  2    think it was, he didn't, again didn't get

03:56:11  3    in touch with the expert, didn't even tell

03:56:13  4    the expert that a trial date had been

03:56:17  5    established.  Went to trial and it was

03:56:22  6    March -- I'm not even sure what year --

03:56:24  7    without an expert which ultimately

03:56:26  8    resulted in the case being dismissed and

03:56:29  9    his client's claim being lost.  That was

03:56:33  10   one episode.

03:56:38  11          In that matter, the same matter,

03:56:43  12   you also see that the hearing committee

03:56:45  13   rejected substantial portions of

03:56:47  14   Mr. George's testimony basically finding

03:56:52  15   that Mr. George had been untruthful under

03:56:54  16   oath in a bar disciplinary proceeding at

03:56:58  17   least in several respects.

03:57:00  18          You also saw his what I would call

03:57:06  19   cavalier attitude about his obligation to

03:57:06  20   pay his state and federal income taxes,

03:57:10  21   and that was even back in the 2000s, 2008,

03:57:15  22   2009, 2010 when his practice was doing

03:57:17  23   very well and his income was, at least one

3-131

03:57:21  1    year I think 214,000 and he testified that

03:57:24  2    it was around 200,000 or maybe a little

03:57:28  3    less during that period and yet he allowed

03:57:30  4    these pretty substantial tax obligations

03:57:33  5    to accumulate. As you also heard,

03:57:38  6    ultimately he was able to discharge at

03:57:43  7    least the federal tax deficit of about

03:57:45  8    $575,000 with a very small payment of

03:57:49  9    $25,000.

03:57:53  10         You'll also recall that he

03:57:55  11   admitted that prior to 2012 in addition to

03:57:59  12   the admonition he had that bar counsel

03:58:02  13   received numerous complaints about

03:58:03  14   Mr. George and that he was notified of

03:58:06  15   those complaints and responded to them,

03:58:09  16   although none of them eventually resulted

03:58:12  17   in any discipline.

03:58:15  18         Most significant, of course, you

03:58:17  19   see Mr. George in the transcripts of the

03:58:21  20   recorded testimony that were a part of the

03:58:24  21   trial and the federal criminal case

03:58:28  22   conversations with his former criminal

03:58:30  23   client and with his mortgage broker

3-132

03:58:33  1      acquaintance.  In those conversations you

03:58:36  2      hear Mr. George who sounds really more

03:58:39  3      like a criminal than a lawyer, swears

03:58:43  4      freely and uses phrases like double mamo

03:58:50  5      money laundering.

03:58:52  6            Finally, and maybe most relevant I

03:58:55  7      would suggest that Mr. George has not

03:58:57  8      totally come clean in this hearing in

03:59:00  9      revealing his motives behind the criminal

03:59:03  10     acts.  He continues to insist that he only

03:59:07  11     got into this because of his desire to

03:59:10  12     help a former client, but frankly it just

03:59:13  13     doesn't ring true but he is unwilling to

03:59:18  14     confess what the evidence suggests or

03:59:21  15     suggested and what the government

03:59:23  16     presented at trial, that Mr. George had

03:59:25  17     some very serious financial obligation at

03:59:28  18     the time that he got into the money

03:59:30  19     laundering and that likely he had hoped to

03:59:33  20     obtain some income and possibly a steady

03:59:37  21     stream of income from his involvement in

03:59:39  22     the deals regarding Mr. Dardinski.

03:59:43  23           The other side of Mr. George is

03:59:47  1    represented by, of course, all the

03:59:48  2    supportive letters that he submitted to

03:59:50  3    the court when he was sentenced in 2012

03:59:53  4    which are attached to his sentencing

03:59:55  5    memorandum, Exhibit 8, and all the letters

03:59:59  6    that he has submitted to this panel which

04:00:01  7    are Exhibits 19 through 57, and clearly

04:00:04  8    there are many people out there, both

04:00:07  9    lawyers and non-lawyers, who say that

04:00:10  10   Mr. George was an exceptionally dedicated,

04:00:14  11   skilled and knowledgeable lawyer, that he

04:00:15  12   was a devoted father and that he was a

04:00:18  13   loyal and generous friend and an active

04:00:20  14   member of his community.

04:00:23  15        There was also testimony that he

04:00:27  16   continues to be a student of law, he keeps

04:00:29  17   up with important decisions in his field

04:00:31  18   and he has taken CLEs and seminars that

04:00:35  19   have otherwise kept him up to date with

04:00:37  20   legal developments.

04:00:38  21        And you've heard Mr. George's own

04:00:39  22   testimony this week in which he

04:00:40  23   acknowledges the conduct that landed him

3-134

04:00:42   1      in a federal camp for 33 months and says

04:00:46   2      convincingly, I think, that he has more

04:00:48   3      than learned his lesson, that in important

04:00:51   4      aspects he is a changed man who would live

04:00:54   5      a different kind of life than he had been

04:00:57   6      living 20 years ago and that he would

04:00:59   7      never repeat the kind of conduct or

04:01:02   8      comparable conduct that led him to the

04:01:04   9      conviction and sentence.

04:01:08   10             So the question for the panel is

04:01:10   11     if you reinstate Mr. George which

04:01:13   12     Mr. George will the bar and the courts and

04:01:15   13     the public be getting?  Will it be a

04:01:18   14     George who presents a very good front to

04:01:22   15     his family and friends but continues to

04:01:24   16     maybe cover up some fundamental cynicism

04:01:27   17     about the legal system and his role in the

04:01:29   18     system or will it be a chastened

04:01:32   19     Mr. George who has learned his lesson and

04:01:34   20     fundamentally changed in the way he sees

04:01:37   21     himself in the world and in his role as a

04:01:39   22     lawyer?

04:01:39   23             Of course, the members of the

3-135

04:01:40    1    panel are going to reach their own

04:01:42    2    conclusion.  We understand that, but bar

04:01:44    3    counsel does not oppose Mr. George's

04:01:47    4    reinstatement.  We believe that he has

04:01:51    5    furnished credible evidence that he has

04:01:53    6    maintained his learning in the law, is

04:01:55    7    morally fit to resume practice and that

04:01:57    8    his reinstatement will not have a

04:01:58    9    detrimental effect on the legal system,

04:02:01   10    the bar, or the public.  Thank you.

04:02:01   11         MS. BAGGER:  Thank you,

04:02:07   12    Ms. Anderson. Mr. Maffei.

04:02:24   13         MR. MAFFEI:  Thank you very much

04:02:26   14    for your time and your attention.  I was

04:02:30   15    in your position almost 30 years ago so I

04:02:35   16    know you will take this very seriously.  I

04:02:38   17    also know that you understand the enormous

04:02:45   18    importance a reinstatement proceeding,

04:02:49   19    particularly for a lawyer who has

04:02:52   20    practiced law for a long time and until

04:02:55   21    his fall from grace practiced at what

04:02:58   22    everyone has said was at the highest

04:03:01   23    level.

3-136

04:03:03  1        I said in my opening that I hoped

04:03:05  2   to prove that Mr. George meets all the

04:03:08  3   standards for reinstatement.  That is the

04:03:11  4   question you have to decide, but I want to

04:03:14  5   just review some of the evidence in light

04:03:17  6   of those standards.

04:03:19  7        On the question of the learning in

04:03:21  8   the law, we've heard evidence that Bob

04:03:25  9   George was a very good lawyer and, to use

04:03:28  10  a grossly overworked cliche, a super

04:03:32  11  lawyer and that he was a super lawyer for

04:03:34  12  a long time.  He handled dozen and dozens

04:03:37  13  of criminal cases, not just tough cases

04:03:40  14  but precedent-setting cases, several of

04:03:44  15  which went to the SJC and made new law.

04:03:49  16        You've heard witnesses say that

04:03:51  17  not only is he book smart but he has great

04:03:56  18  instincts, he has good judgment, he's very

04:03:59  19  strategic in his thinking, all of which

04:04:01  20  are good for any trial lawyer but

04:04:03  21  particularly good for a criminal defense

04:04:06  22  lawyer.  Mr. Hinchey said it, Paul Kelly

04:04:09  23  said it, Judge Gertner and Judge Greenberg

3-137

04:04:14  1     said it.  Judge Borenstein said it in his
04:04:16  2     letter.
04:04:18  3          It is true that some of
04:04:19  4     Mr. George's, some of the people who
04:04:22  5     testified for Mr. George were his good
04:04:26  6     friends but they weren't all his good
04:04:28  7     friends.  The judges who testified --
04:04:28  8          (Court reporter interrupted.)
04:04:53  9          I said that some of Mr. George's
04:04:55  10    witnesses were good friends of his but not
04:04:58  11    all.  The judges were not close to him.
04:05:01  12    They testified that they didn't socialize
04:05:03  13    with him and they have not seen him in
04:05:07  14    quite a while, but they all testified that
04:05:08  15    they had seen him in court and they had
04:05:10  16    seen him in some criminal bar groups.
04:05:14  17          Rosemary Scapicchio who is another
04:05:17  18    high-profile, very able, very successful
04:05:20  19    lawyer, she knows Bob.  She worked for
04:05:23  20    Bob.  She doesn't socialize with him so
04:05:26  21    there's at least three of these people who
04:05:29  22    are not his best friends, and Mr. Catanese
04:05:32  23    is friendly but not his best friend.  But

3-138

04:05:35  1   admittedly Mr. Weishaupt who spent his

04:05:38  2   entire professional life in law

04:05:41  3   enforcement and in particular in the FBI,

04:05:43  4   he is pretty close to him, and Paul Kelly

04:05:47  5   and Ed Hinchey know him well, although I

04:05:50  6   think Mr. Kelly said he doesn't really

04:05:54  7   socialize with him whereas Mr. Hinchey

04:05:54  8   said he does get together with him for

04:05:56  9   coffee.

04:05:57  10        You can judge for yourself whether

04:05:59  11  those people who were really I think you

04:06:04  12  would have to acknowledge at the top of

04:06:07  13  our bar in Massachusetts, whether those

04:06:09  14  people would say anything they didn't

04:06:11  15  believe about Bob George just because they

04:06:14  16  know him.  I also think it's important

04:06:17  17  that Paul Kelly who is a partner at a

04:06:21  18  thousand-lawyer law firm with offices all

04:06:24  19  over the country, he didn't just put his

04:06:27  20  good friend on the payroll at Jackson

04:06:29  21  Lewis.  You can't do that in a large law

04:06:31  22  firm.  He went to the managing partner and

04:06:33  23  he vouched for Bob for his integrity and

04:06:37  1      his character, and I think we all

04:06:39  2      understand that for a huge national law

04:06:42  3      firm to take on a person who was convicted

04:06:44  4      of a crime is a big deal.  Large firms in

04:06:48  5      fact don't usually hire people convicted

04:06:50  6      of a crime, but his firm, Paul Kelly's

04:06:54  7      firm trusted Paul and Paul trusted Bob

04:06:57  8      George.  And as you heard Paul say, he

04:07:02  9      represented, helped Paul represent clients

04:07:04  10     of all types and did superb work.

04:07:10  11          Every reinstatement case I know of

04:07:12  12     and every reported case that I have read

04:07:15  13     takes into account and considers letters

04:07:18  14     and testimony from people who know the

04:07:21  15     person seeking admission.  I submit that

04:07:25  16     the best evidence of who Bob George was

04:07:27  17     and who he is today are those that know

04:07:30  18     him well.  I cannot say that any of the

04:07:37  19     people who don't know Bob George could say

04:07:40  20     anything about who he is as a person or

04:07:45  21     who he was as a lawyer.  It stands to

04:07:47  22     reason and it's why all of these

04:07:48  23     reinstatement cases do delve deeply into

3-140

04:07:53  1          someone's character.

04:07:54  2                    Judge Borenstein and Judge

04:07:56  3          Greenberg called me out of the blue as

04:07:58  4          they testified, said they read in Lawyers

04:08:00  5          Weekly that Bob George was seeking

04:08:01  6          readmission and what could they do.

04:08:05  7                    There is no doubt Mr. George meets

04:08:07  8          the first standard, that is, learning in

04:08:11  9          the law.  I was thinking last night you

04:08:14  10         don't forget learned skills and

04:08:16  11         experience, and you certainly don't forget

04:08:18  12         them if you have done it for 30 years.

04:08:21  13         It's kind of like playing chess.  Once you

04:08:23  14         do it for 30 years, you probably never

04:08:26  15         forget it.  Bob George testified that he

04:08:29  16         is a student of the law, he kept up on the

04:08:32  17         law, he reads everything he can get his

04:08:34  18         hands on, he reads Lawyers Weekly and he

04:08:37  19         took something like 28 or 30 MCLE webinar

04:08:42  20         courses.

04:08:44  21                    I know you will read all the

04:08:45  22         letters that were submitted on his behalf

04:08:48  23         and I know you will consider, as you

3-141

04:08:50  1    should, take into account that some of the

04:08:53  2    people who introduced themselves in those

04:08:56  3    letters say how they know Bob George. Some

04:08:58  4    know him better than others.  A group of

04:09:01  5    those letters that I found most compelling

04:09:04  6    were several of the people at the federal

04:09:06  7    camp in Minersville who spent a lot of

04:09:10  8    time with Bob George because Bob George

04:09:11  9    was one of the few people who would talk

04:09:14  10   to them and give them comfort in what in

04:09:17  11   their case was another sad chapter.

04:09:21  12         Mr. Kelly didn't hold off

04:09:23  13   introducing Mr. George to his white-collar

04:09:27  14   cases.  He didn't just restrict Mr. George

04:09:30  15   to his pro bono, non-paying clients.  He

04:09:34  16   was asked, "Were you proud enough and

04:09:35  17   confident enough to introduce and have

04:09:38  18   Mr. George work on your paying clients,"

04:09:40  19   and he said yes.  That is all I want to

04:09:43  20   say on the learning in the law.

04:09:46  21         The law, as you know, also

04:09:47  22   requires that he has to demonstrate he has

04:09:51  23   the requisite moral qualifications to be a

04:09:55  1  lawyer.  While the public is from time to

04:09:58  2  time cynical more or less about lawyers,

04:10:02  3  one thing this process demonstrates and I

04:10:04  4  think many of the witnesses demonstrate is

04:10:07  5  that good lawyers take that requirement

04:10:12  6  seriously.  We are not just business

04:10:16  7  people -- not to denigrate any trade.  I

04:10:21  8  do a lot of my own woodworking, but being

04:10:24  9  a lawyer carries with it much more than a

04:10:30  10  plumber, an electrician, a barber or

04:10:32  11  anyone else because it carries with it all

04:10:36  12  the responsibilities that all of us who

04:10:38  13  are lawyers know including

04:10:39  14  confidentiality, including loyalty,

04:10:42  15  including zealousness, including truth and

04:10:42  16  including honesty.

04:10:50  17      It is a given and the cases are

04:10:50  18  very clear -- it is a given that at the

04:10:52  19  time Mr. George did the acts which

04:10:56  20  resulted in his conviction, he did lose

04:10:58  21  his moral compass.  There's no question

04:11:01  22  about that, and the case law says very

04:11:03  23  clearly it's not a good idea for any

3-143

04:11:05  1    lawyer seeking readmission to come in and

04:11:07  2    blame everybody including the judge, the

04:11:10  3    jury and the system.

04:11:11  4         As you heard, Mr. George with

04:11:14  5    perhaps some reason to feel this way has

04:11:16  6    never -- I think someone said no sour

04:11:19  7    grapes with him.  He is a half-full-glass

04:11:24  8    kind of guy.  He didn't blame everybody.

04:11:27  9    He took his appeal as he was entitled to

04:11:29  10   do, and he decided, "I'm going to start my

04:11:33  11   prison sentence even before the appeal

04:11:35  12   gets started," because he knew, A, the

04:11:38  13   appeal was probably an uphill as most are

04:11:40  14   and, B, it was going to take a long time

04:11:42  15   and he wanted to get on with the business

04:11:43  16   of getting on with his life.

04:11:47  17        So we have to believe that at the

04:11:48  18   time he committed his crime he lacked

04:11:52  19   whatever the level of morality you need to

04:11:54  20   avoid what he did but, as you heard,

04:11:58  21   everybody who testified on his behalf,

04:12:01  22   they were all shocked.  Not one person

04:12:04  23   said, "Well, you know, he was always on

3-144

04:12:07   1        the edge so sooner or later he was going

04:12:09   2        to fall off the edge."  They were shocked,

04:12:12   3        and it wasn't that he had a darker side or

04:12:15   4        that he was covering it all up.  Too many

04:12:18   5        people with very good reputations

04:12:21   6        testified very eloquently that they know

04:12:23   7        him.

04:12:25   8               Now, what is interesting is

04:12:27   9        Mr. George practiced in an area of the law

04:12:31  10        that I certainly have never practiced in,

04:12:33  11        and I would guess most people involved in

04:12:36  12        this case, except for Paul Kelly, have

04:12:39  13        never practiced in.  This is not a

04:12:42  14        practice for the faint of heart.  This is

04:12:45  15        dealing with some of society's worst and

04:12:49  16        some of society's most sympathetic

04:12:53  17        defendants, but these are not people you

04:12:56  18        go out to the gingerbread house with.

04:12:58  19        These are people who are tough and they do

04:13:00  20        swear, and you do it for 30 years as he

04:13:03  21        said and as Judge Gertner said, you're

04:13:07  22        under a lot of pressure.

04:13:10  23               It's the so-called mob lawyers,

3-145

04:13:11  1    and I don't count Mr. George as a mob

04:13:13  2    lawyer but I will tell you about a mob

04:13:16  3    lawyer shortly, he was always facing the

04:13:21  4    kind of people that none of us ever deal

04:13:23  5    with, but somebody has to do the work.

04:13:28  6    Too many people of really high-quality

04:13:31  7    caliber came and testified about the type

04:13:34  8    of person he was before his arrest.

04:13:40  9         Bar counsel asked I think Nancy

04:13:43  10   Gertner whether had Judge Gorton known the

04:13:47  11   other things he might have acted

04:13:49  12   differently.  Of course, I thought to

04:13:50  13   myself, "What other things," and she went

04:13:53  14   to this admonition and she used this

04:13:57  15   admonition as an example of Mr. George's

04:14:02  16   darker side.

04:14:04  17        Well, for you people who know the

04:14:06  18   bar discipline system well and for lawyers

04:14:10  19   who practice in this area, there are a lot

04:14:13  20   of neglect cases, a lot of them.  The SJC

04:14:17  21   has had trouble over the years trying to

04:14:19  22   figure out, "What do we do with lawyers

04:14:21  23   who neglect a client?  Is it a long-time

3-146

04:14:26  1    neglect, is it a one-off neglect?  How do

04:14:28  2    we deal with it?"

04:14:29  3         Mr. George very simply took on a

04:14:31  4    case from another lawyer, a medical

04:14:34  5    malpractice case.  Now, Mr. George as the

04:14:37  6    superb trial lawyer that you heard about

04:14:40  7    probably could try any case, and he

04:14:42  8    certainly could try 95 percent of the

04:14:45  9    civil cases in the world.  You heard Nancy

04:14:48  10   Gertner testify how he represented

04:14:50  11   Mr. Doolin who got thrown out of West

04:14:52  12   Point because he tested positive for

04:14:55  13   drugs.  That is a civil case, and Nancy

04:14:58  14   Gertner said he did an unbelievable job.

04:15:01  15        But there is something about

04:15:02  16   medical malpractice cases -- and

04:15:04  17   Mr. Hinchey is a pretty good example of

04:15:07  18   somebody who did that day in and day out

04:15:09  19   for years.  There is something about

04:15:10  20   medical malpractice cases that are

04:15:14  21   challenging, technical and difficult.

04:15:19  22   Mr. George said he shouldn't have taken it

04:15:23  23   on, but we go back to this pattern of his

04:15:27　1　of never saying no.  And that is true of a

04:15:30　2　lot of lawyers who get in trouble.  I

04:15:33　3　could recount dozens of examples of

04:15:36　4　lawyers who did a stupid thing and when

04:15:40　5　asked, "Why did you do that?  Why did you

04:15:42　6　add something to that, a settlement

04:15:44　7　statement at that closing when you knew in

04:15:46　8　fact that wasn't an expense?"  "You know,

04:15:50　9　the client asked me to do it.  I didn't

04:15:51　10　want to say no.  I didn't want to

04:15:53　11　disappoint the client."

04:15:54　12　　　　That happens all the time,

04:15:55　13　but I do think it's somewhat of a stretch

04:15:58　14　to say that the admonition that bar

04:16:01　15　counsel -- Ms. Anderson was not the bar

04:16:05　16　counsel on that case, but eight years

04:16:07　17　after the complaint was filed they decided

04:16:09　18　to go after Mr. George.  The hearing panel

04:16:14　19　criticized them for it, and then they

04:16:15　20　tried to throw the kitchen sink at him

04:16:17　21　about coming up with false statements,

04:16:19　22　false answers to interrogatories,

04:16:21　23　misrepresentations to the court.  The

3-148

04:16:23  1     hearing panel said, "We don't buy any of

04:16:25  2     it.  He didn't do any of those things."

04:16:28  3     What he did was he neglected a case and

04:16:31  4     for that he gets an admonition.

04:16:34  5          As far as I know, there is nothing

04:16:36  6     in this record about any other immoral or

04:16:40  7     illegal actions that Judge Gorton could

04:16:43  8     have known about but didn't know about,

04:16:45  9     and you heard Judge Gertner say when the

04:16:49  10    federal government sets their sights on

04:16:51  11    you, if they have the goods on you, they

04:16:55  12    are going to do it to you.  And, boy,

04:16:57  13    there was no better case than this case

04:16:59  14    because this case for all the reasons you

04:17:02  15    heard about -- and it was never, ever

04:17:05  16    raised as any excuse for what he did.  He

04:17:08  17    did it, but it was a story to beat all

04:17:12  18    stories about the government's relentless

04:17:14  19    pursuit of him over 15 months until they

04:17:18  20    finally got Dardinski to get Bob George to

04:17:23  21    take the $20,000 or $25,000 15 months

04:17:27  22    after he first dealt with Dardinski.

04:17:30  23          If you read the record, and I

04:17:31  1      direct you to the exhibit which is

04:17:33  2      Mr. George's brief to the First Circuit,

04:17:38  3      that brief says -- it's Pages 20 to 23 --

04:17:42  4      that Mr. Dardinski called Mr. George -- I

04:17:50  5      think the FBI, former FBI agent said it

04:17:55  6      was 300 times. I think the record actually

04:17:57  7      says he called him 500 times constant,

04:18:00  8      constant, constant, constant.  Mr. George

04:18:01  9      talked to him about 12 times, and it was

04:18:03  10     15 months later in that colloquy which is

04:18:07  11     on those pages of that brief, which was

04:18:11  12     not read to you, in which Mr. George kept

04:18:14  13     saying to Mr. Dardinski, "I don't want to

04:18:17  14     be involved in this, please."  And

04:18:19  15     Dardinski kept on him and on him and on

04:18:22  16     him and finally, sadly Bob George lost his

04:18:30  17     compass and finally gave in and took the

04:18:31  18     money.  I will talk briefly about the why

04:18:34  19     in a minute, but there was one admonition.

04:18:36  20     That is the darker side.

04:18:40  21          I think it's significant that the

04:18:43  22     office that could have come in here as

04:18:45  23     they did in Mr. Cintolo's case, could have

3-150

04:18:50   1       come in here and objected to Mr. George's

04:18:55   2       reinstatement.  The U.S. Attorney's Office

04:18:59   3       did not come.  The Department of Justice

04:19:01   4       did not come.  The FBI didn't come.  The

04:19:04   5       Drug Enforcement Administration didn't

04:19:06   6       come.  They all got notice or at least the

04:19:08   7       U.S. Attorney's Office got notice, and

04:19:10   8       this could not have been more of a

04:19:13   9       high-profile prosecution.  It was in the

04:19:16   10      news constantly.

04:19:18   11              So the U.S. Attorney's Office got

04:19:20   12      the invitation to come here, as

04:19:21   13      Mr. O'Brien did, saw it in Lawyers Weekly

04:19:25   14      and he showed up and he objected.  The

04:19:27   15      U.S. Attorney's Office did not.  Again, I

04:19:32   16      don't say this in any way, shape or form

04:19:34   17      to excuse what happened, but it puts it in

04:19:37   18      context.

04:19:38   19              You heard Judge Gertner say and

04:19:41   20      you also heard Mr. Weishaupt say to

04:19:44   21      descend on a lawyer's house in Westwood

04:19:47   22      with an army of law enforcement agents and

04:19:51   23      surround his house at 6:00 AM when he is

3-151

04:19:53   1          in his pajamas should raise issues in all

04:19:57   2          of our minds about what was really, really

04:20:00   3          going on here.  But, you know -- and when

04:20:05   4          we get to Cintolo's case, Mr. Cintolo

04:20:08   5          represented a guy by the name of Jerry

04:20:11   6          Angiulo, and I am old enough to know that

04:20:12   7          Mr. Angiulo is known as the head of the

04:20:16   8          mafia in New England.  The federal

04:20:18   9          authorities put a wiretap in his store

04:20:20   10         over in the North End, and that's where

04:20:22   11         they got the evidence of the crime that

04:20:24   12         was going on that led to Cintolo's

04:20:27   13         conviction and his disbarment.

04:20:30   14                 That is one way of using

04:20:33   15         eavesdropping evidence and technology.  It

04:20:36   16         is important to keep in mind that that

04:20:40   17         what happened here, and the word reverse

04:20:44   18         sting is in the records, in the papers and

04:20:46   19         in the briefs -- what happened here was

04:20:48   20         the government created the opportunity for

04:20:51   21         the crime, provided the money and then

04:20:55   22         Mr. George walked right into it.  And as

04:20:59   23         sophisticated as he is, he didn't, he

04:21:02  1      didn't stop himself.  That is the big

04:21:06  2      problem for Mr. George.

04:21:15  3           With respect to -- and this is my

04:21:19  4      last point on this.  With respect to the

04:21:21  5      complaints that were filed, I think

04:21:22  6      Mr. George said -- I mean if you've

04:21:25  7      practice law for 30 years you probably

04:21:27  8      don't have 20 or so complaints up there,

04:21:29  9      but a lot of lawyers from -- at least as

04:21:31  10     far as my experience is concerned people

04:21:33  11     complain about lawyers, but they complain

04:21:35  12     about lawyers for all kinds of reasons.

04:21:37  13     They don't return my phone calls, they

04:21:39  14     charged me too much, they yelled at me,

04:21:44  15     they have some conflict -- there are a lot

04:21:47  16     of reasons.  We have really no idea

04:21:48  17     despite our effort to find out and ask, so

04:21:52  18     I don't know quite what you can make of

04:21:54  19     the fact that there were, I don't know

04:21:56  20     what the number was, 20, 25.  I'm not sure

04:21:59  21     Mr. George ever said what he knew the

04:22:01  22     number was, but one thing we do know is we

04:22:04  23     have no idea what those complaints were

3-153

04:22:07  1    about.   None.   We asked and we were not

04:22:10  2    told.

04:22:11  3         I credit Ms. Anderson.   She said,

04:22:13  4    "I don't want to go into all that."   Okay,

04:22:16  5    but that's like taking a grenade and

04:22:18  6    throwing it on the table and run out the

04:22:20  7    door and the thing explodes.   Well, I only

04:22:22  8    meant to throw it on the table.   I didn't

04:22:24  9    think it was going to explode.

04:22:26  10         If you come into a reinstatement

04:22:27  11    and say to the panel of judges that he has

04:22:29  12    23 complaints, that is not a good thing

04:22:31  13    for the reinstatement of a lawyer who is

04:22:34  14    trying to get reinstated.   So I do -- I'm

04:22:38  15    glad that she didn't press it, but I think

04:22:41  16    because it was raised I had to say it.

04:22:44  17         That is all about Mr. George's

04:22:46  18    morality before he got arrested, and we

04:22:50  19    are going to assume that the day he got

04:22:51  20    arrested he lacked it.   I also want to say

04:22:57  21    that, you know, there are some people and

04:22:58  22    we probably all know a few who are always

04:23:01  23    on the edge.   They are always engaging in

3-154

04:23:04  1   some shady conduct and one of these days

04:23:07  2   they're going to get caught.

04:23:08  3        When I was on the board, that was

04:23:10  4   a big issue for us, how do you decide

04:23:12  5   between a lawyer who was always on the

04:23:16  6   edge and one of these days he's going to

04:23:18  7   step in it and he deserves his punishment

04:23:21  8   and the lawyer on the other hand who is

04:23:23  9   generally a good lawyer and a good person

04:23:26  10  but he made a stupid, stupid  intentional

04:23:28  11  mistake.  That is tough.

04:23:31  12       The one thing I can say is, and I

04:23:33  13  think it's evident to anybody, any member

04:23:38  14  of the legal profession, an awful lot of

04:23:40  15  good people end up having criminal law

04:23:42  16  problems.  Not everybody that is convicted

04:23:45  17  of a crime is a despicable, immoral human

04:23:50  18  being.  That is just life.  I think there

04:23:52  19  was a lot of evidence here that for most

04:23:54  20  of Mr. George's life, until he got

04:23:57  21  arrested, he was doing a pretty good job.

04:24:00  22  It was high stress, high stakes,

04:24:04  23  challenging, but he wasn't an immoral

04:24:08  1    person.  The record just doesn't support

04:24:10  2    that and neglecting a med-mal case I don't

04:24:13  3    think makes it so.

04:24:15  4           So since his release what do we

04:24:18  5    say about him because the standard, the

04:24:20  6    moral qualification standard does address

04:24:23  7    the question of let's look at what

04:24:25  8    happened after he got out.  What did he

04:24:27  9    do?

04:24:28  10          Well, he certainly kept up in his

04:24:31  11   learning.  He did all the reading.  He

04:24:36  12   worked hard in various charitable

04:24:42  13   endeavors, and he got particularly

04:24:44  14   involved in the veteran's organization

04:24:46  15   down the Cape but it took him all over The

04:24:49  16   Commonwealth of Massachusetts.  He did an

04:24:50  17   enormous amount of good work at 5:00 AM

04:24:54  18   and 8:00 o'clock at night and driving all

04:24:56  19   over The Commonwealth all the way out to

04:24:58  20   the Berkshires to deliver thousands and

04:25:00  21   thousands of packages of food to people

04:25:03  22   who don't have any food.  He volunteered

04:25:07  23   for Habitat For Humanity and ended up

04:25:10    1          being the supervisor of a construction

04:25:11    2          site down the cape when they were building

04:25:14    3          homes for people who were without homes.

04:25:18    4                  I don't need to say any more about

04:25:20    5          his family life.  While it's not

04:25:25    6          compelling in the sense that it compels a

04:25:28    7          certain result, it's part of the picture.

04:25:32    8          If we put any of us under the kind of

04:25:35    9          microscope that Mr. George has been put

04:25:37   10          under in order to get reinstated, which

04:25:41   11          should be the case -- it should be hard to

04:25:43   12          get reinstated.  It should be hard.  This

04:25:46   13          has been going on for two years, but if

04:25:49   14          you put him under that microscope you see

04:25:52   15          that since he got released he has done

04:25:55   16          everything right.

04:25:57   17                  He was the one that testified that

04:25:58   18          he had to look up what the definition of

04:26:00   19          remorse was and it said, quote, deep

04:26:03   20          regret or guilt for a wrong committed.

04:26:07   21          Wow.  You heard his daughter.  What could

04:26:10   22          be more powerful in the sense of feeling

04:26:15   23          guilt and regret for what you did than to

04:26:18  1    put your family through what he put them

04:26:21  2    through, and his daughter said it all.  So

04:26:24  3    I don't really need to talk anymore about

04:26:29  4    his family.

04:26:34  5         I don't know why the government

04:26:35  6    didn't come forward.  Who knows?  But I

04:26:39  7    think we can conclude that if they felt

04:26:41  8    strongly enough -- because you heard Judge

04:26:43  9    Gertner say it -- they would have been

04:26:45  10   here and they would have taken a position.

04:26:48  11   You also heard Paul Kelly who does a lot

04:26:52  12   of criminal work.  Mr. George didn't go

04:26:57  13   around making enemies.  This is a lawyer

04:27:01  14   -- I think Paul Kelly testified, this is a

04:27:03  15   lawyer like all lawyers should be.  He

04:27:06  16   could battle like crazy in the courtroom,

04:27:08  17   but he could have a relationship with the

04:27:10  18   prosecutors.  That is not always the case.

04:27:12  19        Rosemary Scapicchio said the same

04:27:16  20   thing.  He's an outgoing, affable,

04:27:18  21   friendly person and he respected

04:27:20  22   everybody.  And that story Meghan told

04:27:23  23   about make sure you talk to the clerks, my

3-158

04:27:25  1    early mentors said the very same thing. To

04:27:31  2    sum up I think -- on the issue of his

04:27:35  3    moral qualification, I think the evidence

04:27:38  4    is overwhelming.

04:27:40  5            Then there is the last prong which

04:27:43  6    in the case of convicted lawyers one that

04:27:45  7    you have to think about, whether his

04:27:48  8    reinstatement would be detrimental to the

04:27:51  9    integrity of the bar, the administration

04:27:53  10   of justice or the public interest.

04:27:59  11           I don't think I am overstating it

04:28:00  12   to say that given the people who testified

04:28:04  13   on his behalf and the people who wrote

04:28:07  14   letters, and I'm particularly directing my

04:28:09  15   comments at the three judges and to

04:28:13  16   Mr. Cunha who is the past president of the

04:28:15  17   Mass Association of Criminal Defense

04:28:17  18   Lawyers, they said Bob George has a lot to

04:28:21  19   give, he was a very good lawyer and we are

04:28:25  20   not, we are not blessed with a number, a

04:28:29  21   huge number of people who want to do the

04:28:32  22   kind of work that he did.  The bar would

04:28:38  23   welcome him back and the public would

04:28:40    1    benefit from it, and to the extent that

04:28:44    2    these case say, and they all say it, the

04:28:46    3    fundamental precept at work is redemption,

04:28:52    4    restoration.

04:28:53    5         In fact one of the very early

04:28:58    6    cases says no crime necessarily and

04:29:03    7    automatically disqualifies a disbarred

04:29:06    8    lawyer from being reinstated if he makes

04:29:11    9    the necessary proof, which is what we have

04:29:14   10    been about, so no crime, and I will go

04:29:17   11    through a couple of cases for you and

04:29:18   12    illustrate it.

04:29:20   13         So in terms of -- and Mr. George

04:29:23   14    by the way is going to be 66 in January.

04:29:28   15    He has been out of practice for eight and

04:29:31   16    a half years.  One or two of these cases

04:29:36   17    said the lawyer should wait another year.

04:29:39   18    One of them tried to get in after six

04:29:41   19    years and another tried to get in even

04:29:43   20    earlier.  Mr. George is 66.  If he is

04:29:47   21    going to have anything to contribute to

04:29:48   22    the public and to the bar, this is the

04:29:52   23    time to do it because 66 -- it isn't old,

3-160

04:29:57  1      but it's getting up there.

04:30:04  2              There are three or four key cases

04:30:09  3      that really control the entire law on

04:30:11  4      reinstatement.  One of them is Max Allen,

04:30:19  5      and I know Max Allen very well, not

04:30:20  6      personally but professionally.  Max Allen

04:30:23  7      was convicted of the so-called Symphony

04:30:27  8      Road fires.  I'm not sure anyone will

04:30:29  9      remember that but me, but the Symphony

04:30:32  10     Road fires were a bunch of brownstones in

04:30:36  11     the South End on Symphony Road that Max

04:30:40  12     Allen, a lawyer, and a couple of his

04:30:41  13     friends burned to the ground to collect

04:30:44  14     the insurance proceeds.

04:30:46  15             That case went to the board -- he

04:30:48  16     was convicted, went to jail.  The case

04:30:51  17     went to the Board of Bar Overseers.  It

04:30:56  18     was very controversial.  There was a split

04:30:59  19     decision at the hearing panel.  Then it

04:31:01  20     went up to the SJC, and in a decision in

04:31:04  21     which Chief Justice Hennessy, my former

04:31:09  22     boss, dissented, the majority of the SJC

04:31:10  23     in the Max Allen case said he is entitled

3-161

04:31:14   1      to be reinstated.

04:31:17   2              What they said in that decision

04:31:19   3      was a fundamental precept of our system is

04:31:23   4      that men, pardon me for the women on the

04:31:26   5      panel, that men can be rehabilitated.

04:31:29   6      Rehabilitation is a state of mind, and the

04:31:32   7      law looks with favor upon rewarding with

04:31:37   8      the opportunity to serve one who has

04:31:39   9      achieved reformation and regeneration.

04:31:45   10     Here is the next best line.  Time and

04:31:47   11     experience may mend flaws of character

04:31:51   12     which allow the immature man to err.

04:31:58   13             This tells you that in the law, as

04:32:02   14     in life generally, people who express

04:32:05   15     remorse, pay their dues, accept their

04:32:11   16     punishment, and work like the devil to

04:32:15   17     restore themselves are entitled to another

04:32:18   18     chance.  The SJC in that case said

04:32:24   19     Mr. Allen has served his sentence, paid

04:32:26   20     his fine, and set about to reconstruct his

04:32:30   21     life.  He is now in his 60s, almost ten

04:32:33   22     years have elapsed since he was suspended,

04:32:35   23     he has gained the respect of those who

3-162

04:32:37  1    know him and have dealt with him.  He

04:32:40  2    poses no threat of recidivism or to the

04:32:44  3    integrity of the bar.  He has expressed

04:32:46  4    his sorry and regret for his misconduct.

04:32:49  5         This is a guy who the SJC in its

04:32:52  6    opinion said had conspired and burned down

04:32:57  7    brownstones to collect insurance money and

04:33:00  8    in the process exposed those tenants to

04:33:03  9    the risk of death.

04:33:08  10         There is another famous case.

04:33:11  11   Harvey Prager.  This case is a 1996 case.

04:33:17  12   Prager was in a little bit of a different

04:33:19  13   situation.  He was applying to be a

04:33:22  14   lawyer, not a disbarred lawyer trying to

04:33:25  15   be reinstated.  And the SJC said in the

04:33:29  16   Prager case the standards are pretty much

04:33:32  17   the same.  What did Mr. Prager do?  I will

04:33:35  18   read you an excerpt from the decision.

04:33:38  19         "Over a period of approximately 6

04:33:41  20   years Prager organized and led a

04:33:45  21   large-scale international drug smuggling

04:33:50  22   operation."  They also wrote that he had

04:33:59  23   fled to England and was a fugitive from

3-163

04:34:03    1       justice until the authorities caught up

04:34:05    2       with him and got him to come back here.

04:34:09    3       In that case the SJC decided in 1996 that

04:34:17    4       he could not be reinstated because of the

04:34:22    5       severity and length of his behavior, he

04:34:28    6       has not yet shown that he is fully

04:34:30    7       rehabilitated and worthy of the public

04:34:34    8       trust.  That's what the SJC said there.

04:34:41    9            Subsequently Mr. Prager did gain

04:34:44   10       admission.  I'm not sure because I

04:34:48   11       couldn't find him on the roll of the

04:34:50   12       Massachusetts lawyers, and I have this

04:34:52   13       recollection that he was admitted in New

04:34:55   14       York.  So that is Mr. Prager running an

04:34:59   15       international drug smuggling ring around

04:35:02   16       the world and then running from justice

04:35:04   17       which the SJC said is the ultimate affront

04:35:10   18       to the justice system, to take off and

04:35:12   19       hide while the government tries to find

04:35:14   20       you.

04:35:16   21            Then there is Mr. Cintolo.

04:35:21   22       Mr. Cintolo -- this decision is another

04:35:24   23       decision in 1996.  Mr. Cintolo was

3-164

04:35:31  1    representing the mob in the North End, and

04:35:34  2    the federal government was after

04:35:36  3    Mr. Angiulo and they put a bug in his

04:35:39  4    office.  Mr. Angiulo and Mr. Cintolo

04:35:45  5    figured out that a witness by the name of

04:35:49  6    X, I can't remember his name, was about to

04:35:53  7    testify before the grand jury.  This is

04:35:56  8    all on tape.  And Jerry Angiulo said to

04:36:01  9    Mr. Cintolo, "I want you to go down, chase

04:36:06  10   him.  You're going to represent him and

04:36:10  11   you're going to talk to him and he's not

04:36:12  12   going to testify at the grand jury.  You

04:36:15  13   got it," and some of the same kind of

04:36:16  14   language as in these tapes.

04:36:19  15        That is what Mr. Cintolo did, and

04:36:21  16   Mr. Angiulo was quoted at great length in

04:36:25  17   the decision saying things like, "Does he

04:36:27  18   understand?  Does he understand what he's

04:36:32  19   supposed to do?"  Then Angiulo said,

04:36:36  20   "Well, he's thick.  He doesn't understand

04:36:37  21   about 36 months, but you've got to

04:36:39  22   understand, coming from you," Cintolo,

04:36:43  23   "that's the story."  Coming from him,

3-165

04:36:46   1        "Say, listen, I was there.  Make no

04:36:47   2        mistake.  I was there and no matter where

04:36:50   3        you go, whether it will take a week, two

04:36:54   4        weeks, three weeks to get to you, but

04:36:57   5        we'll get ya."

04:37:00   6             So Mr. Cintolo is being directed

04:37:04   7        by Mr. Angiulo to scare the living

04:37:09   8        daylights out of that witness and he

04:37:11   9        succeeded in doing it, and the feds

04:37:14   10       arrested Cintolo.  He was punished, and

04:37:20   11       initially the hearing committee said he

04:37:26   12       has the moral qualifications, we do not

04:37:29   13       dispute that Mr. Cintolo has the moral

04:37:33   14       qualifications but we think he ought to

04:37:36   15       wait.

04:37:37   16            It went to the single justice of

04:37:38   17       the SJC, and it was at the eight-year

04:37:42   18       point and the single justice allowed

04:37:45   19       Mr. Cintolo back in as a member of the bar

04:37:49   20       and today he practices law with one of

04:37:51   21       best Boston criminal lawyers, Tom Kiley.

04:37:56   22       So that in a nutshell is the law on

04:38:00   23       reinstatement.

04:38:02  1                  I think that when you compare all

04:38:06  2           of that, and I am not in any way

04:38:09  3           diminishing the seriousness of what

04:38:12  4           Mr. George did, on the question of whether

04:38:18  5           stacking his case up against Prager,

04:38:21  6           Cintolo, Max Allen, and it even goes back

04:38:25  7           to Alger Hiss if you can believe it --

04:38:28  8           there are two other cases.  Both involved

04:38:31  9           judges, Judges Gorton and Centracchio.

04:38:34  10          They weren't let back in initially, but

04:38:36  11          their crimes took place while they were on

04:38:39  12          the bench in a time when Massachusetts

04:38:40  13          allowed -- imagine, allowed lawyers to be,

04:38:45  14          quote, so-called special justices in the

04:38:47  15          District Court and practice law.

04:38:51  16                  Look at all that constellation of

04:38:53  17          cases and I think and I submit to you and

04:38:56  18          I hope you will determine that Mr. George

04:39:02  19          who is now home and as you heard he can

04:39:05  20          actually go to the beach and read a book.

04:39:08  21          He is quieter.  He testified at length

04:39:12  22          about the kind of practice he wants to do.

04:39:15  23          I'm not sure he said he is ever going to

3-167

04:39:17  1      go back to that kind of a practice.

04:39:20  2            I submit and I hope that you will

04:39:23  3      grant him the privilege of being

04:39:25  4      reinstated so he can finish up his years

04:39:28  5      as a member of the Massachusetts bar.

04:39:30  6      Thank you very much for your help.

04:39:42  7            MS. BAGGER:  Thank you to

04:39:43  8      everyone.  I think we can go off the

04:39:45  9      record and terminate the live stream.

04:39:51  10           MR. WOOLF:   The panel would like

04:39:52  11     to confer.  I will place a separate call.

04:40:00  12           MS. BAGGER:  Off the record.

          13           (Whereupon, the hearing was

          14     adjourned at 2:16 P.M.)

          15

          16

          17

          18

          19

          20

          21

          22

          23

3-168

```
 1              C E R T I F I C A T E
      COMMONWEALTH OF MASSACHUSETTS:
 2    PLYMOUTH, SS.:

 3        I, ELAINE M. BUCKLEY, a Notary Public in
          and for the Commonwealth Massachusetts, do
 4        hereby certify:

 5        That the witnesses in the foregoing hearing
          were present at the time stated via remote
 6        audiovisual equipment;

 7        That the said proceeding was taken before
          me as a Notary Public at the said time via
 8        remote audiovisual equipment and was taken
          down in shorthand writing by me;
 9
          That I am a Certified Shorthand Reporter,
10        that the said proceeding was thereafter
          under my direction transcribed into
11        computer-assisted transcription, and that
          the foregoing transcript constitutes a
12        full, true, and correct report of the
          proceedings which then and there took
13        place;

14        IN WITNESS WHEREOF, I have hereunto
          subscribed my hand and affixed my official
15        seal this 5th day of November 2020.

16
                        _____
17                      ELAINE M. BUCKLEY

18
                        My commission expires:
19                      November 4, 2022

20

21

22

23
```

Leavitt Reporting, Inc.

1

**$**

**$10,000** [5] - 74:16; 75:4; 89:19; 91:13; 93:2
**$100,000** [3] - 69:12; 95:18; 96:4
**$140,000** [3] - 19:21; 94:21; 95:8
**$150,000** [2] - 22:23; 69:8
**$17,000** [7] - 72:22; 73:12, 16; 74:1, 6; 90:5; 91:17
**$2,500** [2] - 75:11
**$20,000** [1] - 148:21
**$25,000** [10] - 19:22; 26:1, 10; 69:4; 72:14; 73:5; 95:18; 96:4; 131:9; 148:21
**$575,000** [1] - 131:8
**$8,000** [3] - 72:21; 73:5, 22
**$8000** [1] - 93:16
**$9,000** [3] - 72:19; 73:16; 93:16

**'**

**'95** [1] - 39:7
**'97** [1] - 39:7

**0**

**02110** [2] - 1:17, 19

**1**

**1** [2] - 30:10, 16
**1.6** [6] - 16:5; 18:13; 63:20; 64:8, 23
**1/2** [2] - 7:19; 25:9
**101** [1] - 1:19
**10:00** [1] - 1:11
**11:00** [1] - 68:2
**11:25** [1] - 68:2
**12** [1] - 149:9
**121** [1] - 2:4

**12:30** [1] - 126:14
**13** [2] - 59:1; 123:21
**15** [10] - 7:19; 8:16; 25:8; 26:22; 30:9; 85:9; 123:21; 148:19, 21; 149:10
**15-year-old** [2] - 10:23; 21:4
**150** [1] - 69:10
**16** [2] - 8:16; 85:9
**167** [1] - 2:7
**17** [2] - 8:19; 86:4
**17,000** [2] - 73:23; 91:4
**17-year-old** [1] - 10:23
**18** [2] - 49:18; 86:4
**19** [1] - 133:7
**1901** [1] - 98:18
**1990s** [1] - 96:11
**1995** [11] - 19:22; 21:1; 25:8, 13-14; 39:6, 9; 60:18; 67:8; 70:7; 97:9
**1996** [11] - 26:16; 27:13; 39:6, 10; 41:7, 10; 43:14; 70:7; 162:11; 163:3, 23
**1997** [9] - 29:8, 20; 30:10; 39:19; 45:8; 48:19; 70:7; 97:9
**1998** [8] - 5:10; 25:13; 31:1; 47:15; 50:17; 59:17; 60:2, 19
**1999** [5] - 47:12; 48:9, 20; 49:15, 22
**1:15** [2] - 126:16, 19
**1:30** [5] - 126:16; 127:5, 7, 13, 16

**2**

**2** [1] - 29:9
**20** [5] - 22:17; 134:6; 149:3; 152:8, 20
**200,000** [1] - 131:2
**2000** [4] - 48:10; 49:16, 18, 22
**2000s** [1] - 130:21

**2004** [1] - 66:23
**2005** [1] - 67:4
**2007** [8] - 38:5; 51:16; 54:20, 22; 55:5; 60:22; 129:10
**2008** [1] - 130:21
**2009** [4] - 102:14, 16; 103:4; 130:22
**2010** [3] - 99:14, 20; 130:22
**2011** [9] - 38:6; 41:11, 18; 52:12; 55:11, 21; 56:12; 61:1; 103:7
**2012** [4] - 42:1; 129:7; 131:11; 133:3
**2012-050** [2] - 1:3; 3:6
**2013** [1] - 42:1
**2016** [2] - 104:12, 17
**2020** [3] - 1:10; 57:9; 168:15
**2022** [1] - 168:19
**214,000** [1] - 131:1
**22** [1] - 26:15
**23** [7] - 1:10; 5:18; 21:1; 57:9; 58:12; 149:3; 153:12
**24** [3] - 58:13; 81:14
**24-hour** [1] - 30:12
**25** [10] - 19:2; 20:5; 23:4; 67:8; 69:10, 12; 95:22; 98:22; 152:20
**25,000** [1] - 76:3
**27** [1] - 124:16
**270** [1] - 11:1
**28** [2] - 29:9; 140:19
**28920** [1] - 98:18
**2:16** [1] - 167:14

**3**

**3** [1] - 2:2
**30** [6] - 135:15; 140:12, 14, 19; 144:20; 152:7
**300** [1] - 149:6
**33** [1] - 134:1

**330** [1] - 11:4
**36** [2] - 105:3; 164:21
**3:00** [1] - 107:22

**4**

**4** [1] - 168:19
**40** [1] - 66:19
**47** [1] - 2:6

**5**

**5** [1] - 11:1
**500** [1] - 149:7
**57** [1] - 133:7
**58** [1] - 2:2
**5:00** [2] - 118:5; 155:17
**5th** [1] - 168:15

**6**

**6** [4] - 11:1, 3; 26:23; 162:19
**60s** [1] - 161:21
**62** [11] - 2:6; 35:18; 36:9; 46:15; 47:3, 5, 9; 51:11; 52:14; 53:23
**65** [1] - 2:2
**65,000** [1] - 94:13
**66** [3] - 159:14, 20, 23
**6:00** [1] - 150:23

**7**

**7** [1] - 11:4
**7th** [1] - 113:12

**8**

**8** [1] - 133:5
**8300** [4] - 91:9; 93:3, 5
**85,000** [1] - 94:15
**8:00** [1] - 155:18
**8th** [1] - 113:12

**9**

**9** [2] - 26:15; 29:13
**911** [1] - 21:9
**91301** [1] - 98:19
**94** [1] - 2:2
**95** [1] - 146:8
**97** [1] - 21:7
**98** [1] - 2:4
**99** [1] - 1:16

**A**

**abandoned** [2] - 34:11, 15
**abandoning** [1] - 11:14
**able** [15] - 33:17; 38:15; 46:19; 52:20; 83:1; 87:2; 95:21; 96:23; 97:1; 100:21; 104:14; 117:16, 19; 131:6; 137:18
**absolutely** [5] - 10:10; 24:20; 45:9; 51:10; 90:23
**academic** [1] - 99:7
**Academy** [1] - 99:4
**accept** [4] - 93:11; 94:1; 95:9; 161:15
**acceptable** [1] - 97:18
**acceptance** [1] - 84:19
**accepted** [3] - 86:12; 122:17
**accepting** [1] - 84:21
**access** [2] - 42:13; 70:1
**accolades** [1] - 99:7
**according** [1] - 24:3
**account** [34] - 13:8; 17:21; 39:18; 41:19; 42:16, 22; 43:3, 6, 8, 13, 15-16; 72:20, 22; 73:1, 15, 17, 22;

2

74:9, 11, 13; 76:1;
85:22; 89:17; 90:2,
5, 11, 13, 16;
91:20; 139:13;
141:1
**accounting** [1] -
68:18
**accounts** [2] -
90:9; 94:2
**accumulate** [1] -
131:5
**accumulation** [1]
- 75:3
**accurate** [1] -
96:10
**accused** [4] -
75:23; 91:5, 7;
123:20
**accusing** [1] -
29:2
**achieved** [1] -
161:9
**acknowledge** [1]
- 138:12
**acknowledges**
[1] - 133:23
**acquaintance** [1]
- 132:1
**act** [4] - 84:20;
93:19; 112:19
**acted** [2] - 83:2;
145:11
**action** [1] - 88:3
**actions** [3] - 84:12;
122:3; 148:7
**active** [1] - 133:13
**activities** [2] -
62:2; 63:6
**activity** [1] -
108:21
**acts** [8] - 80:7, 11;
81:2, 4, 6; 132:10;
142:19
**actual** [1] - 48:8
**Adam** [1] - 52:14
**add** [1] - 147:6
**addition** [1] -
131:11
**additional** [3] -
38:19; 72:21; 73:21
**address** [7] - 18:9;
37:15; 41:10; 43:8;
58:16; 98:16; 155:6

**adjourned** [1] -
167:14
**adjust** [1] - 85:7
**administration**
[1] - 158:9
**Administration**
[1] - 150:5
**admired** [1] -
119:6
**admission** [2] -
139:15; 163:10
**admit** [3] - 41:4;
46:14
**admitted** [8] -
40:21; 46:18, 22;
47:3; 99:21;
131:11; 163:13
**admittedly** [1] -
138:1
**admonition** [7] -
129:11; 131:12;
145:14; 147:14;
148:4; 149:19
**adult** [6] - 5:17;
11:4; 21:10; 29:17;
30:17; 107:9
**adversary** [1] -
7:17
**affable** [1] - 157:20
**affect** [2] - 17:22;
63:17
**affected** [1] - 82:3
**affixed** [1] - 168:14
**affront** [1] - 163:17
**afraid** [1] - 124:7
**aftermath** [1] -
52:16
**afternoon** [3] -
98:6; 107:22; 128:8
**agent** [1] - 149:5
**agents** [1] - 150:22
**ago** [19] - 19:2;
20:5; 23:4; 33:19;
37:14; 41:21; 42:4;
51:12; 52:23; 53:8;
67:8; 69:4; 74:1;
83:9; 88:17; 95:15;
134:6; 135:15
**Agora** [1] - 98:19
**agree** [2] - 24:21;
79:22
**agreed** [1] - 129:13
**agreement** [3] -

20:3; 71:21; 72:10
**ahead** [1] - 55:10
**AIDS** [1] - 66:22
**aisle** [1] - 104:16
**Al** [1] - 31:16
**alert** [1] - 62:6
**Alger** [1] - 166:7
**alibi** [1] - 7:21
**allegations** [2] -
16:11; 66:13
**Allen** [7] - 160:4-6,
12, 23; 161:19;
166:6
**allow** [3] - 41:2;
125:8; 161:12
**allowed** [6] -
25:23; 124:6;
131:3; 165:18;
166:13
**allowing** [1] - 61:5
**almost** [9] - 5:18;
28:22; 33:7; 51:16;
66:8; 83:9; 86:4;
135:15; 161:21
**alone** [1] - 39:12
**also..** [1] - 54:22
**Altch** [3] - 28:7, 13
**AM** [4] - 1:11; 118:5;
150:23; 155:17
**amazing** [1] -
104:23; 105:20
**America** [2] -
72:19; 75:2
**Amnesty** [1] - 55:1
**amount** [4] - 62:9;
69:9; 112:18;
155:17
**amounted** [1] -
93:18
**amounts** [1] -
95:11
**analyzing** [1] -
12:21
**anderson** [2] -
40:6; 94:7
**Anderson** [19] -
1:15; 18:6; 36:18;
37:8, 11; 38:20;
46:13; 58:1, 11;
61:23; 65:12;
82:22; 94:11;
97:19; 121:11;
128:7; 135:12;

147:15; 153:3
**ANDERSON** [41]
- 16:23; 18:1;
20:14; 22:20;
36:19; 38:21; 41:6,
9, 13, 18, 23; 42:5,
7, 10, 15, 21; 43:2,
7, 12, 20; 44:3, 11,
17, 22; 45:4, 11,
16; 46:7, 17; 58:2,
8; 65:6; 94:8;
96:16; 121:8;
126:10, 23; 127:3,
11, 17; 128:8
**Angeles** [1] -
98:23
**anger** [1] - 4:14
**Angiulo** [8] -
151:6; 164:3, 8, 16,
19; 165:7
**angle** [2] - 80:17;
83:10
**angry** [3] - 59:15;
67:7; 117:12
**anonymously** [1]
- 113:11
**answer** [10] - 6:15;
16:19, 22; 17:4, 7;
18:9; 35:4; 61:20;
84:15; 96:23
**answering** [1] -
110:4
**answers** [2] -
121:21; 147:22
**AOL** [1] - 37:16
**apart** [1] - 91:11
**apologies** [1] -
122:17
**apologized** [1] -
122:5
**Appeal** [3] - 30:22;
48:13, 16
**appeal** [30] - 5:8;
10:12, 14; 11:10,
19; 12:7, 20; 13:11;
14:3; 33:20; 34:13;
47:18; 48:1, 3, 7,
17; 49:8, 14; 50:6,
20, 22; 51:3; 52:9,
15; 54:6, 18; 143:9,
11, 13
**appealed** [4] -
26:4; 27:8; 28:2;
29:17
**appear** [2] -
129:20, 22

**appearance** [2] -
25:7; 97:8
**APPEARANCES**
[1] - 1:14
**appeared** [2] -
3:22; 4:3
**appellate** [2] -
12:15; 49:7; 87:15
**applied** [1] - 69:6
**applies** [1] - 65:5
**applying** [1] -
162:13
**appointed** [3] -
12:1; 14:14; 54:4
**appreciate** [1] -
107:10
**April** [2] - 29:8
**archive** [1] - 38:8
**archived** [1] -
37:18
**archiving** [1] -
39:13
**area** [2] - 144:9;
145:19
**argue** [1] - 27:6
**argued** [6] - 26:6;
27:9; 28:4, 13;
29:6; 49:16
**arguing** [3] - 13:1;
30:4; 50:9
**argument** [4] -
12:9; 13:5; 27:12;
50:9
**arguments** [3] -
12:16; 110:11
**arising** [1] - 94:3
**army** [1] - 150:22
**arraigned** [1] -
29:20
**arrangement** [2]
- 70:22; 71:20
**arrangements**
[1] - 68:12
**arrest** [3] - 103:6;
115:22; 145:8
**arrested** [4] -
55:22; 75:16;
77:11; 106:6;
153:18, 20; 154:21;
165:10
**aside** [3] - 9:11;
20:20; 56:5
**aspect** [3] - 54:5;

3

80:2; 92:19

**aspects** [1] - 134:4

**assemble** [2] - 27:7; 47:20

**assembled** [2] - 47:17; 49:3

**assembly** [3] - 27:12; 49:3

**assigned** [3] - 28:7, 15; 31:1

**assistance** [3] - 12:10; 24:7; 65:22

**assistant** [2] - 7:14; 112:14

**Assistant** [2] - 1:9, 15

**assistants** [1] - 112:23

**assisted** [2] - 105:15; 168:11

**associate** [1] - 100:19

**associates** [2] - 72:11; 88:12

**Associates** [1] - 101:22

**Association** [2] - 14:6; 158:17

**assume** [2] - 48:14; 153:19

**assuming** [1] - 23:8

**Atlantic** [1] - 50:19

**attached** [1] - 133:4

**attack** [2] - 64:10; 65:22

**attempted** [1] - 59:22

**attempts** [3] - 17:18; 62:14; 63:8

**attended** [1] - 66:17

**attention** [3] - 65:1; 128:10; 135:14

**attitude** [1] - 130:19

**Attorney** [4] - 20:11; 54:4; 67:14; 89:14

**attorney** [6] - 7:12, 15, 18; 19:4; 88:12;

**123**:12

**Attorney's** [11] - 23:22; 100:18; 102:8, 17; 103:2; 114:15, 17; 150:2, 7, 11, 15

**attorney's** [2] - 19:4; 37:23

**attorney/client** [5] - 6:1, 19; 17:11; 57:10; 64:18

**attorneys** [3] - 71:11; 112:19; 123:13

**audio** [1] - 3:10

**audiovisual** [2] - 168:6, 8

**Audiovisual** [1] - 1:12

**August** [2] - 30:12; 102:15

**aunts** [1] - 105:12

**authored** [1] - 55:1

**authorities** [3] - 92:9; 151:9; 163:1

**automatically** [1] - 159:7

**available** [1] - 50:22

**Avenue** [1] - 50:19

**avoid** [3] - 92:8; 119:7; 143:20

**Avon** [1] - 60:16

**aware** [3] - 74:14; 79:6; 128:13

**awful** [2] - 119:5; 154:14

---

## B

**b)(2** [1] - 63:20

**b)(5** [2] - 16:5; 18:13

**babysitting** [1] - 22:12

**Bachelor's** [1] - 99:10

**backing** [1] - 92:12

**backyard** [1] - 22:4

**bad** [3] - 24:14;

**92**:2

**Baden** [1] - 32:6

**BAGGER** [46] - 3:4, 13; 20:15; 23:8, 15; 36:17; 38:18, 22; 40:9; 41:1; 46:12, 21; 58:1; 61:20; 67:17, 20; 68:7, 11, 17; 69:3, 13, 20; 70:10, 15; 71:15; 88:21; 89:11, 18, 23; 90:4, 20; 91:1, 22; 93:14; 94:1, 5; 96:19; 97:16; 126:11, 14; 127:13, 21; 128:5; 135:11; 167:7, 12

**bagger** [1] - 89:14

**Bagger** [3] - 1:6; 67:14; 89:14

**bail** [9] - 25:14, 17, 23; 26:1, 3, 7, 9, 11; 69:5

**bailiff** [1] - 112:22

**balance** [4] - 73:15; 77:4; 81:16; 109:18

**Balestra** [2] - 31:16

**ballpark** [1] - 97:1

**Bank** [4] - 72:19; 74:11; 75:2; 90:11

**bank** [5] - 73:1, 21; 85:22; 90:16; 92:12

**bar** [28] - 35:16; 36:12; 43:21; 44:16; 99:22; 100:3, 7, 23; 101:2; 123:11; 126:21; 128:16; 130:16; 131:12; 134:12; 135:2, 10; 137:16; 138:13; 145:18; 147:14; 158:9, 22; 159:22; 162:3; 165:19; 167:5

**BAR** [1] - 1:1

**Bar** [6] - 1:11, 15-16; 84:9; 145:9; 160:17

**barber** [1] - 142:10

**barely** [2] - 119:13, 16

**bars** [1] - 99:21

**base** [1] - 21:23

**based** [4] - 53:11; 69:16; 79:5; 95:13

**basis** [5] - 19:17; 76:2; 87:14; 95:23; 119:4

**basketball** [1] - 113:13

**Bates** [1] - 18:7

**battle** [1] - 157:16

**BBO** [1] - 1:3

**beach** [3] - 99:16; 116:19; 166:20

**beat** [1] - 148:17

**beautiful** [1] - 99:17

**became** [1] - 48:4

**become** [1] - 7:17

**bedroom** [1] - 109:4

**BEFORE** [1] - 1:6

**began** [2] - 39:10; 47:17

**beginning** [5] - 30:4; 39:11; 84:23; 86:13; 111:13

**behalf** [9] - 49:10; 56:17, 22-23; 57:5; 62:9; 140:22; 143:21; 158:13

**behavior** [1] - 163:5

**behind** [2] - 115:11; 132:9

**bench** [1] - 166:12

**bend** [1] - 113:8

**benefit** [3] - 47:21; 123:10; 159:1

**Berger** [3] - 20:8; 52:4; 54:21

**Berkshires** [1] - 155:20

**best** [9] - 12:12; 22:5; 95:13; 109:17; 137:22; 139:16; 161:10; 165:21

**better** [3] - 127:8; 141:4; 148:13

**between** [12] - 6:1; 11:9; 48:12; 49:21; 51:13; 81:16; 95:17; 96:4; 100:15; 102:10;

**125**:12; 154:5

**beyond** [1] - 66:7

**big** [7] - 11:6; 80:23; 98:21; 111:7; 139:4; 152:1; 154:4

**Bill** [1] - 28:18

**billing** [1] - 69:20

**bills** [1] - 78:11

**Bing** [1] - 32:22

**birth** [1] - 121:5

**bit** [4] - 69:3; 100:6; 125:16; 162:12

**blading** [1] - 21:5

**blame** [2] - 143:2, 8

**bleeding** [1] - 21:3

**blend** [1] - 117:3

**blends** [2] - 117:2, 4

**blessed** [1] - 158:20

**blood** [10] - 21:11, 15-17, 19; 22:18; 31:11; 32:20; 34:4

**bloody** [3] - 21:12, 18

**blown** [1] - 29:10

**blue** [1] - 140:3

**BOARD** [1] - 1:1

**board** [2] - 154:3; 160:15

**Board** [2] - 1:11; 160:17

**boards** [1] - 80:23

**Bob** [19] - 19:4; 31:22; 54:2; 136:8; 137:19; 138:15, 23; 139:7, 16, 19; 140:5, 15; 141:3, 8; 148:20; 149:16; 158:18

**body** [2] - 22:19; 62:3

**bono** [2] - 88:1; 141:15

**book** [3] - 116:20; 136:17; 166:20

**bookend** [1] - 86:13

**Borenstein** [2] - 137:1; 140:2

**borrow** [1] - 95:6

4

**borrowed** [2] - 94:13; 95:10
**boss** [1] - 160:22
**Boston** [13] - 1:17, 19; 21:2, 4; 51:22; 90:13; 99:9; 100:18; 102:18; 165:21
**bottle** [1] - 110:18
**bottom** [1] - 86:16
**bound** [1] - 29:16
**boundaries** [1] - 87:2
**bounds** [1] - 57:21
**box** [2] - 58:15; 59:6
**boxes** [2] - 124:5; 125:1
**boy** [3] - 11:2, 5; 148:12
**Bradley** [1] - 19:9
**brag** [1] - 99:6
**brain** [1] - 83:1
**break** [6] - 67:23; 68:1, 4; 97:20; 127:10, 20
**Break** [1] - 68:6
**brief** [4] - 27:6; 149:2, 11
**briefed** [2] - 26:5, 22
**briefing** [2] - 27:11; 28:5
**briefly** [3] - 31:3; 104:1; 149:18
**briefs** [2] - 12:23; 151:19
**bring** [1] - 107:7
**broke** [1] - 80:22
**broker** [1] - 131:23
**brother** [7] - 104:5; 105:23; 108:19; 114:6; 118:20; 119:12; 120:12
**brought** [4] - 19:3; 62:22; 65:1; 75:4
**brownstones** [2] - 160:10; 162:7
**Brudnoy** [1] - 66:23
**BUCKLEY** [2] - 168:3, 17

**bug** [1] - 164:3
**build** [1] - 113:6
**building** [1] - 156:2
**bulldog** [2] - 112:1; 125:17
**bunch** [2] - 45:20; 160:10
**bunker** [1] - 10:20
**burden** [1] - 129:5
**burned** [2] - 160:13; 162:6
**bushes** [1] - 22:5
**business** [6] - 29:14; 100:23; 101:17, 19; 142:6; 143:15
**busy** [4] - 32:8; 105:10; 107:2, 13
**button** [1] - 38:3
**buy** [2] - 75:17; 148:1

## C

**cabinet** [1] - 117:4
**caliber** [1] - 145:7
**California** [9] - 31:13; 98:19; 99:13, 22; 100:1, 12, 20; 102:5; 115:19
**calligrapher** [1] - 33:2
**calmer** [1] - 116:14
**camp** [4] - 42:8, 14; 134:1; 141:7
**cannot** [5] - 4:17; 12:17; 44:18; 70:8; 139:18
**capability** [1] - 46:5
**Cape** [2] - 87:22; 155:15
**cape** [1] - 156:2
**captain** [1] - 19:9
**captured** [1] - 39:18
**car** [1] - 118:4
**care** [6] - 105:6, 11; 113:16, 22; 122:4; 124:19

**career** [3] - 103:20; 119:23; 120:3
**careful** [1] - 6:5
**carefully** [2] - 6:13; 128:13
**cares** [1] - 120:17
**caretaker** [1] - 105:5
**carries** [2] - 142:9, 11
**case** [137] - 5:7, 12; 7:13; 8:14; 10:22; 11:16; 12:1; 13:1, 14; 14:14; 19:20; 20:4, 10-11, 22; 23:10; 24:9; 25:1, 4, 12, 22; 26:6, 12; 27:6, 9; 28:1, 4, 6, 8, 14, 23; 30:6, 9, 11, 23; 31:2, 6, 16; 32:9, 17; 33:7, 16, 22; 34:23; 35:8; 40:15; 44:10; 45:13, 22; 46:3; 47:12, 23; 48:9, 12; 49:15, 17; 50:9, 13; 52:11; 54:8; 55:22; 56:23; 64:21; 68:13; 69:14, 21-22; 70:14, 19; 72:5, 12; 75:13; 78:13; 81:19; 83:19; 92:16; 93:6; 95:18; 96:1; 97:7, 12; 108:15; 115:8; 123:8, 17, 23; 124:10; 128:11; 129:12, 14, 16; 130:8; 131:21; 139:11; 141:11; 142:22; 144:12; 146:4, 7, 13; 147:16; 148:3, 13-14; 149:23; 151:4; 155:2; 156:11; 157:18; 158:6; 159:2; 160:15, 23; 161:18; 162:10, 16; 163:3; 166:5
**case-to-case** [1] - 78:13
**cases** [24] - 4:12; 87:8-10, 12; 96:2; 107:5; 110:12; 136:13; 139:23; 141:14; 142:17;

145:20; 146:9, 16, 20; 159:6, 11, 16; 160:2; 166:8, 17
**cash** [17] - 71:7, 12, 16; 72:14, 16-18; 74:5; 75:23; 77:14; 82:11; 85:13, 15; 89:4, 20; 91:8; 93:1
**Catanese** [1] - 137:22
**catching** [1] - 66:21
**Catholic** [1] - 99:5
**caught** [3] - 86:3; 154:2; 163:1
**caused** [2] - 27:3; 75:8
**cavalier** [1] - 130:19
**Cedar** [2] - 30:19, 21
**cemented** [1] - 84:22
**center** [1] - 88:3
**Centracchio** [1] - 166:9
**century** [3] - 4:13, 19; 95:15
**certain** [3] - 122:6; 126:4; 156:7
**certainly** [5] - 89:9; 140:11; 144:10; 146:8; 155:10
**Certified** [1] - 168:9
**certify** [1] - 168:4
**Chair** [1] - 1:6
**chair** [1] - 128:3
**challenging** [2] - 146:21; 154:23
**chambers** [1] - 111:15
**chance** [2] - 68:3; 161:18
**chances** [2] - 17:22; 63:18
**change** [5] - 29:23; 84:7; 125:21; 126:6
**changed** [9] - 83:17; 84:5; 87:21; 88:5; 122:8; 123:2; 134:4, 20

**changes** [1] - 88:8
**chapter** [1] - 141:11
**character** [4] - 117:17; 139:1; 140:1; 161:11
**charge** [2] - 92:20; 101:13
**charged** [8] - 25:10; 29:3; 74:17; 75:9; 79:17; 116:11; 152:14
**charges** [3] - 30:1; 64:2; 80:6
**charitable** [1] - 155:12
**chase** [1] - 164:9
**chased** [1] - 85:14
**chasing** [1] - 83:20
**chastened** [1] - 134:18
**check** [11] - 73:12, 20, 22; 74:2, 6; 76:16; 85:12; 90:18; 91:16; 92:12
**chess** [1] - 140:13
**Chicago** [1] - 102:5
**Chief** [1] - 160:21
**childhood** [2] - 104:8, 10
**children** [1] - 55:2
**choice** [2] - 26:13; 114:20
**choices** [1] - 120:4
**chose** [2] - 9:3; 18:14
**Christmastime** [1] - 125:3
**chronology** [2] - 48:2; 49:6
**cinnamon** [1] - 125:2
**Cintolo** [13] - 151:4; 163:21-23; 164:4, 9, 15, 22; 165:6, 10, 13, 19; 166:6
**Cintolo's** [3] - 149:23; 151:4, 12
**Circuit** [1] - 149:2
**circulation** [1] -

5

82:12

**circumstances** [2] - 87:21; 92:2

**cities** [1] - 98:21

**Citizens** [2] - 74:11; 90:11

**civil** [5] - 100:13; 101:7; 114:19; 146:9, 13

**claim** [2] - 89:15; 130:9

**claimed** [3] - 73:3, 6; 77:12

**claiming** [1] - 77:15

**clandestine** [1] - 19:13

**clarify** [1] - 86:23

**class** [1] - 99:8

**classmate** [1] - 28:18

**clean** [1] - 132:8

**clear** [5] - 4:12; 17:16; 32:11; 92:18; 142:18

**clearance** [1] - 115:3

**clearer** [1] - 114:14

**clearly** [3] - 95:4; 133:7; 142:23

**clerical** [1] - 110:5

**clerk** [5] - 21:22; 100:9, 23; 112:14; 115:14

**clerks** [1] - 157:23

**CLEs** [1] - 133:18

**cliche** [1] - 136:10

**client** [15] - 4:21; 15:5; 16:9, 12; 62:7; 71:4, 6; 72:8; 89:20; 124:11; 131:23; 132:12; 145:23; 147:9, 11

**client's** [1] - 130:9

**clients** [9] - 87:18; 89:4; 113:6; 125:19; 126:4; 139:9; 141:15, 18

**close** [4] - 97:21; 128:10; 137:11; 138:4

**closed** [2] - 56:3; 60:23

**closer** [3] - 69:10; 89:8

**closest** [1] - 66:17

**closing** [4] - 110:11; 126:20; 127:22; 147:7

**closings** [1] - 128:6

**clothing** [1] - 22:8

**co** [9] - 20:10; 31:20, 23; 52:4; 55:1; 69:14, 16; 95:15

**co-authored** [1] - 55:1

**co-counsel** [8] - 20:10; 31:20, 23; 52:4; 69:14, 16; 95:15

**Cod** [1] - 87:22

**coffee** [1] - 138:9

**Cohen** [1] - 56:4

**collar** [2] - 87:15; 141:13

**colleague** [1] - 14:4

**collect** [2] - 160:13; 162:7

**Collection** [1] - 2:6

**College** [2] - 99:9

**college** [1] - 119:13

**colloquy** [2] - 8:22; 149:10

**comfort** [1] - 141:10

**coming** [3] - 147:21; 164:22

**comment** [1] - 66:4

**commented** [1] - 66:21

**comments** [2] - 66:22; 158:15

**commission** [1] - 168:18

**commit** [2] - 79:7; 81:3

**committed** [5] - 80:11; 81:4, 6; 143:18; 156:20

**Committee** [3] -

11:18; 12:6, 14

**committee** [2] - 130:12; 165:11

**commonwealth** [1] - 44:5

**Commonwealth** [8] - 12:2; 22:2; 44:9; 50:7; 56:3; 155:16, 19; 168:3

**COMMONWEAL TH** [2] - 1:1; 168:1

**communicate** [3] - 39:12; 53:9; 92:7

**communicated** [3] - 49:10, 18; 55:11

**communication** [2] - 59:16; 60:1

**communications** [22] - 5:6; 8:4; 9:8; 15:4, 6, 9, 15, 21; 16:9, 17; 17:8; 18:16; 34:21; 35:7; 40:13; 45:6; 47:11; 50:12; 51:8; 59:20; 61:18; 62:18

**community** [3] - 87:23; 88:1; 133:14

**comparable** [1] - 134:8

**compare** [1] - 166:1

**compass** [2] - 142:21; 149:17

**compelling** [2] - 141:5; 156:6

**compels** [1] - 156:6

**complain** [2] - 152:11

**complaint** [1] - 147:17

**complaints** [7] - 5:13; 131:13, 15; 152:5, 8, 23; 153:12

**complete** [1] - 40:2

**completely** [1] - 120:3

**complexity** [1] - 25:1

**complicated** [1] - 23:10

**comprehensive** [1] - 37:5

**computer** [4] - 38:11; 109:3, 12; 168:11

**computer-assisted** [1] - 168:11

**concern** [2] - 6:20; 13:18

**concerned** [1] - 152:10

**concerning** [6] - 5:11; 14:23; 16:11, 18; 17:9; 45:7

**concerns** [1] - 37:11

**conclude** [1] - 157:7

**conclusion** [3] - 17:2; 129:3; 135:2

**conduct** [4] - 133:23; 134:7; 154:1

**confer** [1] - 167:11

**conference** [1] - 129:21

**conferences** [1] - 111:15

**conferred** [1] - 30:14

**confess** [1] - 132:14

**confident** [1] - 141:17

**confidential** [3] - 5:22; 15:4; 16:8

**confidentiality** [2] - 61:17; 142:14

**conflict** [3] - 13:12; 28:9; 152:15

**confusing** [1] - 115:4

**congratulations** [1] - 104:20

**connection** [1] - 123:23

**consciously** [1] - 63:14

**consequences** [1] - 118:16

**consider** [2] - 129:3; 140:23

**considered** [1] - 84:8

**considering** [2] - 17:14; 79:23

**considers** [1] - 139:13

**conspiracy** [1] - 86:17

**conspired** [1] - 162:6

**constant** [4] - 149:7

**constantly** [7] - 30:3; 78:5, 10; 81:19; 97:13; 150:10

**constellation** [1] - 166:16

**constitute** [1] - 93:21

**constituted** [1] - 74:20

**constitutes** [1] - 168:11

**construction** [1] - 156:1

**consult** [1] - 32:12

**consulted** [5] - 32:2, 19, 21; 33:1; 34:3

**consulting** [3] - 9:19; 33:4; 128:16

**consumed** [1] - 97:6

**consuming** [1] - 108:8

**contact** [1] - 119:7

**contacted** [4] - 5:10; 35:13; 56:12

**contained** [1] - 42:18

**contemplating** [1] - 65:23

**content** [2] - 15:14, 20

**context** [2] - 101:9; 150:18

**continue** [4] - 42:7, 16; 72:15; 118:14

**continued** [1] - 52:5

**continues** [3] -

132:10; 133:16; 134:15

**contractor** [1] - 113:6

**contribute** [1] - 159:21

**control** [1] - 160:3

**controversial** [1] - 160:18

**convenience** [1] - 21:22

**conversation** [3] - 19:10, 19; 120:11

**conversations** [8] - 5:23; 8:7; 54:17; 62:20; 63:5; 125:11; 131:22; 132:1

**converted** [1] - 124:4

**convicted** [9] - 13:3; 121:14, 16; 139:3, 5; 154:16; 158:6; 160:7, 16

**conviction** [14] - 17:18; 48:4, 15; 52:17; 53:11; 55:13; 56:5, 9; 62:16; 89:2; 115:23; 134:9; 142:20; 151:13

**convictions** [2] - 13:9; 129:8

**convinced** [1] - 111:10

**convincingly** [1] - 134:2

**cooking** [1] - 117:1

**copies** [1] - 35:19

**copy** [4] - 45:14; 53:5; 54:23; 60:8

**core** [1] - 117:12

**corner** [1] - 107:20

**correct** [28] - 5:8; 15:1; 16:14; 18:17, 20; 33:23; 41:15; 43:12; 45:2; 48:6; 49:1, 23; 50:1; 57:12, 15; 59:11; 71:7, 13; 93:16; 98:14; 99:16; 102:19; 103:4, 7-8; 107:3; 168:12

**cost** [5] - 11:20, 23;

12:2

**Counsel** [6] - 1:9, 15-16; 12:7, 14; 61:22

**counsel** [30] - 12:10, 15-16; 19:8; 20:10; 24:7; 31:20, 23; 35:16; 36:12; 52:4; 65:22; 69:14, 16; 95:15; 101:13; 111:11; 115:7; 126:15, 21; 128:2, 16; 129:14; 131:12; 135:3; 145:9; 147:15

**Counsel's** [1] - 11:18

**counselor** [1] - 97:5

**count** [2] - 76:5; 145:1

**country** [2] - 25:23; 138:19

**counts** [8] - 75:19; 91:12, 19; 93:12, 15, 18, 22

**County** [1] - 7:13

**couple** [7] - 75:14; 89:1; 104:19; 114:3; 115:10; 159:11; 160:12

**course** [10] - 8:19, 23; 31:7; 97:13; 112:6; 125:23; 131:18; 133:1; 134:23; 145:12

**courses** [1] - 140:20

**court** [6] - 30:3; 63:3; 112:22; 133:3; 137:15; 147:23

**COURT** [1] - 1:2

**Court** [23] - 9:14; 24:9; 25:21; 26:5, 7-8, 17; 27:9-11; 28:5; 29:8, 16, 18, 21; 30:7; 49:5; 99:23; 137:8; 166:15

**courtroom** [15] - 7:17; 8:22; 11:2; 56:2; 81:1; 112:1, 14, 23; 113:5; 114:10; 115:11, 15; 119:9; 125:18;

157:16

**courts** [3] - 13:7; 28:13; 134:12

**cousin** [1] - 106:12

**cousins** [1] - 106:8

**cover** [2] - 73:22; 134:16

**covered** [3] - 25:22; 75:2; 124:5

**covering** [1] - 144:4

**CPCS** [8] - 14:3, 9-10, 14; 33:19, 22; 49:7; 54:6

**Craig** [1] - 33:6

**crazy** [1] - 157:16

**created** [3] - 91:11; 117:5; 151:20

**credible** [1] - 135:5

**credit** [1] - 153:3

**Creek** [1] - 98:18

**crime** [23] - 8:1; 13:4; 21:10; 22:10; 23:3; 26:20; 31:12; 32:20, 23; 62:1; 63:7; 79:11; 84:23; 102:22; 103:3; 139:4, 6; 143:18; 151:11, 21; 154:17; 159:6, 10

**crimes** [4] - 79:7; 81:3; 121:14; 166:11

**criminal** [17] - 4:10; 8:14; 13:20; 71:11; 79:6; 107:2; 123:15; 131:21; 132:3, 9; 136:13, 21; 137:16; 154:15; 157:12; 165:21

**Criminal** [2] - 14:6; 158:17

**critical** [1] - 65:15

**criticized** [1] - 147:19

**cross** [3] - 7:9; 36:20; 39:2

**Cross** [2] - 58:10; 121:10

**CROSS** [1] - 2:1

**cross-examination** [1]

- 7:9

**Cross-Examination** [2] - 58:10; 121:10

**cross-examine** [2] - 36:20; 39:2

**crouched** [1] - 22:4

**cue** [1] - 37:7

**Cunha** [1] - 158:16

**currency** [3] - 75:1, 5; 93:8

**current** [1] - 101:22

**cursed** [1] - 126:1

**custody** [1] - 70:11

**cynical** [1] - 142:2

**cynicism** [1] - 134:16

## D

**D.C** [1] - 51:15

**dad** [18] - 99:6; 103:11, 23; 105:2, 18; 106:6; 107:19; 109:10, 21; 111:22; 114:10; 115:8; 116:5; 120:15; 122:13; 125:16

**dad's** [3] - 105:14; 106:13; 123:9

**daily** [3] - 19:16; 115:21; 119:3

**Dan** [1] - 31:17

**dance** [1] - 107:16

**Dardinksi** [4] - 71:1-3; 75:13

**Dardinski** [17] - 81:22; 82:10, 17-18; 84:16; 85:3, 5-6; 86:5, 7; 125:12; 132:22; 148:20, 22; 149:4, 13, 15

**dark** [1] - 22:8

**darker** [4] - 129:9; 144:3; 145:16; 149:20

**date** [4] - 48:15; 129:23; 130:4; 133:19

**dated** [2] - 54:20; 58:12

**dates** [2] - 46:9; 50:14

**daughter** [5] - 75:17; 76:17; 77:8; 156:21; 157:2

**Dave** [1] - 32:22

**David** [4] - 31:21; 52:3; 54:20; 66:22

**David's** [1] - 67:2

**daylights** [1] - 165:8

**days** [12] - 26:7, 22; 35:12; 52:23; 53:8; 55:18; 56:7; 77:10; 87:7; 128:11; 154:1, 6

**dead** [1] - 21:8

**deal** [6] - 4:10; 112:4; 127:22; 139:4; 145:4; 146:2

**dealing** [3] - 24:16; 126:4; 144:15

**deals** [1] - 132:22

**dealt** [3] - 125:20; 148:22; 162:1

**deans** [1] - 120:9

**Dear** [1] - 54:2

**death** [2] - 21:3; 162:9

**decade** [1] - 51:16

**December** [3] - 19:22; 25:13; 27:13

**decide** [3] - 46:13; 136:4; 154:4

**decided** [6] - 48:9; 49:17; 122:18; 143:10; 147:17; 163:3

**decision** [15] - 8:15, 20; 9:20; 10:9, 14; 27:22; 29:17; 50:10; 160:19; 161:2; 162:18; 163:22; 164:17

**decisions** [2] - 9:14; 133:17

**Dedham** [2] - 19:14; 99:4

**dedicated** [1] - 133:10

**deep** [4] - 82:2;

6

117:17; 119:20; 156:19

**deeper** [1] - 126:8

**deeply** [2] - 47:22; 139:23

**defend** [1] - 18:14

**defendant** [1] - 29:15

**defendant's** [1] - 8:16

**defendants** [1] - 144:17

**defending** [3] - 10:21; 116:10

**Defense** [2] - 14:7; 158:17

**defense** [4] - 13:6; 32:19; 107:2; 136:21

**deficit** [1] - 131:7

**definitely** [2] - 94:16; 126:5

**definition** [1] - 156:18

**defraud** [1] - 92:19

**degree** [6] - 25:11, 21; 30:9, 17; 62:15; 123:14

**Degree** [1] - 99:10

**delay** [2] - 48:22; 50:2

**deliver** [2] - 118:1; 155:20

**delve** [1] - 139:23

**demolished** [2] - 27:17; 28:21

**demonstrate** [5] - 83:13; 84:4, 11; 141:22; 142:4

**demonstrates** [1] - 142:3

**denied** [2] - 29:6, 19

**denigrate** [1] - 142:7

**Dennis** [1] - 58:16

**deny** [1] - 66:15

**Department** [4] - 73:12, 14; 74:3; 150:3

**deposit** [12] - 73:3; 5, 17; 77:17; 89:16, 23; 90:5,

9-10, 12; 91:8, 18

**deposited** [9] - 72:19, 21, 23; 73:21; 74:19, 21; 91:3, 17; 93:19

**depositing** [3] - 74:15; 75:7; 91:9

**deposits** [8] - 73:9, 11; 91:6, 12, 21; 92:1, 22; 93:1

**descend** [1] - 150:21

**description** [1] - 52:1

**DESCRIPTION** [1] - 2:5

**deserves** [1] - 154:7

**desire** [2] - 87:9; 132:11

**desires** [1] - 88:16

**despicable** [1] - 154:17

**despite** [1] - 152:17

**detached** [1] - 124:3

**detailed** [1] - 51:23

**details** [2] - 23:3; 24:22

**determine** [3] - 36:22; 79:18; 166:18

**determined** [2] - 101:4; 128:17

**detrimental** [2] - 135:9; 158:8

**developing** [1] - 12:22

**developments** [1] - 133:20

**devil** [1] - 161:16

**devoid** [1] - 5:1

**devoted** [1] - 133:12

**died** [1] - 66:23

**difference** [3] - 49:21; 113:1; 122:10

**different** [21] - 29:5, 11; 31:15, 18; 32:1, 23; 79:8; 88:14; 90:9; 106:1;

108:20; 111:2; 112:2; 116:6, 12; 126:3; 134:5; 162:12

**differently** [2] - 90:21; 145:12

**difficult** [9] - 103:16, 22; 108:10, 14; 109:18; 115:16; 119:3; 120:11; 146:21

**dig** [1] - 83:1

**digesting** [1] - 50:5

**diminishing** [1] - 166:3

**dinner** [3] - 108:16, 18, 23

**DIRECT** [1] - 2:1

**Direct** [1] - 98:5

**direct** [4] - 61:10; 62:22; 114:12; 149:1

**directed** [1] - 165:6

**directing** [1] - 158:14

**direction** [1] - 168:10

**directly** [2] - 6:15; 99:12

**director** [1] - 115:9

**disagree** [1] - 10:8

**disagreement** [4] - 6:17; 10:13, 17; 11:9

**disagreements** [5] - 5:4; 6:3, 9-10; 7:1

**disappoint** [1] - 147:11

**disbarment** [2] - 80:2; 151:13

**disbarred** [2] - 159:7; 162:14

**discarded** [2] - 69:21; 70:1

**discharge** [1] - 131:6

**disciplinary** [1] - 130:16

**discipline** [2] - 131:17; 145:18

**disclose** [4] -

16:7, 16; 18:15

**disclosed** [1] - 28:9

**discontinued** [2] - 41:19; 43:15

**discovered** [1] - 62:3

**discuss** [3] - 63:15; 65:2; 72:13

**discussed** [5] - 5:20; 7:5; 64:11; 73:23

**discussing** [5] - 54:17; 76:19; 94:19; 95:14

**discussion** [1] - 51:17

**discussions** [8] - 37:17; 61:5, 17, 23; 63:6; 64:4; 86:10

**dismiss** [1] - 29:22

**dismissed** [1] - 130:8

**display** [1] - 58:3

**dispute** [3] - 23:1; 95:19; 165:13

**disputing** [1] - 95:11

**disqualifies** [1] - 159:7

**dissented** [1] - 160:22

**distributed** [1] - 40:23

**district** [2] - 7:12, 14

**District** [2] - 26:17; 166:15

**districts** [1] - 99:23

**division** [3] - 54:7; 101:14; 102:20

**DNA** [1] - 52:10

**docket** [1] - 3:5

**docketed** [3] - 48:17; 49:5, 15

**dockets** [1] - 33:16

**Doctor** [4] - 32:3, 17

**doctors** [1] - 26:18

**document** [1] - 93:7

**documents** [27] -

16:7, 16; 18:15

**disclosed** [1] - 28:9

**discontinued** [2] - 41:19; 43:15

**discovered** [1] - 62:3

**discuss** [3] - 63:15; 65:2; 72:13

**discussed** [5] - 5:20; 7:5; 64:11; 73:23

**discussing** [5] - 54:17; 76:19; 94:19; 95:14

**discussion** [1] - 51:17

**discussions** [8] - 37:17; 61:5, 17, 23; 63:6; 64:4; 86:10

**dismiss** [1] - 29:22

**dismissed** [1] - 130:8

**display** [1] - 58:3

**dispute** [3] - 23:1; 95:19; 165:13

**disputing** [1] - 95:11

**disqualifies** [1] - 159:7

**dissented** [1] - 160:22

**distributed** [1] - 40:23

**district** [2] - 7:12, 14

**District** [2] - 26:17; 166:15

**districts** [1] - 99:23

**division** [3] - 54:7; 101:14; 102:20

**DNA** [1] - 52:10

**docket** [1] - 3:5

**docketed** [3] - 48:17; 49:5, 15

**dockets** [1] - 33:16

**Doctor** [4] - 32:3, 17

**doctors** [1] - 26:18

**document** [1] - 93:7

**documents** [27] -

18:8; 20:7; 35:6, 15, 18-19; 36:2, 5, 10, 21; 37:1, 3; 38:13; 39:14; 46:2; 48:3; 51:1, 18-19; 52:2, 22; 60:4, 7, 11; 70:5

**Doig** [1] - 31:17

**dollars** [3] - 11:22; 12:4; 94:17

**donated** [3] - 113:10, 13, 15

**done** [19] - 25:6; 45:23; 67:19; 74:5; 76:23; 77:2; 83:4, 14; 85:5; 86:7, 18; 91:2, 14; 110:17, 21; 121:19; 140:12; 156:15

**Doolin** [1] - 146:11

**door** [3] - 21:14, 18; 153:7

**DOR** [1] - 91:16

**Dorothy** [4] - 1:15; 19:8; 41:2; 128:6

**double** [1] - 132:4

**doubt** [2] - 15:17; 140:7

**down** [15] - 9:1; 31:9; 39:17; 60:23; 78:12; 85:14; 86:15; 88:22; 104:16; 113:8; 155:15; 156:2; 162:6; 164:9; 168:8

**Downing** [1] - 21:1

**Downing's** [1] - 21:17

**downloading** [1] - 39:13

**dozen** [1] - 136:12

**dozens** [2] - 136:12; 147:3

**dramatically** [2] - 87:21; 88:5

**dressed** [2] - 22:8; 118:8

**drive** [1] - 38:12

**driving** [2] - 117:23; 155:18

**drug** [6] - 72:2, 12; 102:22; 103:3; 162:21; 163:15

7

8

**Drug** [1] - 150:5
**drugs** [1] - 146:13
**due** [1] - 61:22
**dues** [1] - 161:15
**duly** [1] - 98:3
**during** [13] - 5:20; 7:2; 9:21; 10:11; 13:14; 50:4; 63:7; 68:1; 78:6; 80:13; 102:10; 111:12; 131:3

**E**

**early** [6] - 5:10; 97:9; 109:14; 118:6; 158:1; 159:5
**earned** [1] - 85:2
**eat** [1] - 127:7
**eavesdropping** [1] - 151:15
**Ed** [13] - 21:12; 25:8; 27:1; 44:6; 52:10; 53:4, 6; 54:17; 61:10; 62:14; 124:23; 138:5
**Eddie** [60] - 7:7, 19; 8:4, 7, 9, 16; 9:1, 8, 13, 18; 10:1, 8; 11:15; 15:5, 10, 16, 21, 23; 16:17; 17:8-10, 17; 18:11; 21:21; 22:3, 6, 15; 29:15, 20; 30:18; 33:5; 34:11, 15, 23; 35:8, 11; 37:21; 38:15; 39:21; 40:15; 44:6; 49:11; 50:13; 52:16; 54:1; 55:13; 57:8, 18; 58:3; 63:3, 17; 64:21; 66:3; 123:8, 16
**Eddie's** [2] - 21:16; 65:4
**edge** [4] - 144:1; 153:23; 154:6
**Edward** [7] - 6:6; 32:4; 44:6-8; 45:7; 94:11
**effect** [4] - 66:5; 116:1, 3; 135:9
**effective** [1] - 48:5
**effort** [5] - 24:8;

54:12; 64:19; 129:16; 152:17
**efforts** [2] - 9:12; 15:22
**eight** [5] - 53:20; 77:10; 147:16; 159:15; 165:17
**eight-year** [1] - 165:17
**either** [2] - 63:14; 90:1
**ELAINE** [2] - 168:3, 17
**elapsed** [1] - 161:22
**elect** [1] - 100:16
**elected** [1] - 103:19
**electrician** [1] - 142:10
**electronic** [2] - 33:13; 45:19
**electronically** [1] - 69:1
**electronics** [1] - 70:9
**eligible** [1] - 11:17
**Elizabeth** [3] - 14:4; 31:1; 98:17
**eloquently** [1] - 144:6
**elsewhere** [2] - 74:10, 12
**email** [11] - 37:15; 38:2, 9; 39:9; 41:7, 10; 42:13, 18; 53:9; 59:23
**Emails** [1] - 2:6
**emails** [14] - 35:3; 37:3, 6; 38:6, 16; 39:12; 44:12, 14, 19; 45:1; 46:18; 51:13; 52:14; 54:19
**Emerson** [1] - 67:3
**employment** [2] - 101:8, 14
**End** [3] - 151:10; 160:11; 164:1
**end** [6] - 27:13; 72:5; 84:23; 86:17; 111:13; 154:15
**endeavors** [1] - 155:13

**ended** [3] - 32:9; 78:2; 155:23
**enemies** [1] - 157:13
**Enforcement** [1] - 150:5
**enforcement** [3] - 102:23; 138:3; 150:22
**engagement** [1] - 104:13
**engaging** [1] - 153:23
**England** [2] - 151:8; 162:23
**enjoy** [1] - 116:17
**enjoyed** [1] - 116:16
**enjoys** [3] - 117:5; 118:12
**enormous** [2] - 135:17; 155:17
**entered** [3] - 48:17; 49:7; 97:8
**entire** [4] - 33:8; 119:5; 138:2; 160:3
**entitled** [3] - 143:9; 160:23; 161:17
**envelope** [2] - 36:14; 58:8
**environment** [1] - 88:9
**environmental** [1] - 88:9
**episode** [1] - 130:10
**episodic** [1] - 78:12
**Equipment** [1] - 1:12
**equipment** [2] - 168:6, 8
**erased** [1] - 82:18
**err** [1] - 161:12
**error** [1] - 13:14
**Esq** [4] - 1:6, 15, 18
**establish** [1] - 37:2
**established** [1] - 130:5
**estimate** [2] - 69:8; 97:2

**estimated** [1] - 69:7
**etcetera** [3] - 37:2; 46:10; 84:16
**ethical** [2] - 17:2; 82:19
**ethics** [2] - 16:3
**evaluating** [1] - 122:11
**event** [3] - 59:9; 107:14
**events** [1] - 39:5
**eventually** [3] - 90:17; 101:4; 131:16
**evidence** [17] - 7:23; 18:3; 25:19; 32:18; 34:3; 128:10, 22; 129:6; 132:14; 135:5; 136:5, 8; 139:16; 151:11, 15; 154:19; 158:3
**evident** [1] - 154:13
**evolving** [1] - 77:20
**exam** [1] - 100:23
**examination** [2] - 7:9; 61:10
**Examination** [6] - 3:17; 58:10; 65:10; 94:10; 98:5; 121:10
**examine** [2] - 36:20; 39:2
**examined** [1] - 34:3
**example** [7] - 4:9; 6:16; 7:1; 67:6; 123:17; 145:15; 146:17
**examples** [1] - 147:3
**except** [2] - 108:12; 144:12
**exceptionally** [1] - 133:10
**excerpt** [1] - 162:18
**excuse** [3] - 40:17; 148:16; 150:17
**excuses** [1] - 122:2
**Exhibit** [10] -

35:17; 36:9; 46:15; 47:4, 9; 51:10, 12; 52:14; 53:23; 133:5
**exhibit** [4] - 40:20; 46:21; 47:3; 149:1
**Exhibits** [1] - 133:7
**exhibits** [4] - 44:12; 47:6; 49:3; 50:5
**exist** [1] - 70:11
**expecting** [1] - 104:18
**expense** [1] - 147:8
**expenses** [5] - 73:6; 77:5; 85:22; 90:18
**experience** [5] - 44:18; 111:16; 140:11; 152:10; 161:11
**expert** [8] - 31:12; 32:21; 33:2; 129:19; 130:3, 7
**experts** [9] - 24:13; 25:2; 26:20; 31:5; 32:15; 34:2, 5
**expires** [1] - 168:18
**explain** [6] - 10:1, 16; 13:22; 61:14; 80:9; 120:9
**explained** [1] - 49:21
**explaining** [1] - 8:8
**explains** [1] - 50:2
**explanation** [1] - 13:21
**explanations** [1] - 122:2
**explode** [1] - 153:9
**explodes** [1] - 153:7
**exploring** [3] - 52:15; 53:10; 56:2
**exposed** [1] - 162:8
**express** [1] - 161:14
**expressed** [1] - 162:3

9

**extended** [1] - 106:7

**extensive** [2] - 12:21; 79:5

**extent** [2] - 86:7; 159:1

**exterior** [3] - 125:17, 19; 126:3

**extremely** [1] - 110:23

**eye** [1] - 119:7

**eyes** [1] - 12:13

---

**F**

**faced** [1] - 7:9

**facility** [8] - 51:20; 52:6; 60:13, 15, 17; 61:1, 3

**facing** [2] - 13:4; 145:3

**fact** [12] - 8:17; 11:13; 67:9; 80:21; 82:13; 95:9; 117:18; 126:2; 139:5; 147:8; 152:19; 159:5

**faint** [1] - 144:14

**fair** [3] - 9:18; 79:4, 8

**fall** [4] - 25:7, 12; 135:21; 144:2

**false** [2] - 147:21

**familiar** [1] - 16:13

**family** [35] - 6:10; 11:14, 20, 22; 12:4, 11; 19:18; 26:2; 68:16; 69:9; 77:5, 8, 18; 78:8; 81:12; 94:12; 104:2; 105:1; 106:8, 13; 108:6, 17; 109:3; 115:20; 119:12; 120:16; 121:12; 122:16, 18, 23; 134:15; 156:5; 157:1, 4

**family's** [1] - 119:8

**famous** [1] - 162:10

**far** [8] - 35:3; 37:6; 38:5; 64:15; 112:11; 124:20; 148:5; 152:10

**fashion** [1] - 20:22

**fast** [1] - 108:4

**fast-paced** [1] - 108:4

**father** [12] - 61:11; 104:4, 14; 107:1, 6; 108:3; 109:15; 112:4; 121:13; 123:22; 125:12; 133:12

**father's** [4] - 62:1; 103:6; 115:22

**favor** [2] - 34:14; 161:7

**favorable** [1] - 128:22

**FBI** [4] - 138:3; 149:5; 150:4

**February** [3] - 26:23; 49:15, 21

**Federal** [2] - 1:19; 99:23

**federal** [12] - 42:8, 14; 119:22; 120:6; 130:20; 131:7, 21; 134:1; 141:6; 148:10; 151:8; 164:2

**feds** [1] - 165:9

**fee** [13] - 20:3; 71:19; 72:10; 75:11, 13; 83:20; 84:19, 21; 85:21; 89:1

**feeding** [1] - 81:9

**fees** [4] - 68:14, 19; 69:6; 87:19

**feet** [1] - 100:13

**felt** [9] - 11:13; 63:5; 64:13; 92:11; 120:14; 122:16; 157:7

**fence** [1] - 22:7

**few** [9] - 33:18; 35:12; 53:8; 65:18; 79:3; 87:7; 88:21; 141:9; 153:22

**field** [3] - 105:22; 107:18; 133:17

**figure** [1] - 145:22

**figured** [1] - 164:5

**file** [6] - 46:1; 50:7; 52:9; 54:7; 93:3, 7

**filed** [21] - 5:8, 12, 14; 25:7; 28:12, 16; 29:2, 21; 30:1, 22; 34:13; 48:3, 7, 14, 16; 49:7; 78:1; 93:4; 147:17; 152:5

**files** [11] - 34:19; 35:2; 45:13, 21; 50:17; 51:4; 52:5; 60:8, 18; 69:22

**filing** [3] - 12:22; 91:7

**filings** [2] - 45:22; 48:8

**filled** [2] - 26:21; 46:1

**finally** [5] - 86:20; 132:6; 148:20; 149:16

**finances** [1] - 119:3

**financial** [3] - 78:7; 80:18; 132:17

**financially** [1] - 119:14

**fine** [4] - 23:1; 40:9; 97:23; 161:20

**fingerprint** [2] - 21:18; 33:2

**fingerprints** [1] - 21:13

**finish** [2] - 18:7; 167:4

**finished** [1] - 67:18

**fires** [2] - 160:8, 10

**Firm** [2] - 100:10; 101:22

**firm** [14] - 100:11; 101:1, 10, 15, 17, 19, 21, 23; 102:3; 138:18, 22; 139:3, 6

**firms** [4] - 100:9; 101:17; 139:4

**First** [2] - 1:15; 149:2

**first** [18] - 19:12; 21:10; 25:11, 21; 30:9, 17; 36:1; 62:15; 75:22; 85:12; 86:5; 91:17; 100:3, 13; 101:20; 124:1; 140:8; 148:22

**first-degree** [4] -

14; 25:7; 28:12, 16; 29:2, 21; 30:1, 22; 34:13; 48:3, 7, 14, 16; 49:7; 78:1; 93:4; 147:17; 152:5

**fit** [2] - 84:8; 135:7

**Fitzgerald** [1] - 31:17

**five** [13] - 29:5; 31:23; 42:20; 43:17; 55:18; 56:7; 63:21; 69:13; 91:11; 93:22; 114:23; 115:6, 13

**flags** [1] - 74:16

**flavor** [1] - 87:7

**flawed** [1] - 83:5

**flaws** [1] - 161:11

**fled** [1] - 162:23

**flew** [1] - 51:22

**floor** [1] - 21:6

**Florida** [3] - 77:9, 18; 90:15

**flush** [1] - 78:17

**focus** [3] - 23:11; 25:4; 54:12

**focused** [1] - 54:13

**follow** [3] - 84:13; 94:8; 96:22

**follow-up** [2] - 94:8; 96:22

**following** [1] - 9:13

**follows** [1] - 98:4

**food** [5] - 117:22; 118:1, 10; 155:21

**foot** [2] - 11:1, 3

**force** [1] - 102:23

**foregoing** [2] - 168:5, 11

**forensic** [1] - 31:11

**forget** [4] - 55:21; 140:10, 15

**forgot** [1] - 55:8

**forgotten** [1] - 31:10

**form** [1] - 150:16

**Form** [4] - 91:9; 93:3, 5

**former** [5] - 14:5; 131:22; 132:12; 149:5; 160:21

**forum** [1] - 66:12

**forward** [4] - 23:20; 38:6; 122:19; 157:6

**forwarded** [1] - 55:18

**foul** [1] - 27:3

**foundation** [1] - 41:3

**four** [11] - 22:12; 26:7; 30:6; 31:15, 18; 42:19; 43:17; 91:10; 101:9; 104:5; 160:2

**Frank** [2] - 1:7; 31:22

**frankly** [3] - 61:12; 122:1; 132:12

**free** [9] - 13:16; 17:18, 20; 18:9; 32:13; 33:20; 62:15; 63:8; 127:18

**freely** [1] - 132:4

**frequent** [3] - 89:5, 9

**frequently** [1] - 89:3

**fresh** [1] - 12:12

**Friedman** [1] - 102:1

**friend** [6] - 32:6; 67:1; 133:13; 137:23; 138:20

**friendly** [3] - 51:7; 137:23; 157:21

**friends** [7] - 22:5; 134:15; 137:6, 10, 22; 160:13

**front** [7] - 21:14, 18; 29:7; 35:19; 49:14; 75:3; 134:14

**fugitive** [1] - 162:23

**full** [9] - 26:16; 29:10; 49:4; 86:6; 98:15; 107:19; 143:7; 168:12

**full-blown** [1] - 29:10

**full-day** [2] - 26:16

**fully** [2] - 57:14; 163:6

**fundamental** [3] - 134:16; 159:3; 161:3

**fundamentally**
[1] - 134:20
**funds** [2] - 75:7;
76:3
**furnished** [1] -
135:5
**future** [1] - 24:17

## G

**Gailey** [4] - 28:15,
23; 29:15
**gain** [1] - 163:9
**gained** [1] - 161:23
**games** [2] -
107:21; 109:14
**garage** [1] - 124:3
**garbage** [1] -
124:18
**Gardner** [1] - 54:2
**gathering** [1] -
25:17
**Gay** [1] - 19:8
**gay** [1] - 66:20
**general** [1] - 7:18
**General** [1] - 1:9
**generally** [3] -
79:6; 154:9; 161:14
**generate** [1] - 75:6
**generated** [4] -
75:2; 91:18, 20;
93:20
**generation** [1] -
93:8
**generous** [1] -
133:13
**George** [109] - 2:2,
4; 3:5, 9, 14, 19;
14:20; 17:3, 6;
18:11; 20:17;
22:23; 23:1, 11;
24:2, 21; 25:3;
33:18; 36:10, 20;
37:10; 39:4; 41:6;
46:7, 19; 47:4;
57:23; 58:4, 11, 17;
59:14; 61:21; 62:7,
21; 68:11; 70:17;
78:21; 94:11;
96:20, 22; 97:17,
20; 98:2, 7, 10-12,
17; 99:2; 121:8;
125:9; 126:12;
128:15, 19; 129:4,

9, 12; 130:15;
131:14, 19; 132:2,
7, 16, 23; 133:10;
134:11, 14, 19;
136:2, 9; 137:5;
138:15; 139:8, 16,
19; 140:5, 7, 15;
141:3, 8, 13-14, 18;
142:19; 143:4;
144:9; 145:1;
146:3, 5, 22;
147:18; 148:20;
149:4, 8, 12, 16;
151:22; 152:2, 6,
21; 156:9; 157:12;
158:18; 159:13, 20;
166:4, 18
**GEORGE** [2] - 1:4;
98:3
**George's** [13] -
23:21; 24:17;
128:23; 130:14;
133:21; 135:3;
137:4, 9; 145:15;
149:2; 150:1;
153:17; 154:20
**Geragos** [1] -
100:10
**Gerry** [2] - 28:7
**Gertner** [9] -
71:11; 136:23;
144:21; 145:10;
146:10, 14; 148:9;
150:19; 157:9
**gingerbread** [1] -
144:18
**girls** [1] - 99:5
**given** [5] - 33:12;
34:8; 142:17;
158:12
**glad** [1] - 153:15
**glass** [1] - 143:7
**glimmer** [1] -
17:19
**gmail** [7] - 37:16;
39:17; 42:22; 43:6,
16
**goal** [1] - 119:23
**Goldstein** [1] -
52:15
**goods** [1] - 148:11
**Gorton** [4] - 80:21;
145:10; 148:7;
166:9
**gory** [1] - 23:3
**government** [8] -

27:4; 120:6;
132:15; 148:10;
151:20; 157:5;
163:19; 164:2
**government's**
[1] - 148:18
**governor** [3] -
7:19; 27:16; 28:19
**governor's** [1] -
19:7
**grace** [1] - 135:21
**grade** [1] - 113:12
**graduate** [1] -
99:19
**graduated** [5] -
99:8, 11, 14;
100:20; 119:12
**grand** [2] - 164:7,
12
**grandmother** [3]
- 105:13, 15, 17
**grant** [1] - 167:3
**grapes** [1] - 143:7
**grateful** [1] - 125:4
**great** [7] - 6:20;
99:15; 101:11;
111:20, 22; 136:17;
164:16
**greatest** [2] -
118:17
**greed** [1] - 81:2
**greedy** [1] - 81:3
**Greenberg** [2] -
136:23; 140:3
**grenade** [1] -
153:5
**grew** [1] - 104:3
**grisly** [1] - 110:13
**grossly** [1] -
136:10
**ground** [2] - 56:4;
160:13
**grounds** [1] - 24:8
**Group** [1] - 101:20
**group** [1] - 141:4
**groups** [1] -
137:16
**growing** [1] -
106:23
**guess** [4] - 56:21;
91:22; 110:9;
144:11

**guilt** [5] - 4:18;
93:12; 94:2;
156:20, 23
**guilty** [3] - 30:16;
92:21; 93:11
**guy** [6] - 11:7;
24:14; 113:7;
143:8; 151:5; 162:5

## H

**Habitat** [1] -
155:23
**half** [9] - 7:6; 10:21;
31:7, 19; 49:23;
53:21; 76:17;
143:7; 159:16
**half-full-glass**
[1] - 143:7
**hallway** [1] -
109:10
**hammer** [1] - 83:1
**hand** [2] - 154:8;
168:14
**handed** [2] - 72:8,
14
**handing** [1] -
76:20
**handle** [7] - 4:11;
10:14; 12:7; 13:10;
14:3; 87:10, 12
**handled** [4] -
25:12; 90:21;
92:15; 136:12
**handling** [4] -
50:21; 65:15; 87:6,
8
**hands** [1] - 140:18
**Hansen** [9] - 82:7,
15; 84:20, 22; 85:2,
5, 8; 86:10; 125:13
**happiest** [1] -
104:9
**happy** [1] - 104:11
**hard** [11] - 35:2;
38:12; 45:14; 60:8;
64:6; 120:13;
124:2; 155:12;
156:11
**Hartnett** [1] -
101:20
**Harvard** [1] - 28:17
**Harvey** [1] - 162:11

**hate** [1] - 88:22
**head** [3] - 33:11;
83:21; 151:7
**hear** [10] - 23:3;
24:4, 12; 53:2;
66:12; 67:4, 12;
128:1; 132:2
**heard** [28] - 9:10;
14:20; 18:22;
22:20; 23:13;
37:10; 52:12, 23;
53:3; 56:19; 131:5;
133:21; 136:8, 16;
139:8; 143:4, 20;
146:6, 9; 148:9, 15;
150:19; 156:21;
157:8, 11; 166:19
**hearing** [14] -
25:15, 17; 29:10;
53:15; 79:16;
127:23; 130:12;
132:8; 147:18;
148:1; 160:19;
165:11; 167:13;
168:5
**hearings** [7] -
11:3; 26:16; 29:1;
33:15; 46:9; 53:12;
54:9
**heart** [4] - 111:23;
113:21; 126:7;
144:14
**hectic** [1] - 108:20
**Heffernan** [7] -
26:18; 27:1, 15, 23;
28:2, 6
**held** [4] - 26:9;
27:1; 51:2; 129:22
**help** [10] - 32:19;
52:21; 57:18;
81:19; 82:17;
114:2; 118:13;
124:12; 132:12;
167:6
**helped** [1] - 139:9
**helping** [2] -
110:2; 117:15
**Hennessy** [1] -
160:21
**hereby** [1] - 168:4
**hereunto** [1] -
168:14
**Hi** [1] - 104:23
**hide** [1] - 163:19
**High** [1] - 1:16

11

**high** [15] - 14:16, 18; 87:17; 99:3; 107:1, 5; 110:3; 115:2; 137:18; 145:6; 150:9; 154:22
**high-powered** [1] - 107:1
**high-pressure** [1] - 87:17
**high-profile** [4] - 107:2, 5; 137:18; 150:9
**high-quality** [1] - 145:6
**high-security** [1] - 115:2
**high-volume** [1] - 87:17
**highest** [1] - 135:22
**HILL** [21] - 67:14; 70:17; 71:2, 6, 10, 23; 72:6, 15; 73:8; 74:4, 14; 75:10, 20; 76:8, 12, 23; 77:4, 19; 78:1, 5, 21
**Hill** [1] - 1:7
**hill** [6] - 70:15; 71:9; 80:17; 86:15; 91:13
**Hills** [1] - 98:19
**hilt** [2] - 21:20
**Hilton** [1] - 19:14
**himself** [5] - 7:12; 28:3; 59:23; 134:21; 152:1
**Hinchey** [5] - 88:4; 136:22; 138:5, 7; 146:17
**hire** [2] - 24:13; 139:5
**hired** [3] - 31:4, 10; 34:3
**hiring** [1] - 31:6
**Hiss** [1] - 166:7
**history** [3] - 99:18; 100:2, 5
**hit** [3] - 38:1, 3, 7
**hold** [2] - 40:5; 141:12
**holiday** [1] - 66:18
**home** [15] - 21:5; 22:12; 42:15; 43:4; 90:12; 105:8,

16-17; 107:8; 108:6, 16; 109:3, 14; 124:2; 166:19
**homemade** [1] - 125:2
**homes** [2] - 156:3
**homicide** [3] - 8:14; 25:11; 29:1
**homicides** [1] - 27:21
**homophobe** [1] - 66:4
**honesty** [1] - 142:16
**Honor** [2] - 18:4; 23:14
**honors** [2] - 99:11, 14
**hope** [8] - 11:11; 16:3; 17:19; 31:8; 54:3; 72:4; 166:18; 167:2
**hoped** [2] - 132:19; 136:1
**hospital** [1] - 21:8
**hour** [1] - 4:10
**hours** [9] - 9:1; 81:14; 91:11; 97:2, 7, 10; 116:20
**house** [14] - 19:15; 21:3, 6, 11, 14; 22:1, 4; 90:11; 91:15; 144:18; 150:21, 23
**huge** [4] - 95:4; 106:12; 139:2; 158:21
**human** [1] - 154:17
**Humanity** [1] - 155:23
**hundred** [4] - 30:2; 94:17, 23; 95:1
**hundreds** [3] - 19:16; 96:2; 122:5
**hungry** [1] - 118:2
**hurt** [1] - 120:20
**husband** [3] - 104:12; 106:8, 11

### I

**idea** [7] - 4:6;

59:14, 19; 61:4; 142:23; 152:16, 23
**identical** [1] - 29:4
**identification** [4] - 35:17; 40:11, 19, 22
**identified** [1] - 98:4
**ignorant** [2] - 4:23
**ignore** [1] - 23:18
**II** [1] - 3:5
**III** [2] - 1:7, 10
**illegal** [1] - 148:7
**illustrate** [1] - 159:12
**imagine** [1] - 166:13
**immature** [1] - 161:12
**immediate** [1] - 122:23
**immediately** [1] - 82:13
**immersed** [2] - 81:14; 82:2
**immoral** [3] - 148:6; 154:17, 23
**impact** [3] - 62:13; 63:8; 64:20
**impacted** [1] - 64:8
**impactful** [1] - 112:20
**impacting** [1] - 65:4
**imperative** [1] - 24:20
**impinge** [1] - 63:13
**implement** [2] - 87:3; 88:14
**import** [1] - 64:2
**importance** [2] - 24:17; 135:18
**important** [15] - 80:2; 81:20; 104:15; 107:14-16; 108:17, 22; 110:9; 112:10; 122:3; 133:17; 134:3; 138:16; 151:16
**impressive** [1] - 112:2

**imprisonment** [1] - 24:10
**IN** [2] - 1:3; 168:14
**incarceration** [1] - 115:23
**including** [8] - 21:12; 66:3; 142:13-16; 143:2
**income** [6] - 73:4; 119:19; 130:20, 23; 132:20
**incorrect** [1] - 96:6
**incredible** [1] - 7:22
**indication** [1] - 103:13
**indicted** [1] - 121:13
**indigent** [1] - 11:15
**individual** [1] - 70:21
**ineffective** [4] - 12:10; 13:6; 24:7; 65:21
**information** [2] - 46:11; 64:1
**infrequent** [3] - 89:6, 9, 22
**inquiring** [1] - 63:11
**inside** [2] - 80:16; 101:8
**insight** [4] - 80:1, 10; 83:15; 84:17
**insist** [1] - 132:10
**instance** [1] - 7:4
**instances** [1] - 77:1
**instincts** [1] - 136:18
**insurance** [2] - 160:14; 162:7
**integrity** [3] - 138:23; 158:9; 162:3
**intend** [1] - 57:14
**intent** [1] - 92:18
**intention** [1] - 87:6
**intentional** [1] - 154:10

**interaction** [1] - 84:15
**interest** [5] - 12:12; 13:12; 28:9; 78:3; 158:10
**interested** [1] - 110:6
**interesting** [1] - 144:8
**intern** [1] - 102:7
**international** [2] - 162:21; 163:15
**International** [1] - 55:1
**interns** [3] - 114:14; 115:1, 13
**internship** [3] - 100:17; 103:19; 114:13
**interrogatories** [1] - 147:22
**interrupt** [1] - 40:18
**interrupted** [2] - 38:23; 137:8
**interview** [1] - 13:19
**introduce** [1] - 141:17
**introduced** [2] - 106:11; 141:2
**introducing** [1] - 141:13
**investigating** [1] - 103:10
**investigator** [4] - 36:4; 55:12, 16; 56:11
**investigators** [4] - 26:20; 31:15, 18; 61:7
**invitation** [1] - 150:12
**invoked** [1] - 62:8
**involve** [1] - 15:10
**involved** [15] - 20:22; 32:9; 36:4; 47:22; 70:22; 85:18; 86:16; 87:16; 105:21; 111:4, 17; 144:11; 149:14; 155:14; 166:8
**involvement** [3] -

12

84:22; 106:2;
132:21

**involves** [1] -
13:15

**involving** [1] -
52:10

**IRS** [1] - 78:9

**Island** [2] - 32:4;
77:9

**issue** [11] - 12:19;
13:7; 31:4; 52:8,
17; 54:14; 55:6;
154:4; 158:2

**issues** [5] - 7:4;
12:22; 25:5; 77:22;
151:1

---

**J**

**Jackson** [1] -
138:20

**jail** [3] - 35:1; 57:19;
160:16

**James** [1] - 32:20

**Janet** [3] - 21:1, 17;
31:16

**January** [5] -
26:15; 104:19;
121:6; 159:14

**Jeffrey** [1] - 1:8

**jeopardize** [1] -
17:20

**Jerry** [2] - 151:5;
164:8

**job** [17] - 24:2, 11;
30:12; 81:14, 16;
100:22; 108:10;
110:17; 111:19, 21;
119:15, 17; 123:16;
124:22; 146:14;
154:21

**John** [1] - 31:10

**joke** [1] - 106:9

**joy** [1] - 117:9

**judge** [7] - 8:23;
111:9; 112:15;
113:1; 138:10;
143:2

**Judge** [29] - 25:20,
23; 26:18, 23;
27:14, 22; 28:2,
6-7, 13, 15-16, 23;
29:14; 31:21;
71:11; 80:21;

---

136:23; 137:1;
140:2; 144:21;
145:10; 148:7, 9;
150:19; 157:8

**judge's** [1] -
115:14

**Judges** [1] - 166:9

**judges** [5] - 137:7,
11; 153:11; 158:15;
166:9

**judgment** [6] -
82:3, 18-19; 83:6;
136:18

**Judicial** [6] - 26:5,
8; 27:11; 29:7, 18

**JUDICIAL** [1] - 1:2

**July** [1] - 21:1

**jump** [1] - 54:19

**jumping** [1] - 22:7

**Junction** [2] -
30:20, 22

**junior** [3] - 6:5, 8;
7:7

**Junior** [37] - 7:19;
8:4, 9; 9:8, 13, 19;
15:5, 10, 16, 22-23;
16:18; 17:9, 17;
18:12; 22:9, 16;
25:8; 27:2; 29:16;
34:12, 23; 35:12;
39:22; 40:15; 44:7;
45:8; 49:11; 53:4;
54:1; 57:18; 58:4;
61:11; 63:4; 66:3

**Junior's** [6] -
21:12; 35:9; 57:8;
62:14; 63:17; 64:21

**jury** [5] - 30:16;
55:18; 143:3;
164:7, 12

**Justice** [2] - 150:3;
160:21

**justice** [6] -
158:10; 163:1, 16,
18; 165:16, 18

**justices** [1] -
166:14

**juvenile** [11] -
24:9; 25:10; 27:2;
29:1; 53:11; 54:5,
13; 55:7

**juveniles** [4] -
9:15; 27:21; 29:3;
52:18

---

**K**

**keep** [7] - 25:3;
77:13; 78:19;
90:14; 108:3, 9;
151:16

**Keeper** [3] - 60:16,
23; 61:1

**keeps** [1] - 133:16

**Keith** [1] - 31:22

**Kelly** [9] - 19:8;
136:22; 138:4, 6,
17; 141:12; 144:12;
157:11, 14

**Kelly's** [1] - 139:6

**kept** [7] - 70:12;
77:14; 133:19;
140:16; 149:12, 15;
155:10

**key** [2] - 87:14;
160:2

**keys** [1] - 115:1

**kid** [1] - 110:13

**Kiley** [1] - 165:21

**kind** [26] - 24:22;
36:22; 60:2; 66:13;
70:9; 76:11; 85:17;
103:21; 111:22;
113:20; 116:8;
124:18; 126:7;
129:17; 134:5, 7;
140:13; 143:8;
145:4; 156:8;
158:22; 164:13;
166:22; 167:1

**kindness** [2] -
113:3; 114:1

**kinds** [5] - 4:11;
39:14; 66:15; 81:4;
152:12

**kitchen** [1] -
147:20

**knife** [2] - 21:20

**knowing** [4] -
82:2; 86:6; 115:17;
120:18

**knowledgeable**
[1] - 133:11

**known** [6] - 82:5;
86:9; 91:14;
145:10; 148:8;
151:7

**knows** [7] - 10:18;
26:13; 59:19;

---

66:14; 137:19;
157:6

---

**L**

**laboratory** [1] -
32:23

**lacked** [2] -
143:18; 153:20

**landed** [1] - 133:23

**Lane** [1] - 98:18

**language** [2] -
29:5; 164:14

**lap** [2] - 110:19

**large** [4] - 106:7;
138:21; 139:4;
162:21

**large-scale** [1] -
162:21

**last** [16] - 5:18;
20:9; 22:13; 42:19;
43:17; 53:6; 58:21;
76:3; 77:19; 87:7;
97:19; 128:11;
140:9; 152:4; 158:5

**lastly** [1] - 57:7

**late** [3] - 28:8; 78:2;
97:8

**Latham** [1] - 33:6

**laundered** [1] -
76:2

**laundering** [10] -
75:19; 76:5; 91:12;
93:15, 18, 22-23;
94:2; 132:5, 19

**Law** [5] - 28:17;
100:10; 101:20, 22

**law** [56] - 10:19;
13:20; 41:14;
42:18; 43:4; 57:21;
79:6, 20; 81:11;
83:19, 22; 94:14;
99:12, 19; 100:8,
11, 16, 20; 101:10,
21-22; 102:11;
110:6; 111:5, 9;
120:7; 123:14;
128:19; 133:16;
135:6, 20; 136:8,
15; 138:2, 18, 21;
139:2; 140:9,
16-17; 141:20;
142:22; 144:9;
150:22; 152:7;
154:15; 160:3;

---

161:7, 13; 165:20,
22; 166:15

**laws** [1] - 54:8

**lawsuits** [1] - 5:15

**lawyer** [51] - 13:6;
14:8, 11-12; 33:19;
36:3; 49:7; 53:1, 3,
7; 76:7; 106:21;
107:2; 111:18;
112:12, 17; 117:19;
120:5; 121:17;
123:15; 132:3;
133:11; 134:22;
135:19; 136:9, 11,
20, 22; 137:19;
138:18; 139:21;
142:1, 9; 143:1;
145:2; 146:4, 6;
153:13; 154:5, 8-9;
157:13, 15; 158:19;
159:8, 17; 160:12;
162:14

**lawyer's** [2] -
16:12; 150:21

**lawyers** [20] -
4:10; 5:2; 20:8;
34:22; 35:8; 47:11;
51:9, 14, 21; 52:3;
55:14; 60:5; 133:9;
142:2, 5, 13;
144:23; 145:18, 22;
147:2, 4; 152:9,
11-12; 157:15;
158:6; 163:12;
165:21; 166:13

**Lawyers** [5] - 14:7;
140:4, 18; 150:13;
158:18

**lead** [1] - 115:7

**leading** [1] - 119:2

**lean** [3] - 78:15

**learned** [6] -
71:10; 103:12;
129:23; 134:3, 19;
140:10

**learning** [5] -
135:6; 136:7;
140:8; 141:20;
155:11

**least** [7] - 129:7;
130:17, 23; 131:7;
137:21; 150:6;
152:9

**leave** [1] - 70:18

**leaving** [1] - 22:6

**LeBlanc** [13] - 1:7;

13

79:1, 3, 10, 14, 22;
80:5; 84:13; 86:20;
88:18; 96:21; 97:5,
14

**led** [5] - 80:1; 89:2;
134:8; 151:12;
162:20

**left** [11] - 21:17;
38:8; 51:19; 60:7,
19; 69:1; 70:11;
91:15; 109:13;
110:19; 118:9

**legal** [10] - 20:23;
25:2, 5; 71:19;
98:10; 100:5;
133:20; 134:17;
135:9; 154:14

**legislature** [1] -
27:17

**legs** [1] - 22:18

**length** [5] - 9:20;
80:6; 163:5;
164:16; 166:21

**lesbian** [1] - 66:20

**less** [8] - 29:13;
30:5; 69:12; 73:16;
94:22; 95:1; 131:3;
142:2

**lesson** [2] - 134:3,
19

**letter** [19] - 17:14,
16; 18:2; 35:10;
36:7, 14; 53:4, 21,
23; 56:17; 57:8;
58:3, 12, 14, 20-21;
59:3, 10; 137:2

**letters** [8] - 25:18;
133:2, 5; 139:13;
140:22; 141:3, 5;
158:14

**level** [5] - 112:9;
114:1; 126:8;
135:23; 143:19

**Lewis** [1] - 138:21

**license** [1] - 6:22

**licensed** [1] -
101:2

**life** [28] - 4:16; 9:15;
13:4; 30:19; 52:17;
54:13; 55:4, 6;
63:9; 66:16; 67:12;
81:17; 88:5; 95:4;
108:4, 6; 113:22;
125:4; 134:5;
138:2; 143:16;
154:18, 20; 156:5;

**life-without-**
**parole** [1] - 63:9

**light** [3] - 109:5;
136:5

**lights** [1] - 118:4

**likely** [1] - 132:19

**limitations** [1] -
46:23

**limited** [1] - 95:6

**line** [5] - 18:7;
72:16; 106:10;
124:14; 161:10

**listen** [3] - 6:14;
124:17; 165:1

**listened** [1] -
128:13

**listening** [1] -
125:14

**litigation** [5] -
101:1, 13, 17, 19;
114:19

**livable** [1] - 119:16

**live** [12] - 3:2;
33:21; 68:8, 10;
83:17; 87:23;
98:18; 115:18;
128:1, 4; 134:4;
167:9

**lived** [4] - 21:2;
118:23; 124:21

**living** [4] - 105:15;
118:19; 134:6;
165:7

**Liza** [8] - 20:7;
49:16; 50:4, 18-19,
23; 51:6

**LLP** [1] - 1:18

**located** [1] - 36:11

**lodged** [1] - 4:3

**Lodgen** [1] - 1:18

**long-time** [1] -
145:23

**longstanding** [1]
- 67:1

**look** [8] - 12:13;
52:5; 53:23; 60:6;
110:20; 115:5;
155:7; 156:18

**Look** [1] - 166:16

**looked** [7] - 34:4;
38:13; 49:13;
80:16; 82:21; 83:9;

111:1

**looking** [13] -
13:13; 16:10;
22:11; 33:14, 16;
34:18; 48:2; 55:5,
14; 80:15; 107:18;
115:17

**looks** [1] - 161:7

**loose** [1] - 21:21

**Los** [1] - 98:23

**lose** [4] - 4:16;
119:17; 124:15;
142:20

**loss** [1] - 4:17

**lost** [6] - 6:22; 29:8;
119:18; 124:14;
130:9; 149:16

**lousy** [1] - 24:11

**love** [3] - 67:11;
99:6; 122:14

**loves** [1] - 116:18

**low** [2] - 87:13

**low-key** [1] - 87:14

**Lowney** [5] - 19:5;
20:11; 31:23;
94:20; 95:2

**loyal** [1] - 133:13

**loyalty** [1] - 142:14

**luck** [2] - 92:2;
121:5

**lucky** [3] - 14:19;
100:21; 106:17

**lunch** [5] - 97:21;
115:10; 127:7, 20

**Lunt** [11] - 14:5;
20:7; 31:1; 34:14;
47:17; 49:17; 50:4,
18, 20, 23; 51:6

**Lunt's** [1] - 50:18

**LWOP** [2] - 55:2

**lying** [1] - 21:6

---

**M**

---

**MA** [2] - 1:17, 19

**macro** [1] - 88:22

**madame** [1] -
128:3

**MAFFEI** [29] - 3:8;
17:5; 18:4; 23:13,
16; 36:16; 37:7;
39:1; 40:5, 10;
47:2; 57:22; 61:15;

62:6; 65:8; 67:19;
96:12, 18; 97:23;
98:1; 121:4;
126:13, 18; 127:1,
9, 12, 15, 19;
135:13

**Maffei** [22] - 1:18;
3:7, 18; 8:11; 17:1;
20:15; 32:11;
38:23; 44:13; 47:1;
49:12; 63:19;
64:10; 65:1, 11;
67:17; 94:7; 97:17;
98:6; 128:12, 21;
135:12

**mAFFEI** [1] - 36:9

**mafia** [1] - 151:8

**magic** [1] - 117:6

**mail** [1] - 55:3

**maintained** [1] -
135:6

**Majestic** [1] - 67:3

**majority** [1] -
160:22

**mal** [1] - 155:2

**Malibu** [1] - 99:13

**malpractice** [4] -
129:12; 146:5, 16,
20

**mamo** [1] - 132:4

**man** [2] - 134:4;
161:12

**manage** [1] -
108:3

**managing** [1] -
138:22

**Mancini** [1] -
101:21

**March** [1] - 130:6

**Marco** [1] - 77:9

**Marianne** [1] - 1:7

**Marino** [1] - 31:21

**marked** [4] -
35:17; 40:11, 18,
22

**marriage** [1] -
98:7

**married** [3] -
104:11; 105:2

**Mass** [3] - 60:16;
84:9; 158:17

**Massachusetts**
[11] - 14:6; 27:18;
99:4; 104:4;

128:20; 138:13;
155:16; 163:12;
166:12; 167:5;
168:3

**MASSACHUSE**
**TTS** [2] - 1:1;
168:1

**matter** [8] - 3:5;
8:17; 70:18; 97:4;
107:12; 130:11;
165:2

**mattered** [1] -
77:16

**Max** [5] - 160:4, 11,
23; 166:6

**max** [1] - 160:6

**MCLE** [1] - 140:19

**mean** [14] - 15:5;
30:1; 32:13; 43:1;
51:10; 62:21; 63:2;
80:16; 82:23; 89:4;
116:18; 152:6

**meaning** [2] -
78:17; 88:12

**means** [4] - 24:5;
45:7; 55:3; 95:7;
122:7

**meant** [1] - 153:8

**Meanwhile** [1] -
27:16

**med** [1] - 155:2

**med-mal** [1] -
155:2

**medical** [4] -
129:11; 146:4, 16,
20

**meet** [1] - 120:8

**meeting** [3] -
19:13; 33:5; 51:20

**meets** [2] - 136:2;
140:7

**MEGHAN** [1] -
98:3

**Meghan** [8] - 2:4;
98:2, 9, 17; 114:4;
121:4; 126:13;
157:22

**member** [5] -
10:18; 133:14;
154:13; 165:19;
167:5

**members** [2] -
128:9; 134:23

**memorandum**

14

[1] - 133:5

**memorial** [1] - 67:2

**memory** [6] - 40:13; 94:19; 95:13; 96:1, 6, 10

**men** [2] - 161:4

**mend** [1] - 161:11

**mention** [3] - 55:8; 69:2; 71:23

**mentioned** [4] - 6:19; 33:18; 59:18; 86:14

**mentioning** [1] - 53:18

**mentors** [1] - 158:1

**met** [9] - 19:12, 18; 51:22; 52:2; 75:15; 76:15, 18; 98:13; 129:4

**Michael** [2] - 53:19; 54:4

**Michelle** [1] - 127:23

**micro** [1] - 88:23

**microscope** [2] - 156:9, 14

**middle** [4] - 107:23; 109:8, 11; 116:19

**Middlesex** [3] - 7:12; 25:20; 30:8

**might** [5] - 17:7; 34:21; 40:7; 126:17; 145:11

**Mike** [1] - 32:6

**miles** [1] - 98:22

**mind** [3] - 64:3; 151:16; 161:6

**minds** [1] - 151:2

**mine** [4] - 14:4; 32:7; 67:1

**Minersville** [1] - 141:7

**minute** [4] - 51:12; 70:19; 74:1; 149:19

**minutes** [3] - 19:15; 22:17; 33:19

**misconduct** [1] - 162:4

**misrepresentati ons** [1] - 147:23

**missed** [3] - 107:13

**mistake** [7] - 118:22; 120:19, 22; 123:3; 154:11; 165:2

**mistaken** [2] - 34:15; 95:7

**mixed** [1] - 21:18

**mob** [4] - 144:23; 145:1; 164:1

**mom** [8] - 104:21-23; 105:16, 21; 116:21; 118:19; 119:10

**mom's** [1] - 106:14

**money** [42] - 11:23; 19:11; 20:20; 69:5, 17; 72:2, 8, 13; 73:2; 74:8, 10, 12, 15; 75:19; 76:14; 77:5; 78:9, 18-19; 81:9; 85:2, 8, 19; 89:12; 93:15, 18, 21; 95:5, 10-11, 20; 113:16; 132:5, 18; 149:18; 151:21; 162:7

**month** [5] - 28:22; 30:12; 117:2; 118:3

**months** [15] - 27:5; 30:6; 78:15-18; 85:9; 86:4; 104:19; 130:1; 134:1; 148:19, 21; 149:10; 164:21

**moral** [7] - 79:19; 141:23; 142:21; 155:6; 158:3; 165:12

**morality** [2] - 143:19; 153:18

**morally** [2] - 84:8; 135:7

**morning** [10] - 3:8, 18, 20, 23; 14:22; 79:1; 91:15; 94:15; 118:7

**mortgage** [1] - 131:23

**most** [13] - 67:11; 89:15; 95:16; 108:15; 112:10; 120:17, 20; 132:6; 141:5; 143:13;

144:11, 16; 154:19

**Most** [2] - 108:12; 131:18

**mother** [3] - 104:4; 105:14; 125:1

**motion** [7] - 28:12, 16; 29:2; 53:11; 55:14; 56:5, 10

**motions** [9] - 29:21-23; 30:2-4; 45:22; 46:9

**motive** [1] - 79:11

**motives** [1] - 132:9

**mountain** [1] - 7:22

**move** [3] - 37:8; 110:18; 122:19

**moved** [1] - 111:2

**MR** [56] - 3:8; 17:5; 18:4; 23:13, 16; 36:9, 16; 37:7; 39:1; 40:5, 10, 17; 47:2; 57:22; 58:6; 61:15; 62:6; 63:21; 65:8; 67:14, 19; 68:5; 70:17; 71:2, 6, 10, 23; 72:6, 15; 73:8; 74:4, 14; 75:10, 20; 76:8, 12, 23; 77:4, 19; 78:1, 5, 21; 96:12, 18; 97:23; 98:1; 121:4; 126:13, 18; 127:1, 9, 12, 15, 19; 135:13; 167:10

**MS** [101] - 3:2, 4, 13; 16:23; 18:1; 20:14; 22:20; 23:8, 15; 36:17, 19; 38:18, 21-22; 40:9; 41:1, 6, 9, 13, 18, 23; 42:5, 7, 10, 15, 21; 43:2, 7, 12, 20; 44:3, 11, 17, 22; 45:4, 11, 16; 46:7, 12, 17, 21; 58:1, 8; 61:20; 65:6; 67:17, 20; 68:7, 9, 11, 17; 69:3, 13, 20; 70:10, 15; 71:15; 79:1, 3, 10, 14, 22; 80:5; 84:13; 86:20; 88:18, 21; 89:11, 18, 23; 90:4, 20; 91:1, 22; 93:14; 94:1, 5, 8; 96:16, 19, 21; 97:14, 16; 121:8; 126:10, 14,

23; 127:3, 11, 13, 17, 21; 128:3, 5, 8; 135:11; 167:7, 12

**mud** [2] - 24:14, 19

**murder** [9] - 8:2; 22:3; 25:11, 21; 29:4; 30:9, 17; 62:15; 123:20

**Myers** [13] - 20:9; 33:13; 36:3; 51:14; 52:3, 9, 13; 54:21; 55:5, 16-17; 56:8; 61:6

### N

**name** [11] - 19:4; 37:21; 56:13; 70:23; 98:8, 10, 16; 113:4; 151:5; 164:5

**named** [2] - 6:5; 14:4

**names** [5] - 33:9; 37:23; 44:8; 101:16; 113:15

**Nancy** [3] - 145:9; 146:9, 13

**national** [1] - 139:2

**natural** [1] - 105:5

**nature** [5] - 11:8; 30:15; 78:12

**NCCI** [1] - 54:2

**necessarily** [2] - 84:5; 159:6

**necessary** [1] - 159:9

**need** [14] - 23:2; 32:17; 82:17; 87:19; 88:2, 6; 112:13; 122:7; 126:17; 127:21; 143:19; 156:4; 157:3

**needed** [8] - 50:23; 51:3; 52:22; 75:16; 76:14, 21; 82:1; 85:6

**needs** [1] - 88:16

**negative** [2] - 66:22; 82:4

**negatives** [1] - 129:2

**neglect** [4] - 145:20, 23; 146:1

**neglected** [1] - 148:3

**neglecting** [1] - 155:2

**neighbor** [1] - 22:6

**Neil** [1] - 31:17

**never** [36] - 5:10; 6:8; 51:5; 57:6; 59:22; 62:19; 77:2; 81:4, 6, 18; 83:11, 16; 86:1; 92:15, 23; 93:4; 98:13; 106:4; 107:13-15; 116:23; 117:15; 120:21; 121:2, 20-21; 123:2; 125:23; 134:7; 140:14; 143:6; 144:10, 13; 147:1; 148:15

**new** [8] - 12:15; 42:17; 43:16; 52:9; 117:2; 118:12; 126:2; 136:15

**New** [3] - 32:8; 151:8; 163:13

**news** [2] - 119:9; 150:10

**next** [6] - 22:15; 27:5; 53:16; 77:11; 109:13; 161:10

**Nicholson** [1] - 31:22

**night** [6] - 20:9; 108:16; 109:8, 11; 140:9; 155:18

**nightmare** [1] - 118:21

**non** [4] - 76:7; 111:18; 133:9; 141:15

**non-lawyer** [2] - 76:7; 111:18

**non-lawyers** [1] - 133:9

**non-paying** [1] - 141:15

**none** [5] - 45:15; 51:20; 131:16; 145:4; 153:1

**Norfolk** [1] - 30:21

**north** [1] - 98:23

**North** [2] - 151:10; 164:1

**Northeastern** [1]

15

- 32:22
**Notary** [2] - 168:3, 7
**note** [1] - 49:13
**noted** [1] - 91:13
**notes** [2] - 24:4; 127:6
**nothing** [12] - 5:15; 11:20, 23; 26:14; 38:14; 60:19; 65:7; 66:3; 69:1; 81:7; 127:23; 148:5
**Notice** [3] - 30:22; 48:13, 16
**notice** [3] - 48:7; 150:6
**noticeable** [1] - 116:3
**noticing** [1] - 124:1
**notified** [1] - 131:14
**November** [3] - 48:19; 168:15, 19
**nugget** [1] - 82:23
**number** [11] - 40:20; 43:23; 44:2; 79:7; 87:8; 97:2; 101:5; 152:20, 22; 158:20
**NUMBER** [1] - 2:5
**numerous** [1] - 131:13
**nurse** [3] - 105:4, 9; 106:6
**nurses** [1] - 105:4
**nutshell** [1] - 165:22

**O**

**O'Brien** [89] - 3:22; 4:13; 5:6, 9; 6:4, 7, 9, 11; 7:2; 11:10, 13; 12:11; 13:23; 14:21; 15:10; 16:18; 18:23; 19:3, 5, 11; 21:9, 12; 22:3, 6, 9-10, 15, 22; 23:19; 24:18; 25:8; 26:10; 27:1; 32:5; 34:10; 35:11; 37:22; 38:15; 39:21, 23;

44:6-8; 45:7; 50:15; 51:4; 53:1, 7, 17; 54:1; 56:20; 57:4, 7-8, 18; 58:3, 13; 59:15; 60:2, 14, 20; 61:2, 4; 62:14, 21; 63:3; 64:16, 22; 65:13; 67:6; 68:13; 69:7; 70:18; 94:12; 95:3, 10, 20; 97:4, 7; 123:8, 17; 124:23; 150:13
**O'Brien's** [8] - 23:5; 35:8; 37:21; 50:13; 62:5; 63:15; 64:4; 96:14
**O'Briens** [6] - 10:20; 34:7; 55:12; 69:18; 96:11
**o'clock** [1] - 155:18
**O'Melveny** [13] - 20:9; 33:13; 36:2; 51:14; 52:3, 8, 13; 54:21; 55:5, 16-17; 56:8; 61:6
**Oak** [1] - 98:18
**oath** [4] - 3:14, 16; 34:11; 130:16
**object** [3] - 23:20; 36:19; 128:18
**objected** [3] - 24:1; 150:1, 14
**objection** [8] - 4:3; 16:23; 18:1; 20:14; 36:17; 46:17; 61:15; 96:12
**obligation** [2] - 130:19; 132:17
**obligations** [1] - 131:4
**observe** [1] - 116:5
**obtain** [1] - 132:20
**obvious** [1] - 118:17
**obviously** [5] - 106:19, 23; 107:6; 118:15; 126:20
**occasion** [3] - 13:8; 44:21; 107:16
**occasionally** [1] - 89:7
**occur** [1] - 87:4
**occurred** [4] -

22:3; 23:4; 80:14; 81:8
**OCDETF** [1] - 103:1
**October** [10] - 1:10; 30:10, 15; 49:17; 51:16; 54:20; 55:11, 21; 58:23; 59:1
**OF** [4] - 1:1; 168:1
**offer** [1] - 36:9
**offered** [3] - 85:11; 86:4; 101:11
**offering** [1] - 40:6
**offers** [1] - 100:19
**Office** [12] - 1:16; 23:22; 100:18; 102:8, 17; 103:2; 114:15, 17; 150:2, 7, 11, 15
**office** [15] - 26:5, 11; 50:16, 18; 51:23; 58:15; 59:6; 74:8, 13; 102:2, 5-6, 21; 149:22; 164:4
**officer** [1] - 72:9
**officers** [2] - 26:19; 112:23
**Offices** [1] - 101:23
**offices** [3] - 102:3; 138:18
**official** [1] - 168:14
**often** [7] - 59:7; 108:4, 12, 15, 18; 109:1; 123:15
**oftentimes** [1] - 44:18
**old** [10] - 7:20; 8:17; 25:9; 38:13; 39:17; 76:17; 123:21; 151:6; 159:23
**older** [3] - 106:20; 109:22; 111:5
**oldest** [1] - 104:7
**Olivia** [1] - 76:17
**omit** [1] - 23:18
**once** [6] - 50:21; 85:9; 91:4; 110:16; 117:2; 140:13
**one** [49] - 6:21; 7:1, 4, 10; 20:10; 23:20, 23; 31:8; 41:10;

43:9; 54:19; 56:16; 65:8; 75:18; 89:19; 91:20; 96:1, 21; 101:9; 109:7; 110:14; 112:10; 113:5, 10; 115:12; 121:9; 123:4; 125:9; 130:10, 23; 141:9; 142:3; 143:22; 146:1; 149:19; 151:14; 152:22; 154:1, 6, 12; 156:17; 158:6; 159:5, 16, 18; 160:4; 161:8; 165:20
**one-off** [1] - 146:1
**ones** [1] - 44:15
**online** [1] - 3:10
**open** [1] - 54:18
**opening** [2] - 110:11; 136:1
**operating** [3] - 89:17; 90:1, 13
**operation** [1] - 162:22
**opine** [1] - 55:20
**opinion** [1] - 162:6
**opinions** [1] - 29:6
**opportunity** [5] - 80:8; 101:11; 129:1; 151:20; 161:8
**oppose** [1] - 135:3
**opposing** [1] - 4:20
**opposite** [1] - 17:14
**opposition** [1] - 50:8
**oral** [1] - 27:12
**orchestrated** [1] - 28:20
**ordeal** [1] - 120:1
**order** [3] - 41:2; 85:7; 156:10
**ordered** [2] - 27:1; 29:15
**organization** [1] - 155:14
**organized** [3] - 102:22; 103:3; 162:20
**origin** [1] - 71:16

**original** [1] - 50:11
**otherwise** [1] - 133:19
**ought** [1] - 165:14
**outcry** [1] - 27:3
**outgoing** [1] - 157:20
**outside** [2] - 101:8; 109:4
**OVERSEERS** [1] - 1:1
**Overseers** [2] - 1:11; 160:17
**overstating** [1] - 158:11
**overwhelmed** [1] - 86:21
**overwhelming** [1] - 158:4
**overworked** [1] - 136:10
**own** [10] - 17:1; 21:16, 19; 115:1; 117:1; 119:14; 129:3; 133:21; 135:1; 142:8

**P**

**P.M** [1] - 167:14
**pace** [1] - 116:15
**paced** [1] - 108:4
**packages** [1] - 155:21
**PAGE** [1] - 2:5
**Pages** [1] - 149:3
**pages** [1] - 149:11
**paid** [20] - 18:23; 19:1, 19; 20:18, 21; 22:23; 34:5-7; 69:7, 9, 13, 19; 71:19; 94:13; 95:8, 12; 96:4, 11; 161:19
**pain** [2] - 4:14, 18
**pajamas** [1] - 151:1
**pandemic** [1] - 117:23
**panel** [24] - 10:16, 18; 20:21; 31:4; 47:5; 64:7; 67:16, 23; 68:3; 79:17; 94:6; 98:15; 116:4;

16

128:9; 129:2;
133:6; 134:10;
135:1; 147:18;
148:1; 153:11;
160:19; 161:5;
167:10

**pantry** [2] - 117:22;
118:10

**paper** [1] - 35:19

**papers** [3] - 33:3;
124:5; 151:18

**paperwork** [1] -
91:8

**pardon** [1] - 161:4

**parents** [1] - 8:19

**parole** [8] - 4:16;
9:16; 30:19; 52:18;
54:14; 55:4, 7; 63:9

**paroled** [1] - 63:4

**part** [12] - 8:19;
9:22; 12:20; 48:22;
76:3; 79:15; 93:21;
103:19; 111:12;
131:20; 156:7

**participated** [2] -
25:14, 16

**particular** [5] -
23:21; 46:20;
108:15; 110:14;
138:3

**particularly** [4] -
135:19; 136:21;
155:13; 158:14

**partner** [2] -
138:17, 22

**parts** [2] - 108:10

**passed** [5] - 13:19;
48:18; 100:3, 7;
101:2

**passionate** [2] -
117:15; 124:10

**past** [5] - 17:15;
53:19, 21; 66:19;
158:16

**pastes** [1] - 117:3

**path** [1] - 103:20

**pathologists** [1] -
32:3

**pattern** [1] -
146:23

**Paul** [13] - 26:18;
31:21; 136:22;
138:4, 17; 139:6-9;
144:12; 157:11, 14

**Paula** [1] - 1:6

**pay** [10] - 12:2, 5;
69:19; 78:11;
85:14, 22; 90:17;
95:10; 130:20;
161:15

**paying** [5] - 69:15;
78:2; 92:10;
141:15, 18

**payment** [8] -
19:21, 23; 20:2;
68:12; 71:12; 78:8;
89:20; 131:8

**payments** [1] -
89:4

**payroll** [1] - 138:20

**PDFs** [2] - 45:23;
46:2

**penalties** [1] -
78:3

**pendency** [1] - 7:3

**people** [54] -
19:16; 32:12;
33:10; 46:5; 56:16;
66:12, 16; 67:11;
79:7; 88:2; 95:6;
106:17; 112:5, 18;
113:2; 114:2, 9, 11;
116:9; 117:13, 15;
118:1, 13; 119:6;
126:5; 133:8;
137:4, 21; 138:11,
14; 139:5, 14, 19;
141:2, 6, 9; 142:7;
144:5, 11, 17, 19;
145:4, 6, 17;
152:10; 153:21;
154:15; 155:21;
156:3; 158:12, 21;
161:14

**people's** [1] -
113:9

**Pepperdine** [1] -
99:12

**pepperdine** [1] -
99:15

**percent** [1] - 146:8

**Perfect** [1] - 45:20

**perfect** [1] - 123:17

**perhaps** [5] -
12:18; 23:10; 91:7;
97:21; 143:5

**period** [5] - 7:6;
48:11; 50:3; 131:3;
162:19

**permissible** [1] -
63:23

**permit** [1] - 18:14

**permitted** [1] -
16:22

**person** [18] -
17:12; 19:5; 23:23;
72:7; 88:15;
106:10; 116:6;
125:14; 126:8;
129:18; 139:3, 15,
20; 143:22; 145:8;
154:9; 155:1;
157:21

**personal** [4] -
73:1; 90:1; 120:7;
123:23

**personally** [6] -
5:14; 96:14; 97:3;
105:10; 160:6

**pertinent** [1] -
128:14

**Peter** [1] - 31:22

**Petition** [1] - 3:6

**PETITIONER** [1] -
1:4

**Philadelphia** [1] -
102:6

**phone** [1] - 152:13

**phones** [1] - 110:5

**photo** [1] - 117:3

**phrases** [1] -
132:4

**physical** [1] - 7:23

**pick** [2] - 50:17;
109:15

**picture** [1] - 156:7

**piece** [2] - 24:23;
92:2

**place** [8] - 9:11;
51:13, 15; 103:7;
117:17; 166:11;
167:11; 168:13

**placed** [6] - 7:23;
114:17, 20; 115:5

**places** [1] - 102:3

**plaintiff** [1] -
129:13

**plaintiff's** [4] -
100:11; 101:7, 10,
21

**plastered** [1] -
119:8

**playing** [2] -
113:18; 140:13

**plays** [1] - 11:12

**plumber** [1] -
142:10

**PLYMOUTH** [1] -
168:2

**Plymouth** [2] -
9:1; 33:6

**Point** [1] - 146:12

**point** [12] - 22:21;
23:17; 26:3; 82:4;
86:8, 15; 93:4;
103:21; 108:2;
122:6; 152:4;
165:18

**pointing** [1] -
128:22

**points** [2] - 33:1;
105:23

**police** [3] - 19:9;
26:19; 72:9

**policy** [1] - 12:15

**portions** [1] -
130:13

**pose** [1] - 20:16

**poses** [1] - 162:2

**position** [7] -
64:12; 83:23;
103:17; 113:22;
126:22; 135:15;
157:10

**positions** [1] -
100:19

**positive** [1] -
146:12

**possess** [1] - 4:22

**possibility** [1] -
53:10

**possible** [2] -
4:20; 63:22

**possibly** [2] -
66:1; 132:20

**post** [7] - 17:18;
53:11; 55:13; 56:5,
9; 58:15; 59:6

**post-conviction**
[5] - 17:18; 53:11;
55:13; 56:5, 9

**postmark** [1] -
58:13

**postponed** [1] -
130:1

**potential** [1] -
46:23

**pounds** [2] - 11:1,
4

**powered** [1] -
107:1

**powerful** [1] -
156:22

**practice** [23] -
41:14; 78:6, 14;
79:5, 20; 81:6;
83:18, 22; 86:22;
87:4, 17; 98:11;
113:18; 128:19;
130:22; 135:7;
144:14; 145:19;
152:7; 159:15;
166:15, 22; 167:1

**practiced** [6] -
10:19; 135:20;
144:9, 13

**practices** [1] -
165:20

**practicing** [1] -
87:22

**Prager** [8] -
162:11, 16-17, 20;
163:9, 14; 166:5

**precedent** [1] -
136:14

**precedent-
setting** [1] -
136:14

**precept** [2] -
159:3; 161:3

**predecessor** [1] -
129:14

**predisposed** [1] -
29:3

**prefer** [1] - 98:8

**prejudice** [1] -
15:22

**prejudiced** [1] -
15:15

**Preparing** [1] -
30:11

**preparing** [1] - 9:2

**presence** [1] -
62:1

**present** [5] - 3:21;
15:7; 40:16; 100:4;
168:5

**presented** [1] -
132:16

**presenting** [1] - 25:19

**presents** [1] - 134:14

**president** [2] - 14:5; 158:16

**press** [1] - 153:15

**pressure** [5] - 62:10; 78:7, 11; 87:17; 144:22

**pressures** [1] - 80:18

**pretend** [1] - 4:17

**pretrial** [1] - 129:20

**pretty** [8] - 100:11, 21-22; 131:4; 138:4; 146:17; 154:21; 162:16

**previously** [1] - 89:19

**primer** [1] - 8:13

**printer** [1] - 109:8

**priority** [1] - 105:6

**prison** [3] - 16:1; 48:5; 143:11

**private** [4] - 14:8, 11; 33:22

**privilege** [8] - 4:22; 6:1, 20; 17:11; 18:12; 57:11; 62:8; 167:3

**privileged** [2] - 62:20; 103:18

**privy** [1] - 5:22

**pro** [2] - 88:1; 141:15

**problem** [2] - 70:2; 152:2

**problems** [1] - 154:16

**proceeded** [1] - 129:15

**proceeding** [6] - 16:11; 57:5; 130:16; 135:18; 168:7, 10

**proceedings** [4] - 26:23; 54:15; 56:1; 168:12

**proceeds** [2] - 72:2; 160:14

**process** [5] -

36:21; 47:18; 106:16; 142:3; 162:8

**produced** [1] - 36:11

**profession** [1] - 154:14

**professional** [6] - 32:7; 82:19; 88:10; 118:16; 119:21; 138:2

**professionally** [2] - 106:5; 160:6

**professor** [1] - 13:20

**profile** [5] - 87:14; 107:2, 5; 137:18; 150:9

**prominent** [2] - 100:11; 103:17

**prong** [1] - 158:5

**pronounced** [1] - 21:8

**proof** [1] - 159:9

**proper** [1] - 91:7

**propose** [1] - 97:17

**proposed** [1] - 46:14

**prosecuted** [2] - 80:7; 115:8

**prosecuting** [2] - 7:13; 114:10

**prosecution** [2] - 120:13; 150:9

**prosecutor** [2] - 7:15; 119:23

**prosecutors** [2] - 7:10; 157:18

**prospective** [1] - 71:4

**protect** [2] - 13:17; 64:1

**protected** [1] - 27:19

**proud** [2] - 111:21; 141:16

**prove** [2] - 84:10; 136:2

**proven** [1] - 123:1

**provided** [11] - 18:5; 33:19; 35:10, 14; 36:8, 14; 38:2, 4; 51:4; 151:21

**providing** [1] - 51:18

**proving** [1] - 23:9

**psychologist** [1] - 33:7

**psychologists** [1] - 26:19

**PTO** [1] - 105:22

**Public** [5] - 11:18; 12:7, 14; 168:3, 7

**public** [12] - 27:4; 48:2; 66:12; 67:10; 108:4; 134:13; 135:10; 142:1; 158:10, 23; 159:22; 163:7

**pulled** [1] - 60:18

**punished** [1] - 165:10

**punishment** [3] - 120:15; 154:7; 161:16

**pursuant** [2] - 71:19; 72:10

**pursuing** [1] - 17:17

**pursuit** [2] - 85:17; 148:19

**push** [1] - 104:17

**put** [18] - 39:21, 23; 54:23; 80:23; 83:23; 85:4; 90:15; 103:17; 113:17; 121:2; 138:19; 151:9; 156:8, 14; 157:1; 164:3

**puts** [3] - 64:11; 120:16; 150:17

**putting** [3] - 20:20; 85:21; 92:11

**Q**

**qualification** [2] - 155:6; 158:3

**qualifications** [4] - 79:19; 141:23; 165:12, 14

**qualified** [1] - 84:8

**quality** [2] - 116:9; 145:6

**quarter** [3] - 4:12, 19; 95:15

**questioning** [1] - 110:16

**questions** [23] - 6:14; 9:10; 16:19; 17:3, 7; 38:19; 40:7; 46:16; 57:23; 62:9; 63:19; 70:16; 78:22; 79:3; 88:19; 89:1; 94:6; 96:18; 111:3; 114:3; 121:7, 22; 128:14

**quickly** [1] - 100:22

**quiet** [2] - 116:16

**quieter** [1] - 166:21

**Quinlan** [2] - 25:20, 23

**quite** [5] - 17:13; 48:4, 21; 137:14; 152:18

**quote** [3] - 105:2; 156:19; 166:14

**quoted** [1] - 164:16

**R**

**raise** [2] - 74:16; 151:1

**raised** [5] - 26:2, 11; 122:1; 148:16; 153:16

**ramifications** [1] - 119:21

**ran** [2] - 7:18; 43:20

**ranks** [1] - 84:9

**rather** [1] - 23:12

**RE** [1] - 1:3

**reach** [1] - 135:1

**reached** [1] - 19:6

**reaching** [1] - 129:3

**reaction** [1] - 66:6

**read** [16] - 16:15; 35:23; 47:6, 8; 58:14; 116:19; 121:18; 125:10; 139:12; 140:4, 21; 148:23; 149:12; 162:18; 166:20

**reading** [3] - 31:9; 70:20; 155:11

**readmission** [2] - 140:6; 143:1

**reads** [2] - 140:17

**ready** [1] - 129:16

**realization** [1] - 118:19

**realize** [4] - 16:21; 80:19, 22; 82:9

**realized** [1] - 82:10

**really** [49] - 13:15; 61:12; 81:12; 93:5; 95:7; 103:15, 17-18, 22; 104:15; 107:5, 7-9; 108:9, 14; 111:15, 21; 112:2, 17; 113:21; 115:4, 16; 116:2, 9, 16; 117:5, 7, 11, 17; 120:1, 10, 13; 122:3, 7; 124:1; 125:6; 126:16; 129:15, 19; 132:2; 138:6, 11; 145:6; 151:2; 152:16; 157:3; 160:3

**reason** [16] - 23:2; 48:22; 50:23; 70:3; 73:10; 74:19; 83:10; 85:20; 86:2; 90:7; 120:23; 139:22; 143:5

**reasons** [9] - 8:8; 10:2; 12:8; 79:8; 101:5; 121:1; 148:14; 152:12, 16

**receive** [3] - 71:12; 89:3; 94:21

**received** [12] - 35:11; 44:20; 53:5, 20; 58:19, 21; 59:6, 9; 60:1; 72:16; 74:5; 131:13

**receiving** [3] - 95:16; 106:10

**recently** [3] - 54:3; 105:13; 118:2

**recidivism** [1] - 162:2

**recital** [1] - 107:16

**recollection** [3] - 20:12; 47:10; 163:13

**recollections** [1] - 49:9

**recommendatio**

17

**n** [2] - 8:9; 10:3

**recommended** [1] - 12:6

**recommending** [1] - 11:15

**reconstruct** [4] - 33:17; 34:20; 161:20

**Record** [3] - 60:16, 23; 61:1

**record** [14] - 9:22; 12:21; 27:7; 47:17, 19, 21; 49:4; 148:6, 23; 149:6; 155:1; 167:9, 12

**recorded** [2] - 125:11; 131:20

**recording** [1] - 126:9

**records** [8] - 20:4; 25:19; 27:12; 69:20; 70:10, 13; 120:8; 151:18

**recount** [2] - 31:3; 147:3

**RECROSS** [1] - 2:1

**Recross** [1] - 94:10

**Recross-Examination** [1] - 94:10

**recuse** [2] - 28:12, 16

**red** [1] - 74:16

**redemption** [1] - 159:3

**Redirect** [1] - 65:10

**REDIRECT** [1] - 2:1

**redirect** [1] - 3:17

**reenter** [1] - 84:9

**reevaluate** [1] - 120:3

**refer** [4] - 65:20; 82:6, 11, 14

**reference** [1] - 37:22

**referral** [10] - 72:5; 75:11, 13; 76:6, 11; 84:16; 85:1, 10-11, 14

**referred** [8] - 45:19; 53:1, 8; 54:15; 60:14; 71:3; 79:11; 102:23

**referring** [4] - 11:2; 23:18; 58:4; 85:3

**reflection** [1] - 82:16

**reformation** [1] - 161:9

**refresh** [2] - 40:13; 47:9

**refused** [1] - 85:12

**refusing** [1] - 28:3

**regard** [2] - 14:16, 18

**regarding** [2] - 55:13; 132:22

**regardless** [1] - 112:9

**regeneration** [1] - 161:9

**Regina** [1] - 25:20

**regret** [4] - 66:11; 156:20, 23; 162:4

**regularly** [1] - 115:20

**regurgitated** [1] - 44:16

**rehabilitated** [2] - 161:5; 163:7

**rehabilitation** [1] - 161:6

**Reilly** [5] - 7:11; 26:4; 27:7; 28:2, 11

**reinstate** [1] - 134:11

**reinstated** [9] - 87:1; 153:14; 156:10, 12; 159:8; 161:1; 162:15; 163:4; 167:4

**Reinstatement** [1] - 3:7

**reinstatement** [21] - 4:4, 20; 17:22; 23:7, 21; 79:16; 123:10; 128:18, 23; 135:4, 8, 18; 136:3; 139:11, 23; 150:2; 153:10, 13; 158:8; 160:4; 165:23

**rejected** [1] - 130:13

**relate** [1] - 36:6

**related** [3] - 10:17; 35:7; 38:14

**relating** [1] - 36:2

**relation** [1] - 98:20

**relationship** [2] - 28:10; 157:17

**relative** [1] - 105:12

**release** [3] - 24:8; 116:5; 155:4

**released** [3] - 9:13; 16:1; 156:15

**relentless** [1] - 148:18

**relevance** [2] - 61:13; 63:1

**relevant** [1] - 132:6

**remain** [1] - 3:13

**remainder** [1] - 73:2

**remained** [1] - 50:22

**remaining** [1] - 40:7

**remains** [1] - 5:21

**remanded** [2] - 27:14; 28:1

**remarks** [1] - 66:15

**remember** [20] - 19:10, 21; 37:23; 48:1; 55:20; 56:23; 57:2; 71:4; 95:16; 104:10; 105:12; 106:22; 107:17; 110:14; 111:7; 112:12; 124:1; 160:9; 164:6

**remind** [2] - 47:13; 61:16

**reminds** [1] - 56:19

**remorse** [3] - 84:6; 156:19; 161:15

**Remote** [1] - 1:12

**remote** [2] - 168:5, 8

**remotely** [1] - 81:7

**remove** [1] - 28:3

**removed** [2] - 28:6, 14

**repeat** [1] - 134:7

**reply** [1] - 50:7

**report** [5] - 54:23; 75:1, 5; 93:9; 168:12

**reported** [1] - 139:12

**reporter** [2] - 63:3; 137:8

**Reporter** [1] - 168:9

**reporting** [2] - 52:6; 92:9

**reports** [1] - 25:18

**represent** [5] - 5:16; 8:13; 72:11; 139:9; 164:10

**representation** [5] - 6:11; 11:19; 14:23; 16:12; 71:21

**represented** [6] - 5:17; 129:13; 133:1; 139:9; 146:10; 151:5

**representing** [1] - 164:1

**reputations** [1] - 144:5

**request** [2] - 34:18; 67:15

**requests** [1] - 5:14

**required** [3] - 25:2, 17; 27:11

**requirement** [1] - 142:5

**requires** [1] - 141:22

**requisite** [2] - 79:18; 141:23

**research** [1] - 92:17

**resentful** [1] - 117:13

**respect** [9] - 61:22; 84:18; 93:15; 112:9, 15; 113:2; 152:3; 161:23

**respected** [1] - 157:21

**respects** [1] - 130:17

**removed** [2] - 28:6, 14

**respond** [5] - 16:10; 37:4; 53:13; 64:12, 19

**responded** [1] - 131:15

**responding** [2] - 64:16, 22

**responsibilities** [1] - 142:12

**responsible** [1] - 68:14

**rest** [3] - 69:21; 90:15; 122:22

**Restaurant** [1] - 19:14

**restitution** [1] - 85:7

**restoration** [1] - 159:4

**restore** [1] - 161:17

**restrict** [1] - 141:14

**result** [7] - 30:18; 62:16; 74:18; 91:21; 92:17; 93:13; 156:7

**resulted** [3] - 130:8; 131:16; 142:20

**resume** [1] - 135:7

**retained** [1] - 27:2

**retainer** [1] - 26:12

**retaining** [1] - 72:10

**retro** [1] - 27:19

**retroactive** [1] - 27:20

**retrospect** [1] - 110:23

**return** [2] - 79:19; 152:13

**returned** [3] - 30:16; 38:7; 68:9

**returns** [1] - 78:2

**reveal** [2] - 62:20; 63:23

**revealed** [1] - 71:16

**revealing** [2] - 63:5; 132:9

**Revenue** [3] - 73:13; 74:3

**reverse** [1] - 151:17
**reversed** [1] - 27:14
**reversing** [1] - 13:8
**review** [5] - 54:5; 55:19; 128:21; 129:1; 136:5
**reviewed** [2] - 56:7; 65:2
**reviewing** [1] - 51:18
**revolved** [1] - 61:23
**rewarding** [1] - 161:7
**RGeorgelaw** [3] - 39:17; 43:1, 13
**RGeorgeLaw@ gmail** [1] - 37:15
**RGeorgeSenior @gmail.com** [1] - 43:11
**Rhode** [1] - 32:4
**Richard** [1] - 32:3
**rights** [5] - 64:18; 65:4; 100:13; 101:7, 14
**ring** [2] - 132:13; 163:15
**ripped** [1] - 24:13
**risk** [1] - 162:9
**Road** [3] - 160:8, 10
**ROBERT** [1] - 1:4
**Robert** [3] - 2:2; 19:9; 128:18
**rock** [1] - 104:23
**role** [3] - 32:16; 134:17, 21
**roll** [1] - 163:11
**roller** [1] - 21:5
**rolls** [1] - 125:2
**room** [1] - 124:4
**rosemary** [2] - 137:17; 157:19
**Rule** [6] - 16:5; 18:13; 63:20; 64:8, 23
**rule** [2] - 16:10, 13
**rules** [2] - 16:3

**run** [2] - 43:22; 153:6
**running** [3] - 8:12; 163:14, 16

## S

**sad** [1] - 141:11
**saddened** [1] - 4:6
**sadly** [1] - 149:16
**samples** [1] - 34:4
**sat** [5] - 108:23; 115:11, 14; 119:5; 121:16
**satisfaction** [1] - 116:22
**satisfied** [3] - 39:16; 40:2; 92:19
**saved** [1] - 125:4
**saw** [5] - 22:6; 112:21; 118:4; 130:18; 150:13
**scale** [1] - 162:21
**scan** [1] - 70:5
**scanned** [1] - 46:2
**scanning** [3] - 20:5; 39:13; 46:5
**Scapicchio** [2] - 137:17; 157:19
**scare** [1] - 165:7
**scene** [8] - 8:1; 21:10; 22:7, 10; 26:20; 31:12; 32:20; 62:2
**schedule** [1] - 107:12
**scheduled** [2] - 50:9; 53:16
**schedules** [1] - 108:21
**Schneider** [5] - 53:19; 54:5; 57:11; 59:10, 12
**School** [1] - 28:17
**school** [19] - 25:18; 99:1, 3, 5, 12, 15, 19; 100:8, 16, 21; 102:11; 105:20; 110:4; 111:6, 9; 113:15; 120:7
**schools** [2] -

106:1, 3
**scientist** [1] - 31:11
**scrapes** [1] - 22:18
**screen** [2] - 3:21; 67:10
**seal** [1] - 168:15
**search** [17] - 36:23; 37:5; 38:1, 3, 17; 40:1; 43:21; 44:1, 3, 14, 16, 19; 45:2; 46:20
**searched** [3] - 37:1; 43:13, 16
**second** [6] - 19:23; 20:2; 22:21; 58:7; 100:15; 102:10
**section** [1] - 102:20
**security** [2] - 115:2
**see** [18] - 23:2; 34:19; 81:15; 82:7, 13, 16; 87:22; 91:23; 112:2, 17; 124:8; 126:6; 127:15; 130:12; 131:19; 156:14
**seeing** [1] - 107:19
**seeking** [3] - 139:15; 140:5; 143:1
**seem** [1] - 8:12
**seemingly** [1] - 4:22
**sees** [1] - 134:20
**select** [1] - 110:12
**selection** [1] - 55:19
**seminars** [1] - 133:18
**send** [1] - 125:1
**sends** [1] - 117:2
**senior** [3] - 5:6; 6:7; 101:12
**Senior** [16] - 6:4; 8:7; 10:1, 8; 11:10; 15:11; 16:18; 17:9; 21:9; 22:10; 39:22; 44:7; 57:4; 60:3; 94:12; 124:23
**sense** [4] - 13:11; 64:7; 156:6, 22
**senses** [1] - 4:18

**sent** [10] - 35:21; 44:20; 54:1; 58:14; 73:13, 20; 86:5; 91:16; 92:13; 120:6
**sentence** [6] - 13:4; 63:9; 134:9; 143:11; 161:19
**sentenced** [3] - 9:15; 30:18; 133:3
**sentencing** [2] - 55:2; 133:4
**separate** [3] - 108:5; 167:11
**separately** [1] - 91:9
**September** [10] - 30:5, 9, 13; 49:16, 22; 57:9; 58:12; 104:12, 17
**series** [1] - 51:13
**serious** [2] - 13:4; 132:17
**seriously** [4] - 110:22; 135:16; 142:6
**seriousness** [1] - 166:3
**serve** [1] - 161:8
**served** [1] - 161:19
**services** [1] - 67:2
**set** [9] - 12:13; 35:18; 36:10; 42:17; 43:3; 56:5; 75:17; 76:19; 161:20
**sets** [1] - 148:10
**setting** [1] - 136:14
**settlement** [1] - 147:6
**sever** [1] - 29:23
**several** [8] - 41:21; 42:4; 50:20; 52:23; 121:14; 130:17; 136:14; 141:6
**severity** [1] - 163:5
**shady** [1] - 154:1
**Shamshak** [4] - 56:13, 21; 57:3
**shape** [1] - 150:16
**Sherin** [1] - 1:18
**shifted** [1] - 109:19
**shifting** [1] - 34:9
**Shirley** [1] - 30:20

**shirts** [1] - 113:18
**shocked** [6] - 4:5; 66:7; 67:4; 117:11; 143:22; 144:2
**shocking** [1] - 112:18
**shoes** [1] - 113:9
**shoeshine** [1] - 113:4, 7
**shore** [1] - 129:17
**shorthand** [1] - 168:8
**Shorthand** [1] - 168:9
**shortly** [2] - 129:21; 145:3
**show** [3] - 46:18; 122:7
**showed** [1] - 150:14
**shown** [3] - 21:21; 129:10; 163:6
**shows** [1] - 129:7
**shut** [1] - 39:17
**sick** [1] - 105:11
**side** [13] - 81:9; 93:7, 9; 106:13; 110:19; 129:10; 132:23; 144:3; 145:16; 149:20
**sidebar** [4] - 67:15; 68:1, 4; 111:14
**sides** [3] - 106:13; 112:3; 129:8
**sights** [1] - 148:10
**significant** [2] - 131:18; 149:21
**similar** [2] - 21:20; 81:7
**simple** [2] - 117:8
**simpler** [1] - 116:22
**simply** [1] - 146:3
**single** [5] - 80:17; 105:16; 106:10; 165:16, 18
**sink** [1] - 147:20
**sister** [7] - 94:14; 104:6; 105:23; 108:20; 114:6; 118:20; 120:12
**sister-in-law** [1] -

19

94:14

**sisters** [1] - 22:13

**sit** [4] - 96:3; 111:11; 114:4; 124:17

**site** [1] - 156:2

**sitting** [1] - 109:10

**situation** [2] - 13:2; 162:13

**six** [3] - 19:15; 29:5; 159:18

**SJC** [13] - 48:18; 49:8; 136:15; 145:20; 160:20, 22; 161:18; 162:5, 15; 163:3, 8, 17; 165:17

**skilled** [1] - 133:11

**skills** [1] - 140:10

**sleeper** [2] - 109:5

**slower** [1] - 116:15

**small** [3] - 11:12; 114:23; 131:8

**smart** [1] - 136:17

**smuggling** [2] - 162:21; 163:15

**snowball** [1] - 86:14

**so-called** [3] - 144:23; 160:7; 166:14

**socialize** [3] - 137:12, 20; 138:7

**society's** [2] - 144:15

**softball** [1] - 107:18

**someone** [4] - 8:13; 13:3; 82:11; 143:6

**Somerville** [3] - 19:8; 21:2; 26:17

**sometime** [10] - 37:14; 42:1, 19; 47:15; 48:10, 19; 50:16; 53:6; 58:21; 59:1

**sometimes** [4] - 71:12; 79:10; 107:22; 125:18

**somewhat** [1] - 147:13

**somewhere** [1] - 95:17

**son** [17] - 4:15; 5:2, 17, 19; 6:2, 8, 12; 10:3, 21; 14:23; 21:4; 22:11; 24:2; 67:8; 77:8; 124:20

**son's** [5] - 5:12; 7:3; 12:12; 64:18; 125:4

**soon** [1] - 127:4

**sooner** [1] - 144:1

**sophisticated** [1] - 151:23

**sorry** [11] - 38:22; 39:22; 40:17; 55:23; 63:2; 67:13; 71:20; 96:22; 122:9; 123:2; 162:4

**sort** [13] - 20:21; 47:9; 66:11; 92:1; 100:12; 108:3; 111:18; 117:8; 123:17; 124:17; 125:21; 126:2

**sounds** [1] - 132:2

**sour** [1] - 143:6

**source** [1] - 119:19

**South** [2] - 58:16; 160:11

**Southern** [1] - 100:12

**speaking** [3] - 32:10; 73:18; 95:2

**special** [2] - 115:2; 166:14

**specific** [1] - 49:12

**specifically** [5] - 16:4; 20:18; 84:17; 119:20

**spends** [1] - 116:21

**spent** [6] - 8:23; 28:22; 66:18; 80:14; 138:1; 141:7

**spice** [3] - 117:1, 3

**splatter** [2] - 31:12; 32:21

**split** [2] - 90:8; 160:18

**spoken** [2] - 5:9; 53:18

**sporting** [1] - 107:15

**spotlight** [1] - 88:3

**spreading** [1] - 106:3

**spring** [2] - 25:13; 30:23

**Square** [1] - 22:16

**SR** [1] - 1:4

**SS** [1] - 168:2

**stabbed** [1] - 21:7

**stacking** [1] - 166:5

**staff** [2] - 14:9; 31:21

**stake** [1] - 64:14

**stakes** [1] - 154:22

**stamped** [1] - 18:7

**stand** [11] - 3:10; 7:8; 8:6, 10, 21; 9:2, 21; 10:4; 94:17; 113:7; 122:15

**standard** [3] - 140:8; 155:5

**standards** [3] - 136:3, 6; 162:16

**standing** [1] - 107:20

**stands** [1] - 139:21

**start** [4] - 49:6; 128:1; 129:9; 143:10

**started** [11] - 39:20; 41:7; 70:8; 76:4; 100:6; 101:6; 106:19; 110:2, 8; 111:2; 143:12

**starting** [1] - 3:4

**state** [3] - 7:11; 130:20; 161:6

**statement** [2] - 10:12; 147:7

**statements** [2] - 14:22; 147:21

**statute** [3] - 27:18, 20; 28:20

**stay** [1] - 115:19

**stayed** [2] - 30:23; 101:1

**steady** [1] - 132:20

**Stelzer** [1] - 31:22

**step** [1] - 154:7

**steps** [2] - 21:14, 23

**Sterner** [3] - 32:3, 10, 17

**still** [11] - 4:13; 17:17; 47:23; 77:15; 98:10; 101:12; 112:12; 117:6; 122:12; 125:7

**sting** [1] - 151:18

**stomach** [1] - 120:2

**stoop** [1] - 113:8

**stop** [4] - 8:3; 9:17; 49:19; 152:1

**stopped** [6] - 37:14; 41:20, 23; 42:4, 10; 73:20

**storage** [9] - 51:19; 52:6; 60:6, 13-15, 17; 61:1, 3

**store** [2] - 21:22; 151:9

**stories** [1] - 148:18

**storm** [1] - 27:3

**story** [4] - 7:21; 148:17; 157:22; 164:23

**strategic** [1] - 136:19

**stream** [7] - 3:2; 68:8, 10; 127:14; 128:1; 132:21; 167:9

**streaming** [1] - 128:4

**street** [1] - 114:19

**Street** [4] - 1:16, 19; 21:2, 4

**stress** [1] - 154:22

**stretch** [1] - 147:13

**strictly** [1] - 85:4

**strike** [3] - 5:4; 59:7; 77:20

**strongly** [1] - 157:8

**structuring** [15] - 74:18, 20; 75:9; 89:2; 91:5, 19-20; 92:15, 18, 20-21; 93:2, 11-12, 20

**Stuart** [1] - 32:20

**student** [3] - 7:21; 133:16; 140:16

**studied** [1] - 100:9

**study** [1] - 110:8

**stumble** [1] - 124:7

**stupid** [3] - 147:4; 154:10

**subject** [1] - 34:9

**subjects** [1] - 18:22

**submit** [3] - 139:15; 166:17; 167:2

**submitted** [4] - 56:16; 133:2, 6; 140:22

**subpoenas** [1] - 120:6

**subscribed** [1] - 168:14

**subsequently** [1] - 163:9

**substantial** [2] - 130:13; 131:4

**suburb** [1] - 98:22

**succeeded** [1] - 165:9

**successful** [1] - 137:18

**suffered** [2] - 118:16, 18

**suffering** [1] - 120:18

**suggest** [1] - 132:7

**suggested** [1] - 132:15

**suggests** [1] - 132:14

**suit** [1] - 107:19

**sullied** [1] - 103:21

**sum** [1] - 158:2

**summary** [2] - 13:18; 20:22

**summer** [5] - 100:15, 19; 102:14; 103:4; 111:8

**summers** [1] - 110:3

**super** [2] - 136:10

**superb** [2] - 139:10; 146:6

**Superior** [5] -

21

25:20; 29:16, 21;
30:7

**supervisor** [3] -
114:12; 115:6;
156:1

**support** [3] -
106:18; 119:11;
155:1

**supporting** [1] -
78:8

**supportive** [2] -
106:15; 133:2

**supposed** [3] -
22:11; 75:22;
164:19

**supposedly** [1] -
80:22

**suppress** [1] -
29:22

**Supreme** [14] -
9:14; 24:9; 26:4, 6,
8; 27:8-10; 28:4;
29:7, 18; 49:5

**SUPREME** [1] -
1:2

**surprise** [3] - 4:8;
61:8; 86:3

**surprised** [1] - 4:2

**surround** [1] -
150:23

**suspended** [1] -
161:22

**Sussman** [3] -
32:4, 10, 18

**swear** [1] - 144:20

**swears** [1] - 132:3

**swing** [2] - 75:17;
76:19

**switching** [1] -
18:22

**sworn** [1] - 98:4

**sympathetic** [1] -
144:16

**Symphony** [3] -
160:7, 9, 11

**system** [8] - 39:20;
134:17; 135:9;
143:3; 145:18;
161:3; 163:18

---

**T**

---

**t-shirts** [1] -

113:18

**table** [3] - 111:11;
153:6, 8

**tail** [1] - 86:17

**tape** [3] - 76:19;
126:9; 164:8

**tapes** [1] - 164:14

**task** [1] - 102:23

**tasks** [2] - 110:5, 9

**taught** [1] - 112:11

**tax** [6] - 73:4; 77:14;
78:1; 92:9; 131:4, 7

**taxes** [8] - 73:7;
77:12, 16, 22;
89:15; 92:10, 14;
130:20

**team** [1] - 113:13

**teams** [1] - 113:19

**technical** [2] -
92:19; 146:21

**technology** [1] -
151:15

**telephone** [1] -
73:19

**ten** [4] - 27:5; 68:2;
83:9; 161:21

**tenants** [1] - 162:8

**tendency** [1] -
13:16

**term** [1] - 43:21

**terminate** [1] -
167:9

**terms** [19] - 38:17;
40:1, 4; 43:22;
44:1, 3, 14, 19;
45:2; 46:20; 48:8;
60:4; 63:22; 65:11;
84:15; 97:2, 7;
107:7; 159:13

**terrible** [1] - 24:2

**terrified** [2] -
119:17

**tested** [1] - 146:12

**testified** [27] -
17:13; 22:22;
29:12; 31:13;
32:14; 34:10; 61:9;
68:17; 69:3; 94:12,
15; 98:4; 131:1;
137:5, 7, 12, 14;
140:4, 15; 143:21;
144:6; 145:7;
156:17; 157:14;
158:12; 166:21

**testify** [10] - 8:15;
9:7; 32:16, 18;
56:22; 57:4; 96:3;
146:10; 164:7, 12

**testimony** [29] -
4:9; 18:2; 22:22;
23:6, 11, 18; 25:18;
26:21; 44:11, 23;
44:4; 46:8, 22;
56:21; 57:2; 59:3,
21; 60:9; 62:5;
63:16; 77:21;
80:13; 94:18;
96:15; 130:14;
131:20; 133:15, 22;
139:14

**testing** [2] - 32:22;
52:10

**thankless** [2] -
123:16; 124:22

**THE** [72] - 1:2; 3:12,
15; 36:13; 41:8, 12,
16, 20; 42:3, 6, 9,
12, 17, 23; 43:5, 9,
19, 23; 44:5, 15,
21; 45:3, 9, 14, 18;
68:15, 20; 69:11,
15, 23; 70:12; 71:1,
5, 8, 14, 18; 72:3,
7, 18; 73:10; 74:7,
17; 75:12, 21; 76:9,
13; 77:2, 7, 23;
78:4, 10, 23; 79:2,
9, 13, 21; 80:4, 12;
84:21; 87:5; 88:20;
89:7, 13, 21; 90:3,
7, 23; 91:3; 92:5;
93:17; 94:4; 97:5

**Theater** [1] - 67:3

**themselves** [5] -
12:5; 68:4; 106:11;
141:2; 161:17

**thereafter** [1] -
168:10

**therefore** [2] -
25:9; 26:10

**thick** [1] - 164:20

**thin** [1] - 106:4

**thinking** [3] -
82:14; 136:19;
140:9

**thinks** [1] - 31:8

**third** [2] - 100:16;
102:11

**Thomas** [1] - 1:18

**Thornton** [2] -

31:11; 32:14

**thousand** [2] -
94:17; 138:18

**thousand-
lawyer** [1] -
138:18

**thousands** [6] -
11:21; 12:4; 97:9;
155:20

**threat** [2] - 65:21;
162:2

**three** [9] - 22:5;
30:5; 32:2; 59:4;
128:11; 137:21;
158:15; 160:2;
165:4

**throughout** [1] -
100:8

**throw** [4] - 24:14,
19; 147:20; 153:8

**throwing** [1] -
153:6

**thrown** [1] -
146:11

**thumbprint** [1] -
21:13

**tie** [1] - 107:19

**Timothy** [1] -
28:15

**tirelessly** [1] -
124:9

**title** [2] - 42:19;
44:10

**today** [13] - 15:18;
39:21; 45:10; 46:1,
6; 49:8; 67:9;
82:16; 88:14;
92:14; 128:17;
139:17; 165:20

**Todd** [1] - 101:23

**together** [5] -
108:18, 23; 109:1;
122:20; 138:8

**Tom** [11] - 7:11, 14;
26:3; 27:7; 28:2,
10; 56:13; 57:3;
127:11, 17; 165:21

**took** [25] - 9:11;
47:16; 48:21;
51:13, 15; 59:3;
72:18; 85:20; 86:2,
6, 12; 103:7;
105:11; 110:15, 22;
111:14; 140:19;
143:9; 146:3;

149:17; 155:15;
166:11; 168:12

**top** [3] - 33:10;
99:8; 138:12

**topic** [1] - 111:3

**totality** [1] - 45:5

**totally** [1] - 132:8

**touch** [4] - 5:1;
80:12; 115:19;
130:3

**tough** [6] - 7:16;
125:16, 19; 136:13;
144:19; 154:11

**toughest** [1] -
7:10

**towards** [2] - 69:6;
113:17

**towered** [1] - 11:6

**towing** [1] - 70:22

**trade** [1] - 142:7

**trafficking** [1] -
72:12

**transaction** [4] -
75:1, 5; 93:8; 94:3

**transcribed** [1] -
168:10

**transcript** [7] -
11:21; 12:3, 13;
48:23; 65:16; 72:1;
168:11

**transcription** [1]
- 168:11

**transcripts** [10] -
33:11, 14-15;
45:19; 50:5; 56:8;
70:20; 125:10;
131:19

**transfer** [11] -
11:3; 27:17, 20;
28:20; 29:1, 3, 10;
33:15; 50:17;
53:12; 54:9

**transferred** [2] -
30:7; 74:8

**travel** [2] - 77:17;
90:14

**traveled** [1] - 77:7

**treat** [2] - 112:13,
15

**treated** [1] - 113:2

**treats** [2] - 112:8;
113:23

**tree** [1] - 107:20

trial [44] - 5:20; 7:3; 8:18; 9:11, 21, 23; 11:5; 12:16; 15:13, 16; 31:14, 20; 34:13; 39:5; 41:22; 46:2; 48:13; 60:8, 18; 65:15; 66:17; 83:7; 108:13; 110:14; 111:8, 12-13; 114:4; 115:15; 119:3; 121:17; 129:16, 21, 23; 130:1, 4-5; 131:21; 132:16; 136:20; 146:6

trials [1] - 110:10

tried [12] - 26:16; 29:10; 65:3; 69:14; 78:19; 80:12; 83:13; 84:3; 108:9; 147:20; 159:18

tries [1] - 163:19

trips [1] - 105:22

trouble [2] - 145:21; 147:2

trucks [1] - 118:1

true [7] - 45:13; 78:4; 119:14; 132:13; 137:3; 147:1; 168:12

truly [1] - 126:5

trust [1] - 163:8

trusted [2] - 139:7

truth [2] - 124:21; 142:15

try [9] - 6:15; 9:12; 23:10; 25:3; 35:4; 84:10, 12; 146:7

trying [14] - 30:8; 46:13; 62:23; 63:4; 81:19; 85:4; 87:23; 91:23; 92:7; 124:12; 145:21; 153:14; 162:14

turn [1] - 127:14

turned [6] - 20:7; 26:2; 35:15; 75:6; 76:1; 81:22

turning [1] - 8:18

turns [1] - 75:7

twice [1] - 90:17

twins [2] - 104:18; 121:6

two [33] - 7:6; 10:20; 25:14, 16;

31:7, 19; 72:11; 73:9, 11; 75:4; 76:17; 81:12; 91:6, 11, 18; 93:12, 14; 94:2, 9; 97:13; 101:2, 18; 102:4; 104:6; 112:2; 124:9, 13; 129:8; 130:1; 156:13; 159:16; 165:3; 166:8

two-and-a-half-year-old [1] - 76:17

two-day [2] - 25:14, 16

type [5] - 21:16; 101:5; 116:10; 145:7

typed [2] - 37:20

types [5] - 87:9; 123:12; 125:19; 139:10

## U

U.S [11] - 23:22; 100:17; 102:8, 17; 103:2; 114:15; 150:2, 7, 11, 15

ultimate [1] - 163:17

ultimately [2] - 130:7; 131:6

unavailable [1] - 51:6

unbelievable [1] - 146:14

unconsciously [1] - 63:15

uncover [1] - 46:19

under [17] - 3:13, 16; 34:10; 43:21; 56:3; 74:15; 78:7, 11; 91:13; 93:2; 107:20; 130:15; 144:22; 156:8, 10, 14; 168:10

undercover [1] - 72:9

underline [1] - 16:8

underlying [1] - 56:1

understood [1] - 85:17

underway [2] - 15:23; 54:12

unequivocally [1] - 120:21

uniforms [2] - 113:13, 17

Union [1] - 22:16

unit [9] - 103:1, 3, 9-10; 114:21, 23; 115:2, 7, 9

units [1] - 114:16

University [1] - 99:13

unless [1] - 94:6

unprofessional [1] - 82:6

untranslatable [1] - 45:21

untruthful [1] - 130:15

unwilling [2] - 62:11; 132:13

up [52] - 32:10; 38:3, 7, 16; 39:20; 40:15; 42:17; 43:3; 49:8; 50:17; 52:5; 62:22; 78:2, 12, 19; 80:23; 84:13; 86:22; 90:8; 93:4; 94:8; 95:21; 96:7, 22; 100:3; 104:3; 106:23; 109:6, 15; 112:23; 117:20; 119:2; 129:17; 133:17, 19; 134:16; 140:16; 144:4; 147:21; 150:14; 152:8; 154:15; 155:10, 23; 156:18; 158:2; 160:1, 20; 163:1; 166:5; 167:4

up-and-down [1] - 78:12

uphill [1] - 143:13

Ursuline [1] - 99:3

uses [1] - 132:4

## V

vacated [1] - 26:8

valuable [1] - 111:16

vantage [1] - 108:2

various [5] - 46:9; 80:6; 100:9; 102:3; 155:12

venue [1] - 29:23

verdict [2] - 30:16; 56:6

versus [2] - 44:5; 56:3

veteran's [1] - 155:14

veterans [1] - 117:23

via [2] - 168:5, 7

Via [1] - 1:12

viable [1] - 12:9

vices [2] - 81:8, 10

victim's [3] - 21:19; 22:1, 18

video [1] - 3:11

view [1] - 13:9

viewpoint [1] - 111:18

violate [1] - 64:17

virtual [1] - 3:21

visit [1] - 105:17

visited [1] - 118:2

Volume [1] - 1:10

volume [1] - 87:17

volunteered [1] - 155:22

volunteers [2] - 117:21

vouched [1] - 138:23

## W

wage [1] - 119:16

wait [4] - 30:14; 53:14; 159:17; 165:15

waiting [3] - 50:6, 8, 10

waive [1] - 57:10

waived [2] - 17:10; 18:12

wake [1] - 109:6

walk [1] - 104:16

walked [1] - 151:22

wants [5] - 23:1; 88:16; 114:1; 125:7; 166:22

war [1] - 124:4

Washington [2] - 51:15, 21

watched [1] - 10:22; 115:15; 119:6

watching [1] - 104:22

water [1] - 110:18

ways [4] - 111:4; 116:13; 117:20; 118:13

webinar [1] - 140:19

wedding [2] - 104:15; 106:9

Wednesday [2] - 3:22; 14:21

week [13] - 17:15; 29:13; 53:6, 16, 21; 58:22; 59:1; 116:19; 118:10; 133:22; 165:3

Weekly [3] - 140:5, 18; 150:13

weeks [6] - 53:20; 59:4; 65:18; 75:14; 165:4

Weishaupt [2] - 138:1; 150:20

welcome [1] - 158:23

Weld [1] - 28:18

West [1] - 146:11

Weston [1] - 104:3

Westwood [1] - 150:21

wet [1] - 100:13

whereas [1] - 138:7

WHEREOF [1] - 168:14

white [2] - 87:15; 141:13

white-collar [1] - 141:13

whole [4] - 30:12; 106:16; 122:16

wife [3] - 73:15, 18; 77:9

23

willing [1] - 57:17
win [1] - 124:16
wiretap [1] - 151:9
wished [1] - 16:5
withdraw [2] -
40:14; 47:14
withdrew [4] - 5:7;
34:14; 47:12, 14
witness [13] - 7:8;
8:20; 9:2, 21; 10:4;
33:4; 61:16; 97:20;
110:16, 22; 129:19;
164:5; 165:8
WITNESS [73] -
2:1; 3:12, 15;
36:13; 41:8, 12, 16,
20; 42:3, 6, 9, 12,
17, 23; 43:5, 9, 19,
23; 44:5, 15, 21;
45:3, 9, 14, 18;
68:15, 20; 69:11,
15, 23; 70:12; 71:1,
5, 8, 14, 18; 72:3,
7, 18; 73:10; 74:7,
17; 75:12, 21; 76:9,
13; 77:2, 7, 23;
78:4, 10, 23; 79:2,
9, 13, 21; 80:4, 12;
84:21; 87:5; 88:20;
89:7, 13, 21; 90:3,
7, 23; 91:3; 92:5;
93:17; 94:4; 97:5;
168:14
witnesses [6] -
29:12; 128:15;
136:16; 137:10;
142:4; 168:5
women [1] - 161:4
wonderful [2] -
104:8, 10
wonderfully [1] -
106:15
woodworking
[1] - 142:8
Woolf [4] - 1:8;
35:13, 16; 58:2
WOOLF [5] -
40:17; 58:6; 63:21;
68:5; 167:10
Worcester [1] -
32:5
Word [1] - 45:20
word [4] - 42:18;
43:3; 123:13;
151:17

words [7] - 26:9;
44:2; 64:9; 66:7;
69:18; 73:4; 77:13
workday [1] -
107:23
world [6] - 33:21;
118:6; 120:18;
134:21; 146:9;
163:16
worse [2] - 67:2,
10
worst [2] - 120:15;
144:15
worth [1] - 17:16
worthy [1] - 163:7
Wow [1] - 156:21
wrapped [1] -
86:22
write [2] - 31:9;
59:22
writing [3] - 12:23;
50:6; 168:8
written [3] - 28:23;
73:12; 74:2
wrongdoing [1] -
80:1
wrongly [1] -
74:23
wrote [5] - 53:4;
76:15; 85:12;
158:13; 162:22

## Y

year [13] - 27:13;
48:10; 49:23;
76:17; 99:19;
100:16; 102:11, 13;
125:2; 130:6;
131:1; 159:17;
165:17
years [58] - 5:19;
7:6, 15, 20; 8:16;
10:21; 19:2; 20:5;
23:4; 25:9; 31:8,
19; 37:19; 41:21;
42:4, 20; 43:18;
66:19; 67:8; 81:5;
83:8; 88:17; 89:5;
95:22; 97:13;
101:3, 9; 104:5, 9;
105:3; 113:11;
119:11; 123:21;
124:9, 13, 16;
134:6; 135:15;

140:12, 14; 144:20;
145:21; 146:19;
147:16; 152:7;
156:13; 159:16, 19;
161:22; 162:20;
167:4
yelled [1] - 152:14
yesterday [9] -
16:7, 15; 18:6;
19:6; 34:20; 35:15;
36:11; 56:20; 64:11
York [2] - 32:8;
163:14
younger [5] -
22:12; 104:5, 7;
105:8; 107:11
yourself [5] -
13:13, 17; 18:15;
64:1; 138:10
YU [3] - 3:2; 68:9;
128:3

## Z

zealousness [1] -
142:15

**29**

**COMMONWEALTH OF MASSACHUSETTS**
**BOARD OF BAR OVERSEERS**
**OF THE SUPREME JUDICIAL COURT**

|  |  |  |
|---|---|---|
| _____ ) | | |
| **In the Matter of** ) | | |
| **ROBERT A. GEORGE, SR.** ) | **SJC No. BD-2012-050** | |
| ) | | |
| **Petition for Reinstatement** ) | | |
| _____) | | |

## HEARING PANEL REPORT

**I.    Introduction**

On May 19, 2019, the petitioner, Robert A. George, Sr., filed his petition for

reinstatement with the Supreme Judicial Court.  A hearing was held October 20, 21 and 23, 2020.

In addition to the petitioner, the following witnesses testified in support of the reinstatement

petition:  Edward Hinchey, Rosemary Scapicchio, Donald Cox, William Weishaupt, Jr., the Hon.

Nancy Gertner, Peter Cantanese, Paul V. Kelly, the Hon. Mel L. Greenberg, and Meghan

George.  Bar counsel called no witnesses, but Edward O'Brien, Sr., the father of a former client

of the petitioner, requested permission to testify in opposition and was allowed to do so.  Sixty-

two exhibits were initially admitted into evidence.  At the end of the hearing on October 23,

2021, bar counsel did not oppose reinstatement.

On December 15, 2020, we issued an "Order and Notice of Reopened Hearing," where

we required the production of certain specified documents and indicated we would take further

testimony from the petitioner.  Those documents were produced and marked as exhibits 63-69.

We took additional testimony from the petitioner on January 22, 2021.  After considering the

evidence and testimony, we recommend that the petition for reinstatement be allowed.

**II.    Standard**

A petitioner for reinstatement to the bar bears the burden of proving that he has satisfied

the requirements for reinstatement set forth in S.J.C. Rule 4:01, § 18(5), namely, that he

possesses "the moral qualifications, competency and learning in law required for admission to

practice law in this Commonwealth, and that [his] resumption of the practice of law will not be detrimental to the integrity and standing of the bar, the administration of justice, or to the public interest." Matter of Leo, 484 Mass. 1050, 1051 (2020), quoting Matter of Weiss, 474 Mass. 1001, 1002, 32 Mass. Att'y Disc. R. 263, 264-265 (2016).  The S.J.C.'s rule establishes two distinct requirements, focusing on (1) the personal characteristics of the petitioner and (2) the effect of reinstatement on the bar and the public. Matter of Gordon, 385 Mass. 48, 52, 3 Mass. Att'y Disc. R. 69, 73 (1982).

In making these determinations, a panel considering a petition for reinstatement "looks to '(1) the nature of the original offense for which the petitioner was disbarred, (2) the petitioner's character, maturity, and experience at the time of his disbarment, (3) the petitioner's occupations and conduct in the time since his disbarment, (4) the time elapsed since the disbarment, and (5) the petitioner's present competence in legal skills.'" Matter of Prager, 422 Mass. 86, 92 (1996); Matter of Hiss, 368 Mass. 447, 460, 1 Mass. Att'y Disc. R. 122, 133 (1975).

## III.   Disciplinary History

The petitioner was admitted to the bar of the Commonwealth on December 18, 1980. (Tr. I:26-27, petitioner; Ex. 1, p. RAG 0001).  He was disbarred after multiple felony convictions for money laundering, money laundering conspiracy, aiding and abetting money laundering, and structuring financial transactions to avoid reporting them. (Ex. 5, indictment; Ex. 6, jury verdict form; Ex. 10, judgment in a criminal case; Ex. 11, the amended judgment; and Ex. 15, the First Circuit decision affirming his conviction on all counts).[1]

The factual background of the convictions is as follows.  In early 2009, the petitioner, a well-known criminal defense lawyer, had a chance encounter with a former client and ex-convict, Robert Dardinski, who had recently been released from prison after being convicted of

---

[1] Our summary of the petitioner's criminal conduct is based in part on the description in United States v. George, 761 F. 3d 42 (1st Cir. 2014), the decision of the U.S. Court of Appeals for the First Circuit affirming the petitioner's conviction, admitted as Ex. 15.  The brief for the United States in the petitioner's appeal from his convictions, admitted as Ex. 13, includes excerpts of recordings of the petitioner that support the conviction and the First Circuit's decision.

larceny in a scam where he had "sold" some repossessed cars that were not his to sell, pocketing $750,000 from would-be buyers without giving them the autos.[2]  (Ex.15, p. RAG 0574; Ex. 13, p. RAG 1018).  When Dardinski told the petitioner that he still had "a bunch of [the money] hidden," the petitioner told him "I can get rid of it for you."  (Ex. 15, pp. RAG 574-575; Ex. 13, pp. RAG 1018-1019).  Dardinski reported this to a DEA agent for whom he was a paid informant and, in a follow-up meeting, the petitioner gave Dardinski the name of a mortgage broker who could "clean up" the cash proceeds of this scam.  Dardinski told the petitioner that he had some drug money to launder, too, and the petitioner reported back that the broker had "agreed to do the rest," meaning he could handle the drug money as well.  (Ex. 15, p. RAG 575; Ex. 13, pp. RAG 1018-1019).  Dardinski was to give the broker $100,000 and the broker would cut him a check for $80,000 from the mortgage company account and pocket the rest as a fee.  (Ex. 15, pp. RAG 575-576; Ex. 13, pp. RAG 1019-1020, 1027-1030).  After this happened twice and the government learned of it, the broker agreed to cooperate with the DEA as well.  (Ex. 3, pp. RAG 1031-1032).

The petitioner had told Dardinski that he was not getting any money from brokering Dardinski's money laundering.  When the broker asked the petitioner about those statements, the petitioner told the broker that what he had told Dardinski was "something I made up."  The petitioner wanted the $20,000 in referral fees that the broker paid him "for helping to make the transactions happen." (Ex. 15, p. RAG 0576; Ex. 13, p. RAG 1018).

In late January 2011, while the money "laundering was going on, [the petitioner] also told Dardinski that he would pay him a fee for client referrals.  So Dardinski introduced [the petitioner] to 'Angel,' a supposed drug-dealing friend of his who was really [an] undercover officer . . . ."  Dardinski told the petitioner that "the coke money he had laundered through [the mortgage broker] had come from drug sales involving 'Angel.'"  Thereafter, on March 4, 2011, the petitioner met with "Angel," who paid the petitioner a $25,000 cash retainer.  That same

_____

[2] The petitioner had not represented Dardinski in connection with these charges, to which Dardinski pleaded guilty and for which he served four years in state prison.  (Ex. 15, p. RAG 0574).

day, the petitioner "deposited $9,000 in cash into an account at a Bank of America branch located in Needham, Massachusetts.  Twelve minutes later, he deposited $8,000 in cash into [the same] account at a different Bank of America branch located a half mile away."  Two weeks later, the petitioner gave Dardinski a $2,500 check payable to a fictitious office disposal company, representing Dardinski's referral fee on the retainer.  (Ex. 15, pp. RAG 576-577; Ex. 13, pp. RAG 1036-1038; Ex. 65; Ex. 66).

After a lengthy trial, at which he did not testify, the petitioner was convicted of the following: "money-laundering conspiracy (count 1) [18 U.S.C. §§ 1956(h), 1957], aiding and abetting money laundering (counts 2–3) [18 U.S.C. §§ 2, 1956(a)(3), money laundering (counts 4–6) [18 U.S.C. § 1956(a)(3)], and structuring financial transactions to avoid reporting them (count 7) [31 U.S.C. § 5324(a)(1)]."  (Ex. 15, p. RAG 0577).

The petitioner was sentenced to forty-two months in prison (one-third below the sentencing guidelines).  (Tr. II:83, Gertner).  He served thirty-three months in Schuylkill Federal Correctional Camp in Minersville, PA. (Tr. I:50-51, petitioner).  He was released from a one-year supervision (probation) on January 28, 2017.  (Ex. 1, pp. RAG 0015, 0069, 0002).

Bar counsel filed a notice of conviction with the S.J.C. on June 12, 2012, and the petitioner was temporarily suspended on June 21, 2012.  Bar counsel filed a petition for discipline on November 5, 2012, charging misconduct and rule violations based on the petitioner's convictions for serious crimes.  (Ex. 1, p. RAG 0035; Ex. 16, pp. RAG 0612-0614).  BBO proceedings were deferred pending the outcome of the petitioner's appeal, which was decided on July 30, 2014. (Ex. 15, p. RAG 0573). The petitioner submitted an Affidavit of Resignation dated January 9, 2015. (Ex. 1, p. RAG 0020).  The Board accepted it on February 23, 2015 (Ex. 1, pp. RAG 0033 and 0035) and the Court disbarred him on March 15, 2015, retroactive to June 21, 2012. (Ex. 1, pp. RAG 0033-0034; Ex. 17).

## IV.  Findings and Conclusions

### A.  Moral Qualifications

The conduct giving rise to the petitioner's suspension is affirmative proof that he lacks

the moral qualifications to practice law.  See <u>Matter of Hiss</u>, 368 Mass. at 460, 1 Mass. Att'y

Disc. R. at 134.  That the misconduct "continues to be evidence against  . . . [the petitioner] with

respect to lack of moral character at later times [is] in accordance with the principle that 'a state

of things once proved to exist may generally be found to continue.'" <u>Matter of Hiss</u>, <u>id</u>. (citation

omitted).  To gain reinstatement, the petitioner has the burden of proving that he has led "'a

sufficiently exemplary life to inspire public confidence once again, in spite of his previous

actions.'" <u>Matter of Prager</u>, 422 Mass. at 92, quoting <u>Matter of Hiss</u>, 368 Mass. at 452, 1 Mass.

Att'y Disc. R. at 126.  He can do this by proving he has reformed, since a "fundamental precept

of our system is that persons can be rehabilitated." <u>Matter of Ellis</u>, 457 Mass. 413, 414, 26 Mass.

Att'y Disc. R. 162, 163 (2010).

## 1.  The Petitioner's Questionnaire Responses and Hearing Testimony

We find and conclude, as explained below, that the petitioner has demonstrated that he

has the moral character required for readmission to the bar.  We reach this conclusion despite

having been concerned by the petitioner's written description of his criminal misconduct and his

initial hearing testimony about it.  First, Part I of his Reinstatement Questionnaire was not

completely forthcoming about the nature and extent of his own criminal conduct, particularly his

money laundering and structuring.  (Compare Ex. 1, p. RAG 0002, which lists only some of the

various criminal statutes resulting in his convictions, with RAG 0055, which lists all of the

offenses.)

Also in his Personal Statement, the petitioner was not candid about the motivation for his

misconduct, writing, "After all these years, I am still searching for the 'why.'  I was financially

secure then . . . ." (Ex. 1, p. RAG 0013).  Yet the documentary evidence clearly demonstrated

that he was not, and at the hearing, he modulated that position, acknowledging that he knew now

that he had financial problems at the time of his arrest, while clinging to the claim that he had not

realized it then. He denied that financial pressures played any role in his crimes, saying that "the

financial pressures that were on me at the time, I didn't realize them at the time the way I do now

. . . . So I can tell you that these acts are [sic] not the acts of greed."  (Tr. III:80-81, petitioner).

Yet the evidence of his financial position at the time of his arrest in 2011 was clear.  He admitted to owing the IRS about $563,000[3] at that time (Tr. IV:7, "with penalties and interest, . . . the number was $500,000 thousand or more"), and still having a remaining indebtedness of about $150,000 to $160,000 to the Mass. Department of Revenue, with whom he is on a $500 a month payment plan.  (Ex. 3, pp. RAG 0117 and 157-158, debt of $175,561.87; Tr. I:99-100, 120, petitioner; paid back $11,000).  Moreover, at the time of his arrest, the petitioner had not filed federal income tax returns for 2007 and 2008, was behind on his taxes for two years (Tr. IV:7, petitioner), and owed the IRS $90,472.52 for the tax year 2007; $128,390.92 for 2008, and $167,016.92 for 2009.  (Ex. 13, p. RAG 1038).

When questioned further about this discrepancy on the fourth day of his hearing, the petitioner testified that in 2011 he was not focused on his financial pressures because he was "just going day to day, court to court to court, family event to family event."  He also explained that he had been expecting a large referral fee from an anticipated recovery in a civil case, which he ultimately did not receive because the judgment for the plaintiff was reversed on appeal.  (Tr IV:6-7, petitioner).  We credit these explanations.

Similarly, on several occasions during his initial testimony, the petitioner showed an unfortunate tendency to try to minimize or explain away his crimes by adding or omitting detail to his narrative that did not square with the record.  For instance, with respect to the charge that he accepted a fee for referring Dardinski to Hansen, he at first testified that Hansen had "chased [him] down" to pay him $20,000 in cash. (Tr. I:192-193, petitioner).  He later clarified that what he meant by "chased [him] down" was that Hansen had called to ask why he had not negotiated Hansen's $20,000 check.  (Tr. IV:37-38, petitioner).  He also admitted that, after he twice ascertained that Hansen's check was not backed by sufficient funds, he told Hansen this and

---

[3] His longtime and close friend, William J. Weishaupt, Jr., also knew of the petitioner's tax problems with the IRS at the time of his arrest and initially thought this was the reason when he learned that the petitioner had been arrested.  (Tr. II:52, Weishaupt).  The IRS has since settled its claim of $563,000 for $25,000, which the petitioner paid by a loan from his wife's family.  (Tr. I:99, 123, petitioner).

thereafter went to Hansen's office and received $20,000 in cash (id.; see also Ex. 13, p. RAG 01035), and that part of the reason he referred Dardinski to a money launderer (Hansen) was that he hoped to make money on the referral (Tr. IV:22, petitioner).

He also described, as a "terrible mistake," his having referred Dardinski to the mortgage broker he knew would help Dardinski (Tr. I:48, petitioner), although at the time he thought he had done nothing wrong, because all he had done was to make a referral.  (Tr. I:159, petitioner).  However, the petitioner did much more than make a referral: he had advised Dardinski how to effect the money laundering scheme, for example, by telling Dardinski to tell the broker that he should be "giving you a mortgage against a piece of property," and that "the check should be cut from East Coast Mortgage directly to [Dardinski's] company."  (Ex. 13, p. RAG 1077).

Similarly, with respect to his testimony concerning the $25,000 cash retainer that "Angel" paid him, the petitioner initially testified that he had deposited $8,000 into one account at the Bank of America and then later deposited $9,000 into a different account at the Bank of America. (Tr. I:49; Tr. III:75, petitioner).  Then, he testified that he had deposited $9,000 into his office account, which was at Bank of America, but then four or five hours later, he put an additional $8,000 into the same account, after learning that his wife had sent a check to the Department of Revenue for which there otherwise would be insufficient funds.  (Tr. III:91, 73-74, petitioner).  He corrected this testimony on the fourth day of the hearing, acknowledging that the deposits had been twelve minutes apart (and that he "always knew" that they were "twelve minutes apart") (Tr. IV:10-11, 13, petitioner).  He explained that he realized the problem created by the check to the DOR when he looked at his check register after making the first deposit, and that he had no memory of when that day he had spoken to his wife. (Tr. IV:14, petitioner).  Although this final version of the story was late in coming, we credit it.

Petitioner's further testimony on January 22, 2021 (in part as noted above) allayed some of our concerns about his initial characterization of his criminal activity, as well as the tendency to seek to cast a less unfavorable light on his conduct.  His later testimony was more fully consistent with his general statements, made throughout these proceedings, that he appreciated

the criminality of his conduct and accepted responsibility for his actions.  (Ex. 1, p. RAG 0013).

We conclude that the petitioner understands what he did, appreciates that it was dishonest and

shameful, is suitably remorseful, and is not likely to reoffend.  The petitioner does not question

the legitimacy of his convictions.  While claiming he was the victim of a sting and efforts by the

government and its cooperating witnesses to entrap him, he admits he should not have taken the

bait and should have told Dardinski to go elsewhere.  (Tr. I:147, 203, petitioner).[4]  More

persuasive than the petitioner's own testimony was that of his supporting witnesses, including his

older daughter, Meghan George, about the shame and embarrassment to which he subjected his

entire family, and that he would not do this to them again.[5]

### 2.      Education and Work In and After His Release from Prison

While imprisoned for his convictions, the petitioner studied landscaping and horticulture

and became nationally certified.  (Tr. I:52, petitioner; Ex. 1, pp. RAG 0101, 0102, 0103, 0106,

0107, and 0108).  Also while in prison he earned an M.B.A. from California Coast University; he

received his degree in 2014.  (Tr. I:52-53, petitioner; Ex.1, RAG 008, 0015, and 0074).

In addition, while incarcerated, the petitioner put his education and skills to good use to

assist his fellow inmates.  He taught weekly classes on Sunday mornings about current events,

trends in the legal system, and job-interviewing techniques. He assisted fellow inmates in

classroom instruction on a variety of subjects ranging from criminal justice to the economy,

understanding institutional policies and procedures and dealing with personal issues at home.  He

---

[4] The petitioner specifically referred to this as a "reverse sting," where " . . . the government creates the crime and creates the opportunity for you to commit the crime and you get -- you -- if you're lured into criminal activity, that's what is -- that's what a reverse sting is."  (Tr. I:203, petitioner).  At his criminal trial, the petitioner received an entrapment instruction to the jury, which it rejected "because the defendant was, at all times, a ready and willing participant in this drug money laundering conspiracy." (Ex. 7, RAG 0184).  The record is clear that it was the petitioner who had asked Dardinski about his money and then offered to—and did—put Dardinski in touch with the mortgage broker who laundered the money for him.  Moreover, no one asked or told the petitioner to structure the cash deposits of the drug money he deposited in his own bank account.

[5] We also acknowledge the letters of unqualified support from every member of the petitioner's immediate family:  his wife, Deborah May-George (Ex. 48); his older daughter, Meghan George Deschamps, Esq. (Ex. 36), who also testified; his younger daughter, Meredith George Wieland (Ex. 37), and his son, Robert A. George, Jr. (Ex. 35), as well as his cousin, Sam Hyder (Ex. 42).

also coached athletic teams for fellow inmates.  (Ex. 1, p. RAG 0016).  As appears from the letters from fellow inmates (Exs. 20, 24, 27, 32, and 38), he provided support and guidance to other inmates who were having difficulty adjusting to their lives in prison.

Since his release from prison, the petitioner has worked at two different car dealerships (Central Auto Team and later Balise Motor Sales Co.).  (Ex. 1, p. RAG 0016; Ex, 3, pp. RAG 0114 and 00121-0125).[6]  We received testimony from Peter Cantanese of Central, who has known the petitioner for many years, from legal matters that the petitioner handled for him and family members prior to the petitioner's conviction and incarceration.  (Tr. II:109-110, Cantanese).  After the petitioner was released from prison, he asked Cantanese for a job.  He started at the bottom, shoveling snow and detailing cars.  He then worked as a floor salesman for about three months.  (Tr. I:78-79).  After this, Cantanese sent the petitioner to school to become a business manager, and then to training in finance and insurance, where he was certified as having completed the requirements for legal and ethical standards training.  (Tr. II:110-113, Cantanese; Ex. 1, p. RAG 0097; Ex. 23, support letter from James Beauregard, the northeast regional manager of JM&A, which conducted these training programs).  The petitioner worked for Cantanese at two different locations before finding work at a different dealership closer to the petitioner's home on Cape Cod.  (Tr. I:80-81, petitioner; Tr. II:113-118, Cantanese).  Cantanese said the petitioner "did a great job" and was well-liked and that he would hire the petitioner "back in a minute."  (Tr. II:118-119).  A fellow finance director at Central Auto Team, Justin T. Aptt, also wrote a letter of recommendation for the petitioner, praising his work ethic and his "transparency, passion, honesty and resilience."  (Ex. 20).

The petitioner left Central Auto in February 2020 to work at Balise Motor Sales Company.  (Ex. 1, p. RAG 0004).  He worked as a finance/business manager until a month before the hearing, leaving that job to prepare for these reinstatement proceedings, as well as to plan to travel to California, where his oldest daughter was expecting twins.  (Tr. I:81-82,

---

[6] As appears from the petitioner's W-2 statements, Central is an umbrella name for several car dealerships.

petitioner).  David Cuesta, general manager of Balise, also wrote a letter, saying he was "one of the best-liked and most effective business managers I have had the pleasure of working with in my long career."  (Ex. 29).

In addition, the petitioner works part time as a paralegal for the law firm of Jackson Lewis, P.C. (Tr. I:75-76, petitioner) and for Brad Bailey Law (Ex. 3, pp. RAG 0114-0115). Attorney Paul V. Kelly of Jackson Lewis testified on the petitioner's behalf (Tr. II:127-165) and Attorney Bailey wrote a letter supporting the petitioner's reinstatement.  (Ex. 22).

### 3.    <u>Witness Testimony and Letters</u>

<u>Witnesses</u>

Several witnesses testified on behalf of the petitioner.  The first was Edward Hinchey, a retired Boston trial lawyer, who has known the petitioner for twenty-seven or twenty-eight years, and considers the petitioner to be one of his closest friends.  (Tr. I:230-231, Hinchey).  When the petitioner was charged in federal court, Hinchey wrote a letter on his behalf.  After the petitioner's conviction and incarceration, Hinchey drove to FCC Schuylkill in Minersville, PA (about six or seven hours away) to visit him several times.  (Tr. I:231-233, 136-237, Hinchey). Hinchey has spent many hours talking with the petitioner since his conviction and release and considers him a "changed man" who wants "to redeem himself and prove to the world that he wasn't a bad person."  (Tr. I:236-238, 242-243, Hinchey).  Hinchey supports the petitioner's reinstatement efforts and said he would be a "great asset" to the bar, to young lawyers, and to criminal defendants.  (Tr. I:246, Hinchey).

We next heard from Rosemary Scapicchio, a criminal defense attorney in Boston.  (Tr. I:248-250, Scapicchio).  As a young lawyer, she followed the petitioner's career and would ask him questions; he served as a mentor.  At one point in time, they worked out of the same office suite.  She observed the long hours he worked, his dedication to his cases and his willingness to help other attorneys.  (Tr. I:253-259, 260, Scapicchio).  She opined that, if reinstated, the petitioner would be welcomed back to the bar and would be an asset to the Committee for Public Counsel Services.  (Tr. I:264-266, Scapicchio).  She also opined that the petitioner would never

violate the law again; that he has "learned his lesson"; that he would "be a lot slower and a lot more cautious and careful than he was before"; and that he is a "changed man."  (Tr. I:267-268, Scapicchio).

Donald Cox, a Marine Corps veteran, who founded and runs two large charities, has known the petitioner since 1980.  (The petitioner's extensive volunteer activities for these charities are discussed in the next section.)  Cox knew of the petitioner's conviction and incarceration and testified that the petitioner is much humbler now and more empathetic.  (Tr. I:278, Cox).  He also testified that the petitioner's reinstatement would be beneficial to the veterans who need legal advice and representation in the veterans' courts.  (Tr. I:294-295, Cox).

William J. Weishaupt, Jr. is a former FBI special operations officer who is now chief of investigations in the Ulster County, NY, district attorney's office.  (Tr. II:33-40, Weishaupt).  He has known the petitioner since college and they have been close friends since the late 1970's. They vacationed together and their children grew up together.  (Tr. II:40-41, Weishaupt).  He testified that the petitioner was dedicated to his clients but also is a devoted family man who compartmentalized his work from his family, which is very close-knit.  (Tr. II:41-43, 46-47, 49, Weishaupt).  Weishaupt attended parts of the petitioner's trial and is aware of the charges of which he was convicted, which he discussed.  (Tr II:49-51, Weishaupt).

Paul V. Kelly is partner at the Boston office of Jackson Lewis.  He first met the petitioner in the mid- to late-1980's when he was a federal prosecutor and the petitioner represented a defendant in a case of his.   (Tr. II:131, Kelly).  Kelly found him to be a skilled practitioner and after that case they became friendly (and remained so), although they do not socialize together. (Tr. II:132-133, Kelly). In 2019, the petitioner told Kelly that he would be seeking reinstatement and asked if he could work for Kelly's firm as a paralegal or legal assistant, which Kelly's firm agreed to.  (Tr. II:134, Kelly).  At Jackson Lewis, Kelly had the petitioner do legal research; on a few occasions, Kelly and the petitioner met with a client together, after which the petitioner provided Kelly with reactions, guidance and support.  Kelly and his colleagues at the firm all found the petitioner's work and insights to be very helpful.  (Tr. II:137, 140, Kelly).

The final witness to testify on behalf of the petitioner was his oldest child, Meghan George, who is also a lawyer.   She had been an intern at the U.S. Attorney's Office, in the organized crime drug enforcement task force, during law school, at the time of her father's arrest and trial.  (Tr. III:102-103, George).  She testified at length about her happy childhood and how devoted her father was to his family, taking time off from work to attend her sports events, dance recitals and other events, and how he would always be home for the family dinner, despite the consuming nature of his law practice.  (Tr. III:107-109, George).  She testified how she, her siblings and their mother all sat through the petitioner's trial.  (Tr. III:114-115, George).  In particular, she testified persuasively how her father had changed:  that he is much calmer and now takes time to enjoy the simpler things in life including his extensive volunteer activities. (Tr. III:116-118).  We were persuaded by her testimony that the petitioner is keenly aware of the pain and suffering, and the nightmare of his trial and incarceration, to which his mistakes had subjected his family; that he has proven that he is sorry; and that, as a result of the consequences of his actions, the petitioner would never make any such mistakes again.  (Tr. III:118-123, George).

Letters

The petitioner submitted thirty-nine letters of recommendation in support of his reinstatement petition. (Exs. 19-57 and Ex. 61).  Particularly helpful were letters from people who have known the petitioner both before and after the misconduct, and were able to discuss in specific detail the nature, extent and manifestation of his reform.[7]  See, e.g., Ex. 19, letter from Ernest G. Abdalah; Ex. 22, letter from Richard B. (Brad) Bailey, Esq.; Ex. 26, letter from Eric L. Brown, Psy.D.; Ex. 30, letter from John H. Cunha, Jr., Esq.; Ex. 31, letter from Neil A. Doig;

---

[7] By contrast, evidence that does not distinguish the petitioner's conduct before and after his underlying discipline, that sheds little light on his rehabilitation, or that does not acknowledge the petitioner's unethical conduct, carries little weight.  See Matter of Dawkins, 432 Mass. 1009, 1011, n.5, 16 Mass. Att'y Disc. R. 94, 96, n.5 (2000); Matter of Corben, 31 Mass. Att'y Disc. R. 91, 101 (2015); Matter of Lee, 28 Mass. Att'y Disc. R. 540, 549-551 (2012).  The Court has specifically disclaimed reliance on letters where the writers "knew little or nothing about the reasons for either of [the petitioner's] suspensions or of the fact that he had been suspended twice."  Dawkins, id.

John H. Cunha, Jr., Esq.; Ex. 33, letter from Daniel P. Fitzgerald, Esq.; Ex. 34, letter from Mark Gannon; Ex. 39, letter from Peter P. Harrington, Jr., Esq.; letter from Francis E. Hartig, Esq.; Ex. 41, letter from Christopher C. Henes, Esq., Col USA (Ret.); Ex. 43, letter from Mark Lambert; Ex. 45, letter from Robert N. Launie, Esq.; Ex. 46, letter from Timothy Long; Ex. 47, letter from State. Rep. Christopher M. Markey; Ex. 49, letter from Steven A. Meyer, Esq.; Ex. 51, letter from Francis O'Bryant; Ex. 52, letter from Gary G. Pelletier, Esq.; Ex. 53, letter from the Very Rev. Dr. Joseph F. Purpura; Ex. 54, letter from Thomas P. Shamshak; Ex. 55, letter from Peter J. Stelzer, Esq.; Ex. 56, letter from Dennis Teehan; and Ex. 57, letter from Donna and Keith White.

We also received letters from several prison inmates at FCC Schuylkill, attesting to the petitioner's selfless assistance of fellow inmates while he was incarcerated.  (Exs. 20, 24, 27, 32, and 38).

### 4.   <u>Volunteer Activities</u>

Since his release from prison, the petitioner has been doing volunteer work for the Mass. Military Support Foundation and the U.S.A. Veterans and Military Support Foundation, two sister organizations, where he volunteers on a weekly basis.[8]  His activities include driving trucks to deliver supplies and food, loading and unloading trucks, picking up donations from toy drives, wrapping Christmas gifts, and collecting backpack supplies from all over New England to provide back-to-school bags.  (Tr. I:281-282, Cox).  Basically, any time Cox needed someone to help, even nights and weekends, he would call the petitioner, who would do so "without even asking any questions" and never says "no."  (Tr. I:282-284, 278, Cox).

The petitioner's other volunteer activities included the following:  the Brewster Ladies Library, where he organized books for book sales and donations to schools and communities; Habitat for Humanity, where he assisted in the construction of five new affordable houses in Brewster, MA; the Family Food Pantry of Cape Cod, where he leads a weekly warehouse crew

---

[8] Mass. Military services 340,000 veterans' families and about 60,000 active-duty families. "U.S.A." serves roughly 800,000 people throughout the New England States. (Tr. I:279, Cox).  Cox's letter in support of the petitioner (Ex. 28) concisely but eloquently details more of the charities' efforts and the petitioner's selfless and modest volunteer activities.

hat unloads tons of food deliveries distributed by the Greater Boston Food Bank and serves over 9,300 clients, to whom it distributes over 1.5 million meals and over 30 tons of gently used clothing; the Community Development Corporation of Boston, where he assisted in online real estate research and planning for inner city women;  the Cape Cod Literacy Program, where he was certified  as a volunteer tutor; and the Francis O'Bryant Mentorship Program, where assisted in planning mentorship programs for inner-city young men.  (Ex. 1, RAG 0004-0005, 0015-0016; Ex. 50, letter from the Food Pantry of Cape Cod; Ex. 51, letter from Francis O'Bryant, who founded the Francis O'Bryant Mentorship Program).

We were impressed by the petitioner's work ethic, resourcefulness, and his commitment to charities, including the support of veterans and the families of active-duty service people. We note that evidence of moral reform can be found in good works that demonstrate a sense of responsibility to others.  See Matter of Wong, 442 Mass. 1016, 1017-1018, 20 Mass. Att'y Disc. R. 540, 544 (2004) (Court notes approvingly physical labor, active role in church community, participation in sons' activities and community work); Matter of Sullivan, 25 Mass. Att'y Disc. R. 578, 583 (2009) ("[a] petitioner's moral character can be illustrated by charitable activities, volunteer activities, commitment to family, or community work.").

### 5.    Conclusions as to Moral Fitness

Having considered and weighed the evidence set out above, we conclude that the petitioner has carried his burden.

Where, as here, there is compelling third-party evidence of reform and good moral character in general, we focus on the fundamental issue of whether the petitioner has "adduce[d] substantial proof that he has 'such an appreciation of the distinctions between right and wrong in the conduct of men toward each other as will make him a fit and safe person to engage in the practice of law.'"  Matter of Hiss, 368 Mass. 447, 457, 1 Mass. Att'y Disc. R. 122, 130 (1975), quoting In re Koenig, 152 Conn. 125, 132, 204 A.2d 33, 36 (1964).

While the petitioner indulged in a propensity to try to minimize his misconduct, he does not argue that he did not commit the crimes and he is sincerely contrite.  This is one measure of

reform because it demonstrates that the petitioner understands the nature of the misconduct and its wrongfulness and can avoid its repetition armed with that understanding.  On balance, the abundant compelling testimony of the petitioner's witnesses (whose testimony we have summarized at some length for that reason), coupled with the many strong letters of support and his admirable charitable activities, far outweigh any propensity to minimize his conduct for which he has taken full responsibility with a complete description of said conduct. We conclude that the petitioner has shown that he is morally fit to resume the practice of law.

**B.**   **Competence and Learning in Law**

Under S.J.C. Rule 4:01, § 18, a petitioner must demonstrate that he has the "competency and learning in law required for admission to practice law in this Commonwealth."  We conclude that he has done so.

The petitioner practiced law from 1980 until his suspension in 2012, handling high profile criminal defense cases.  (Tr. I:29-30, petitioner; Ex. 1, RAG 0014-0015).  At this point, he has been out of practice since June 21, 2012, about eight and one-half years.

In preparation for his reinstatement hearing, the petitioner has taken over thirty-one MCLE online courses (RAG 0075-0095), as well as a forty-hour mediation training program (RAG 0097).  He reads the Massachusetts Lawyers Weekly and the ABA Journal regularly, as well as weekly opinions from the U.S. Supreme Court, federal district courts, the S.J.C. and the Massachusetts Appeals Court.  (Ex. 1, pp. RAG 0009 and 0016).  Our conclusion is supported by the testimony of Paul Kelly, for whom the petitioner worked as a paralegal during while disbarred.  Kelly found the petitioner's work and input to be very beneficial to his clients.  (Tr. II:139-140, Kelly).

The petitioner now lives on Cape Cod and testified that he would likely have an office there.  He wants to do appellate work and white-collar criminal defense.  He does not want or need to be involved in a high-pressure, high-volume practice with many clients.  He would like to do more pro bono work and more community work for people.  (Tr. III:87-88, petitioner).  He would also like to collaborate with the two attorneys for whom he now works as a paralegal, Paul

V. Kelly of Jackson Lewis, who testified on his behalf (Tr. II:127-165) and Brad Bailey, who wrote a letter in support of his reinstatement.  (Ex. 22).

       **C.**      **Effect of Reinstatement on the Bar, the Administration of Justice
and the Public Interest**

"Consideration of the public welfare, not [a petitioner' s] private interest, dominates in considering the reinstatement of a disbarred applicant." Matter of Ellis, supra, 457 Mass. at 414, 26 Mass. Att'y Disc. R. at 164.  The public's perception of the legal profession as a result of the reinstatement, and the effect on the bar, must be considered.  "In this inquiry we are concerned not only with the actuality of the petitioner's morality and competence, but also [with] the reaction to his reinstatement by the bar and public."  Matter of Gordon, supra, 385 Mass. at 52, 3 Mass. Att'y Disc. R. at 73.  "The impact of a reinstatement on public confidence in the bar and in the administration of justice is a substantial concern." Matter of Waitz, 416 Mass. 298, 307, 9 Mass. Att'y Disc. R. 336, 345 (1993).

Consistent with the principle of redemption, there is precedent for reinstating to the bar petitioners with felony convictions or notorious misconduct.  E.g., Matter of Allen, 400 Mass. 417, 425, 5 Mass. Att'y Disc. R. 10, 23 (1987) (allowing reinstatement almost ten years after conviction of conspiracy to commit arson and conspiracy to defraud an insurance company, despite the risk "that a few members of the public may be perturbed if petitioner is reinstated"); Matter of Gibson, 32 Mass. Att'y Disc. R. 178, 189 (2016) (former felon reinstated in 2016 after 1999 indefinite suspension; "[t]he public will not be concerned about the integrity of the bar and its disciplinary system if a person like the  petitioner is allowed to return to the law.")  Cf. Matter of Finnerty, 34 Mass. Att'y Disc. R. 103, 111 (2018) (allowing reinstatement of attorney disbarred in 2008 for urging client to lie to protect the brother of criminal/fugitive Whitey Bulger; Single Justice noted that "[d]espite the gravity of the events underlying Finnerty's disbarment—and the seriousness of the charges that prompted that sanction—Finnerty appears to have come to terms with what led him to this juncture in his professional life").  See also Matter of Cintolo, 6 Mass. Att'y Disc. R. 54 (1990) (disbarred retroactive to 1987 and incarcerated

following his conviction for obstruction of justice), 10 Mass. Att'y Disc. R. 40 (1994) (reinstated after felony conviction and incarceration).

The petitioner submitted thirty-nine letters of recommendation in support of his reinstatement petition. (Exs. 19-57 and Ex. 61, the latter of which is from a retired superior court judge). Two former judges—Nancy Gertner of the federal district court, and Mel Greenberg of the Massachusetts Appeals Court—both testified in support of the petitioner.[9] We give weight to the opinions, as retired members of the judiciary, that the petitioner's reinstatement would not adversely affect the public's perception of the legal profession and would not be detrimental to the administration of justice. (Tr. II:88-92, Gertner; II:179-182, Greenburg). We also acknowledge letters from James J. Brennan, a retired chief probation officer (Ex. 25) and the Hon. Isaac Borenstein (ret.) (Ex. 61), who were not friends of the petitioner but who wrote that his reinstatement would not be detrimental. Paul V. Kelly, an experienced former federal prosecutor and now a white-collar criminal defense lawyer, for whom the petitioner works as a paralegal, also testified that the petitioner's reinstatement would be a "credit to the bar" and not be detrimental to the administration of justice or the public interest. (Tr. II:149-150, Kelly).

We acknowledge the testimony of Edward O'Brien, Sr., who contacted board counsel on his own and testified in opposition to the petitioner's reinstatement. Mr. O'Brien is the father of a former client of the petitioner (Edward O'Brien, Jr., or "Eddie") who was convicted of murdering the mother of a friend when Eddie was fifteen years old. (Tr. II:14, O'Brien).[10] His testimony raised three points: that the petitioner, as Eddie's counsel, charged more than he said he would and never gave them an itemized bill (Tr. II:8-10, 13, 31, O'Brien); that he charged for

---

[9] Judge Greenberg testified on his own initiative, having learned of the reinstatement petition. (Tr. II:175-176, Greenberg). Neither judge had any personal relationship with the petitioner and therefore could not speak about his personal moral rehabilitation. (Tr. II: 78-79, Gertner; Tr. II:172-174, Greenberg). See footnote 7, above.

[10] We take administrative notice of S.J.C. decisions on two of the issues mentioned during the father's testimony. Commonwealth v. O'Brien, 423 Mass. 841 (1996) (whether it was proper to try Eddie as an adult rather than as a juvenile) and Commonwealth v. O'Brien, 432 Mass. 578 (2000) (upholding the defendant's conviction and addressing several issues).

the use of experts who were never hired or never called to testify at trial (Tr. II:9-10, 29-30, O'Brien); and that he failed to turn over his files to successor counsel for Eddie's several appeals and to otherwise cooperate with them.  (Tr. II:4-6, 18, 21, 26-28, O'Brien).

The petitioner testified again after Mr. O'Brien's testimony, and we credit the petitioner's testimony on several points.  First, that while he cannot recall what he initially quoted the O'Brien family, and cannot recall what he was actually paid, the hundreds (if not thousands) of hours he spent on this case were earned and more than exceeded what he was paid.  (Tr. III:19-20, 25-30, petitioner).[11]  Second, that some of the money was in fact spent on experts, even though they did not testify at trial, either because their testimony would not have been helpful or apparently because a foundation could not have been laid without calling Eddie to testify on his own behalf, which the petitioner believed would have been fatal to the case.  (Tr. III:31-34, 7-8, petitioner).  And third, the petitioner did not knowingly or intentionally fail to cooperate with successor counsel (Tr. III:50-51, 54-46, petitioner, indicating that he had communications of which the father was unaware), but in hindsight had destroyed his original files that he should have retained, but did not, in part because of the volume of material and the lack of scanning technology.  (Tr. III:45-47, 51-52, 60-61, 69-70, petitioner).  We credit the petitioner's rebuttal testimony and conclude that the father's testimony does not require denying a recommendation for reinstatement.

When asked how we could be assured that financial pressures would not affect his conduct as an attorney, the petitioner testified that he now wants a "more low-key, quiet existence" and "can't see [himself] "handling 50 cases at a time, appearing in three to four courts a day, running from case to case, trying cases for three and four months at a time."  (Tr. IV:16-17, petitioner).  We were actually more persuaded by the fact that he no longer has the financial pressures that he had before: he no longer has his expensive house in Westwood; his "personal overhead" today is a "fraction of what it was" in 2009 (Tr. IV:20-21, petitioner); and his children

---

[11] The petitioner also testified that his co-counsel were paid out of the fees he received from the O'Brien family. (Tr. III:69, petitioner).

are done with their schooling and have successful careers.  (Ex. 35, letter of Robert A. George, Jr.; Ex. 36, letter of Meghan George; Ex. 37, letter of Meredith George Wieland; Tr. III:99-102, testimony of Meghan George).

**V.      Conclusions and Recommendation**

As the Court said in <u>Matter of Prager</u>, 422 Mass. 86, 93 (1996), "The protection of the public is universally recognized as a significant and central goal of admitting only qualified persons to the practice of a particular profession."  With that as our litmus test, along with the other factors, we recommend that the petition for reinstatement of Robert A. George, Sr., be allowed.

Respectfully submitted,
By the Hearing Panel,

*Paula M. Bagger*
Paula M. Bagger, Esq., Chair

*Frank E. Hill, III*
Frank E. Hill, III, Member

*Marianne C. LeBlanc*
Marianne C. LeBlanc, Esq., Member

Dated:  March 23, 2021

19

CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the Hearing  Report of the Board of

Bar Overseers In the Matter of Robert A. George, Sr. Petition for Reinstatement, by email

only to Petitioner's counsel Thomas F. Maffei,  Esq., First Assistant Bar Counsel, Dorothy

Anderson, Esq., and Bar Counsel Rodney S. Dowell, Esq.

Dated this 23rd  day of March 2021.

BOARD OF BAR OVERSEERS

By  *June D. Risk*

June D. Risk
Legal Administrative Assistant

30

**From:** Dorothy Anderson
**To:** June Risk
**Subject:** RE: Robert George Reinstatement
**Date:** Wednesday, March 31, 2021 9:47:20 AM

Hi, June.

No, we will not appeal.

---

**From:** June Risk <j.risk@massbbo.org>
**Sent:** Wednesday, March 31, 2021 9:45 AM
**To:** Dorothy Anderson <d.anderson@massbbo.org>
**Subject:** Robert George Reinstatement

Good morning, Dorothy. Hope all is well with you.

Do you plan to file an appeal in this matter?

June D. Risk
Legal Administrative Assistant
Board of Bar Overseers
99 High Street
Boston, MA   02110
617-728-8706
j.risk@massbbo.org

**31**

1              COMMONWEALTH OF MASSACHUSETTS
                   BOARD OF BAR OVERSEERS
                OF THE SUPREME JUDICIAL COURT

         * * * * * * * * * * * * * * * * *
         IN RE:                          *   BBO No. 2012-050
         ROBERT A. GEORGE, SR.           *
         PETITIONER                      *
                                         *
         * * * * * * * * * * * * * * * * *

         BEFORE:        Paula Bagger, Esq., Chair
                        Marianne C. LeBlanc, Esq.
                        Frank E. Hill, III

                        Jeffrey Woolf
                        Assistant General Counsel

                           Volume IV
                           January 22, 2021
                           12:00 Noon
                           Board of Bar Overseers
                           Via Remote Audiovisual
                           Equipment


         APPEARANCES:

         Dorothy Anderson, Esq.
         First Assistant Bar Counsel
         Office of Bar Counsel
         99 High Street
         Boston, MA 02110

         Thomas F. Maffei, Esq.
         Sherin and Lodgen, LLP
         101 Federal Street
         Boston, MA 02110




                        LEAVITT REPORTING, INC.

```
                    I N D E X
WITNESS           DIRECT CROSS REDIRECT RECROSS

Robert George                  20       21
                               35
                               40




                    E X H I B I T S
NUMBER          DESCRIPTION                    PAGE
                                                4
63      Copy of Check No. 3669

64      Documents RAG HP002 - HP013             4

65      Deposit Slip, $9,000                    4

66      Deposit Slip, $8,000                    4

67      Form 1040, 2011 Income Tax Return       4

68      Schedule E, 2011 Income Tax Return      4

69      Form 1120S, 2011 Income Tax Return      4
```

4-3

1          P R O C E E D I N G S

2          MS. BAGGER:   We can go onto the

00:33:05    3    livestream if there are no preliminary

00:33:07    4    matters to discuss.

00:33:13    5          MS. YU:   Bear with me and I will

00:33:15    6    bring the meeting to the livestream.   This

00:33:19    7    meeting is now livestreaming, thank you.

00:33:21    8          MS. BAGGER:   Good afternoon.   We

00:33:23    9    are here for a continued hearing in the

00:33:24    10    matter of Robert A. George, Senior, BBO

00:33:28    11    2012-050.   Good afternoon, and thank you

00:33:33    12    all for being here.

00:33:36    13          As the first order of business,

00:33:38    14    after the third day of the hearing the

00:33:41    15    board contacted Attorney Maffei and asked

00:33:46    16    to have some documents, additional

00:33:49    17    documents produced which he did, and thank

00:33:52    18    you.

00:33:56    19          they have been marked as Exhibits

00:33:57    20    63 through 69 in this proceeding.   So

00:34:01    21    unless there are any objections, we will

00:34:05    22    enter them into evidence at this point.

00:34:09    23          MS. ANDERSON:   No objections from

4-4

00:34:11    1        me.

00:34:12    2                        MR. MAFFEI:  No objection.

00:34:14    3                        MS. BAGGER:  They are entered

00:34:15    4        then.

            5                        (Exhibits No. 63 - 69

            6                        admitted.)

            7                        ROBERT GEORGE, SENIOR,

            8                        having been duly identified

            9                        and sworn testified as

00:34:47   10                        follows:

00:34:47   11                        MS. BAGGER:  I think Mr. Hill had

00:34:51   12        some questions.

00:34:51   13                        MR. HILL:   Thank you.

00:34:54   14        Mr. George, at your trial when Judge

00:35:00   15        Gorton asked you what you were thinking,

00:35:04   16        you answered, "Well, obviously I wasn't

00:35:06   17        thinking and I still ask myself why I got

00:35:10   18        caught up into this."

00:35:15   19            At the BBO hearing that we went

00:35:17   20        through you told us that you didn't know

00:35:20   21        why, this is a paraphrase, "I ask myself

00:35:23   22        that all the time."  So then at the

00:35:28   23        hearing you also testified that you were

4-5

00:35:30   1    unaware of your financial situation until

00:35:34   2    you saw big boards -- quote, unquote -- at

00:35:38   3    Federal Court.  However, you had not filed

00:35:43   4    tax returns for years, and it's clear we

00:35:45   5    all know that you owed more than $500,000

00:35:50   6    to the IRS.

00:35:52   7         So the question is:  How could you

00:35:54   8    not know that you were not in financial

00:35:58   9    trouble?

00:35:58   10        THE WITNESS:  Mr. Hill, what I

00:36:03   11   said to you on the 21st and the 23rd when

00:36:07   12   you asked me is that I was going day to

00:36:11   13   day to day, case to case to case.  And

00:36:14   14   when I said to Judge Gorton that when I

00:36:18   15   didn't realize I was broke until we sat in

00:36:25   16   the courtroom is because I wasn't

00:36:26   17   operating on a daily basis that way.

00:36:29   18        I recognize now that I was under

00:36:31   19   financial pressure and I recognize that

00:36:33   20   the tax situation of course was pressure,

00:36:38   21   but that -- I wasn't thinking of it on a

00:36:42   22   daily basis that way.  I was paying my

00:36:44   23   bills as the money came in.  I was trying

4-6

00:36:47  1      to keep up with the taxes as best I could.

00:36:49  2              As I look back on it now I

00:36:51  3      understand that I was under financial

00:36:55  4      strain and I was under financial pressure

00:36:58  5      because of all the different things that

00:37:00  6      were going on at the time, office

00:37:03  7      overhead, personal overhead.  At the time

00:37:08  8      it was going on I wasn't thinking about

00:37:10  9      what kind of financial pressure I was

00:37:15  10     under because I didn't -- you know, at the

00:37:16  11     age of 66 tomorrow, I understand it now as

00:37:21  12     I look back on it.  But then I was just

00:37:23  13     going day to day to day, court to court to

00:37:26  14     court, family event to family event, and I

00:37:29  15     wasn't focused on the financial pressure

00:37:32  16     that you just set out just now but I

00:37:37  17     recognize it now.

00:37:39  18             MR. HILL:   Who paid the bills in

00:37:40  19     your family, you or your wife?

00:37:42  20             THE WITNESS:   We both paid them.

00:37:44  21             MR. HILL:  You were getting

00:37:45  22     notices from the IRS year after year.

00:37:50  23             THE WITNESS:   Yes.

4-7

00:37:50  1          MR. HILL:  You were assuming that

00:37:54  2      you owed a huge amount of money to the

00:37:56  3      IRS.

00:37:57  4          THE WITNESS:  At the time this

00:37:59  5      occurred I was two years, I was at two

00:38:05  6      years.  The half a million dollar number

00:38:06  7      that you mentioned was an accumulation of

00:38:08  8      four and a half years which occurred

00:38:11  9      because after I was charged in 2011 I was

00:38:16  10     unable to catch up and then another two or

00:38:19  11     three years tacked on that. With penalties

00:38:21  12     and interest I will agree with you that

00:38:23  13     the number was $500,000 thousand or more.

00:38:26  14          At the time this occurred I had

00:38:29  15     paid 2011, and I was current through 2006

00:38:35  16     and I was trying to catch up with 2007 and

00:38:40  17     2008.  I don't mean to correct you.  I

00:38:42  18     shouldn't have been behind two years, but

00:38:44  19     I planned on catching up with cases that

00:38:47  20     came in and I had a large settlement that

00:38:50  21     was coming in on the Donohue case which

00:38:52  22     ended up being reversed.  That is not the

00:38:55  23     way I should have been doing it, but that

4-8

| | | |
|---|---|---|
| 00:38:57 | 1 | is the way I was doing it at the time. |
| 00:38:57 | 2 | (Reporter interrupts because of |
| 00:38:58 | 3 | interference.) |
| 00:38:58 | 4 | MR. HILL:   So your wife wrote a |
| 00:39:33 | 5 | check to the Department of Revenue |
| 00:39:37 | 6 | Massachusetts on or about March 4. |
| 00:39:50 | 7 | THE WITNESS:   Mr. Hill, a check |
| 00:39:51 | 8 | was written -- I actually filled out the |
| 00:39:52 | 9 | check on March 2.  That's the date on the |
| 00:39:58 | 10 | check.  It cleared on the 4th. |
| 00:40:00 | 11 | MR. HILL:   I have another |
| 00:40:02 | 12 | question a little unrelated to that.  When |
| 00:40:06 | 13 | you took the cash, did you know that it |
| 00:40:14 | 14 | was drug money? |
| 00:40:15 | 15 | THE WITNESS:   To me it was just, |
| 00:40:18 | 16 | to me it was a legal fee but -- to me it |
| 00:40:20 | 17 | was a legal fee.  I did not know it was |
| 00:40:23 | 18 | drug money, no. |
| 00:40:24 | 19 | MR. HILL:   So how frequently did |
| 00:40:31 | 20 | you take cash? |
| 00:40:32 | 21 | THE WITNESS:   Actually it was |
| 00:40:34 | 22 | very infrequent. |
| 00:40:36 | 23 | MR. HILL:   And you knew that this |

4-9

| | | |
|---|---|---|
| 00:40:37 | 1 | fellow had been involved in criminal |
| 00:40:42 | 2 | activities? |
| 00:40:43 | 3 | THE WITNESS:  Yes, that's what he |
| 00:40:45 | 4 | told me during the course of our |
| 00:40:48 | 5 | discussion. |
| 00:40:49 | 6 | MR. HILL:  Did you question the |
| 00:40:51 | 7 | source of the cash at the time you |
| 00:40:52 | 8 | received it? |
| 00:40:53 | 9 | THE WITNESS:  I did not question |
| 00:40:54 | 10 | the source of the cash when it was paid as |
| 00:40:58 | 11 | a fee. |
| 00:41:00 | 12 | MR. HILL:  Is that normal for a |
| 00:41:02 | 13 | criminal defense attorney? |
| 00:41:04 | 14 | THE WITNESS:  In fact it is |
| 00:41:05 | 15 | normal.  It's normal because under the |
| 00:41:07 | 16 | money laundering statute and the safe |
| 00:41:11 | 17 | harbor provision of the money laundering |
| 00:41:14 | 18 | statue you can take a legal fee as long as |
| 00:41:17 | 19 | you do not know the fee has come from |
| 00:41:22 | 20 | illegal activity, yes. |
| 00:41:29 | 21 | MR. HILL:  I have no more |
| 00:41:33 | 22 | questions at this time. |
| 00:41:47 | 23 | MS. LeBLANC:  Thank you.  Good |

4-10

| | | |
|---|---|---|
| 00:41:49 | 1 | afternoon, Mr. George.  I have a couple of |
| 00:41:51 | 2 | questions for you as well. |
| 00:41:56 | 3 | As you know, a successful petition |
| 00:41:59 | 4 | for reinstatement requires an |
| 00:42:01 | 5 | acknowledgment of the misconduct that led |
| 00:42:06 | 6 | to the disbarment and part of the panel's |
| 00:42:10 | 7 | assessment as to your trustworthiness is |
| 00:42:13 | 8 | based in large part on an assessment of |
| 00:42:16 | 9 | your candor to this panel.  So there are |
| 00:42:22 | 10 | just a number of inconsistencies that we |
| 00:42:26 | 11 | perceived between your prior testimony and |
| 00:42:30 | 12 | some of the documentary evidence that we |
| 00:42:32 | 13 | have, and I wanted to ask you about that |
| 00:42:37 | 14 | to see if you can square that. |
| 00:42:41 | 15 | For example, there is this issue |
| 00:42:43 | 16 | about structuring deposits that were made, |
| 00:42:49 | 17 | and I believe your testimony to us earlier |
| 00:42:52 | 18 | was that you had made those deposits about |
| 00:42:54 | 19 | four to five hours apart and that the |
| 00:42:58 | 20 | second one was made after you had learned |
| 00:43:00 | 21 | from your wife that she had mailed the |
| 00:43:03 | 22 | check to the IRS. |
| 00:43:06 | 23 | The documents that we have show |

4-11

```
00:43:07   1        that those deposits were eleven minutes
00:43:11   2        apart and, as you said, the check appears
00:43:15   3        to have cleared on the 4th, the day that
00:43:18   4        these deposits were made.
00:43:20   5               So are you able to square your
00:43:21   6        earlier testimony with the documentary
00:43:24   7        evidence that we are now looking at?
00:43:27   8               THE WITNESS:   Yes.   If I said it
00:43:31   9        was four hours apart, I always knew it was
00:43:34  10        twelve minutes apart because the deposit
00:43:36  11        slips, as you have already seen, for Bank
00:43:39  12        of America are approximately twelve
00:43:41  13        minutes apart.
00:43:42  14               I explained on the 21st and on the
00:43:45  15        23rd the circumstances that surrounded how
00:43:49  16        I made these deposits twelve minutes
00:43:51  17        apart.   If I testified before that they
00:43:56  18        were four hours apart, they were twelve
00:43:59  19        minutes apart.   As a matter of fact, it
00:44:01  20        was a matter of, it was a matter of quite
00:44:05  21        some discussion at trial that it was only
00:44:07  22        eleven or twelve minutes apart.
00:44:10  23               It was the same bank, the same
```

4-12

00:44:11  1    account, and the way it occurred -- if you

00:44:16  2    want me to go over it again -- is how it

00:44:18  3    occurred.  It occurred exactly the way I

00:44:21  4    told you.

00:44:22  5         I deposited $9,000 into the

00:44:25  6    account in Needham Center into the Bank of

00:44:29  7    America thinking that was enough to cover

00:44:30  8    the check.  In reviewing my check register

00:44:35  9    and speaking to my wife I was able to

00:44:37  10   determine that the check had come out of

00:44:40  11   that account, the account I put the money

00:44:45  12   into rather than a different account.

00:44:48  13        So I immediately had to get enough

00:44:49  14   money into that account because I didn't

00:44:51  15   remember that it had come out of that

00:44:53  16   account.  So I stopped at the Bank of

00:44:56  17   America next to the Roche Brothers in

00:44:58  18   Needham about eleven or twelve minutes

00:45:00  19   later and immediately went in to where I

00:45:03  20   knew everybody and made the second deposit

00:45:05  21   to cover the check.

00:45:06  22        That's the way it happened, 9,000,

00:45:10  23   8,000 and, of course, the check cleared as

4-13

00:45:12  1        you have already told me cleared that day

00:45:15  2        leaving a balance of about $400.

00:45:18  3                That is how it happened, and that

00:45:21  4        was my intent in putting the money in the

00:45:24  5        account that way.  That amounts to

00:45:28  6        structuring because it wasn't as one

00:45:30  7        deposit and both deposits were under

00:45:32  8        $10,000, and that is what I was charged

00:45:37  9        with.  I was charged with four counts as a

00:45:39  10       result of the way it went into the bank.

00:45:43  11               To answer you, that is how I

00:45:44  12       square it.  It wasn't four hours.  It was

00:45:47  13       eleven or twelve minutes but it was on my

00:45:49  14       way home.  It was like on a straight, a

00:45:53  15       straight shot from Needham Center going

00:45:55  16       into Westwood through the back way that

00:46:00  17       the Bank of America attached to Roche

00:46:03  18       Brothers which is where I had stopped to

00:46:04  19       pick up some things to take home is when I

00:46:07  20       realized what happened.

00:46:09  21               MS. LeBLANC:  Thank you.  I have

00:46:10  22       no further questions.

00:46:18  23               MS. BAGGER:  Just so that we

4-14

00:46:24  1      understand, on that March 4, 2011, you

00:46:29  2      called your wife during the twelve minutes

00:46:32  3      between the two deposits?

00:46:34  4              THE WITNESS:  We spoke early in

00:46:36  5      the morning and we spoke at some time

00:46:38  6      during the day, but I found out after the

00:46:41  7      first deposit as a result of speaking with

00:46:45  8      my wife and looking at my check register

00:46:47  9      that the check had been written out of

00:46:49  10     that account on the second rather than a

00:46:51  11     different account.

00:46:53  12             MS. BAGGER:  So you looked at your

00:46:54  13     check register when you were at the first

00:46:56  14     Bank of America?

00:46:58  15             THE WITNESS:   No, at the second

00:46:59  16     Bank of America.  In the Roche Brothers

00:47:02  17     parking lot actually at the Bank of

00:47:06  18     America, and I have no memory of when I

00:47:07  19     actually spoke to my wife.

00:47:09  20             MS. BAGGER:  So presumably it was

00:47:10  21     in the twelve minutes because otherwise

00:47:13  22     you would have deposited the $17,000 in

00:47:16  23     the first bank?

4-15

00:47:16  1          THE WITNESS:   Presumably, but I

00:47:17  2     just don't want you to ever thinking I am

00:47:19  3     saying that without -- I don't know.   It

00:47:21  4     was a long time ago.   It was ten years

00:47:23  5     ago.

00:47:23  6          MS. BAGGER:   And so with respect

00:47:28  7     to the questions that Mr. Hill was asking

00:47:30  8     you about your sort of recognition of

00:47:33  9     financial strain and that you were

00:47:37  10    operating day to day and so you weren't

00:47:40  11    focused about it or thinking about it, but

00:47:44  12    it sounds as if you later came to realize

00:47:47  13    that you were working under some financial

00:47:50  14    pressures during that period.

00:47:52  15          THE WITNESS:   Yes, Ms. Bagger.

00:47:57  16    I'm sorry, Attorney Bagger.   In going over

00:47:59  17    all of the documents I went over getting

00:48:01  18    ready for trial and in the past ten years

00:48:03  19    I certainly can see it now, but at the

00:48:06  20    time when I told Judge Gorton that I meant

00:48:10  21    it.   At the time I was working I didn't

00:48:12  22    realize it the way I realize it now.

00:48:15  23          MS. BAGGER:   And during your

4-16

00:48:18  1      reflection on the matter over the past ten

00:48:21  2      years or so, have you thought about

00:48:24  3      whether the financial pressures did affect

00:48:27  4      your conduct in 2010 and 2011?

00:48:31  5              THE WITNESS:   In some ways it

00:48:33  6      did, yes.

00:48:35  7              MS. BAGGER:  And are you -- have

00:48:38  8      you thought about a plan to ensure that

00:48:41  9      should you be reinstated financial

00:48:43  10     pressures would not affect your conduct as

00:48:47  11     an attorney?

00:48:48  12             THE WITNESS:   Absolutely.

00:48:49  13             MS. BAGGER:  What is that?

00:48:51  14             THE WITNESS:   I don't intend to

00:48:53  15     practice law at the pace and at the level

00:48:57  16     and the types of cases I was operating and

00:49:00  17     handling before.  I want a more low-key,

00:49:04  18     quiet existence so to speak.

00:49:06  19             I hope to practice law if I was

00:49:09  20     allowed on Cape Cod, do some pro bono

00:49:13  21     work, do some community service work and

00:49:15  22     some criminal work if need be, more

00:49:18  23     appellate work, but I can't see myself

4-17

00:49:22  1    handling 50 cases at a time, appearing in

00:49:26  2    three to four courts a day, running from

00:49:28  3    case to case, trying cases for three and

00:49:31  4    four months at a time.  I just don't see

00:49:32  5    that as the practice that I want anymore.

00:49:35  6          MS. BAGGER:  When we asked you I

00:49:40  7    don't know whether it was first or second

00:49:41  8    day of your hearing about any insights you

00:49:44  9    had gained into what may have caused you

00:49:46  10   to go off the straight and narrow, would

00:49:50  11   it have been appropriate to have included

00:49:52  12   financial pressures as part of your

00:49:54  13   answer?

00:49:56  14         THE WITNESS:  The financial

00:49:56  15   pressures that we just discussed with

00:49:58  16   Mr. Hill and now with you ought to be

00:50:03  17   certainly considered as part of the

00:50:04  18   picture.  I just can't blame it solely on

00:50:14  19   that.

00:50:18  20         MR. HILL:   Attorney Bagger, I

00:50:19  21   have another question.

00:50:20  22         MS. BAGGER:  Yes, of course.

00:50:21  23         MR. HILL:   Mr. George, you were

4-18

00:50:25  1    convicted of money laundering, not

00:50:27  2    structuring or smurfing, correct?

00:50:30  3         THE WITNESS:   I was convicted of

00:50:32  4    one count of structuring and five counts

00:50:35  5    of money laundering and one count of

00:50:38  6    conspiracy.

00:50:42  7         MR. HILL:   If one were to assume

00:50:42  8    that you were convicted of money

00:50:45  9    laundering, it would mean you knew that

00:50:47  10   the cash was ill gotten?

00:50:53  11        THE WITNESS:   Not necessarily,

00:50:58  12   but I recognize that there was an

00:51:02  13   inference drawn by the jury that I should

00:51:04  14   have known it was ill gotten and I agree

00:51:07  15   that I should have known that it was ill

00:51:09  16   gotten.

00:51:10  17        I don't mean to talk like -- I was

00:51:14  18   charged with four counts of money

00:51:16  19   laundering because of the structuring, I'm

00:51:18  20   sorry, three counts of the money

00:51:21  21   laundering because of the structuring.

00:51:26  22        MR. HILL:   Thank you.

00:51:29  23        MS. BAGGER:  Do you draw a

4-19

00:51:30  1    distinction in your mind, Mr. George,

00:51:33  2    between those three counts of structuring

00:51:35  3    that had to do with the legal fee and the

00:51:37  4    one count that had to do with the

00:51:37  5    Dardinski-Hansen conspiracy?

00:51:44  6            THE WITNESS:  Well, I don't say

00:51:47  7    I'm any less culpable.  I am guilty of

00:51:49  8    all, but it was a two-part event.  The

00:51:52  9    first part which is what you just referred

00:51:54  10   to as the Dardinski-Hansen counts were

00:51:58  11   certainly different in nature than the

00:52:00  12   second counts, but I was guilty of all of

00:52:04  13   them.

00:52:06  14           MS. BAGGER:  Mr. Hill or

00:52:09  15   Ms. LeBlanc, do you have any further

00:52:11  16   questions?

00:52:11  17           MS. LEBLANC:  (Indicating.)

00:52:14  18           MR.  HILL:  (Indicating.)

00:52:14  19           MS. BAGGER:  I'm not sure who goes

00:52:16  20   first, but I would ask whether either

00:52:19  21   Ms. Anderson or Mr. Maffei wants to

00:52:22  22   question they should feel free.

00:52:26  23           MR. MAFFEI:  I guess I should go

4-20

00:52:29  1      since I have the burden.

00:52:29  2                    Examination of Mr. George

00:52:31  3      **Q.**   (By Mr. Maffei) I have one question to

00:52:33  4      clarify something.  Mr. George, just so

00:52:36  5      the record is clear, at the time you met

00:52:39  6      with Dardinski that led to the

00:52:42  7      convictions, was your tax bill to the IRS

00:52:48  8      half a million or less than half a

00:52:50  9      million?

00:52:51  10     **A.**   Well, it was a fraction of that.

00:52:56  11     **Q.**   So the half a million is after you

00:53:01  12     were arrested and then you were out of

00:53:02  13     work and then the penalties began to grow

00:53:07  14     and the interest grow and that is what led

00:53:11  15     to the 500, the principal balance owed the

00:53:14  16     IRS back in -- I forget the dates now,

00:53:18  17     2000 -- when was the Dardinski meeting,

00:53:23  18     what year?

00:53:23  19     **A.**   The meeting with Dardinski began in

00:53:26  20     2009 and concluded in 2011.

00:53:40  21     **Q.**   So in 2009 you owed the IRS less than

00:53:44  22     a half a million dollars?

00:53:46  23     **A.**   Yes.

4-21

| | | |
|---|---|---|
| 00:53:47 | 1 | **Q.**   And part of your -- you mentioned |
| 00:53:54 | 2 | personal overhead.  Was part of you |
| 00:53:56 | 3 | personal overhead that you lived in a |
| 00:53:59 | 4 | fairly expensive house in Westwood? |
| 00:54:06 | 5 | **A.**   Yes. |
| 00:54:07 | 6 | **Q.**   And have you sold -- you sold that |
| 00:54:11 | 7 | house, correct? |
| 00:54:11 | 8 | **A.**   Yes. |
| 00:54:11 | 9 | **Q.**   So your personal overhead now is less |
| 00:54:15 | 10 | than it was back in 2009? |
| 00:54:20 | 11 | **A.**   I only smile because it's a fraction |
| 00:54:24 | 12 | today of what it was. |
| 00:54:26 | 13 |       MR. MAFFEI:  That's all I have. |
| 00:54:30 | 14 |       MS. BAGGER:  Mr. Anderson. |
| 00:54:36 | 15 |       <u>Examination of Mr. George</u> |
| 00:54:36 | 16 | **Q.**   (By Ms. Anderson) So, Mr. George, are |
| 00:54:39 | 17 | you now admitting that part of the reason |
| 00:54:42 | 18 | that you got involved with Mr. Dardinski |
| 00:54:46 | 19 | was in order to make some money? |
| 00:54:51 | 20 | **A.**   No, not necessarily.  I had known |
| 00:54:55 | 21 | Dardinski a long time, and he had referred |
| 00:54:57 | 22 | me cases.  So I got involved with him |
| 00:54:59 | 23 | because I had known him, and he came to me |

4-22

| | | |
|---|---|---|
| 00:55:02 | 1 | saying he had something he needed me to |
| 00:55:04 | 2 | do. |
| 00:55:05 | 3 | Q.   I guess my question is:  Is part of |
| 00:55:07 | 4 | the reason why you agreed to do it was |
| 00:55:10 | 5 | that you hoped to make some money? |
| 00:55:12 | 6 | A.   Well, I wish I could say that that was |
| 00:55:18 | 7 | the reason. I -- |
| 00:55:20 | 8 | Q.   Part of the reason I said, Mr. George. |
| 00:55:22 | 9 | A.   It was certainly out there, but it |
| 00:55:24 | 10 | wasn't one of the reasons that was |
| 00:55:26 | 11 | foremost in my mind at the time. |
| 00:55:28 | 12 | Q.   What again were you reasons that were |
| 00:55:31 | 13 | foremost in your mind, just to help |
| 00:55:34 | 14 | Mr. Dardinski? |
| 00:55:34 | 15 | A.   He had come to me, as I testified on |
| 00:55:38 | 16 | the 21st and the 23rd, with problems.  He |
| 00:55:44 | 17 | described them to me, and I tried to help |
| 00:55:46 | 18 | him in the way I did and it was wrong to |
| 00:55:48 | 19 | do it. |
| 00:55:53 | 20 | Q.   Calling your attention to this |
| 00:55:55 | 21 | transcript that has been marked an |
| 00:55:59 | 22 | exhibit, I am not sure which number -- |
| 00:56:02 | 23 | MS. ANDERSON:  Jeff, can you help |

4-23

00:56:07  1    me out?

00:56:08  2            MR. WOOLF:    64.

00:56:10  3    **Q.**   -- Exhibit 64, what was that meeting

00:56:15  4    all about?

00:56:17  5    **A.**   That was the meeting at which the

00:56:21  6    $25,000 was paid by Angel to represent

00:56:27  7    him.

00:56:27  8    **Q.**   Let me call your attention to a

00:56:48  9    specific page.  On Page 25 you talk about

00:57:07  10   the fact that -- Angel is Angel Nieves?

00:57:14  11   **A.**   Yes, that is the undercover agent.

00:57:16  12   **Q.**   You talk about the fact that you're

00:57:18  13   his lawyer but nobody could know that he

00:57:21  14   was your lawyer.  Why was that?

00:57:24  15   **A.**   Because he was concerned that he had

00:57:27  16   not yet been charged with a crime and he

00:57:30  17   didn't want anyone to think he needed a

00:57:33  18   criminal lawyer before he had been

00:57:36  19   charged.

00:57:37  20   **Q.**   What was the crime that he was

00:57:40  21   anticipating being charged with?

00:57:42  22   **A.**   From the discussions I was having with

00:57:45  23   him it appeared drug trafficking and drug

4-24

00:57:49   1     distribution.

00:57:56   2     **Q.**   What exactly -- you refer several

00:57:59   3     times to a written agreement that was

00:58:01   4     signed at that meeting.  What does that

00:58:04   5     agreement say?

00:58:05   6     **A.**   That agreement set out the fee,

00:58:09   7     $25,000, as well as it referenced conflict

00:58:12   8     of interest and it served as a receipt for

00:58:15   9     the $25,000 because it referenced the

00:58:17   10    $25,000 being paid.  And it was a form

00:58:21   11    that I had gotten, had been using from the

00:58:24   12    Massachusetts Bar Association for years

00:58:25   13    but it had been tailored for conflict of

00:58:30   14    interest and the payment of the fee.

00:58:32   15    **Q.**   There is discussion about various

00:58:36   16    people who were going to call you or might

00:58:40   17    want to get in touch with you.  Who were

00:58:42   18    those people?

00:58:43   19    **A.**   I took it to be they were people

00:58:46   20    associated with him that he was concerned

00:58:49   21    might be arrested for drug distribution.

00:58:53   22    **Q.**   What was the plan with respect to

00:58:55   23    those people?

4-25

| | |
|---|---|
| 00:58:56 | 1 |
| 00:59:07 | 2 |
| 00:59:10 | 3 |
| 00:59:12 | 4 |
| 00:59:14 | 5 |
| 00:59:17 | 6 |
| 00:59:19 | 7 |
| 00:59:22 | 8 |
| 00:59:25 | 9 |
| 00:59:32 | 10 |

**A.**    The discussion was that when they called me I would meet with them to determine if there was a conflict of interest.  If there was a conflict of interest between them and Mr. Nieves I would -- I'm sorry.  Mr. Nieves, Angel which was his pseudonym -- I would refer them out to other attorneys because I was his counsel.  If there was no conflict, I would represent them.

**Q.**    Did you retain a copy of the written agreement?

**A.**    At the time I did.  As a matter of fact, on this transcript I'm handing him a copy which may have been the original, it may not have been, and I have copies.

**Q.**    So that was something that the U.S. Attorney obtained?

**A.**    Yes.

**Q.**    And you were going to disclose to these potential people who called you that you represented Angel?

**A.**    Absolutely.

4-26

01:00:26  1          MR. WOOLF:   Mr. Maffei, could you

01:00:26  2     please mute yourself since you're not

01:00:28  3     speaking.  That will improve the audio

01:00:31  4     quality for everyone else.  Thank you.

01:00:35  5     Obviously if you want to object you will

01:00:38  6     need to unmute yourself, but please do it

01:00:41  7     in the interim.

01:00:42  8          MR. MAFFEI:  I clicked on the

01:00:45  9     three dots and it says spotlight me.

01:00:47  10          MR. WOOLF:   There should be a

01:00:49  11    microphone icon.

01:00:51  12          MS. YU:  Or you can hit control

01:00:54  13    shift M, either or. Thank you.

01:00:56  14    **Q.**  Mr. George, on Page 27 of the

01:00:58  15    transcript -- let me ask you this.

01:01:15  16          Angel was apparently concerned

01:01:16  17    that some of these people might cooperate

01:01:20  18    with the district attorney or the

01:01:22  19    government and give testimony against him?

01:01:26  20    **A.**   Yes.

01:01:27  21    **Q.**   And was part of your role to prevent

01:01:32  22    that from happening?

01:01:34  23    **A.**    No.  In fact I made it very clear to

4-27

01:01:36    1        him that that was something I would not

01:01:38    2        do.

01:01:40    3        **Q.**    In the middle of the page you say,

01:01:45    4        "But the thing is that we don't, if we

01:01:47    5        want to open an investigation, say a

01:01:52    6        couple of your buddies get arrested..."

01:01:55    7        what did you mean by open an

01:01:57    8        investigation?

01:01:59    9        **A.**    As I look at it now, I don't have a

01:02:02   10        specific memory but --

01:02:03   11               MR. MAFFEI:  (Indicating.)

01:02:05   12               MS. YU:   Hold on. Mr. Maffei, can

01:02:05   13        you unmute yourself.

01:02:08   14               MR. MAFFEI:  I just lost the last,

01:02:10   15        I don't know, three minutes of the

01:02:11   16        questioning for some reason.

01:02:16   17               MS. YU:   Can you hear now?

01:02:17   18               MR. MAFFEI:  I can hear now.

01:02:24   19               MS. YU:  Do you want to ask

01:02:25   20        Ms. Buckley to repeat the

01:02:26   21        questioning or --

01:02:27   22               MS. BAGGER:  Three minutes?  It

01:02:36   23        may make sense to ask Ms. Buckley to go

4-28

1    back a couple of questions and you can see

2    what you lost.

3            MR. MAFFEI:   Fine, or Dorothy can

4    summarize. Whatever is easiest.

5            MS. ANDERSON:   I think it would be

6    better if you go back and read it.

7            (Reporter read back the

8            record from Page 26, Line

01:03:52    9            14, to Page 27, Line 10.)

01:04:01   10    **Q.**   Immediately after that you say, "Then

01:04:05   11    you call and you talk about the price and

01:04:07   12    you don't hear enough to make yourself

01:04:10   13    comfortable." What did that mean?

01:04:14   14    **A.**   As I look at it today, I don't recall

01:04:17   15    but I'm not talking about a conversation

01:04:19   16    with me.   I'm talking about a conversation

01:04:25   17    he would be having with someone else.   I

01:04:26   18    am just drawing that from what I see here.

01:04:28   19    **Q.**   Right, but what price are you

01:04:29   20    referring to?

01:04:32   21    **A.**   That I don't know.

01:04:35   22    **Q.**   Would it have been the price of your

01:04:40   23    fee to these third parties?

4-29

01:04:42  1      **A.**   It could very well be, but I -- it's

01:04:46  2      just such a mumbo-jumbo of words.  Yes. I

01:04:53  3      mean  that is possible, very possible.

01:04:55  4      **Q.**   The idea was that Angel was going to

01:04:58  5      pay you to represent these people?

01:05:01  6      **A.**   Or looking at this or they were going

01:05:03  7      to pay me to represent these people.  That

01:05:06  8      is why I'm trying not to say what I think

01:05:09  9      it means.

01:05:10  10     **Q.**   Then on the page a little further down

01:05:21  11     you say, "We have to play each one.

01:05:27  12     Believe me, I've done this a long time."

01:05:29  13     What did that mean?

01:05:31  14     **A.**   That means we have to look at each

01:05:33  15     case on a case-by-case basis, a

01:05:35  16     case-by-case basis as to whether there was

01:05:38  17     a conflict.

01:05:39  18     **Q.**   That's what the word play meant?

01:05:42  19     **A.**   Looking at it today, that is what it

01:05:45  20     means to me.

01:05:51  21     **Q.**   Then you say, "And I know from talking

01:05:55  22     to Ronnie what will likely happen."  Do

01:06:01  23     you remember what you were referring to

4-30

01:06:02  1    there?

01:06:02  2    **A.**   No, I don't.  I have looked at it, and

01:06:06  3    I don't know what that means.

01:06:08  4    **Q.**   Then you say, "One of the main things

01:06:12  5    here is to protect my incorruptibility."

01:06:16  6    What was your incorruptibility you were

01:06:19  7    referring to?

01:06:19  8    **A.**   The conflict, the fact that I couldn't

01:06:22  9    be caught up in a conflict of interest.

01:06:39  10   **Q.**   On the following page you talk about a

01:06:42  11   hypothetical situation in which a person

01:06:46  12   in lockup would address you and say, "You

01:06:52  13   promised we could go home," and that you

01:06:55  14   would deny being Bob George.  What was

01:06:58  15   that all about?

01:06:59  16   **A.**   As I look it today, I'm embarrassed

01:07:04  17   even today looking at how this looks or

01:07:06  18   sounds, but what I mean when I am saying

01:07:07  19   that is if you tell -- if someone on the

01:07:10  20   phone was saying to me that promises were

01:07:12  21   made or that there was something that was

01:07:14  22   going to be done or had been promised by

01:07:17  23   another that you're talking to the wrong

4-31

01:07:19  1    person, you're not talking to me.  That's

01:07:22  2    what I mean.

01:07:23  3    **Q.**    What kind of promises?

01:07:24  4    **A.**    That you're going to go home on bail,

01:07:27  5    that everything is going to be all right,

01:07:30  6    in other words that no one should be

01:07:32  7    discussing what was going to happen in the

01:07:34  8    case other than me.

01:07:39  9    **Q.**    Then you emphasize that you will go

01:07:41  10   anywhere on Page 29.  What were you

01:07:48  11   willing to go anywhere to do?

01:07:50  12   **A.**    That I would appear in any court

01:07:54  13   meaning any court where they were

01:07:56  14   arrested, that is where I would go.  That

01:07:57  15   is what that means.

01:08:03  16   **Q.**    What exactly was the $25,000 for, was

01:08:07  17   that just a down payment?

01:08:08  18   **A.**    No, it was a flat fee to be available

01:08:12  19   for any representation that was needed by

01:08:14  20   Angel himself or by anybody that he

01:08:18  21   referred to me in which there wasn't a

01:08:20  22   conflict of interest.

01:08:22  23   **Q.**    And the flat fee certainly could not

4-32

01:08:25   1      have covered the entire representation so

01:08:27   2      what did it cover?

01:08:29   3      A.   What the flat fee covered was that no

01:08:33   4      matter when he called me, no matter what

01:08:35   5      time of night or day that I would be

01:08:37   6      available for him or anyone who called me

01:08:41   7      that was referred by him and that I would

01:08:45   8      go to any court where anyone had been

01:08:48   9      arrested and that I would handle any case

01:08:50   10     that got referred in if there was not a

01:08:54   11     conflict.

01:08:55   12     Q.   Handle any case for $25,000?

01:08:57   13     A.   No.  In fact I discussed with him that

01:08:59   14     if the case involved was more complex, was

01:09:03   15     something that cost more than $25,000 on a

01:09:06   16     case-by-case basis that the $25,000 would

01:09:10   17     be credited towards the final fee.

01:09:12   18     Q.   How was the final fee to be

01:09:15   19     determined?

01:09:15   20     A.   It would be determined by me on a

01:09:17   21     case-by-case basis based on what the

01:09:19   22     charges were, what court it was in and

01:09:22   23     whether it was Superior or District Court,

4-33

01:09:25  1    how far I would have to travel to handle

01:09:28  2    the case and the nature of the case.

01:09:30  3    **Q.**   So would it be fair to say that you

01:10:02  4    hoped to earn a lot more than $25,000

01:10:05  5    through this arrangement with Angel?

01:10:09  6    **A.**   It was set up that no matter what kind

01:10:12  7    of case came in and when it came in if

01:10:15  8    there wasn't a conflict I would make what

01:10:17  9    it was worth at the time, yes.

01:10:20  10         MS. ANDERSON:  I have no further

01:10:22  11   questions.

01:10:26  12         MS. BAGGER:  Mr. Maffei, do you

01:10:29  13   have anything further?

01:10:30  14         MR. MAFFEI:  Nothing further.

01:10:31  15         MS. BAGGER:  I think before we

01:10:38  16   close up we are going to ask, the panel is

01:10:41  17   going to ask Michelle or Mr. Wolf or

01:10:45  18   whoever it is to put us into another room

01:10:47  19   so we can compare notes briefly.

01:10:50  20         MS. YU:   I will cut us off the

01:10:52  21   livestream while we do so.

01:10:54  22         MR. MAFFEI:  Can I go off for five

01:10:56  23   minutes as well?

4-34

01:10:57  1          MS. BAGGER:  Yes, that's great.

01:11:04  2          MS. ANDERSON:  Can we say we will

01:11:05  3      reconvene in ten minutes, is that fair?

01:11:07  4          MS. BAGGER:  That's fine.  So

01:11:10  5      maybe five past one?

01:11:18  6          MS. ANDERSON:  Thank you.

01:11:19  7          MS. YU:   You should be getting a

01:11:20  8      call from Mr. Wolf and then, Ms. LeBlanc,

01:11:25  9      he will probably bring you in next and

01:11:27  10     then, Mr. Hill, you should be getting a

01:11:29  11     call on your phone from Jeffrey.  If you

01:11:35  12     would just turn camera off, sir, so that

01:11:38  13     way we will not see you.  Thank you.

01:32:53  14         (Break taken at this time.)

01:32:53  15         MS. YU:  We have now returned to

01:32:58  16     livestream, thank you.

01:32:59  17         MS. BAGGER:  Thank you all for

01:33:03  18     waiting for us for more than the ten

01:33:05  19     minutes predicted.

01:33:07  20         Mr. Maffei, you had something

01:33:08  21     additional?

01:33:09  22         MR. MAFFEI:  Yes, I wanted to

01:33:10  23     clarify something during the break so I am

4-35

01:33:14  1    going to ask Mr. George to go back over

01:33:17  2    one piece of the evidence to make sure

01:33:19  3    it's clear and clarify something.

01:33:22  4              Examination of Mr. George

01:33:22  5    **Q.**   (By Mr. Maffei) Mr. George, in

01:33:25  6    particular I wanted you to address the

01:33:28  7    conflict of interest issue that you were

01:33:30  8    asked about and the fee arrangement with

01:33:36  9    Angel.

01:33:38  10   **A.**   Well, during the break as a result of

01:33:43  11   the questions from bar counsel I went back

01:33:47  12   through my electronic file and was able to

01:33:49  13   come up with an unsigned copy of the

01:33:52  14   representation agreement that I had at the

01:33:56  15   table with Angel that day at the Dedham

01:33:59  16   Hilton.

01:34:00  17             The conflict of interest language

01:34:02  18   is indeed in the agreement, but I also

01:34:07  19   noticed as I was reading it -- and this is

01:34:10  20   what I wanted you to know, Mr. Maffei, as

01:34:12  21   well as the panel -- is that it refers to

01:34:15  22   the $25,000 fee as a monthly

01:34:18  23   non-refundable fee.  I believe I said it

4-36

01:34:20  1    was a flat $25,000 fee.  I noticed that

01:34:25  2    language as well, and I have a copy of the

01:34:28  3    agreement.  I went back and looked at it

01:34:29  4    because I was originally looking because

01:34:31  5    of the conflict, and I found -- I wanted

01:34:33  6    to clarify both of those things.  I have

01:34:36  7    it right here.

01:34:38  8         MS. BAGGER:  Thank you.  I think

01:34:45  9    we really -- I have only one further

01:34:48  10   question, and this really is a

01:34:52  11   continuation of remarks and questions that

01:34:56  12   Ms. LeBlanc had earlier about how one

01:35:00  13   thing that the panel pays attention to is

01:35:07  14   the candor of an applicant for

01:35:09  15   reinstatement in their testimony to the

01:35:13  16   panel.

01:35:15  17        I wanted to ask you about the

01:35:19  18   $20,000 payment that you received as part

01:35:24  19   of what I have been calling the Dardinski-

01:35:28  20   Hansen arrangement.  In your testimony to

01:35:32  21   us in October you testified that Hansen

01:35:39  22   paid you those funds on his own and that

01:35:45  23   you did not cash the check that he gave

4-37

01:35:49  1    you and that he chased you down and then

01:35:53  2    gave you the $20,000 in cash.

01:35:58  3         That was one area that didn't

01:36:00  4    really square with what we saw in the

01:36:07  5    brief with respect to the criminal matter.

01:36:10  6    That is why I wanted to ask you about it.

01:36:12  7    The suggestion there was that you were

01:36:14  8    given a check and tried to cash it and

01:36:17  9    there were insufficient funds and,

01:36:21  10   therefore, you went to Mr. Hansen and gave

01:36:24  11   him the check and he gave you 20,000 in

01:36:27  12   cash.  Can you comment on that

01:36:30  13   discrepancy?

01:36:33  14        THE WITNESS:  Absolutely.  The

01:36:35  15   way it occurred was that Hansen had sought

01:36:39  16   me out and surprised me with a check for

01:36:43  17   $20,000 which is the check you just

01:36:46  18   referred to, and it was drawn on Needham

01:36:50  19   Bank.

01:36:51  20        I didn't try, I didn't try to cash

01:36:55  21   the check.  I went into my regular branch

01:36:57  22   and I had them check the check to see

01:37:01  23   whether there were sufficient funds and

4-38

01:37:03  1      found pretty early on that there were not

01:37:06  2      sufficient funds in that account.  In

01:37:08  3      other words, the check was insufficient.

01:37:10  4           I took the check, I folded it up

01:37:13  5      and put it in the console of my car and

01:37:15  6      then never addressed it again.  In fact I

01:37:20  7      barely talked to Hansen in the meantime,

01:37:24  8      and after I think about three weeks Hansen

01:37:27  9      called me up and said, "How come you

01:37:29  10     didn't cash the check?"  I said, "There

01:37:33  11     were insufficient funds in the check," and

01:37:35  12     he said, "Come by the office." His office

01:37:37  13     was attached to Starbuck's on 109 in

01:37:40  14     Westwood.  I met him at the office, and he

01:37:43  15     gave me cash.

01:37:49  16          MS. BAGGER:  When you got the

01:37:51  17     check, why did you ask the Needham Bank

01:37:55  18     just to check the account as opposed to

01:37:57  19     just presenting it for payment?

01:38:00  20          THE WITNESS:  Because I thought

01:38:03  21     it was posturing by Hansen just trying to

01:38:05  22     get my attention.  I wanted to -- it was

01:38:09  23     almost as if it was a gesture, and I

| | | |
|---|---|---|
| 01:38:14 | 1 | always used to check to see if checks were |
| 01:38:20 | 2 | sufficient before I put them in my account |
| 01:38:22 | 3 | because I didn't want them to bounce in my |
| 01:38:25 | 4 | office account.  I didn't want to be |
| 01:38:26 | 5 | looking at it eleven days later and having |
| 01:38:30 | 6 | everything coming back.  It was a regular |
| 01:38:32 | 7 | course of business to check, before I |
| 01:38:35 | 8 | deposited the check to ask. |
| 01:38:37 | 9 | MS. BAGGER:  And had the Needham |
| 01:38:41 | 10 | Bank reported to you that there were |
| 01:38:42 | 11 | sufficient funds, would you have presented |
| 01:38:44 | 12 | the check? |
| 01:38:45 | 13 | THE WITNESS:   Likely, yes. |
| 01:38:52 | 14 | MS. BAGGER:  But it doesn't sound |
| 01:38:54 | 15 | like anywhere in there Mr. Hansen was |
| 01:38:58 | 16 | chasing you down.  That was the term you |
| 01:39:01 | 17 | used in your testimony. |
| 01:39:02 | 18 | THE WITNESS:   When I said chasing |
| 01:39:03 | 19 | me down, he had called me to see why I |
| 01:39:06 | 20 | hadn't cashed the check, and then over the |
| 01:39:10 | 21 | course of the next two or three days asked |
| 01:39:13 | 22 | me to come by his office two or three |
| 01:39:15 | 23 | times.  That was my definition of chasing |

4-40

01:39:18  1      me down.  I didn't mean to say that he was

01:39:21  2      chasing me the entire period.

01:39:25  3               MS. BAGGER:  Thank you.  Mr. Hill

01:39:28  4      or Ms. LeBlanc, do you have anything

01:39:30  5      further?

01:39:33  6               MS. LEBLANC:  Nothing further from

01:39:33  7      me, thank you.

01:39:34  8               MR. HILL:   Nothing here.

01:39:36  9               MS. BAGGER:  Do either Mr. Maffei

01:39:37  10     or Ms. Anderson have anything?

01:39:39  11              MR. MAFFEI:  Let me just ask a

01:39:42  12     couple of follow-up questions.  I do this

01:39:45  13     because of the break in the hearing and

01:39:49  14     memories sort of fade little.

01:39:51  15              Examination of Mr. George

01:39:51  16     Q.  (By Mr. Maffei) Mr. George, your first

01:39:56  17     meeting with Dardinski when he said he

01:39:59  18     needed to get some money laundered took

01:40:03  19     place when?

01:40:04  20     A.  March of 2009.

01:40:13  21     Q.  And then when was it that he gave you

01:40:19  22     this check?

01:40:22  23     A.  Dardinski never gave me a check.  Are

4-41

01:40:26  1    you talking about Hansen?

01:40:27  2    **Q.**   Yes, Hansen.

01:40:28  3    **A.**   September of 2011.

01:40:31  4    **Q.**   Okay.  So at the first meeting you

01:40:35  5    had -- you were asked earlier questions

01:40:37  6    about why did you do this and your

01:40:39  7    testimony was because, you know, you had

01:40:45  8    helped Dardinski in the past.

01:40:49  9          At that first meeting when he

01:40:51  10   approached you about laundering the money,

01:40:53  11   did you tell him then that you expected to

01:40:56  12   be paid?

01:40:57  13   **A.**   Absolutely not.

01:40:59  14   **Q.**   And then I think, if I recall this

01:41:03  15   correctly, during that entire period from

01:41:06  16   March of 2009 until September of 2011, so

01:41:13  17   it's more than two years, there were

01:41:16  18   various times when Dardinski was talking

01:41:20  19   to you about asking you to take the money

01:41:24  20   that was going to be laundered and you

01:41:26  21   deal with the broker, correct?

01:41:28  22   **A.**   On a couple of occasions, yes.

01:41:32  23   **Q.**   And at no time you handled the money,

4-42

01:41:38    1       quote, unquote?

01:41:38    2       **A.**    I did not.

01:41:45    3               MR. MAFFEI:  That is all I have.

01:41:49    4               MS. BAGGER:  Ms. Anderson?

01:41:50    5               MS. ANDERSON:  I have no further

01:41:51    6       questions.

01:41:52    7               MS. BAGGER:  Well, I think that

01:41:54    8       the hearing is concluded now, and I thank

01:41:57    9       you all for your participation.

           10               (Whereupon, the hearing was

           11       adjourned at 1:22 P.M.)

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

4-43

```
 1              C E R T I F I C A T E
     COMMONWEALTH OF MASSACHUSETTS:
 2   PLYMOUTH, SS.:

 3        I, ELAINE M. BUCKLEY, a Notary Public in
          and for the Commonwealth Massachusetts, do
 4        hereby certify:

 5        That the witness in the foregoing hearing
          was present at the time stated via remote
 6        audiovisual equipment;

 7        That the said proceeding was taken before
          me as a Notary Public at the said time via
 8        remote audiovisual equipment and was taken
          down in shorthand writing by me;
 9
          That I am a Certified Shorthand Reporter,
10        that the said proceeding was thereafter
          under my direction transcribed into
11        computer-assisted transcription, and that
          the foregoing transcript constitutes a
12        full, true, and correct report of the
          proceedings which then and there took
13        place;

14        IN WITNESS WHEREOF, I have hereunto
          subscribed my hand and affixed my official
15        seal this 27th day of January 2021.

16

                        _____
17                      ELAINE M. BUCKLEY

18
                        My commission expires:
19                      November 4, 2022

20

21

22

23
```

1

**$**

**$10,000** [1] - 13:8
**$17,000** [1] - 14:22
**$20,000** [3] -
36:18; 37:2, 17
**$25,000** [11] -
23:6; 24:7, 9-10;
31:16; 32:12,
15-16; 33:4; 35:22;
36:1
**$400** [1] - 13:2
**$500,000** [2] - 5:5;
7:13
**$8,000** [1] - 2:11
**$9,000** [2] - 2:10;
12:5

**0**

**02110** [2] - 1:17, 20

**1**

**10** [1] - 28:9
**101** [1] - 1:19
**1040** [1] - 2:12
**109** [1] - 38:13
**1120S** [1] - 2:14
**12:00** [1] - 1:11
**14** [1] - 28:9
**1:22** [1] - 42:11

**2**

**2** [1] - 8:9
**20** [1] - 2:2
**20,000** [1] - 37:11
**2000** [1] - 20:17
**2006** [1] - 7:15
**2007** [1] - 7:16
**2008** [1] - 7:17
**2009** [5] - 20:20;
21:10; 40:20; 41:16
**2010** [1] - 16:4
**2011** [10] - 2:12-14;
7:9, 15; 14:1; 16:4;
20:20; 41:3, 16
**2012-050** [2] - 1:4;
3:11

**2021** [2] - 1:11;
43:15
**2022** [1] - 43:19
**21** [1] - 2:2
**21st** [3] - 5:11;
11:14; 22:16
**22** [1] - 1:11
**23rd** [3] - 5:11;
11:15; 22:16
**25** [1] - 23:9
**26** [1] - 28:8
**27** [2] - 26:14; 28:9
**27th** [1] - 43:15
**29** [1] - 31:10

**3**

**35** [1] - 2:3
**3669** [1] - 2:8

**4**

**4** [10] - 2:7, 9-14;
8:6; 14:1; 43:19
**40** [1] - 2:3
**4th** [2] - 8:10; 11:3

**5**

**50** [1] - 17:1
**500** [1] - 20:15

**6**

**63** [3] - 2:8; 3:20;
4:5
**64** [3] - 2:9; 23:2
**65** [1] - 2:10
**66** [2] - 2:11; 6:11
**67** [1] - 2:12
**68** [1] - 2:13
**69** [3] - 2:14; 3:20;
4:5

**8**

**8,000** [1] - 12:23

**9**

**9,000** [1] - 12:22
**99** [1] - 1:17

**A**

**able** [3] - 11:5;
12:9; 35:12
**absolutely** [4] -
16:12; 25:23;
37:14; 41:13
**account** [14] -
12:1, 6, 11-12, 14,
16; 13:5; 14:10;
38:2, 18; 39:2, 4
**accumulation** [1]
- 7:7
**acknowledgme
nt** [1] - 10:5
**activities** [1] - 9:2
**activity** [1] - 9:20
**additional** [2] -
3:16; 34:21
**address** [2] -
30:12; 35:6
**addressed** [1] -
38:6
**adjourned** [1] -
42:11
**admitted** [1] - 4:6
**admitting** [1] -
21:17
**affect** [2] - 16:3, 10
**affixed** [1] - 43:14
**afternoon** [3] -
3:8, 11; 10:1
**age** [1] - 6:11
**agent** [1] - 23:11
**ago** [2] - 15:4
**agree** [2] - 7:12;
18:14
**agreed** [1] - 22:4
**agreement** [7] -
24:3, 5-6; 25:12;
35:14, 18; 36:3
**allowed** [1] - 16:20
**almost** [1] - 38:23
**America** [7] -
11:12; 12:7, 19;
13:17; 14:14, 16,

18
**amount** [1] - 7:2
**amounts** [1] - 13:5
**ANDERSON** [7] -
3:23; 22:23; 28:5;
33:10; 34:2, 6; 42:5
**Anderson** [6] -
1:15; 19:21; 21:14,
16; 40:10; 42:4
**Angel** [11] - 23:6,
10; 25:6, 22; 26:16;
29:4; 31:20; 33:5;
35:9, 15
**answer** [2] - 13:11;
17:13
**answered** [1] -
4:16
**anticipating** [1] -
23:21
**apart** [9] - 10:19;
11:2, 9-10, 13,
17-19, 22
**appear** [1] - 31:12
**APPEARANCES**
[1] - 1:14
**appeared** [1] -
23:23
**appearing** [1] -
17:1
**appellate** [1] -
16:23
**applicant** [1] -
36:14
**approached** [1] -
41:10
**appropriate** [1] -
17:11
**area** [1] - 37:3
**arrangement** [3]
- 33:5; 35:8; 36:20
**arrested** [4] -
20:12; 24:21;
31:14; 32:9
**arrested..** [1] -
27:6
**assessment** [2] -
10:7
**Assistant** [2] -
1:9, 16
**assisted** [1] -
43:11
**associated** [1] -
24:20

**Association** [1] -
24:12
**assume** [1] - 18:7
**assuming** [1] -
7:1
**attached** [2] -
13:17; 38:13
**attention** [4] -
22:20; 23:8; 36:13;
38:22
**Attorney** [4] -
3:15; 15:16; 17:20;
25:18
**attorney** [3] - 9:13;
16:11; 26:18
**attorneys** [1] -
25:8
**audio** [1] - 26:3
**audiovisual** [2] -
43:6, 8
**Audiovisual** [1] -
1:12
**available** [2] -
31:18; 32:6

**B**

**bagger** [1] - 15:15
**Bagger** [3] - 1:7;
15:16; 17:20
**BAGGER** [31] -
3:2, 8; 4:3, 11;
13:23; 14:12, 20;
15:6, 23; 16:7, 13;
17:6, 22; 18:23;
19:14, 19; 21:14;
27:22; 33:12, 15;
34:1, 4, 17; 36:8;
38:16; 39:9, 14;
40:3, 9; 42:4, 7
**bail** [1] - 31:4
**balance** [2] - 13:2;
20:15
**Bank** [10] - 11:11;
12:6, 16; 13:17;
14:14, 16-17;
37:19; 38:17; 39:10
**bank** [3] - 11:23;
13:10; 14:23
**BAR** [1] - 1:1
**bar** [1] - 35:11
**Bar** [4] - 1:12, 16;
24:12

2

**barely** [1] - 38:7
**based** [2] - 10:8; 32:21
**basis** [6] - 5:17, 22; 29:15; 32:16, 21
**BBO** [3] - 1:4; 3:10; 4:19
**bear** [1] - 3:5
**BEFORE** [1] - 1:7
**began** [2] - 20:13, 19
**behind** [1] - 7:18
**best** [1] - 6:1
**better** [1] - 28:6
**between** [4] - 10:11; 14:3; 19:2; 25:5
**big** [1] - 5:2
**bill** [1] - 20:7
**bills** [2] - 5:23; 6:18
**blame** [1] - 17:18
**board** [1] - 3:15
**BOARD** [1] - 1:1
**Board** [1] - 1:12
**boards** [1] - 5:2
**Bob** [1] - 30:14
**bono** [1] - 16:20
**Boston** [2] - 1:17, 20
**bounce** [1] - 39:3
**branch** [1] - 37:21
**Break** [1] - 34:14
**break** [3] - 34:23; 35:10; 40:13
**brief** [1] - 37:5
**briefly** [1] - 33:19
**bring** [2] - 3:6; 34:9
**broke** [1] - 5:15
**broker** [1] - 41:21
**Brothers** [3] - 12:17; 13:18; 14:16
**Buckley** [2] - 27:20, 23
**BUCKLEY** [2] - 43:3, 17
**buddies** [1] - 27:6
**burden** [1] - 20:1
**business** [2] - 3:13; 39:7

**C**

**camera** [1] - 34:12
**candor** [2] - 10:9; 36:14
**Cape** [1] - 16:20
**car** [1] - 38:5
**case** [22] - 5:13; 7:21; 17:3; 29:15; 31:8; 32:9, 12, 14, 16, 21; 33:2, 7
**case-by-case** [4] - 29:15; 32:16, 21
**cases** [5] - 7:19; 16:16; 17:1, 3; 21:22
**cash** [12] - 8:13, 20; 9:7, 10; 18:10; 36:23; 37:2, 8, 12, 20; 38:10, 15
**cashed** [1] - 39:20
**catch** [2] - 7:10, 16
**catching** [1] - 7:19
**caught** [2] - 4:18; 30:9
**caused** [1] - 17:9
**Center** [2] - 12:6; 13:15
**certainly** [5] - 15:19; 17:17; 19:11; 22:9; 31:23
**Certified** [1] - 43:9
**certify** [1] - 43:4
**Chair** [1] - 1:7
**charged** [7] - 7:9; 13:8; 18:18; 23:16, 19, 21
**charges** [1] - 32:22
**chased** [1] - 37:1
**chasing** [4] - 39:16, 18, 23; 40:2
**Check** [1] - 2:8
**check** [35] - 8:5, 7, 9-10; 10:22; 11:2; 12:8, 10, 21, 23; 14:8, 13; 36:23; 37:8, 11, 16-17, 21-22; 38:3, 10-11, 17-18; 39:1, 7-8, 12, 20; 40:22
**checks** [1] - 39:1

**circumstances** [1] - 11:15
**clarify** [4] - 20:4; 34:23; 35:3; 36:6
**clear** [4] - 5:4; 20:5; 26:23; 35:3
**cleared** [4] - 8:10; 11:3; 12:23; 13:1
**clicked** [1] - 26:8
**close** [1] - 33:16
**Cod** [1] - 16:20
**comfortable** [1] - 28:13
**coming** [2] - 7:21; 39:6
**comment** [1] - 37:12
**commission** [1] - 43:18
**Commonwealth** [1] - 43:3
**COMMONWEAL TH** [2] - 1:1; 43:1
**community** [1] - 16:21
**compare** [1] - 33:19
**complex** [1] - 32:14
**computer** [1] - 43:11
**computer-assisted** [1] - 43:11
**concerned** [3] - 23:15; 24:20; 26:16
**concluded** [2] - 20:20; 42:8
**conduct** [2] - 16:4, 10
**conflict** [14] - 24:7, 13; 25:3, 9; 29:17; 30:8; 31:22; 32:11; 33:8; 35:7, 17; 36:5
**considered** [1] - 17:17
**console** [1] - 38:5
**conspiracy** [2] - 18:6; 19:5
**constitutes** [1] - 43:11

**contacted** [1] - 3:15
**continuation** [1] - 36:11
**continued** [1] - 3:9
**control** [1] - 26:12
**conversation** [2] - 28:15
**convicted** [3] - 18:1, 3, 8
**convictions** [1] - 20:7
**cooperate** [1] - 26:17
**copies** [1] - 25:16
**Copy** [1] - 2:8
**copy** [4] - 25:11, 15; 35:13; 36:2
**correct** [5] - 7:17; 18:2; 21:7; 41:21; 43:12
**correctly** [1] - 41:15
**cost** [1] - 32:15
**counsel** [2] - 25:9; 35:11
**Counsel** [3] - 1:9, 16
**count** [3] - 18:4; 19:4
**counts** [7] - 13:9; 18:4, 18, 20; 19:2, 10, 12
**couple** [5] - 10:1; 27:6; 28:1; 40:12; 41:22
**course** [6] - 5:20; 9:4; 12:23; 17:22; 39:7, 21
**Court** [2] - 5:3; 32:23
**court** [7] - 6:13; 31:12; 32:8, 22
**COURT** [1] - 1:2
**courtroom** [1] - 5:16
**courts** [1] - 17:2
**cover** [3] - 12:7, 21; 32:2
**covered** [2] - 32:1, 3
**credited** [1] -

32:17
**crime** [2] - 23:16, 20
**criminal** [5] - 9:1, 13; 16:22; 23:18; 37:5
**CROSS** [1] - 2:1
**culpable** [1] - 19:7
**current** [1] - 7:15
**cut** [1] - 33:20

**D**

**daily** [2] - 5:17, 22
**Dardinski** [13] - 19:5, 10; 20:6, 17, 19; 21:18, 21; 22:14; 36:19; 40:17, 23; 41:8, 18
**Dardinski-Hansen** [2] - 19:5, 10
**date** [1] - 8:9
**dates** [1] - 20:16
**days** [2] - 39:5, 21
**deal** [1] - 41:21
**Dedham** [1] - 35:15
**defense** [1] - 9:13
**definition** [1] - 39:23
**deny** [1] - 30:14
**Department** [1] - 8:5
**deposit** [4] - 11:10; 12:20; 13:7; 14:7
**Deposit** [2] - 2:10
**deposited** [3] - 12:5; 14:22; 39:8
**deposits** [7] - 10:16, 18; 11:1, 4, 16; 13:7; 14:3
**described** [1] - 22:17
**DESCRIPTION** [1] - 2:7
**determine** [2] - 12:10; 25:3
**determined** [2] - 32:19
**different** [1] - 6:5;

12:12; 14:11; 19:11
**DIRECT** [1] - 2:1
**direction** [1] - 43:10
**disbarment** [1] - 10:6
**disclose** [1] - 25:20
**discrepancy** [1] - 37:13
**discuss** [1] - 3:4
**discussed** [2] - 17:15; 32:13
**discussing** [1] - 31:7
**discussion** [4] - 9:5; 11:21; 24:15; 25:1
**discussions** [1] - 23:22
**distinction** [1] - 19:1
**distribution** [2] - 24:1, 21
**District** [1] - 32:23
**district** [1] - 26:18
**documentary** [2] - 10:12; 11:6
**Documents** [1] - 2:9
**documents** [4] - 3:16; 10:23; 15:17
**dollar** [1] - 7:6
**dollars** [1] - 20:22
**done** [2] - 29:12; 30:22
**Donohue** [1] - 7:21
**Dorothy** [2] - 1:15; 28:3
**dots** [1] - 26:9
**down** [7] - 29:10; 31:17; 37:1; 39:16, 19; 40:1; 43:8
**draw** [1] - 18:23
**drawing** [1] - 28:18
**drawn** [2] - 18:13; 37:18
**drug** [5] - 8:14, 18; 23:23; 24:21
**duly** [1] - 4:8

**E**

**early** [2] - 14:4; 38:1
**earn** [1] - 33:4
**easiest** [1] - 28:4
**either** [3] - 19:20; 26:13; 40:9
**ELAINE** [2] - 43:3, 17
**electronic** [1] - 35:12
**eleven** [5] - 11:1, 22; 12:18; 13:13; 39:5
**embarrassed** [1] - 30:16
**emphasize** [1] - 31:9
**ended** [1] - 7:22
**ensure** [1] - 16:8
**enter** [1] - 3:22
**entered** [1] - 4:3
**entire** [3] - 32:1; 40:2; 41:15
**Equipment** [1] - 1:13
**equipment** [2] - 43:6, 8
**Esq** [4] - 1:7, 15, 18
**event** [3] - 6:14; 19:8
**evidence** [4] - 3:22; 10:12; 11:7; 35:2
**exactly** [3] - 12:3; 24:2; 31:16
**Examination** [4] - 20:2; 21:15; 35:4; 40:15
**example** [1] - 10:15
**exhibit** [1] - 22:22
**Exhibit** [1] - 23:3
**Exhibits** [1] - 3:19
**exhibits** [1] - 4:5
**existence** [1] - 16:18

**expected** [1] - 41:11
**expensive** [1] - 21:4
**expires** [1] - 43:18
**explained** [1] - 11:14

**F**

**fact** [9] - 9:14; 11:19; 23:10, 12; 25:14; 26:23; 30:8; 32:13; 38:6
**fade** [1] - 40:14
**fair** [2] - 33:3; 34:3
**fairly** [1] - 21:4
**family** [3] - 6:14, 19
**far** [1] - 33:1
**Federal** [2] - 1:19; 5:3
**fee** [18] - 8:16; 9:11, 18-19; 19:3; 24:6, 14; 28:23; 31:18, 23; 32:3, 17-18; 35:8, 22-23; 36:1
**fellow** [1] - 9:1
**file** [1] - 35:12
**filed** [1] - 5:3
**filled** [1] - 8:8
**final** [2] - 32:17
**financial** [13] - 5:1, 8, 19; 6:3, 9, 15; 15:9, 13; 16:3, 9; 17:12, 14
**fine** [2] - 28:3; 34:4
**first** [10] - 3:13; 14:7, 13, 23; 17:7; 19:9, 20; 40:16; 41:4, 9
**First** [1] - 1:16
**five** [4] - 10:19; 18:4; 33:22; 34:5
**flat** [4] - 31:18, 23; 32:3; 36:1
**focused** [2] - 6:15; 15:11
**folded** [1] - 38:4
**follow** [1] - 40:12
**follow-up** [1] - 40:12
**following** [1] -

30:10
**follows** [1] - 4:10
**foregoing** [2] - 43:5, 11
**foremost** [2] - 22:11, 13
**forget** [1] - 20:16
**Form** [2] - 2:12, 14
**form** [1] - 24:10
**four** [9] - 7:8; 10:19; 11:9, 18; 13:9, 12; 17:2, 4; 18:18
**fraction** [2] - 20:10; 21:11
**Frank** [1] - 1:8
**free** [1] - 19:22
**frequently** [1] - 8:19
**full** [1] - 43:12
**funds** [6] - 36:22; 37:9, 23; 38:2, 11; 39:11

**G**

**gained** [1] - 17:9
**General** [1] - 1:9
**George** [18] - 2:2; 3:10; 4:14; 10:1; 17:23; 19:1; 20:2, 4; 21:15; 22:8; 26:14; 30:14; 35:1, 4-5; 40:15
**GEORGE** [2] - 1:4; 4:7
**gesture** [1] - 38:23
**given** [1] - 37:8
**Gorton** [3] - 4:15; 5:14; 15:20
**government** [1] - 26:19
**great** [1] - 34:1
**grow** [2] - 20:13
**guess** [2] - 19:23; 22:3
**guilty** [2] - 19:7, 12

**H**

**half** [6] - 7:6, 8; 20:8, 11, 22
**hand** [1] - 43:14

**handing** [1] - 25:14
**handle** [3] - 32:9, 12; 33:1
**handled** [1] - 41:23
**handling** [2] - 16:17; 17:1
**Hansen** [12] - 19:5, 10; 36:20; 37:10, 15; 38:7, 21; 39:15; 41:1
**harbor** [1] - 9:17
**hear** [3] - 27:17; 28:12
**hearing** [9] - 3:9, 14; 4:19, 23; 17:8; 40:13; 42:8, 10; 43:5
**help** [3] - 22:13, 17, 23
**helped** [1] - 41:8
**hereby** [1] - 43:4
**hereunto** [1] - 43:14
**High** [1] - 1:17
**hill** [7] - 4:11; 5:10; 15:7; 17:16; 19:14; 34:10; 40:3
**Hill** [2] - 1:8; 8:7
**HILL** [17] - 4:13; 6:18, 21; 7:1; 8:4, 11, 19, 23; 9:6, 12, 21; 17:20, 23; 18:7, 22; 19:18; 40:8
**Hilton** [1] - 35:16
**himself** [1] - 31:20
**hit** [1] - 26:12
**Hold** [1] - 27:12
**home** [4] - 13:14, 19; 30:13; 31:4
**hope** [1] - 16:19
**hoped** [2] - 22:5; 33:4
**hours** [4] - 10:19; 11:9, 18; 13:12
**house** [2] - 21:4, 7
**HP002** [1] - 2:9
**HP013** [1] - 2:9
**huge** [1] - 7:2
**hypothetical** [1] - 30:11

3

4

## I

**icon** [1] - 26:11
**idea** [1] - 29:4
**identified** [1] - 4:8
**III** [1] - 1:8
**ill** [3] - 18:10, 14
**illegal** [1] - 9:20
**immediately** [3] - 12:13, 19; 28:10
**improve** [1] - 26:3
**IN** [2] - 1:4; 43:14
**included** [1] - 17:11
**Income** [3] - 2:12
**inconsistencies** [1] - 10:10
**incorruptibility** [2] - 30:5
**indeed** [1] - 35:18
**Indicating** [3] - 19:17; 27:11
**inference** [1] - 18:13
**infrequent** [1] - 8:22
**insights** [1] - 17:8
**insufficient** [3] - 37:9; 38:3, 11
**intend** [1] - 16:14
**intent** [1] - 13:4
**interest** [10] - 7:12; 20:14; 24:8, 14; 25:4; 30:9; 31:22; 35:7, 17
**interference** [1] - 8:3
**interim** [1] - 26:7
**interrupts** [1] - 8:2
**investigation** [2] - 27:5, 8
**involved** [4] - 9:1; 21:18, 22; 32:14
**IRS** [7] - 5:6; 6:22; 7:3; 10:22; 20:7, 16, 21
**issue** [2] - 10:15; 35:7
**IV** [1] - 1:10

## J

**January** [2] - 1:11; 43:15
**Jeff** [1] - 22:23
**Jeffrey** [2] - 1:9; 34:11
**Judge** [3] - 4:14; 5:14; 15:20
**JUDICIAL** [1] - 1:2
**jumbo** [1] - 29:2
**jury** [1] - 18:13

## K

**keep** [1] - 6:1
**key** [1] - 16:17
**kind** [3] - 6:9; 31:3; 33:6
**known** [4] - 18:14; 21:20, 23

## L

**language** [2] - 35:17; 36:2
**large** [2] - 7:20; 10:8
**last** [1] - 27:14
**laundered** [2] - 40:18; 41:20
**laundering** [8] - 9:16; 18:1, 5, 9, 19, 21; 41:10
**law** [2] - 16:15, 19
**lawyer** [3] - 23:13, 18
**learned** [1] - 10:20
**leaving** [1] - 13:2
**LEBLANC** [2] - 19:17; 40:6
**LeBlanc** [7] - 1:7; 9:23; 13:21; 19:15; 34:8; 36:12; 40:4
**led** [3] - 10:5; 20:6, 14
**legal** [4] - 8:16; 9:18; 19:3
**less** [4] - 19:7; 20:8, 21; 21:9
**level** [1] - 16:15

**likely** [2] - 29:22; 39:13
**Line** [2] - 28:8
**lived** [1] - 21:3
**livestream** [4] - 3:3, 6; 33:21; 34:16
**livestreaming** [1] - 3:7
**LLP** [1] - 1:19
**lockup** [1] - 30:12
**Lodgen** [1] - 1:19
**look** [6] - 6:2, 12; 27:9; 28:14; 29:14; 30:16
**looked** [3] - 14:12; 30:2; 36:3
**looking** [7] - 11:7; 14:8; 29:19; 30:17; 36:4; 39:5
**looks** [1] - 30:17
**lost** [2] - 27:14; 28:2
**low** [1] - 16:17
**low-key** [1] - 16:17

## M

**MA** [2] - 1:17, 20
**MAFFEI** [13] - 4:2; 19:23; 21:13; 26:8; 27:11, 14, 18; 28:3; 33:14, 22; 34:22; 40:11; 42:3
**Maffei** [12] - 1:18; 3:15; 19:21; 20:3; 26:1; 27:12; 33:12; 34:20; 35:5, 20; 40:9, 16
**mailed** [1] - 10:21
**main** [1] - 30:4
**March** [5] - 8:6, 9; 14:1; 40:20; 41:16
**Marianne** [1] - 1:7
**marked** [2] - 3:19; 22:21
**Massachusetts** [3] - 8:6; 24:12; 43:3
**MASSACHUSE TTS** [2] - 1:1; 43:1
**matter** [10] - 3:10; 11:19; 16:1; 25:13;

32:4; 33:6; 37:5
**matters** [1] - 3:4
**mean** [10] - 7:17; 18:9, 17; 27:7; 28:13; 29:3, 13; 30:18; 31:2; 40:1
**meaning** [1] - 31:13
**means** [5] - 29:9, 14, 20; 30:3; 31:15
**meant** [2] - 15:20; 29:18
**meantime** [1] - 38:7
**meet** [1] - 25:2
**meeting** [10] - 3:6; 20:17, 19; 23:3, 5; 24:4; 40:17; 41:4, 9
**memories** [1] - 40:14
**memory** [2] - 14:18; 27:10
**mentioned** [2] - 7:7; 21:1
**met** [2] - 20:5; 38:14
**Michelle** [1] - 33:17
**microphone** [1] - 26:11
**middle** [1] - 27:3
**might** [3] - 24:16, 21; 26:17
**million** [5] - 7:6; 20:8, 11, 22
**mind** [3] - 19:1; 22:11, 13
**minutes** [15] - 11:1, 10, 13, 16, 19, 22; 12:18; 13:13; 14:2, 21; 27:15, 22; 33:23; 34:3, 19
**misconduct** [1] - 10:5
**money** [20] - 5:23; 7:2; 8:14, 18; 9:16; 12:11, 14; 13:4; 18:1, 5, 8, 18, 20; 21:19; 22:5; 40:18; 41:10, 19, 23
**monthly** [1] - 35:22
**months** [1] - 17:4

**morning** [1] - 14:5
**MR** [33] - 4:2, 13; 6:18, 21; 7:1; 8:4, 11, 19, 23; 9:6, 12, 21; 17:20, 23; 18:7, 22; 19:18, 23; 21:13; 23:2; 26:1, 8, 10; 27:11, 14, 18; 28:3; 33:14, 22; 34:22; 40:8, 11; 42:3
**MS** [50] - 3:2, 5, 8, 23; 4:3, 11; 9:23; 13:21, 23; 14:12, 20; 15:6, 23; 16:7, 13; 17:6, 22; 18:23; 19:14, 17, 19; 21:14; 22:23; 26:12; 27:12, 17, 19, 22; 28:5; 33:10, 12, 15, 20; 34:1, 4, 6-7, 15, 17; 36:8; 38:16; 39:9, 14; 40:3, 6, 9; 42:4, 7
**mumbo** [1] - 29:2
**mumbo-jumbo** [1] - 29:2
**mute** [1] - 26:2

## N

**narrow** [1] - 17:10
**nature** [2] - 19:11; 33:2
**necessarily** [2] - 18:11; 21:20
**need** [2] - 16:22; 26:6
**needed** [4] - 22:1; 23:17; 31:19; 40:18
**Needham** [6] - 12:6, 18; 13:15; 37:18; 38:17; 39:9
**never** [2] - 38:6; 40:23
**next** [3] - 12:17; 34:9; 39:21
**Nieves** [3] - 23:10; 25:5
**night** [1] - 32:5
**nobody** [1] - 23:13
**non** [1] - 35:23
**non-refundable** [1] - 35:23

5

**Noon** [1] - 1:11
**normal** [3] - 9:12, 15
**Notary** [2] - 43:3, 7
**notes** [1] - 33:19
**nothing** [3] - 33:14; 40:6, 8
**noticed** [2] - 35:19; 36:1
**notices** [1] - 6:22
**November** [1] - 43:19
**NUMBER** [1] - 2:7
**number** [4] - 7:6, 13; 10:10; 22:22

**O**

**object** [1] - 26:5
**objection** [1] - 4:2
**objections** [2] - 3:21, 23
**obtained** [1] - 25:18
**obviously** [2] - 4:16; 26:5
**occasions** [1] - 41:22
**occurred** [7] - 7:5, 8, 14; 12:1, 3; 37:15
**October** [1] - 36:21
**OF** [4] - 1:1; 43:1
**office** [6] - 6:6; 38:12, 14; 39:4, 22
**Office** [1] - 1:16
**official** [1] - 43:14
**One** [1] - 30:4
**one** [15] - 10:20; 13:6; 18:4, 7; 19:4; 20:3; 22:10; 29:11; 31:6; 34:5; 35:2; 36:9, 12; 37:3
**open** [2] - 27:5, 7
**operating** [3] - 5:17; 15:10; 16:16
**opposed** [1] - 38:18
**order** [2] - 3:13; 21:19
**original** [1] - 25:15

**originally** [1] - 36:4
**otherwise** [1] - 14:21
**ought** [1] - 17:16
**overhead** [5] - 6:7; 21:2, 9
**OVERSEERS** [1] - 1:1
**Overseers** [1] - 1:12
**owed** [4] - 5:5; 7:2; 20:15, 21
**own** [1] - 36:22

**P**

**P.M** [1] - 42:11
**pace** [1] - 16:15
**PAGE** [1] - 2:7
**page** [4] - 23:9; 27:3; 29:10; 30:10
**Page** [5] - 23:9; 26:14; 28:8; 31:10
**paid** [8] - 6:18, 20; 7:15; 9:10; 23:6; 24:10; 36:22; 41:12
**panel** [5] - 10:9; 33:16; 35:21; 36:13, 16
**panel's** [1] - 10:6
**paraphrase** [1] - 4:21
**parking** [1] - 14:17
**part** [13] - 10:6, 8; 17:12, 17; 19:8; 21:1, 17; 22:3, 8; 26:21; 36:18
**participation** [1] - 42:9
**particular** [1] - 35:6
**parties** [1] - 28:23
**past** [4] - 15:18; 16:1; 34:5; 41:8
**Paula** [1] - 1:7
**pay** [2] - 29:5, 7
**paying** [1] - 5:22
**payment** [4] - 24:14; 31:17; 36:18; 38:19
**pays** [1] - 36:13

**penalties** [2] - 7:11; 20:13
**people** [8] - 24:16, 18-19, 23; 25:21; 26:17; 29:5, 7
**perceived** [1] - 10:11
**period** [3] - 15:14; 40:2; 41:15
**person** [2] - 30:11; 31:1
**personal** [4] - 6:7; 21:2, 9
**petition** [1] - 10:3
**PETITIONER** [1] - 1:5
**phone** [2] - 30:20; 34:11
**pick** [1] - 13:19
**picture** [1] - 17:18
**piece** [1] - 35:2
**place** [2] - 40:19; 43:13
**plan** [2] - 16:8; 24:22
**planned** [1] - 7:19
**play** [2] - 29:11, 18
**PLYMOUTH** [1] - 43:2
**point** [1] - 3:22
**possible** [2] - 29:3
**posturing** [1] - 38:21
**potential** [1] - 25:21
**practice** [3] - 16:15, 19; 17:5
**predicted** [1] - 34:19
**preliminary** [1] - 3:3
**present** [1] - 43:5
**presented** [1] - 39:11
**presenting** [1] - 38:19
**pressure** [5] - 5:19; 6:4, 9, 15
**pressures** [5] - 15:14; 16:3, 10; 17:12, 15
**presumably** [2] -

14:20; 15:1
**pretty** [1] - 38:1
**prevent** [1] - 26:21
**price** [3] - 28:11, 19, 22
**principal** [1] - 20:15
**pro** [1] - 16:20
**problems** [1] - 22:16
**proceeding** [3] - 3:20; 43:7, 10
**proceedings** [1] - 43:12
**produced** [1] - 3:17
**promised** [2] - 30:13, 22
**promises** [2] - 30:20; 31:3
**protect** [1] - 30:5
**provision** [1] - 9:17
**pseudonym** [1] - 25:7
**Public** [2] - 43:3, 7
**put** [4] - 12:11; 33:18; 38:5; 39:2
**putting** [1] - 13:4

**Q**

**quality** [1] - 26:4
**questioning** [2] - 27:16, 21
**questions** [13] - 4:12; 9:22; 10:2; 13:22; 15:7; 19:16; 28:1; 33:11; 35:11; 36:11; 40:12; 41:5; 42:6
**quiet** [1] - 16:18
**quite** [1] - 11:20
**quote** [2] - 5:2; 42:1

**R**

**RAG** [1] - 2:9
**rather** [2] - 12:12; 14:10
**RE** [1] - 1:4

**read** [2] - 28:6
**reading** [1] - 35:19
**ready** [1] - 15:18
**realize** [4] - 5:15; 15:12, 22
**realized** [1] - 13:20
**really** [3] - 36:9; 37:4
**reason** [5] - 21:17; 22:4, 7-8; 27:16
**reasons** [2] - 22:10, 12
**receipt** [1] - 24:8
**received** [2] - 9:8; 36:18
**recognition** [1] - 15:8
**recognize** [4] - 5:18; 6:17; 18:12
**reconvene** [1] - 34:3
**record** [2] - 20:5; 28:8
**RECROSS** [1] - 2:1
**REDIRECT** [1] - 2:1
**refer** [2] - 24:2; 25:7
**referenced** [2] - 24:7, 9
**referred** [6] - 19:9; 21:21; 31:21; 32:7, 10; 37:18
**referring** [3] - 28:20; 29:23; 30:7
**refers** [1] - 35:21
**reflection** [1] - 16:1
**refundable** [1] - 35:23
**register** [3] - 12:8; 14:8, 13
**regular** [2] - 37:21; 39:6
**reinstated** [1] - 16:9
**reinstatement** [2] - 10:4; 36:15
**remarks** [1] - 36:11
**remember** [2] -

6

12:15; 29:23

**Remote** [1] - 1:12

**remote** [2] - 43:5, 8

**repeat** [1] - 27:20

**report** [1] - 43:12

**reported** [1] - 39:10

**Reporter** [3] - 8:2; 28:7; 43:9

**represent** [4] - 23:6; 25:10; 29:5, 7

**representation** [3] - 31:19; 32:1; 35:14

**represented** [1] - 25:22

**requires** [1] - 10:4

**respect** [3] - 15:6; 24:22; 37:5

**result** [3] - 13:10; 14:7; 35:10

**retain** [1] - 25:11

**Return** [3] - 2:12

**returned** [1] - 34:15

**returns** [1] - 5:4

**Revenue** [1] - 8:5

**reversed** [1] - 7:22

**reviewing** [1] - 12:8

**ROBERT** [2] - 1:4; 4:7

**Robert** [2] - 2:2; 3:10

**Roche** [3] - 12:17; 13:17; 14:16

**role** [1] - 26:21

**Ronnie** [1] - 29:22

**room** [1] - 33:18

**running** [1] - 17:2

## S

**safe** [1] - 9:16

**sat** [1] - 5:15

**saw** [2] - 5:2; 37:4

**Schedule** [1] - 2:13

**seal** [1] - 43:15

**second** [6] - 10:20;

12:20; 14:10, 15; 17:7; 19:12

**see** [10] - 10:14; 15:19; 16:23; 17:4; 28:1, 18; 34:13; 37:22; 39:1, 19

**SENIOR** [1] - 4:7

**Senior** [1] - 3:10

**sense** [1] - 27:23

**September** [2] - 41:3, 16

**served** [1] - 24:8

**service** [1] - 16:21

**set** [3] - 6:16; 24:6; 33:6

**settlement** [1] - 7:20

**several** [1] - 24:2

**Sherin** [1] - 1:19

**shift** [1] - 26:13

**shorthand** [1] - 43:8

**Shorthand** [1] - 43:9

**shot** [1] - 13:15

**show** [1] - 10:23

**signed** [1] - 24:4

**situation** [3] - 5:1, 20; 30:11

**Slip** [2] - 2:10

**slips** [1] - 11:11

**smile** [1] - 21:11

**smurfing** [1] - 18:2

**sold** [2] - 21:6

**solely** [1] - 17:18

**someone** [2] - 28:17; 30:19

**sorry** [3] - 15:16; 18:20; 25:6

**sort** [2] - 15:8; 40:14

**sought** [1] - 37:15

**sound** [1] - 39:14

**sounds** [2] - 15:12; 30:18

**source** [2] - 9:7, 10

**speaking** [3] - 12:9; 14:7; 26:3

**specific** [2] - 23:9; 27:10

**spotlight** [1] - 26:9

**square** [4] - 10:14; 11:5; 13:12; 37:4

**SR** [1] - 1:4

**SS** [1] - 43:2

**Starbuck's** [1] - 38:13

**statue** [1] - 9:18

**statute** [1] - 9:16

**still** [1] - 4:17

**stopped** [2] - 12:16; 13:18

**straight** [2] - 13:14; 17:10

**strain** [2] - 6:4; 15:9

**Street** [2] - 1:17, 19

**structuring** [7] - 10:16; 13:6; 18:2, 4, 19, 21; 19:2

**subscribed** [1] - 43:14

**successful** [1] - 10:3

**sufficient** [4] - 37:23; 38:2; 39:2, 11

**suggestion** [1] - 37:7

**summarize** [1] - 28:4

**Superior** [1] - 32:23

**SUPREME** [1] - 1:2

**surprised** [1] - 37:16

**surrounded** [1] - 11:15

**sworn** [1] - 4:9

## T

**table** [1] - 35:15

**tacked** [1] - 7:11

**tailored** [1] - 24:13

**Tax** [3] - 2:12

**tax** [3] - 5:4, 20; 20:7

**taxes** [1] - 6:1

**ten** [5] - 15:4, 18; 16:1; 34:3, 18

**term** [1] - 39:16

**testified** [5] - 4:9, 23; 11:17; 22:15; 36:21

**testimony** [8] - 10:11, 17; 11:6; 26:19; 36:15, 20; 39:17; 41:7

**THE** [27] - 1:2; 5:10; 6:20, 23; 7:4; 8:7, 15, 21; 9:3, 9, 14; 11:8; 14:4, 15; 15:1, 15; 16:5, 12, 14; 17:14; 18:3, 11; 19:6; 37:14; 38:20; 39:13, 18

**thereafter** [1] - 43:10

**therefore** [1] - 37:10

**thinking** [7] - 4:15, 17; 5:21; 6:8; 12:7; 15:2, 11

**third** [2] - 3:14; 28:23

**Thomas** [1] - 1:18

**thousand** [1] - 7:13

**three** [11] - 7:11; 17:2; 18:20; 19:2; 26:9; 27:15, 22; 38:8; 39:21

**today** [5] - 21:12; 28:14; 29:19; 30:16

**tomorrow** [1] - 6:11

**took** [5] - 8:13; 24:19; 38:4; 40:18; 43:12

**touch** [1] - 24:17

**towards** [1] - 32:17

**trafficking** [1] - 23:23

**transcribed** [1] - 43:10

**transcript** [4] - 22:21; 25:14; 26:15; 43:11

**transcription** [1] - 43:11

**travel** [1] - 33:1

**trial** [3] - 4:14; 11:21; 15:18

**tried** [2] - 22:17; 37:8

**trouble** [1] - 5:9

**true** [1] - 43:12

**trustworthiness** [1] - 10:7

**try** [2] - 37:20

**trying** [5] - 5:23; 7:16; 17:3; 29:8; 38:21

**turn** [1] - 34:12

**twelve** [9] - 11:10, 12, 16, 18, 22; 12:18; 13:13; 14:2, 21

**two** [9] - 7:5, 10, 18; 14:3; 19:8; 39:21; 41:17

**two-part** [1] - 19:8

**types** [1] - 16:16

## U

**U.S** [1] - 25:17

**unable** [1] - 7:10

**unaware** [1] - 5:1

**under** [8] - 5:18; 6:3, 10; 9:15; 13:7; 15:13; 43:10

**undercover** [1] - 23:11

**unless** [1] - 3:21

**unmute** [2] - 26:6; 27:13

**unquote** [2] - 5:2; 42:1

**unrelated** [1] - 8:12

**unsigned** [1] - 35:13

**up** [14] - 4:18; 6:1; 7:10, 16, 19, 22; 13:19; 30:9; 33:6, 16; 35:13; 38:4, 9; 40:12

## V

**various** [2] - 24:15; 41:18

**Via** [1] - 1:12
**via** [2] - 43:5, 7
**Volume** [1] - 1:10

### W

**waiting** [1] - 34:18
**wants** [1] - 19:21
**ways** [1] - 16:5
**weeks** [1] - 38:8
**Westwood** [3] - 13:16; 21:4; 38:14
**WHEREOF** [1] - 43:14
**wife** [7] - 6:19; 8:4; 10:21; 12:9; 14:2, 8, 19
**willing** [1] - 31:11
**wish** [1] - 22:6
**witness** [1] - 43:5
**WITNESS** [28] - 2:1; 5:10; 6:20, 23; 7:4; 8:7, 15, 21; 9:3, 9, 14; 11:8; 14:4, 15; 15:1, 15; 16:5, 12, 14; 17:14; 18:3, 11; 19:6; 37:14; 38:20; 39:13, 18; 43:14
**wolf** [2] - 33:17; 34:8
**Woolf** [1] - 1:9
**WOOLF** [3] - 23:2; 26:1, 10
**word** [1] - 29:18
**words** [3] - 29:2; 31:6; 38:3
**worth** [1] - 33:9
**writing** [1] - 43:8
**written** [4] - 8:8; 14:9; 24:3; 25:11
**wrote** [1] - 8:4

### Y

**year** [3] - 6:22; 20:18
**years** [11] - 5:4; 7:5, 8, 11, 18; 15:4, 18; 16:2; 24:12; 41:17
**yourself** [4] - 26:2,

6; 27:13; 28:12
**YU** [8] - 3:5; 26:12; 27:12, 17, 19; 33:20; 34:7, 15

**32**

| | |
|---|---|
| **From:** | June Risk |
| **To:** | Dorothy Anderson; Thomas F. Maffei |
| **Cc:** | Rodney S. Dowell; Anne T. Brown; Matthew Stewart; "Jeffrey Woolf" |
| **Subject:** | In the Matter of Robert A. George Petition for Reinstatement |
| **Date:** | Wednesday, April 21, 2021 12:55:37 PM |
| **Attachments:** | George - vote 4-12-21.pdf |
| | George - signed Vlet 4-21-21.pdf |

Dear Counsel,

Attached please find a copy of the vote of the Board of Bar Overseers taken at its meeting held on April 12, 2021 with regard to the above matter.

Thank you.


June D. Risk

Legal Administrative Assistant

Board of Bar Overseers

99 High Street

Boston, MA   02110

617-728-8706

j.risk@massbbo.org

# BOARD OF BAR OVERSEERS
### *of the Supreme Judicial Court*
99 HIGH STREET
BOSTON, MASSACHUSETTS 02110

BOARD OF BAR OVERSEERS
JEFFREY R. MARTIN, CHAIR
MARIANNE C. LEBLANC, VICE CHAIR
PAULA M. BAGGER
ELISABETH O. daSILVA
APRIL C. ENGLISH
FRANK E. HILL, III
MARSHA V. KAZAROSIAN
FRANCIS P. KEOUGH
DAVID B. KRIEGER, M.D.
ELIZABETH RODRIGUEZ-ROSS
ERNEST L. SARASON, JR.
A. CLARISSA WRIGHT

617-728-8700
Fax: 617-482-8000

massbbo.org

GENERAL COUNSEL
JOSEPH S. BERMAN

ASSISTANT GENERAL COUNSEL
PAUL M. REZENDES
JEFFREY D. WOOLF
MERLE R. HASS

LEGAL PROGRAM MANAGER
MICHELLE YU

EXECUTIVE DIRECTOR
GREGORY J. WENGER

April 21, 2021
<u>Via email</u>

Dorothy Anderson, Esq.
Office of Bar Counsel
99 High Street, 2nd Floor
Boston, MA  02110

Thomas F. Maffei, Esq.
Sherin And Lodgen
101 Federal Street
Boston, MA 02110

RE:   In the Matter of Robert Albert George, Sr.
      Petition for Reinstatement
      <u>Supreme Judicial Court No. BD-2012-050</u>

Dear Attorneys Anderson and Maffei:

Enclosed kindly find a copy of the Vote of the Board of Bar Overseers taken at its meeting held April 12, 2021 with regard to the above matter.

Thank you for your attention to this matter.

Sincerely yours,

*June D. Risk*

June D. Risk
Legal Administrative Assistant

/jdr
cc:   Rodney S. Dowell, Esq.

# BOARD OF BAR OVERSEERS
*of the Supreme Judicial Court*
99 HIGH STREET
BOSTON, MASSACHUSETTS 02110

BOARD OF BAR OVERSEERS
JEFFREY R. MARTIN, CHAIR
MARIANNE C. LEBLANC, VICE CHAIR
PAULA M. BAGGER
ELISABETH O. daSILVA
APRIL C. ENGLISH
FRANK E. HILL, III
MARSHA V. KAZAROSIAN
FRANCIS P. KEOUGH
DAVID B. KRIEGER, M.D.
ELIZABETH RODRIGUEZ-ROSS
ERNEST L. SARASON, JR.
A. CLARISSA WRIGHT

617-728-8700
Fax: 617-482-8000

massbbo.org

GENERAL COUNSEL
JOSEPH S. BERMAN

ASSISTANT GENERAL COUNSEL
PAUL M. REZENDES
JEFFREY D. WOOLF
MERLE R. HASS

LEGAL PROGRAM MANAGER
MICHELLE YU

EXECUTIVE DIRECTOR
GREGORY J. WENGER

In accordance with the Rules of the Board of Bar Overseers, at its meeting held April 12, 2021, the Board of Bar Overseers considered the record in re **Matter of Robert A. George, Sr.** (BD-2012-050). After consideration and upon Motion duly made and seconded, it was unanimously

> VOTED: to adopt the report and recommendation of the hearing panel and to recommend to the Supreme Judicial Court that Mr. George's petition for reinstatement be allowed.

(Ms. Bagger, Ms. LeBlanc, Mr. Hill, and Mr. Sarason recused themselves from the discussion and vote.)

*Marsha V. Kazarosian*
Marsha V. Kazarosian
Secretary