```
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF MASSACHUSETTS



    ROBERT M. FARRELL,                )
              Clerk of Court          )
                                      ) Civil Action
    Vs.                               )
                                      ) No. 12-mc-91221-FDS
    ROBERT A. GEORGE,                 )
              Respondent              )
                                      )
                                      )


    BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR, IV

                IN RE: Attorney DISCIPLINARY PROCEEDINGS




           John Joseph Moakley United States Courthouse
                        Courtroom No. 10
                        1 Courthouse Way
                        Boston, MA 02210


                        December 3, 2021
                           10:00 a.m.





                        Valerie A. O'Hara
                      Official Court Reporter
           John Joseph Moakley United States Courthouse
                        1 Courthouse Way
                        Boston, MA 02210
                    E-mail: vaohara@gmail.com
```

APPEARANCES:

For the Respondent:

    Sherin and Lodgen LLP, by THOMAS F. MAFFEI, ESQ., 101 Federal Street, Boston, Massachusetts 02110.

|  |  |
|---|---|
| 1 | PROCEEDINGS |
| 2 | THE CLERK: All rise. Thank you. You may be |
| 3 | seated. Court is now in session in the matter of |
| 4 | In Re: Attorney Disciplinary Proceedings, |
| 5 | Matter Number 12-91221. |
| 6 | Would counsel please identify themselves for the |
| 7 | record. |
| 8 | MR. MAFFEI: Good afternoon, Thomas Maffei for |
| 9 | Mr. George. |
| 10:01AM 10 | THE COURT: All right. Good morning. This is a |
| 11 | hearing on the application for readmission to the |
| 12 | United States District Court Bar by Robert A. George, Sr. |
| 13 | The matter was assigned to me not because I'm |
| 14 | Chief Judge but because I was the duty judge when the |
| 15 | application was filed, which I think was in September. |
| 16 | The process is governed by our Local Rule 83.6.10. |
| 17 | (b)(4)(c) says after notice, the presiding judge, which is |
| 18 | me, shall schedule a hearing on the application. |
| 19 | This is the hearing. The standard for |
| 10:01AM 20 | reinstatement as set forth in (b)(5) of the rule, which |
| 21 | says the applicant should have the burden of demonstrating |
| 22 | by clear and convincing evidence that he or she is |
| 23 | qualified and fit to practice law before this court, and |
| 24 | that the applicant's presumption of the practice of law |
| 25 | before this court will not adversely affect the interest of |

|  |  |
|---|---|
| 1 | potential clients, public confidence and the integrity of |
| 2 | the bar of this court or the proper administration of |
| 3 | justice. |
| 4 | (b)(6) says that if I grant the application, it |
| 5 | goes to the full court, and a person can only be reinstated |
| 6 | upon a majority vote.  That doesn't say what happens if I |
| 7 | deny the application.  I brought it up before the full |
| 8 | court at our last meeting because I knew this was coming, |
| 9 | and we voted we need to change the rule, but if I deny the |
| 10:02AM 10 | application, it will also be referred to the full court, |
| 11 | and that will also be decided by a majority vote, the point |
| 12 | being that it is not my decision alone, although I think |
| 13 | implicit in all of this is that if fact-finding of any kind |
| 14 | is required that I would be the finder of fact, so that's |
| 15 | the procedural framework. |
| 16 | I have Mr. George's affidavit.  I understand there |
| 17 | were matters submitted to the SJC.  I don't think they're |
| 18 | part of the docket, but, Mr. Maffei, the floor is yours. |
| 19 | Obviously, I've never done one of these.  You probably |
| 10:03AM 20 | never have either. |
| 21 | MR. MAFFEI:  I've never done one in this court. |
| 22 | THE COURT:  Okay. |
| 23 | MR. MAFFEI:  Thank you, your Honor.  As you |
| 24 | probably know, Mr. George was a member of the bar |
| 25 | practicing criminal law, and 31 years after he was |

