UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

                                              )
IN RE:                                        )         Misc. Business Docket No.
APPLICATION FOR REINSTATEMENT                 )         12-mc-91221-FDS
OF ROBERT A. GEORGE, SR.                      )
_____)


MEMORANDUM AND ORDER ON APPLICATION FOR
REINSTATEMENT TO THE BAR OF THE DISTRICT COURT

SAYLOR, C.J.

       Petitioner Robert A. George, Sr., a disbarred attorney, has applied for reinstatement to the

bar of the United States District Court for the District of Massachusetts pursuant to Local Rule

83.6.10.

       Petitioner was convicted in 2012 of seven felony counts involving money laundering and

related crimes.  At the time of his indictment, he was a prominent and successful criminal

defense lawyer who appeared regularly in this court.  He received a sentence of 42 months in

prison, followed by a term of one year of supervised release.  He was suspended from the

practice of law, and ultimately disbarred, by the Commonwealth of Massachusetts.  This court in

turn disbarred him as well.

       After a hearing lasting four days before the Board of Bar Overseers, petitioner was

reinstated to the bar of the Commonwealth of Massachusetts on May 5, 2021.  He now seeks

reinstatement to the bar of this court.

       The circumstances of petitioner's criminal convictions, standing alone, are profoundly

troubling.  He committed the crimes solely for financial gain; not only was there no excuse, there

were no mitigating factors (such as youth, addiction, or mental-health problems).  Furthermore,

during the same period, he had failed to pay any state or federal income taxes for four years. The Massachusetts Board of Bar Overseers, despite substantial reservations, recommended that he be reinstated, and the Supreme Judicial Court accepted that recommendation.

This Court, however, is not so convinced. If an attorney who has committed multiple felonies is ever to be reinstated—a debatable proposition in itself—at a minimum he or she must demonstrate a complete acceptance of responsibility and extraordinary remorse and rehabilitation. Here, however, petitioner continues to minimize his conduct, and to cast much of the blame for his criminal conduct to the impact of his busy law practice rather than his own personal failings. Furthermore, his complete disregard of his tax obligations, for which he has expressed no remorse or regret at all, likewise suggests a disturbing lack of respect for the law.

Under the circumstances, and for the reasons set forth below, the Court concludes that petitioner has failed to establish, by clear and convincing evidence, that his resumption of the practice of law before this court would not adversely affect "public confidence in the integrity of the bar of this court" and "the proper administration of justice" within the meaning of Local Rule 83.6.10(b)(5). The application will accordingly be denied.

I.    **Background**

As of 2011, Robert A. George, Sr., was a member of the bar of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts. (Hr'g R. at 924; George Aff. ¶ 1). His practice focused largely, although not exclusively, on criminal defense. (Hr'g R. at 1466).

George was indicted in the District of Massachusetts on April 7, 2011, on seven felony counts relating to money laundering. (*Id.* at 769). Specifically, he was charged with one count of money laundering conspiracy (18 U.S.C. § 1956(h)); two counts of aiding and abetting money

laundering (18 U.S.C. § 1956(a)(3)(B)); three counts of money laundering (18 U.S.C. § 1956(a)(3)(B) and (C)); and one count of structuring transactions to evade reporting requirements (31 U.S.C. § 5324(a)(1)).  (*Id.*).

After a jury trial before District Judge Nathaniel M. Gorton, George was convicted on all counts on June 8, 2012.  (*Id.* at 68).  On October 31, 2012, he was sentenced to 42 months in prison; a term of supervised release of one year; a fine of $12,500; and a special assessment of $700.  (*Id.* at 573-75).  His appeal, which was unsuccessful, was decided on July 30, 2014.  (*Id.* at 923).

After serving 33 months of his sentence, he was released from prison on October 6, 2015, and served his term of supervised release, which concluded on January 29, 2017.  (*Id.* at 35).

In the meantime, bar counsel for the Commonwealth of Massachusetts filed a notice of conviction with the Supreme Judicial Court on June 12, 2012.  (*Id.* at 1940).  George was suspended on June 21, 2012, and disbarred on March 15, 2015, retroactive to that date.  (*Id.*).  This court issued an order of temporary suspension on October 8, 2012, and a judgment of disbarment on June 1, 2015.  (Order of Temporary Suspension at 1; J. Disbarment at 1).

On May 19, 2019, George petitioned for reinstatement with the SJC.  (Hr'g R. at 1937).  After hearings in October 2020 and January 2021, in which nine witnesses testified on his behalf, the hearing panel recommended on March 23, 2021, that his petition for reinstatement be allowed.  (*Id.* at 1955).  The SJC entered a judgment of reinstatement on May 5, 2021.  (J. Reinstatement at 1).

Although it had not been the basis of his disbarment, evidence admitted at the reinstatement hearing revealed that George did not pay federal or state income taxes for the years 2008, 2009, 2010, or 2012.  (Tr. 3:130).  During that period, he was an attorney with a successful

3

practice, earning more than $200,000 during at least one of those years. (*Id.*). His unpaid federal taxes, plus interest and penalties, amounted to more than $563,000. (Hr'g R. at 1942). After his release from prison, he discharged that obligation through a payment of $25,000. (Tr. 1:123). His unpaid state taxes amounted to more than $175,000. (*Id.* at 1:122).