1  admitted, he was arrested, and 10 years ago last March,
2  that arrest took place, and he went through the federal
3  judiciary system, was convicted.
4  　　　　There was an appeal, it was affirmed, and he went
5  off to spend 42 months in Shanksville, Pennsylvania at a
6  federal facility.
7  　　　　He was discharged from that federal facility in
8  2015, served his probation.  His probation was successfully
9  terminated in 2017, and in November of 2017, he took the
10:04AM 10  multi-state professional ethics examination and passed it,
11  all the while working in an automobile dealership down on
12  Cape Cod and doing various sundry charitable things in his
13  spare time.
14  　　　　We applied for the permission to have him function
15  as a paralegal in 2019, and then I filed on his behalf in
16  May of 2020 his petition for reinstatement to the Mass.
17  Bar.
18  　　　　That petition was tried before a hearing committee
19  in the Board of Bar Overseers for four days.  We did three
10:05AM 20  days, and then the panel asked us to come in and provide
21  some further evidence on some points, which we did, so that
22  was the fourth day.
23  　　　　The ultimate result of the hearing committee's
24  hearing was a unanimous decision that he be reinstated.
25  Bar counsel had told me before the hearing started, as is

1       their practice, they wouldn't commit ahead of time as to
2       whether or not they would oppose it or not but wanted to
3       hear the evidence.
4              At the end of my case, bar counsel did
5       cross-examine Mr. George at length and then told the
6       hearing panel the bar counsel's office did not oppose his
7       reinstatement.
8              It then went to the single justice.
9       Single Justice Cypher approved his reinstatement, and he
10:06AM 10      was reinstated in May of 2021, so that's the procedural
11      history.
12             I have volumes and volumes of paper that I'm more
13      than happy to share with the Court coming out of the
14      hearing committee proceedings as well as papers that went
15      to the full board in order to finalize that proceeding.
16             I'll summarize very briefly the evidence that took
17      place there on which the hearing committee made its
18      findings.
19             There was an "outpouring," I guess is the word I
10:06AM 20      would use, of support for Mr. George to be allowed to
21      return to the bar, and many people testified, dozens, maybe
22      as many as 50 or 60 people submitted letters, including
23      former United States Attorneys who had been opposed to
24      Mr. George when he was practicing, including a former judge
25      of this court who supported his reinstatement and testified

1  on his behalf, and a lesion of other people, including many
2  people for whom he's worked that he's been out of practice.
3       Most of the testimony, very little of the
4  testimony, frankly, related to his learning the law because
5  everyone seemed to have pretty much acknowledged throughout
6  that when he was in practice, he was a skilled, successful,
7  well-known and respected criminal defense lawyer.
8       Most of the testimony at the hearing had to do
9  with the public's perception of re-admitting him, he having
10 been charged and convicted of conspiracy to launder money.
11 It was a long and complicated story, most of which didn't
12 play much of a role during the hearing committee hearing,
13 but, nonetheless, that was the focus of both the hearing
14 committee and I believe the SJC, single justice, and every
15 one of them concluded that he had paid his debt, he had
16 acted and he acknowledged what he did and admitted what he
17 had done, but when Judge Gorton sentenced him,
18 Judge Gorton's remarks before the sentencing were part of
19 the record before the hearing committee, and it's very
20 interesting to read Judge Gorton's remarks, but one of the
21 things he said was how is it possible that someone who was
22 as skillful and respected as you, what were you thinking?
23      And he said I think the answer is you weren't
24 thinking, and there was a lot of testimony about the life
25 of a fast-paced, going in six different directions, three