On September 17, 2021, George petitioned for reinstatement to the bar of this Court. (Appl. Reinstatement at 1-2). The matter was assigned to the undersigned judge as the "presiding judge" under Local Rule 83.6.5(c)(2) and 83.6.10(b)(4).

This Court held a hearing on the matter pursuant to Local Rule 83.6.10(b)(4)(C) on December 3, 2021. (Ct. Tr. at 1). Counsel for George did not offer new evidence, but stated that he intended to rely on the record developed in the state-court proceeding, which he provided to the Court. (*Id.* at 13). George did, however, speak briefly at the hearing in response to a question raised by the Court. (*Id.* at 13-16).

## II.    Standard of Review

Under Local Rule 83.6.10(b)(5), the standard for reinstatement after disbarment is as follows:

> The applicant shall have the burden of demonstrating by clear and convincing evidence that he or she is qualified and fit to practice law before this court and that the applicant's resumption of the practice of law before this court will not adversely affect the interests of potential clients, public confidence in the integrity of the bar of this court, or the proper administration of justice.

## III.    Analysis

As noted, petitioner relies entirely on the evidentiary record in the state disciplinary proceedings. That record consists of more than 2,000 pages, including, among other things, his response to the written questionnaire from the BBO; various materials from his criminal conviction; letters of support; and a transcript of the four days of hearings.

4

### A.  **Petitioner's Criminal Conduct**

The basic facts underlying the federal criminal offenses, as summarized by the First

Circuit, were as follows:

> Standing in line to buy coffee at a Dunkin' Donuts [in early 2009], George
> bumped into ex-con Ronald Dardinski.  The two went back a ways.  George had
> represented Dardinski in a couple of criminal proceedings.  And Dardinski had
> wanted George to represent him in another criminal matter too, a larceny scheme
> where he had "sold" some repossessed cars that were not his to sell, pocketing
> $750,000 from would-be buyers without giving them the autos.  Dardinski had
> told George "everything" about the repo scam but hired another lawyer instead
> and eventually did four years in prison after pleading guilty to state-larceny
> charges. . . . [R]eunited at Dunkin' Donuts, George asked Dardinski, "Oh, what
> did you ever do with all that money?" . . . .  "I still have a bunch of it hidden,"
> Dardinski said.  "Well," George shot back, "I can get rid of it for you."  As he was
> leaving, Dardinski promised to call George once he figured out "what was what."
> And he later would—but not before telling DEA Special Agent Joseph Tamuleviz
> about his run-in with George and agreeing to become a paid informant against his
> erstwhile attorney.
>
> During a follow-up meeting, George told Dardinski that he had a mortgage broker
> who could clean the repo-scam money . . . .  "[I]f this guy isn't alright, you can
> hold me 100% responsible," Dardinski taped George saying.  Dardinski said that
> he had to hide some "coke" money too.  George announced at their next
> conclave—held in George's Lexus—that the broker had "agreed to do the rest,"
> an apparent allusion to the coke money.  And he explained the plot's particulars:
> Dardinski would give the broker $100,000, who would then cut him an $80,000
> check from East Coast Mortgage's account and pocket the rest as a fee.
>
> Thanks to George, Dardinski eventually hooked up with the broker, Michael
> Hansen.  "How many times do you think you'll need it?" Hansen asked Dardinski
> when they met in person, referring to his laundry services.  "Probably ten,"
> Dardinski said.  "That a boy!" an excited Hansen shouted.  Two times Dardinski
> handed Hansen $100,000.  And two times Hansen gave Dardinski a check for
> $80,000 made out to Crane Industries, a fake company set up by the DEA.
> Agents then contacted Hansen, who agreed to cooperate with the government.
> George had told Dardinski that he was not getting a cent on the deals.  But that
> was a big lie, George told Hansen. And Hansen ended up paying George $20,000
> for helping to make the transactions happen.
>
> While this laundering was going on, George also told Dardinski that he would pay
> him a fee for client referrals.  So Dardinski introduced him to "Angel," a
> supposed drug-dealing friend of his who was really undercover officer Pedro

5

Nieves.  The coke money he had laundered through Hansen had come from drug sales involving this dealer, Dardinski told George.  "Angel" later gave George a $25,000 cash retainer.  That same day, George deposited $9,000 in cash into an account at a Bank of America branch located in Needham, Massachusetts. Twelve minutes later, he deposited $8,000 in cash into that account at a different Bank of America branch located a half mile away.  Two weeks later, George gave Dardinski a $2,500 check payable to Crane Industries.  Written on the same account into which George had deposited the $17,000, this check represented Dardinski's "cut" of the retainer.  The check had "office disposal" on the memo line, even though Dardinski had not done a lick of office-disposal work for George.

*United States v. George*, 761 F.3d 42, 46-47 (1st Cir. 2014) (footnotes omitted).

As noted, the jury found petitioner guilty on all seven counts, including counts alleging money laundering, money laundering conspiracy, aiding and abetting money laundering, and structuring transactions.  (Hr'g R. at 769).