1    courtrooms in one day life that Mr. George was leading but
2    none of it was offered to excuse what he had done.  He
3    acknowledged what he had done.  It had taken a terrible
4    toll on him, his family.  It expended most of his
5    resources.  His wife went back to work.
6         So, the last thing that took some time during the
7    hearing committee was Mr. George has had a fairly
8    significant list, which I'm happy to share with you, of
9    charitable things that he had done all the time following
10:09AM 10   his arrest, and, in fact, they started when he was at the
11   federal facility in Pennsylvania.
12        He was a model prisoner, he ran the motor pool, he
13   was running classes, he was taking courses online, he got a
14   master's degree when he was there, and then when he got
15   out, much of his charitable activities was spent with a
16   couple of veteran's related organizations on Cape Cod, one
17   in particular delivers food to veterans around the state,
18   and the testimony was across the board.
19        He worked long hours.  If the person who manages
10:10AM 20   this very large nonprofit called him on a Sunday morning
21   and said I need someone to drive a truck to Pittsfield to
22   deliver a load of food, he'd be the first to say I'll do
23   it, and he'd get in the truck and drive out there.
24        So in terms of the standard in the rule, which is
25   the same standard as exists in the SJC rules, I think

1  there's no question that he's qualified.  He's kept up on
2  the law.  He passed the NPRE, and the question of will his
3  readmission affect the public's perception at the bar,
4  except for one witness who came out of the woodwork at the
5  last minute who did testify, who was the father of a
6  gentleman by the name O'Brien who was convicted of
7  murdering the next door neighborhood, that defendant's
8  father testified, and watching his testimony, it was done
9  online, it was a sad presentation, but it wasn't clear
10 exactly what he was complaining about.
11          It went from, you know, I paid a fee, and I don't
12 think I got any value.  When I cross-examined him and then
13 I put in the records of that event, it turns out Mr. George
14 represented this young fellow right through to
15 incarceration and continued to stay with him after he went
16 to jail and to this day continues to assist his new lawyers
17 who are trying to figure out how to get him out of jail
18 because I believe he's serving a life sentence, and he was
19 a young person when he was convicted.
20          So with the exception of that one person, no one
21 appeared to oppose the reinstatement, and as I said before,
22 federal authorities, the head of the FBI Office in New York
23 City came in and testified on his behalf.  All of them, and
24 Judge Gertner testified, they all said the law of
25 reinstatement in Massachusetts is such that even people who

1   are convicted of serious crimes are entitled to a second
2   chance if they meet these standards, and that given the
3   record that was before the hearing panel, they determined
4   that he did meet those standards and that he was entitled
5   to a second chance.
6          The only decision I could find that's remotely --
7   well, it's relevant to this, but it's the only one I found,
8   it goes back to 1996 involves a lawyer by the name of
9   William Cintolo.
10  Cintolo, and I remember the facts well when I
11  first got into the case in preparing for Mr. George's
12  hearing, Cintolo was charged with intimidating, I guess, my
13  word a witness in the whole organized crime Jerry Angiulo
14  world, and Cintolo was convicted, and he then, when he got
15  out, he petitioned for reinstatement.
16         Everybody in the picture, the bar counsel, the
17  hearing committee, the full board of bar overseers, they
18  all said denied, what you did in terms of actually
19  interfering with the system in which you've spent most of
20  your career is a bridge too far, but, on the other hand, we
21  recognize that all lawyers have a chance for redemption and
22  a chance to be re-admitted, so despite all this opposition,
23  including the opposition in this court to his
24  reinstatement, and the U.S. Attorney's Office objected to
25  it, three Judges of this court said we think he's done