On appeal, petitioner argued in substance that the evidence was insufficient to sustain a verdict and that he was unduly prejudiced by certain evidentiary rulings.  (*Id.* at 657-62).  He also stated or suggested throughout his brief that he had been victimized by overly aggressive government conduct and manipulation of the evidence.  *See, e.g.*, Appellant Br. at 12 (Hr'g R. at 636) (referring to the government's "relentless pursuit to manufacture a conspiracy"); *Id.* at 31 (Hr'g R. at 655) (referring to the "agents['] attempt to 'negate' any trial defense George might possess.").[1]

The First Circuit denied the appeal and affirmed the conviction on July 30, 2014.  761

---

[1] In his sentencing memorandum, petitioner stated the following:

To Mr. George, [the request from Dardinski] was not an invitation to a criminal conspiracy to launder criminal funds; rather, it was a human being asking Mr. George for help—and the priest's son had been raised to help others claiming to be in need.  Unbeknownst to Mr. George, however, life as he and his family knew it came unraveled in the Spring of 2009, when Ronald Dardinski sunk his hooks into Mr. George for, the defense would respectfully submit, the purpose of revenge and financial rewards.

(Hr'g R. at 406).

6

F.3d at 61.

**B.  Petitioner's Testimony at Hearing**

Petitioner filed responses to a written questionnaire with the Board of Bar Overseers.

(Hr'g R. at 34-51).  He also testified at some length at the hearing on his reinstatement

proceeding.  (Tr. 1:24-213).  In his testimony, he addressed a wide variety of topics, including,

among other things, his employment since his conviction; his subsequent charitable activities; his

family and friendships; a prior admonition by the BBO for mishandling a medical malpractice

matter; a legal malpractice claim against him; and other client complaints to the BBO that did not

result in discipline.  (*Id.* at 1:25-26; 1:55-57; 1:67-93; 1:116-18; 1:139-40).

Two areas of his testimony are particularly noteworthy:  his testimony concerning (1) his

reported remorse and rehabilitation for the crimes and (2) his failure to pay state and federal

income taxes for the years 2008, 2009, 2010, and 2012.  (*Id.* at 1:24-120).

**1.  Testimony Concerning Petitioner's Reported Remorse and Rehabilitation**

With respect to the issues of his remorse and rehabilitation, petitioner testified on both

direct and cross-examination.  On direct, he testified in part as follows:

Q.    Mr. George, do you feel any remorse for what happened to you?

A.    Yes, I do.  I -- I told Judge Gorton from day one that over all those years
        of practice I was never a person who would commit a crime.  And since --
        since it's happened I've spent hours and hours and hours asking myself
        what Judge Gorton said to me that day when he was sentencing me in
        October of 2012, "What were you thinking?"

        Well, obviously I wasn't thinking.  And I still ask myself why I got caught
        up in this.  And, honestly, the answer isn't crystal clear.  I didn't have a
        need for money.  What I did didn't involve a lot of money.  I was
        successful and respected and did good work for my clients.

        I had a wonderful family and I was a good family man.  I -- I -- for
        goodness sakes, I wasn't even out late, you know.  I had no vices, you

7

know, no drugs, no alcohol, no -- no crazy lifestyle.

And I do know, I do know this.  I never found it easy to say no to anybody, especially to clients.  I spent my career walking in other people's shoes, trying to see it from their point of view.  And, you know, I lost my way here.  But I accepted responsibility for what I did.  I accepted my punishment, and I tried to be -- I tried to be a model prisoner and citizen since I was released back in October of 2015.

You know, this weekend I looked up the term "remorse," and it means deep regret or guilt for a long deeply -- held for a long commitment.  And that hits on the head everything that I felt since I was convicted.

I deeply regret what I did.  I beat myself up over of it every day since.  And I -- and I -- and I felt the guilt and the sorrow for what I did.  It was there every day.  What I did affected my friends, family, and the people that love me and care about me.  And I just will -- would never -- I can't even imagine ever putting myself in that position again with the people around me I care about.

Q.      It's somewhat difficult to ask this question . . , but do you think you're a changed person today from what you were before you were arrested?

A.      Well, at the time I was arrested I was a thousand percent immersed up to my neck in a busy, high stress, high profile criminal defense practice.  . . .

And I thought a lot about what my life was like back then and what it is now.  Back then I never said no.  I overextended myself.  I used to think there was nothing I couldn't do or I couldn't accomplish.  And I thought I was -- I actually -- I thought I was infallible.  And I think I lost track of how fast I was moving and how deep I was in.

Every criminal defense lawyer's alert to keep the lines clear between you and your clients, and I did a pretty good job of that until a terrible mistake I made when I introduced Dardinski to Michael Hansen and then accepted a fee for it later.  The desk between myself and the client had disappeared, and I wasn't communicating in a professional manner.  Although it was -- in what I thought was the privacy of the attorney/client relationship, it was -- it was a bad situation I shouldn't have found myself in.

I was wrong to say yes in referring him, and I was wrong to think that.  If I made an introduction as I did, I was not exposing myself to the criminal process.  I was wrong.  And a day does not go by that I don't think about it.  And the regret, remorse I have for having done it, not just to myself but more importantly to my wife and my children, the people -- and the people

who care about me.

Spending 33 months in the federal prison with a complete loss of my freedom opened my eyes and gave me the time and insight to see what's really important in life and what is not.  More importantly, what is not.