1   enough to satisfy the standard in the rule, but we also --
2               THE COURT:  I think that was kind of an ad hoc
3   procedure at the time, if I remember, they appointed three
4   judges.
5               MR. MAFFEI:  Yes, it was Judge Lindsay,
6   Judge O'Toole and Judge --
7               THE COURT:  Ponsor.
8               MR. MAFFEI:  -- Ponsor.  And what they said was,
9   because I do a lot of bar discipline work, it's an
10  important decision.  What they said was, the effect, the
11  perception of the public is important, and if we let you in
12  now, we're concerned it sends the wrong message because you
13  monkeyed around with the justice system in very serious
14  circumstances, so we'll let you in, but you're going to
15  wait and we're not punishing you for this, we're just
16  telling the public that there are serious lines we're going
17  to draw, and this is one of them, so they put off his
18  readmission for two years.
19              Contrary to that case, no one here, including bar
20  counsel, no one from the U.S. Attorney's Office came out
21  and opposed this, so it's a very different situation, so I
22  respectfully submit that he's more than met the standards
23  in the rule, and, as I said, I'm happy to deliver over to
24  you a binder of the documents that we submitted to the
25  hearing committee if you want to go through them all.

|  |  |
|---|---|
| 1 | THE COURT:  I think that does raise the question |
| 2 | of what the record ought to be.  It seems to me probably to |
| 3 | do this right, I ought to have that information.  I assume |
| 4 | there was a transcript? |
| 5 | MR. MAFFEI:  Yes, there's a transcript.  The |
| 6 | hearing committee report is helpful. |
| 7 | THE COURT:  I think we probably ought to have that |
| 8 | stuff.  I don't know that it needs to be in -- well, it's |
| 9 | up to you whether paper form or a disk, I don't know what |
| 10:15AM 10 | form it exists in, but I think that's probably the universe |
| 11 | of evidence.  You can supplement it, of course. |
| 12 | MR. MAFFEI:  That's fine, your Honor.  Would you |
| 13 | prefer a paper or disk?  I can have either one. |
| 14 | THE COURT:  You're talking to a 66 year-old man. |
| 15 | I'd rather have the paper.  It's a lot of it, it sounds |
| 16 | like.  I'd probably prefer the paper, probably the disk as |
| 17 | well.  One way or another, this is going to wind up with |
| 18 | the full court, and so I probably ought to have it |
| 19 | electronically. |
| 10:16AM 20 | MR. MAFFEI:  Your preference to your age reminds |
| 21 | me, one of the other differentiating practices, I don't |
| 22 | know how old Mr. Cintolo was. |
| 23 | THE COURT:  Pretty young, I think. |
| 24 | MR. MAFFEI:  Mr. George is 66, about to turn 67 in |
| 25 | January, so time is passing, and he's anxious and desirous |

```
 1    of going back to work as soon as possible.  I'm older than
 2    both of you.
 3               THE COURT:  As you probably know, you get to a
 4    certain age, and it feels like you're old, and that's the
 5    right word, it doesn't matter what the number is.
 6               Anyway, so I think the record ought -- again, it's
 7    up to you.  You can submit whatever you want, but it seems
 8    to me that probably the best way to handle this is just
 9    whatever the record was at the BPO or the hearing
10    committee, including the transcript, you probably ought to
11    supplement the record here with whatever supplementation
12    you want to provide.
13               This was last spring; is that right, the hearing?
14               MR. MAFFEI:  Yes.  It was last November.
15               THE COURT:  It was a hearing, and the decision was
16    in the spring?
17               MR. MAFFEI:  Yes.
18               THE COURT:  Okay.
19               MR. MAFFEI:  Thank you.
20               THE COURT:  Anything else you want to add?
21               MR. MAFFEI:  Mr. George is here if you want to ask
22    him any question, your Honor.
23               THE COURT:  The only question, and I haven't
24    looked at the record, obviously, but does it make a
25    difference whether or not, you know, in the federal
```