But I was never driven by money and I never had a fancy lifestyle, but looking back I was on a never-ending high of being a successful criminal defense lawyer who -- who -- who had it made.

And having gone over -- having gone through this over the past eight years I think, I believe, I'm more grounded.  I'm a lot less stressed.  I'm now accustomed to a more quieter life outside of the spotlight.

(*Id.* at 1:110-15).

On cross-examination, he was asked about many of the same topics, including the question of whether he had been entrapped into committing the crime.  He testified in part as follows:

Q.      Sitting here today, do you believe you were entrapped?

A.      You know, I don't -- believe it or not, I don't want this to sound -- I don't look backwards, I look forwards.

I was convicted of the crime.  The jury did not believe I was entrapped.  The appeals court did not believe I was entrapped.[2]  And as I said before, I accept the verdict and I don't dispute the verdict because my appeal was affirmed.

And I do not -- I don't revisit it, you know.  I want you to know that -- I want you to know that I know I did wrong getting inmeshed in all of this.  And as I look back on it now, technically I was involved in a conspiracy and I was involved in the crimes for which I was convicted because bottom line is technically I was.  And I -- I don't dispute any of it.

Q.      Okay.  Mr. George, I'm still a little bit concerned about your testimony that you don't really know why you did it.  If you don't know why you did it, that raises an issue of whether or not you would do it again.  And I

---

[2] In fact, petitioner did not raise entrapment as a defense on appeal.  In substance, he argued that the evidence was insufficient to sustain a verdict and that he had been unduly prejudiced by certain evidentiary rulings. (Hr'g R. at 657-62).

know of course you say you would never do it again.

But I ask you one more time to tell the hearing panel why it was that you engaged in these acts at the time.

A.   Well, Counsel Anderson, I've spent -- I've spent so much time trying to figure out why this all happened and why I don't believe it will ever happen again, and it's because I was never a bad person intent on committing any crimes, you know.

I -- you know, my life before this was one for -- one of 32 years, a career of 32 years in which I never was involved in this kind of behavior.  I was 56 years old at the time.  I had a wonderful life and I had a wonderful family and I had a wonderful career.

Q.   Mr. George, I don't want to cut you off, but you are making points that you've already made.

And, again, I'm just asking you:  Do you have any insight into why you got involved in this?

MR. MAFFEI:  I think he's trying to answer the question.

A.   I had no structure to my life back then.  I had no -- I had no balance.  I had no structure in my office.  I had no balance.  I was going from case to case to case to case to case.  I was just too deeply immersed in the practice to see that what I had been doing or what I did with Dardinski was wrong and dangerous.

I had no office structure.  I – it's a hundred percent on me.  I had too many cases and the lines became blurred, and I was way too busy to make -- and too negligent to make careful, reason[ed] judgments.

I was communicating, although it was in the -- although it was within the confines of attorney/client privilege when I listen to the tapes, communicating with people like Dardinski on their level I was -- I should have been more professional.  I should have been more professional and distant.

But, please, just -- just -- just take it from me that this was what I was doing every minute of every day.  I was so -- I was -- I was so immersed in the practice that I didn't see the danger I was putting myself in and the -- and the wrongfulness of what I did.

I don't believe it will happen again because I will never be put -- put myself in that position again.  Not only because I don't intend to practice law that way ever

again but also because I -- and I -- you know, sometimes -- you know, I'm getting
-- I'm older.  I'm a -- I don't need to go from case to case.  Many of the
stressors that caused this are gone.  I want to practice on a much more low profile,
a quiet scale.  I know it happened because I -- I never said no when I should have
said no, and I took on every case that came in my door.

(*Id.* at 1:148-52).

### 2.  <u>Testimony Concerning Petitioner's Failure to Pay Income Taxes</u>

Petitioner also testified at the hearing about his failure to pay income taxes for an

extended period of time.

According to the record, petitioner paid no state or federal income taxes for the years

2008, 2009, 2010, and 2012, despite earning substantial income.[3]  His income for the year 2008

does not appear to be in the record.  His income for the years 2009 and 2010 was in the range of

$150,000 to $225,000, according to petitioner.  (*Id.* at 1:127).  In 2012, he declared $213,000 in

income.  (*Id.*).

As of approximately 2019, petitioner owed a federal income-tax debt of approximately

$563,000, including interest and penalties.  (*Id.* at 1:122-23).  He negotiated a settlement with the

IRS in the amount of $25,000, resulting in a forgiveness of his federal tax debt of approximately

$538,000.  (*Id.* at 1:123-24).  As of December 2019, his state income-tax arrearage was

$175,561.  (*Id.* at 1:122).  He is paying that amount at a rate of $500 per month.  (*Id.*).  He was

not, however, prosecuted for income-tax evasion or any other federal or state tax crime.

As for the reasons for his failure to pay taxes, on direct examination, petitioner testified

in part as follows:

Q.      [W]hy didn't you pay your taxes when they were due like -- as in the

---

[3] There is some discrepancy in the record as to whether he owed back taxes for the year 2007 as well.  *See*
Govt. Appellate Br. (Hr'g R. at 1136) (stating that petitioner owed more than $90,000 in back taxes for the tax year
2007).

ordinary course?