1  criminal sentencing regime, we have something we call
2  acceptance of responsibility.  Going to trial is not
3  necessarily inconsistent with acceptance of responsibility,
4  but, obviously it's a piece of this.
5          Do you acknowledge you committed a crime or do you
6  deny it?  And that's a piece of this, and I wonder if
7  either or both of you could address that issue.  Did he, in
8  fact, accept responsibility?
9          In other words, it's one thing to say I made a
10 mistake, I accept the consequences, something other to be
11 defiant and refusing to acknowledge what you did, and, of
12 course, there's lots of gradations and nuances in between
13 depending on the facts, and I am not particularly familiar
14 with the facts.
15         I read the news articles when they came out way
16 back when, but that's really the extent of it at this
17 point.  I wonder if you could address that.
18         MR. MAFFEI:  I think Mr. George should address
19 that head on.
20         MR. GEORGE:  Having gone through the hearing, your
21 Honor, and testified at some length in the hearing at the
22 Board of Bar Overseers, I was asked the same questions that
23 you just asked, and I fully accept responsibility for what
24 occurred.
25         I fully accept responsibility for my actions and

1   conduct that led to my indictment, and I exercised my right
2   to trial, and at the sentencing before Judge Gorton, I
3   accepted responsibility in a way that might have at the
4   time not seemed as much as I'm doing now, but I had an
5   appeal pending at the time.
6          I'm sorry for what I've said many times, not only
7   under oath, but, of course, to family, friends and loved
8   ones and supporters that what happened was my fault.  It
9   should not have happened.
10         The life I was leading at the time, which I just
11  want to be clear only because I don't know if you know
12  this, there was no drugs, no alcohol.  It wasn't that kind
13  of situation.  I'm not using any of that as an excuse for
14  what occurred.
15         What I told the Court at the time was that the
16  prosecution wanted -- well, presented evidence that
17  possibly greed was involved or that I was in need of funds.
18  What I told the board and what I told Judge Gorton was that
19  at the time I didn't realize how upside down I was
20  financially, and I acknowledge now that I was, and that
21  isn't the type of life I'm leading now, it isn't the type
22  of practice that I intend to have.
23         That was, you know, the busy hectic life of
24  someone who was carrying 50 cases at a time, and I don't
25  see it ever happening again, and for the past 10 years,

1    I've tried to do everything I could possibly do to
2    demonstrate to everybody around me or anyone who asks I'm
3    sorry for what happened and I'm a changed person who just
4    wants a second chance.
5            THE COURT:  Okay.  Thank you.
6            Anything else, Mr. Maffei?
7            MR. MAFFEI:  No.  Thank you, your Honor.
8            THE COURT:  All right.  And if you can get, I
9    guess, the record to me, I don't know what the time frame
10   is here, I think I could look through that, obviously.  And
11   it has to go to the full court, and we meet once a month,
12   and so there's going to be some degree of delay inevitably
13   with almost everything we do, but I will take into account
14   his desire for expeditious review.
15           It's also not clear to me whether I need to write
16   anything or if so how extensive that needs to be.  I'll
17   just take it up in due course.  As I said, I haven't done
18   this before, I'm not sure this has occurred before since
19   Billy Cintolo, and we have a different procedure in place
20   now, but I will take that up in due course.  All right.
21   Anything else?
22           MR. MAFFEI:  Thank you, your Honor.  No,
23   thank you.
24           MR. GEORGE:  Thank you.
25           THE COURT:  Thank you, we'll stand in recess.

1        THE CLERK:  All rise.

2        (Whereupon, the hearing was adjourned at 10:22 a.m.)

3

4                    C E R T I F I C A T E

5

6  UNITED STATES DISTRICT COURT )

7  DISTRICT OF MASSACHUSETTS ) ss.

8  CITY OF BOSTON )

9

10       I do hereby certify that the foregoing transcript,

11  Pages 1 through 17 inclusive, was recorded by me

12  stenographically at the time and place aforesaid in Civil

13  Action No. 12-mc-91221-FDS, ROBERT M. FARRELL, CLERK OF COURT

14  vs. ROBERT A. GEORGE and thereafter by me reduced to

15  typewriting and is a true and accurate record of the

16  proceedings.

17       Dated January 11, 2022.

18

19                         s/s Valerie A. O'Hara

20                         _____

21                         VALERIE A. O'HARA

22                         OFFICIAL COURT REPORTER

23

24

25