A.    Well, my -- my income -- my income while I was practicing law, and I'm
      not using it as an excuse, it was episodic.  It was up and down.  It was --
      you know, I paid my taxes when I had the money.  I just wasn't paying my
      quarterlies which is what I should have been paying.  My quarterlies
      would have avoided the problem in April of not having enough money or
      then again in October of not having the money to pay your tax returns.

      So I would always pay what I had.  And as I just said, my income was up
      and down.  I had planned to get current, believe it or not, with [a
      settlement of a civil matter].  I would have been completely current had it
      not been reversed.  But that was just the nature of the way I was doing
      business at the time.

      . . . I would always file my returns.  I always used a C.P.A.  I never
      avoided to pay my taxes.  I was never really in collection.  I -- I always
      caught up with my payments including penalties and interest.  And I -- I
      know it sounds dumb, but it just was -- it was just part of the cost of doing
      business for me.

      I mean, I have paid millions of dollars of taxes over my life, and a lot of it
      was in penalties and interest.  . . . All my own fault, but it was just part of
      the cost of -- of paying late.  And I got into a bad habit of paying late.

      And I would have eventually caught up, but I -- once I was -- once I was
      arrested, my income fell 60 percent then eventually down to 100 percent.
      I lost any ability to pay it back.  . . .

Q.    [W]ere you in serious money difficulties in '08, '09?

A.    No, not really.  [I]t's hard to explain what caused all of this, but it
      certainly wasn't money.  I made a lot of money; I spent a lot of money.
      But I will tell you this.  I paid my taxes late, and as a result of paying them
      late I was always playing catch up on my taxes.  But I was never a person
      who didn't file, and I wasn't a person who didn't eventually pay his taxes.

      I -- it wasn't as a result of not having the money on a personal level.  But
      with the episodic up-and-down income, I would try to pay it out of -- out
      of my business and it wasn't always there.

(*Id.* at 1:101-04).

On cross-examination, he testified in part as follows:

> Q.    And how do you feel about the fact that you were able to free yourself from $538,000 worth of tax debt?
>
> A.    I would -- how do I feel about it?  I addressed a problem that was causing -- causing my family a great deal of stress, and I was able to resolve it for them and resolve it for myself.  That's how I feel.
>
> Q.    All right.  But you understand that many other people that would be, you know, 10 or 20 years worth of taxes that they didn't have to pay?
>
> A.    Yes.  I mean -- I mean, I don't know that, but I can tell you that it was a good result.  It was a good result because I needed to resolve it, and I didn't have the income to pay more than that, more than the 25,000.

(*Id.* at 1:128-29) (colloquy of counsel omitted).

### C.  **Other Witnesses**

Petitioner called nine witnesses in addition to his own testimony.  The witnesses included Edward Hinchey, a retired attorney and close friend (*Id.* at 1:226-47); Rosemary Scapicchio, a criminal defense attorney (*Id.* at 1:248-73); Donald Cox, the operator of a non-profit organization on Cape Cod for which petitioner volunteered his services after his release from prison (*Id.* at 1:275-86); Peter Catanese, an automobile dealer who employed petitioner after his release from prison (*Id.* at 2:109-26); Paul V. Kelly, an attorney who employed petitioner as a paralegal after his release from prison (*Id.* at 2:127-65); and petitioner's daughter, Meghan George (*Id.* at 3:98-126).  In addition, Edward O'Brien, a disgruntled former client, testified against petitioner's reinstatement.  (*Id.* at 2:3-32).

William Weishaupt, an attorney, retired FBI agent, and close friend, testified for petitioner.  (*Id.* at 2:33-73).  Among other things, Weishaupt testified on cross-examination as follows:

> Q.    [T]he fact that he was convicted of these crimes apparently did not affect your opinion that he is a man of great integrity?

13

A.      No, it didn't.  I saw it for what it was.  I saw it as an aberration.  Why it occurred
        -- we never discussed personally as to why it occurred.  The circumstances under
        which it occurred I understand, and quite frankly having come from that
        background I can tell you quite frankly that if the federal government targets you
        for something and they decide they want to go after you without regard to any
        ethics, chances are you're going to slip up and they are going to get a shot at you.

(*Id.* at 2:64-65).

Retired judge Mel Greenberg also testified as a witness for petitioner.  (*Id.* at 2:166-85).

He testified, in substance, that petitioner was a highly capable criminal defense attorney who

should be reinstated to the bar.  (*Id.* at 2:177-84).  He further testified that criminal defense

lawyers are subject to "pressures" and "pitfalls that [such a] practice entails, and that it's a

perilous course to be a criminal trial lawyer from the point of view of managing an office on fees

that you have to earn yourself."  (*Id*. at 2:177).

Retired judge Nancy Gertner also testified as a witness for petitioner.  (*Id.* at 2:74-107).

She testified, among other things, that the fact that petitioner received a below-guideline

sentence from Judge Gorton was "extraordinary":

        Judge Gorton was not -- I know him well.  He was not a judge who varied from
        the guidelines very much.  It was not his practice.  It was very rare and so going
        down, reducing the guideline range 33 percent below the low end of the
        applicable range is extraordinary.

(*Id.* at 2:84).  She then quoted Judge Gorton's statement that petitioner's career had been

"unblemished" before the crime occurred, which "suggest[ed] to [her] that he understood" that

"this offense was aberrant."  (*Id.* at 2:84-85).  As bar counsel pointed out on cross-examination,

however, she did not call attention to Judge Gorton's other comments at the sentencing, such as

the fact that he was "appalled by the brazenness and stupidity of the flagrant crime [petitioner]

committed" and that "it was incomprehensible to him how a smart, successful, respected

criminal defense lawyer such as yourself could fall so far and stoop so low to consort with

common criminals and agree to launder the money of drug dealers . . . ." (*Id.* at 2:94).

Judge Gertner further testified that Judge Gorton had "presided over [the] very aggressive litigating of the case," in which petitioner had challenged the "way the government conducted itself which is usually not something that Judge Gorton would be much interested in," which led her to believe that the judge's sentencing comment was an "extraordinary statement." (*Id.* at 2:86).

She also testified that "[t]he government not infrequently goes after" members of the criminal defense bar, "[n]ot all the time, not all prosecutors[,] but that is not unusual," suggesting that the prosecution was otherwise tainted by an improper motive. (*Id.* at 2:91).[4]

### D. Position of Bar Counsel

At his panel hearing, bar counsel stated that they did not object to the reinstatement of petitioner, but felt obligated to "review the negatives that this panel will want to consider in reaching its own conclusion." (*Id.* at 3:128-29). Counsel outlined three sets of issues before reaching the federal criminal conviction.

First, counsel noted that petitioner had received an admonition from the Board of Bar Overseers in 2007, arising out of a complaint from a client, and that the BBO hearing committee had concluded he had been untruthful under oath:

> Now, I think that the evidence shows that at least prior to his 2012 convictions there were two sides of Mr. George. I will start with the darker side. That side is shown in the 2007 admonition. That was the medical malpractice case in which Mr. George represented a plaintiff and agreed to take over the case from predecessor counsel and then proceeded to really make very little effort to ready that case for trial.

---

[4] Judge Gertner further testified: "I've heard of cases in which prosecutors would select, which had a target, lawyers who had [b]ested them in cases. . . . So I had experienced that personally, and that wasn't the only example. Other defense lawyers in town experienced that. It's a peril of the job. . . . [T]hat defense lawyers get targeted all [the] time is really clear." (*Id.* at 2:100).

He did not kind of shore up the person who he thought was going to be the expert witness, did not really talk to him, didn't appear at a pretrial conference shortly before when the trial was to be held, did not appear on the trial date.  Then when he learned the trial had been postponed for two months I think it was, he didn't, again didn't get in touch with the expert, didn't even tell the expert that a trial date had been established.  Went to trial and it was March -- I'm not even sure what year -- without an expert which ultimately resulted in the case being dismissed and his client's claim being lost.  That was one episode.

In that matter, the same matter, you also see that the hearing committee rejected substantial portions of Mr. George's testimony basically finding that Mr. George had been untruthful under oath in a bar disciplinary proceeding at least in several respects.

(*Id.* at 3:129-30).

Second, counsel noted petitioner's failure to pay state and federal income taxes for

several years:

You also saw his what I would call [a] cavalier attitude about his obligation to pay his state and federal income taxes, and that was even back in the 2000s, 2008, 2009, 2010 when his practice was doing very well and his income was, at least one year I think [$]214,000 and he testified that it was around [$]200,000 or maybe a little less during that period and yet he allowed these pretty substantial tax obligations to accumulate.  As you also heard, ultimately he was able to discharge at least the federal tax deficit of about $575,000 with a very small payment of $25,000.

(*Id.* at 3:130-31).

Third, counsel pointed to a number of other complaints filed against petitioner that had

not resulted in discipline:

You'll also recall that he admitted that prior to 2012 in addition to the admonition he had that bar counsel received numerous complaints about Mr. George and that he was notified of those complaints and responded to them, although none of them eventually resulted in any discipline.

(*Id.* at 3:131).

Bar counsel then turned to the federal criminal conviction.  Counsel noted that on the

tapes, "Mr. George . . . sounds really more like a criminal than a lawyer."  (*Id.* at 3:132).

Counsel then observed:

> Finally, and maybe most relevant I would suggest that Mr. George has not totally
> come clean in this hearing in revealing his motives behind the criminal acts.  He
> continues to insist that he only got into this because of his desire to help a former
> client, but frankly it just doesn't ring true but he is unwilling to confess what the
> evidence suggests or suggested and what the government presented at trial, that
> Mr. George had some very serious financial obligations at the time that he got
> into the money laundering and that likely he had hoped to obtain some income
> and possibly a steady stream of income from his involvement in the deals
> regarding Mr. Dardinski.

(*Id.* at 3:132).

Bar counsel then reviewed some of the positive aspects of petitioner's life, including the

fact that "there are many people out there, both lawyers and non-lawyers, who say that Mr.

George was an exceptionally dedicated, skilled and knowledgeable lawyer, that he was a devoted

father and that he was a loyal and generous friend and an active member of his community."

(*Id.* at 3:133).  And counsel stated that petitioner "says convincingly, I think, that he has more

than learned his lesson, that in important aspects he is a changed man who would live a different

kind of life than he had been living 20 years ago and that he would never repeat the kind of

conduct or comparable conduct that led him to the conviction and sentence."  (*Id.* at 3:134).

### E.  Findings of the Hearing Panel

The state hearing panel concluded that petitioner had "demonstrated that he has the moral

character required for readmission to the bar."  (Hr'g R. at 1941).  It did so, however,

notwithstanding substantial reservations about his truthfulness and candor with the panel:

> We reach this conclusion despite having been concerned by the petitioner's
> written description of his criminal misconduct and his initial hearing testimony
> about it.

(*Id.*).  The panel identified three principal issues with petitioner's testimony.

First, the panel concluded that Part I of his Reinstatement Questionnaire "was not

completely forthcoming about the nature and extent of his own criminal conduct, particularly his money laundering and structuring." (*Id.*).  Second, it found that "petitioner was not candid about the motivation for his misconduct . . . ." (*Id.*).  Third, it found that "on several occasions during his initial testimony, the petitioner showed an unfortunate tendency to try to minimize or explain away his crimes by adding or omitting detail to his narrative that did not square with the record." (*Id.* at 1942).

> The panel nonetheless concluded:

> Petitioner's further testimony on January 22, 2021 (in part as noted above) allayed some of our concerns about his initial characterization of his criminal activity, as well as the tendency to seek to cast a less unfavorable light on his conduct.  His later testimony was more fully consistent with his general statements, made throughout these proceedings, that he appreciated the criminality of his conduct and accepted responsibility for his actions.  We conclude that the petitioner understands what he did, appreciates that it was dishonest and shameful, is suitably remorseful, and is not likely to reoffend.  The petitioner does not question the legitimacy of his convictions.  While claiming he was the victim of a sting and efforts by the government and its cooperating witnesses to entrap him, he admits he should not have taken the bait and should have told Dardinski to go elsewhere.  More persuasive than the petitioner's own testimony was that of his supporting witnesses, including his older daughter, Meghan George, about the shame and embarrassment to which he subjected his entire family, and that he would not do this to them again.

(*Id.* at 1943-44) (footnote and citations omitted).

### F.  Hearing Before This Court

The Court held a hearing in this matter on December 3, 2021, at which it heard from counsel and petitioner himself.  Petitioner elected to rely on the record before the Board of Bar Overseers and did not introduce any additional evidence.

Petitioner did, however, speak briefly at the hearing, and made the following statement:

> I fully accept responsibility for my actions and conduct that led to my indictment, and I exercised my right to trial, and at the sentencing before Judge Gorton, I accepted responsibility in a way that might have at the time not seemed as much

as I'm doing now, but I had an appeal pending at the time.

I'm sorry for what I've said many times, not only under oath, but, of course, to family, friends and loved ones and supporters that what happened was my fault. It should not have happened.

The life I was leading at the time, which I just want to be clear only because I don't know if you know this, there was no drugs, no alcohol. It wasn't that kind of situation. I'm not using any of that as an excuse for what occurred.

What I told the Court at the time was that the prosecution wanted -- well, presented evidence that possibly greed was involved or that I was in need of funds. What I told the board and what I told Judge Gorton was that at the time I didn't realize how upside down I was financially, and I acknowledge now that I was, and that isn't the type of life I'm leading now, it isn't the type of practice that I intend to have.

That was, you know, the busy hectic life of someone who was carrying 50 cases at a time, and I don't see it ever happening again, and for the past 10 years, I've tried to do everything I could possibly do to demonstrate to everybody around me or anyone who asks I'm sorry for what happened and I'm a changed person who just wants a second chance.

(Ct. Tr. at 14-16).

### G.  <u>Discussion</u>

Petitioner bears the burden of demonstrating by clear and convincing evidence that (1) "he is qualified and fit to practice law before this court" and (2) that "[his] resumption of the practice of law before this court will not adversely affect the interests of potential clients, public confidence in the integrity of the bar of this court, or the proper administration of justice." D. Mass. L.R. 83.6.10(b)(5).

In the Court's view, the principal issue is not whether he is "qualified" (he is an experienced and apparently capable criminal defense attorney) or "fit," in the sense of his physical or mental capacity. Nor is it whether his resumption of the practice of law would adversely affect "the interests of potential clients," in the sense that he has not embezzled client

funds or generally neglected his duties to his clients (although there is substantial evidence that

he has done so in the past).  Rather, it is whether his readmission would adversely affect "public

confidence in the integrity of the bar of this court" or "the proper administration of justice."

      As noted, petitioner was convicted of multiple felony counts.  The conduct occurred over

a substantial period of time and involved a series of deliberate acts; it was not the product of a

single act or impulse.  He was not young and immature.  The crimes were not the product of

addiction or other substance abuse, mental illness, poverty, childhood abuse or neglect, a

gambling problem, or other potentially mitigating circumstances.  Petitioner engaged in criminal

conduct solely for the purpose of making money.

      The facts of those convictions, standing alone, are a sufficient basis to deny the petition.

Being a lawyer is not simply an occupation.  A lawyer holds a special license that brings with it

certain obligations, including the obligation to uphold the law.  Public confidence in the courts is

always undermined whenever a lawyer commits a crime; the more serious the crime, the more

that confidence is undermined.   In the words of Judge Gorton at petitioner's sentencing:

> Attorneys have to set a higher example, and when they commit crimes and betray
> their solemn undertaking to uphold the law, they must be punished not only for
> their criminal acts and deeds but also in order to send the clearest possible
> message of deterrence to other attorneys.  The honor of the entire legal profession
> demands it . . . .

(Hr'g R. at 573).

      Likewise, an unduly liberal reinstatement policy for lawyers fosters public cynicism and

disrespect for the court system.  That is particularly so where the lawyer is well-connected and

successful and committed the crimes in question for no reason other than financial gain.

      In any event, if a lawyer is to be reinstated after committing serious felonies, and in the

absence of any mitigating circumstances, at a minimum that lawyer should demonstrate complete

acceptance of responsibility, an extraordinary degree of remorse, and substantial evidence of rehabilitation.  In the Court's view, those qualities are lacking here.

To begin, petitioner's acceptance of responsibility is far from complete.  At the trial, and on appeal, he contended that he was a victim of improper conduct by the government.  That contention was accepted neither by the jury nor by the Court of Appeals.  Of course, petitioner had the right to defend himself as he saw fit.  But he cannot expect that the Court at this stage should ignore the manner in which he chose to defend himself in assessing his level of remorse.

More importantly, even today, petitioner's acceptance of responsibility is grudging at best.  He testified, for example, that "technically I was involved in a conspiracy and I was involved in the crimes for which I was convicted because bottom line is technically I was."  (Tr. 1:148-49).  And he blames his involvement in large part on the fact that he had a busy practice:

> I had no structure to my life back then.  I had . . . no balance. . . .  I was going from case to case to case to case to case.  I was just too deeply immersed in the practice to see that what I had been doing or what I did . . . was wrong and dangerous. . . .  I had too many cases and the lines became blurred, and I was way too busy . . . and too negligent to make careful, reason[ed] judgments. . . .
>
> I should have been more professional.  I should have been more professional and distant.

(*Id.* at 1:150-51).  Petitioner is free to assert that he committed the crimes because he was "too busy" and "too negligent" to obey the law.  But that is not an expression of complete remorse, and this Court declines to construe it as such.

Similarly, the testimony of some of the witnesses called by petitioner at the hearing tended to downplay or minimize the nature of the crimes and his responsibility for having committed them, or suggested that he was somehow a victim of government misconduct.  That, too, is inconsistent with a full acceptance of responsibility for his criminal conduct.

21

Petitioner's explanation as to his motive for committing the crimes is disingenuous at best. He testified that he does not completely understand why he committed the crimes, and that it was not for financial gain:

> "I didn't have a need for money."  (*Id.* at 1:111).

> "I was never driven by money."  (*Id.* at 1:115).

> "[I]t's hard to explain what caused all of this, but it certainly wasn't money." (*Id.* at 1:103).

In fact, petitioner committed the crimes at a time when he was paying no federal or state income taxes, and indeed spending money at such a rate that (by his own admission) he could make no tax payments of any kind. As bar counsel noted, his claim that his only motivation was to help a former client "just doesn't ring true," because he "had some very serious financial obligation[s] at the time that he got into the money laundering and that likely he had hoped to obtain some income and possibly a steady stream of income from his involvement in the deals . . . ." (*Id.* at 3:132). He nonetheless continues to deny that his motive, even in part, was financial gain.

The Court is also deeply troubled by the complete disregard that petitioner displayed for his income tax obligations. Petitioner did not merely understate his tax obligations; he ignored them entirely, for years. Although he was not prosecuted for income-tax evasion, there can hardly be any doubt that he willfully disobeyed the law. He again minimizes that conduct, stating that his disregard of the law was due to a "bad habit of paying late." (*Id.* at 1:102). And his apparent lack of concern over the fact that his federal tax liability was settled for approximately 4% of the outstanding amount—which he simply characterized as "a good result"—is also disturbing.

It is of course true that one of the goals of our criminal justice system is rehabilitation,

22

which includes both moral rehabilitation (seeking to ensure that the defendant understands and appreciates the wrongfulness of his conduct) and practical rehabilitation (seeking to ensure that the defendant becomes a productive member of society after incarceration).

As for the former, the Court is not convinced that petitioner is genuinely remorseful and willing to accept full responsibility for his actions.

As for the latter, petitioner is no longer disbarred in the state courts; he is free to earn a living as a lawyer.  For that matter, he is no longer in prison, no longer under supervision, and indeed no longer subject to restrictions of any kind.  The denial of his request for reinstatement will prevent him from practicing law in this court, but otherwise he is able to contribute to society in any way he chooses.

In summary, and under the circumstances presented here, the Court concludes that petitioner has failed to establish, by clear and convincing evidence, that his resumption of the practice of law before this court would not adversely affect public confidence in the integrity of the bar of this court and the proper administration of justice.  The application will therefore be denied.

## IV.   <u>Conclusion</u>

For the foregoing reasons, the application of Robert A. George, Sr., for reinstatement to the bar of the United States District Court for the District of Massachusetts is DENIED. **So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV

Dated: June 28, 2022                    Chief Judge, United States District Court

23